# EXHIBIT A

RAISSA DJUISSI KENGNE
_____
Name
570 PIEDMONT AVE NE #55166
_____
Address

ATLANTA          GA          30308
_____
City            State          Zip Code
404-932-1651
_____
Phone Number
PETITIONER/PLAINTIFF PRO SE

## FULTON COUNTY SUPERIOR COURT
## STATE OF GEORGIA

In re:

RAISSA DJUISSI KENGNE                     Case File No. 2022CV365268
Plaintiff,

v.                                        Praecipe
Illinois Corporation Service C (BDO USA, LLP)
                801 Adlai Stevenson Drive
Defendant(s). Springfield, Ilinois 62703-4261

To the Sheriff of _____ Sangamon, IL _____ County:

Please serve upon the Respondent/Defendant the following documents

•        Summons (two copies)

•        Complaint (one copy) and Exhibits/Notice of Filing (one copy)

Also enclosed is:

•        1)The Plaintiff's Affidavit of Indigency, 2) Motion to Proceed in Forma Pauperis, and 3) Order on Affidavit of Indigency, which waive the fee for service in this matter signed by Judge Leftridge in the Fulton County Superior Court in Atlanta, Georgia.

-        Self-Addressed Stamped Envelope

BDO USA LLP is the Defendant.
ILLINOIS CORPORATION SERVICE C is
the registered agent to be
served.

Raissa D. Kengne

Fulton County Superior Court
***EFILED***QW
Date: 5/25/2022 1:23 PM
Cathelene Robinson, Clerk

# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA

### 136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303

## SUMMONS

BAICSA NTUISSI KENKNE ) Case 2022CV365268
) No.: _____
)
_____ )
Plaintiff, )
)
vs. )
WESLEY FREEMAN, BND USALIP )
SCOTT MEIER, ET AL. )
Defendant )
)
)
)

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at
https://efilega.tylerhost.net/ofsweb (unless you are exempt from filing electronically) and serve upon
plaintiff's attorney, whose name and address is:

570 Piedmont Ave NE #55166
ATLANTA, GA 30308

An answer to the complaint which is herewith served upon you, within 30 days after service of this
summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed
within five (5) business days of such service. Then time to answer shall not commence until such proof of
service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN
AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This___5/25/2022_____day of_____, 20_____

Honorable Cathelene "Tina" Robinson
Clerk of Superior Court,
By_____
Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you _____, 20_____

Deputy Sherriff

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used

Fulton County Superior Court
***EFILED***QW
Date: 5/25/2022 1:23 PM
Cathelene Robinson, Clerk

# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
**136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303**

## SUMMONS

RAISSA NTUISSI KENKNE

)Case 2022CV365268
)No.:_____

_____
Plaintiff,

)
)
)
)
)

vs.

WESLEY FREEMAN, BND USALIP
SCOTT MEIER, ET AL.

)
)
)
)

Defendant

)
)
)
)
)

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at https://efilega.tylerhost.net/ofsweb (unless you are exempt from filing electronically) and serve upon plaintiff's attorney, whose name and address is:

570 Piedmont Ave NE #55166
ATLANTA, GA 30308

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed within five (5) business days of such service. Then time to answer shall not commence until such proof of service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This___5/25/2022_____day of_____, 20_____.

Honorable Cathelene "Tina" Robinson
Clerk of Superior Court,
By_____
Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you _____, 20_____

Deputy Sherriff

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used

Fulton County Superior Court
***EFILED***QW
Date: 5/25/2022 1:23 PM
Cathelene Robinson, Clerk

# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA

### 136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303

## SUMMONS

RAICSA NTUISSI KENKNE

)Case 2022CV365268
)No.:_____

_____
Plaintiff,

vs.

WESLEY FREEMAN, BAD USALIP
SCOTT MEIER, ET AL.
Defendant

)
)
)
)
)
)
)
)
)
)
)
)

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at
https://efilega.tylerhost.net/ofsweb (unless you are exempt from filing electronically) and serve upon
plaintiff's attorney, whose name and address is:

570 Piedmont Ave NE #55166
ATLANTA, GA 30308

An answer to the complaint which is herewith served upon you, within 30 days after service of this
summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed
within five (5) business days of such service. Then time to answer shall not commence until such proof of
service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN
AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This  5/25/2022  _____day of_____, 20 _____

Honorable Cathelene "Tina" Robinson
Clerk of Superior Court,
By:_____
Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you  _____, 20_____

Deputy Sherriff

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used

Fulton County Superior Court
***EFILED***QW
Date: 5/25/2022 1:23 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| RAISSA DJUISSI KENGNE, | § |
| Plaintiff, | § |
| | § |
| v. | §            2022CV365268 |
| WESLEY FREEMAN; BDO USA, LLP; SCOTT | §   Civil Action File No._____ |
| MEIER; PAUL DAVISON; JASON CUDA; | § |
| JUSTIN WILKES; ANTHONY REH; | § |
| PETER POPPO; MARK DAVENPORT; | § |
| JOHNSON WONG; JUSTIN MUNGAL, | § |
| | § |
| BEACON MANAGEMENT SERVICES, LLC; | § |
| LISA SIMMONS; STEVEN WEIBEL; | § |
| 1280 WEST CONDOMINIUM ASSOCIATION; | § |
| MICHAEL SHINNERS; MICAH KURTZBERG; | § |
| RONNIE BRIDGES; BRETT DETTMERING; | § |
| MICHAEL SHAFFER; ROHAN RUPANI, | § |
| | § |
| FINCH MCCRANIE; | § |
| MICHAEL SULLIVAN; WALTER JOSPIN, | § |
| | § |
| and | § |
| | § |
| INTERFACE, INC.; | § |
| ATLANTICUS HOLDINGS CORPORATION; | § |
| SPAR GROUP, INC. (NMS SPAR); | § |
| BIOHORIZONS IMPLANT SYSTEMS, INC. | § |
| (an Henry Schein Subsidiary); KAS NADERI, | § |
| | § |
| Defendants. | §     JURY TRIAL DEMANDED |

# PLAINTIFF'S ORIGINAL COMPLAINT

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

PLAINTIFF, RAISSA DJUISSI KENGNE ("Plaintiff" or "Whistleblower") files this Original Complaint against WESLEY FREEMAN, BDO USA, LLP, SCOTT MEIER, PAUL DAVISON, JASON CUDA, JUSTIN WILKES, ANTHONY REH, PETER POPPO, MARK DAVENPORT, JOHNSON WONG, JUSTIN MUNGAL, BEACON MANAGEMENT SERVICES, LLC ("Beacon Management"), LISA SIMMONS, STEVEN WEIBEL, 1280 WEST ASSOCIATION, INC, MICHAEL SHINNERS, MICAH KURTZBERG, RONNIE BRIDGES, BRETT DETTMERING, MICHAEL SHAFFER, ROHAN RUPANI, FINCH MCCRANIE, MICHAEL SULLIVAN, WALTER JOSPIN, INTERFACE, INC. ("Interface"), ATLANTICUS HOLDINGS CORPORATION ("Atlanticus"), SPAR GROUP, INC. (NMS SPAR) ("NMS"), BIOHORIZONS IMPLANT SYSTEMS, INC. (AN HENRY SCHEIN SUBSIDIARY) ("BioHorizons"), and KAS NADERI, together the ("Defendants") to show that Plaintiff, upon making a disclosure in the public interest ("Whistleblowing"), was subjected to a bribery attempt, Plaintiff's attorney-client privilege was violated, Plaintiff was prevented to communicate with the authorities, Plaintiff's computer systems were hacked, Plaintiff's phones were spoofed, Plaintiff's home was burglarized, Plaintiff was retaliated against, persecuted, harassed, and attacked in violation of The Dodd-Frank Wall Street Reform and Consumer Protection Act, 18 U.S.C. §1514A Sarbanes Oxley Act ("SOX"), Title VII of the Civil Rights Act of 1964 (Title VII), section 11(c) of the Occupational Safety and Health Act, O.C.G.A § 45-1-4 Georgia Whistleblower Statute,

O.C.G.A. § 9-11-11.1 Anti-SLAPP Statute, O.C.G.A. § 24-9-24 Client's communications to attorney privileged Statute, 18 U.S. Code § 1512 Tampering with a witness, victim, or an informant, O.C.G.A. §16-10-93 Influencing Witness Statute, O.C.G.A. § 16-4-8 Conspiracy to Commit a Crime Statute, O.C.G.A. §§ 16-9-90 - 16-9-94 Computer Crimes Statute, O.C.G.A. §§ 16-9-150 - 16-9-157 Computer Security Statute, O.C.G.A. §16-10-2 Bribery Statute, O.C.G.A. § 16-7-1 Burglary Statute, O.C.G.A. § 16-8-24 Theft by possession of stolen mail Statute, 18 U.S. Code § 1701 Obstruction of mails generally, 18 U.S. Code § 1702 Obstruction of correspondence, and 61 FR 38687 (47 CFR 20, 47 CFR 52) Telephone Number Portability (CC Docket No. 95-116, FCC 96-286).

The horrific events that started in 2021 were a direct and foreseeable consequence of the willful actions perpetrated by the Defendants, both individually and in concert. In support of this instrument, Plaintiff, would respectfully show as described herein.

### PRELIMINARY STATEMENT

1.      This case concerns the retaliation, persecution, harassment, intimidation, threats, burglary, computer hacking, phone spoofing, and other attacks the Plaintiff was subjected to upon reporting to the relevant authorities a violation of the SEC regulations, the PCAOB Standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The unlawful, criminal, immoral, and illegal acts presented in this instrument were perpetrated by the Defendants.

2.      Other attacks the Plaintiff was subjected to, included, but are not limited to blocking access to her personal emails containing relevant evidence, blocking access

to finances and bank accounts, blocking access to her phone number by preventing the porting of her number to a different carrier, which is against the Federal Communications Commission (FCC) regulations, blacklisting her on relevant job opportunities, preventing her from receiving unemployment benefits, preventing her from receiving Homeowner Assistance Funds (HAF) benefits, and preventing her from receiving SNAP benefits.

3.      The parties in this case can be divided into four (4) main groups.

Group 1 - Plaintiff is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 - Defendants is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP. In addition to BDO USA, LLP and Justin Mungal, Group 2 includes the clients assigned to Plaintiff while she was employed at BDO USA, LLP specifically Interface, Inc., Atlanticus Holdings Corporation, Kas Naderi, BioHorizons Implant Systems, Inc., and National Merchandising Services, LLC.

Group 3 - Defendants is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The

attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 - Defendants is comprised of the 1280 West Condominium Association and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

4.      Plaintiff was hired at BDO USA, LLP Atlanta office as an Information Technology ("IT") Audit Manager in September 2019. When Plaintiff started, Plaintiff noticed that the workpapers for both private clients and public clients were being rolled forward year after year without doing the work or without performing the work based on U.S. Securities and Exchange Commission (SEC) regulations, Public Company Accounting Oversight Board (PCAOB) standards, and American Institute of Certified Public Accountants (AICPA) standards.

5.      The public clients included BlueLinx Holdings, Atlanticus Holdings Corporation, BioHorizons Implant Systems, Inc., NMS, and Interface, Inc. Interface had recently been under an SEC investigation and an executive employee at Interface has been suspended.

6.      In addition, to the work being mostly rolled forward on the public clients such as BlueLinx, Atlanticus, BioHorizons, NMS, and Interface, the Information Technology ("IT") findings severity were not properly reported on BlueLinx, Atlanticus, BioHorizons, Interface, and IZEA.

7.      An IT finding can be classified as a significant deficiency or a material weakness.

The SEC, PCAOB, and AICPA define a <u>significant deficiency</u> as a deficiency, or a combination of deficiencies, in internal control over financial reporting, that is less severe than a material weakness yet important enough to merit attention by those responsible for oversight of the company's financial reporting.

The SEC, PCAOB, and AICPA define a <u>material weakness</u> as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a "reasonable possibility" that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

Furthermore, an aggregation of deficiencies can rise to the level of material weaknesses as it was the case with the public and private clients the Plaintiff worked on.

There is a "reasonable possibility" of an event when the likelihood of the event is either "reasonably possible" or "probable," as those terms are used in paragraph 3 of Financial Accounting Standards Board Statement No. 5, Accounting for Contingencies. If the financial statements contain material misstatements, Auditing Standards ("AS") 3105, Departures from Unqualified Opinions and Other Reporting Circumstances, indicates that the auditor should issue a qualified or an adverse opinion on the financial statements.

8.  When Plaintiff started performing the IT audits and noted significant deficiencies and/or material weaknesses, which would have had for effect an adjustment in audit procedures and potentially the audit report, the results of the audit were intentionally disregarded by Defendant Wesley Freeman, IT Audit Director, and intentionally removed from being reported as significant deficiencies and material weaknesses.

9. The private clients included Janus, Dustex, FCCI Insurance Group ("FCCI"), RSR Group, ProCare, Vacation Express, and many others.

10. The issue with the IT audit work performed was that several deficiencies that should have been identified as significant deficiencies and/or material weaknesses were actually identified as control deficiencies. Because they were never communicated to the financial statements audit team as significant deficiencies or material weaknesses, the financial statements audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls ("ITGCs") increasing the risk that the financial statements filed with the SEC were materially misstated.

11. Private companies usually request audit reports because the banks require an audit to loan substantial amounts of money.

12. Public companies are required to have an independent audit performed by a public accounting firm in conformity with the PCAOB standards. Defendant BDO USA, LLP is one such public accounting firm. Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

13. FCCI is an insurance company that is required to comply with Section 624.424(8), Florida Statutes by having an external independent Certified Public Accounting ("CPA") firm prepare the workpapers as required by Rule 690-137.002, Florida Administrative Code. FCCI IT audit had not been performed per the standards and regulations established by the SEC and the PCAOB since 2018. The required and relevant evidence was not requested and obtained in 2018. The right evidence was requested and obtained in 2019 and 2020 by the Plaintiff. However, the evidence was

not properly tested by BDO USA, LLP and left out significant deficiencies and/or material weaknesses.

14.     Plaintiff has informed the IS Assurance Director, Defendant Wesley Freeman, of the work that was not performed in roughly 75% of the public and private engagements she oversaw in the BDO USA, LLP Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, Wesley Freeman kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers.

15.     As Plaintiff took the stand of performing the IS Assurance work with due diligence and refused to obey Wesley Freeman's tacit command to "stop doing my job so well" as Wesley Freeman stated one day, Wesley Freeman launched a smear campaign against Plaintiff. Wesley Freeman enlisted the assistance of junior associates to attempt to smear her reputation. It went so far that a Partner, Peter Popo, asked to talk to Plaintiff and stated that he has never heard so many bad things mentioned about someone's behavior; usually what he hears is the bad work someone does. In the Plaintiff's case, it was the opposite. These associates enlisted to smear Plaintiff's reputation were part of the group who delivered such a poor work product as described above.

16.     Most of the people responsible for executing the IT audit (Ling Tang and Dale Drushella) have left the Company, probably because they could no longer keep up with the fraud. Shaivi Patel, an associate, who was also involved in the deficient audits transferred to a different department.

17.     During a meeting with Scott Meier, the new IT Audit Principal who started at BDO USA, LLP in 2021, Scott Meier led Plaintiff to understand that Wesley Freeman had accumulated a lot of good will with other Partners and Plaintiff may need more Partners to speak on her behalf. The meeting happened at the Establishment restaurant located in 1197 Peachtree Street NE Main Level, Overlooking The Grove, Suite #517, Atlanta, GA 30305.

18.     Plaintiff refused to commit fraud and was targeted for it by Group 2 as defined above, and which is comprised of BDO USA, LLP, Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong. Group 2 also includes Justin Mungal, a 1280 West condominium homeowner who lives across from Plaintiff.

19.     Defendant Wesley Freeman is not above lying to the PCAOB, the internal inspectors, and the Partners. Plaintiff has observed as much during the PCAOB inspection of the publicly traded company Atlanticus Holdings Corporation, when Wesley Freeman attempted to provide misleading information to the PCAOB inspectors.

20.     The PCAOB decided in 2021 to inspect the audit work performed by BDO USA, LLP for the 2020 audit of Atlanticus. During the 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was pressure by Scott Meier, BDO IS Assurance Principal, and Kas Naderi, Chief Information Officer of Atlanticus, to provide misleading information to the PCAOB inspectors in order to address the questions asked by the PCAOB inspectors. Meetings were held with Kas Naderi in order to obtain evidence that should not have been admitted or considered in the audit because the 2020 Atlanticus audit report had already been filed.

21.     Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if she was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home due to the pandemic. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

22.     During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Mark Davenport (Audit Partner), Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept using the word "dead" with emphasis in different meetings held to discuss responses to the PCAOB questions.

23.     Anthony Reh, the BDO USA Atlanta Office Managing Partner at the time and the Audit Partner on the 2020 Otelco engagement, noted during a closing meeting with Scott Meier (IT Audit Principal) that a material weakness in the Information Technology ("IT") findings were hidden from him in 2019 as evidenced by his question "Did we have this IT finding last year?" The answer the Plaintiff provided was "Yes". Plaintiff had identified the IT finding classified as a material weakness in the 2019 Otelco audit and had shared the IT finding with Wesley Freeman, IT Audit Director.

Plaintiff had shared the 2019 IT finding with Wesley Freeman because Wesley Freeman had stated that Anthony Reh had asked about an updated list of 2019 IT findings. The 2020 internal closing meeting with Otelco showed that Wesley Freeman had hidden the 2019 IT finding by removing it from the Otelco files, thereby committing fraud and violating AICPA, PCAOB, and SEC standards and regulations.

24.    Plaintiff kept being vocal about issues within the IT audits performed at BDO USA, LLP Atlanta office, and the inadequate evaluation of identified material weaknesses by the audit team in charge of the public companies' SOX audits. In response to the Plaintiff's continued concerns about the effectiveness, efficiency, accuracy, quality, and existence of the IT audit work, Scott Meier told the Plaintiff that he had nothing to lose and implied that Plaintiff would have more to lose if Plaintiff were to continue in this direction.

25.    Plaintiff believes the PCAOB and SEC standards and regulations were violated because Plaintiff has noted as much when reviewing prior year workpapers. In some instances, evidence required for the audits was not obtained, requested, or appropriately evaluated or tested. In addition, the severity of the IT findings on Plaintiff's engagements was inappropriately reported, and therefore, audit procedures may not have been performed to provide reasonable assurance that the financial statements were free from material misstatements due to error or fraud. Furthermore, BDO hired a new IS Assurance Principal, Scott Meier, at the beginning of the year 2021 who has also noted the IT findings were not evaluated appropriately.

26.    During the 2021 SOX audit of Interface, Inc., the Plaintiff sent an email to Wayne Berson, the CEO of BDO USA, LLP, in copy, along with other Partners on

the Interface, Inc. engagement to let them know that the IT audit work for the Interface, Inc's engagement was not completed and the IT audit team will not be meeting the internal deadline. Paul Davison, the Audit Partner, and Scott Meier, the IT Audit Principal on the 2021 Interface engagement was unhappy with this communication.

27.    Plaintiff's home was broken into several times in 2021. Plaintiff had notified the 1280 West Condominium management's company (Beacon Management), the 1280 West Board of Directors, the Atlanta Police Department, Chief Deputy Peek, and BDO USA, LLP' management. Officer Caleb was dispatched to Plaintiff's residence twice and told Plaintiff that "she was not paid the big bucks".

The 1280 West Condominium has a 24 hours and 7 days a week concierge staff, and requires an access card to enter the premises as well as the elevators leading to the residential area. In addition, the 1280 West Condominium is under video and audio surveillance; recordings exist. It would be nearly impossible for someone to break into Plaintiff's unit without the assistance of the building management. Upon noticing the burglary, Plaintiff notified the 1280 West Management company and the 1280 West Board of Directors to retain all evidence (video recordings, audio recordings, emails, and other documents) that will be subject to a lawsuit.

28.    Defendant Justin Mungal, mentioned as part of Group 2 above, is a homeowner in the 1280 West Peachtree condominium building. Justin Mungal lives in Unit 2108 and the Plaintiff lives in unit 2109. Justin Mungal lives directly across from Plaintiff and their doors are separated by approximately two (2) feet. Justin Mungal repeatedly told the Plaintiff that he worked for BDO, the Plaintiff's former employer and a defendant on this case.

29.     According to Defendant Justin Mungal, he mistakenly received a United States Citizenship and Immigration Services ("USCIS") letter addressed to the Plaintiff. The USCIS letter in question was an immigration letter that the Plaintiff needed as she was in the process of becoming a United States ("US") Citizen. Justin Mungal turned over the letter to the Plaintiff and stated he was waiting to hear the Plaintiff come home at night in order to deliver the letter to the Plaintiff. Plaintiff believes that it was an intimidation technic from the Defendants since the Plaintiff needed the information in the USCIS letter as a step to become a US Citizen.

30.     Defendant Justin Mungal stated to the Plaintiff "Raissa do you need any help because I am busy and I have a job". Plaintiff had recently resigned from her position at BDO USA, LLP due to the retaliatory acts she was subjected to and had not shared her job status with Justin Mungal. Thereafter, Justin Mungal repeatedly told the Plaintiff that he worked for BDO. Plaintiff believes that Justin Mungal was spying on Plaintiff and may have himself broken into the Plaintiff's unit.

31.     Justin Mungal also stated to the Plaintiff that "she should not let her important documents lay around. The banks have lockboxes." The Plaintiff had her $1,000,000 State Farm life insurance policy documents in plain sight in her living room for several weeks. Plaintiff believes that Justin Mungal was one of the perpetrators who broke into her unit.

32.     Defendant Scott Meier (IT Audit Partner at BDO USA, LLP) told Plaintiff that "it was too bad that you could not choose your neighbors". Plaintiff believes that the Defendants have hired agents to break into Plaintiff's unit in order to steal information and intimidate Plaintiff.

33.     Plaintiff noted that her personal laptop had been accessed by the following neighbors: Jamie Johnson living at 1280 West Peachtree ST NW Unit 2009, Sylvia Calloway living at 1280 West Peachtree ST NW Unit 2209, and Sirocus Barnes living at 1280 West Peachtree ST NW Unit 2007.

34.     Plaintiff notified BDO USA's Human Resources of the retaliation faced by the Plaintiff. Plaintiff clearly stated to Human Resources she believed BDO USA, LLP and the clients Plaintiff had worked on were responsible for the persecution and attacks.

35.     Plaintiff also notified BDO USA's Information Technology ("IT") department of the burglary in her unit due to the sensitive nature of the engagements the Plaintiff was working on. Plaintiff also believed at the time that information could have been stolen not only from her computers and physical files, but also from BDO USA, LLP's laptop.

36.     Plaintiff was given a Continuing Professional Education ("CPE") disciplinary action warning by BDO USA, LLP that was inappropriately assigned and Plaintiff fought to have it removed from her file. Plaintiff believes that it was also an intimidation technic.

37.     The Plaintiff initially retained the services of a law firm Finch McCranie in June of 2021.

38.     Finch McCranie, the attorney firm the Plaintiff initially hired, disclosed the content of the attorney-client privileged conversation to BDO USA, LLP.

39.     The two (2) attorneys representing Finch McCranie who discussed the case with BDO USA, LLP as well as with some of the members in Group 2 as defined

above were Michael Sullivan and Walter Jospin. The attorney firm Finch McCranie, Michael Sullivan, and Walter Jospin are part of Group 3 as referred to above.

40.     Anthony Reh, the BDO USA Atlanta Office Managing Partner in 2021 and the Audit Partner on some of the engagements the Plaintiff worked on offered Plaintiff a raise of approximately 12% and stated to the Plaintiff "You should take it." Plaintiff believes it was a bribe.

41.     When the bribe was offered to Plaintiff, Plaintiff was still being represented by Finch McCranie, Michael Sullivan, and Walter Jospin. Plaintiff notified her attorneys at the time of the unusual salary increase and the possibility that it could be a bribe. Plaintiff's attorneys at the time implicitly told the Plaintiff that she should take the salary increase and not proceed with blowing the whistle on BDO USA, LLP.

42.     When Plaintiff informed her attorneys that Plaintiff wanted to pursue with reporting the fraud to the proper authorities, including the SEC, Finch McCranie, Michael Sullivan, and Walter Jospin resigned from the case.

43.     Anthony Reh, the BDO USA Atlanta Office Managing Partner in 2021 and the Audit Partner on some of the engagements the Plaintiff worked on stated to the Plaintiff that "You and your family should be careful."

44.     Around the time Anthony Reh, the BDO USA Atlanta Office Managing Partner in 2021 and the Audit Partner on some of the engagements the Plaintiff worked on, stated to the Plaintiff that "You and your family should be careful", Plaintiff was unable to reach her family abroad for several weeks. Plaintiff believes her phone was spoofed.

45.    In view of all the attacks and the persecution, Plaintiff resigned from her position at BDO USA, LLP on November 18, 2019 fearing for her life and her family's lives. It was a constructive discharge.

46.    Wesley Freeman, IT Audit Director, posted on his LinkedIn profile that the "BDO Partners have made the right choice" by standing with him.

47.    Plaintiff contacted several attorney firms who declined to take the Plaintiff's case because of inexperience in this type of case or the existence of a conflict of interest. Plaintiff even flew to Washington, DC to meet with attorney's but some of them declined due to their relationship with Michael Sullivan and Finch McCranie.

48.    The persecution faced by the Plaintiff extended to her private life. The Plaintiff lives at 1280 West Peachtree ST NW Unit 2109 Atlanta, GA 30309. The Plaintiff's home was broken into several times.

49.    Per the governing documents of the 1280 Condominium Association, homeowners are required to have a copy of their keys on file in the 1280 West management office located on the Plaza level. The following individuals and entities would have access to the keys of the Plaintiff's home or can exercise influence over the individuals with access to the key of the Plaintiff's home: Beacon Management Services, LLC, Lisa Simmons, Steven Weibel, Michael Shinners, 1280 West Condominium Association, 1280 West Board of Directors (Micah Kurtzberg, Ronnie Bridges, Michael Shaffer, Brett Dettmering, And Rohan Rupani). These individuals and entities are referred to as Group 4 above and are responsible for allowing unauthorized individuals to break into Plaintiff's home in order to facilitate the harassment and retaliation perpetuated by Group 2 and Group 3 as defined above.

50.     Plaintiff is currently involved in a separate lawsuit with the 1280 West Management company ("Beacon"), the 1280 West Condominium Association, and some current and former members of the 1280 West Condominium Board of Directors. Plaintiff's relationship with the 1280 West Management company ("Beacon"), the 1280 West Condominium Association, and some current and former members of the 1280 West Condominium Board of Directors has been strained for many years.

51.     The Plaintiff had left her house key in her car and had asked the concierge staff at the 1280 West building where she lives if it was possible to open her door with the double of the Plaintiff's key that is kept in the 1280 West Management office. The event happened at night. The concierge staff refused to give the key to the Plaintiff, but offered to unlock the door of her home for her. The concierge staff opened the Plaintiff's door showing previous knowledge of unauthorized entrance by only opening one (1) lock on the Plaintiff's door, then pushing the door wide open and doing so with a smirk on his face. The plaintiff's door has two (2) locks. There was no way for the concierge staff to know that he only needed to insert the key into only one (1) lock to open the Plaintiff's door when there are two (2) locks on the door and to choose the right lock to open, without having previously entered the premises without authorization.

52.     The Plaintiff has specific instructions on file with the 1280 West management to never enter her unit without the Plaintiff being present.

53.     Plaintiff has faced harassment from the 1280 West Condominium General Manager, Michael Shinners, who has wrongly claimed that Plaintiff owed Homeowners Association ("HOA") fees in April 2022 and accosted Plaintiff on the Plaza level of the 1280 West Condominium and stated that Plaintiff's HOA fees account

was not in good standing. Plaintiff noted that it was not accurate because Plaintiff had a high positive balance on her HOA account.

54.     When Plaintiff reported the burglary to the 1280 West Management General Manager, Michael Shinners, he stated to the Plaintiff "Until when did you think you could keep living like that?"

55.     In 2021, when Plaintiff decided to travel to ensure Plaintiff's family was safe and sound, members of the 1280 West Management company ("Beacon"), the 1280 West Condominium Association, and/or some current members of the 1280 West Condominium Board of Directors withheld for several days the Plaintiff's newly issued US passport, Georgia Driver License, and Georgia ID card.

The 1280 West Management company ("Beacon"), the 1280 West Condominium Association, and/or some current members of the 1280 West Condominium Board of Directors have access to all the mailboxes or exert significant influence on employees and/or contractors having access to the mailboxes.

56.     Plaintiff had also communicated to her previous attorneys Finch McCranie, Michael Sullivan, and Walter Jospin that Plaintiff was awaiting her US passport when they were still representing Plaintiff.

57.     The Defendants have conspired to retaliate against Plaintiff for reporting the violations of PCAOB and SEC standards and regulations as well as the fraud related to the issuance of the public companies' audit reports the Plaintiff worked on.

58.     Plaintiff has been unable to receive unemployment benefits even though she qualified for them. Plaintiff was directed to the following address to apply for unemployment benefits: 223 Courtland St NE, Atlanta, GA 30303.

59.     Plaintiff has been blacklisted from many jobs she qualifies for. Plaintiff has been unable to find another job since she resigned on November 18th, 2021. This situation may have been compounded with the economic effect of the COVID-19 pandemic.

60.     Plaintiff has been unable to receive SNAP benefits. Plaintiff believes it is also a retaliatory act from BDO USA, LLP.

61.     Plaintiff has been unable to receive benefits from the Homeowners Assistance Fund program ("HAF") even though Plaintiff qualifies for it. Plaintiff believes it is also a retaliatory act from BDO USA, LLP.

62.     Plaintiff's primary phone number has been blocked and Plaintiff has been unable to port her number to a different carrier effectively preventing plaintiff from communication with family, friends, and business partners. Phone companies are required by law to port your number out when you start service with a new carrier. According to the FCC, a company cannot refuse to port your number even if you have an outstanding balance or unpaid termination fees. Plaintiff believes it is also a retaliatory act from BDO USA, LLP.

63.     Plaintiff's access to her funds in her Gemini Trust Company, LLC ("Gemini") account has been blocked. Plaintiff created an account online on 05/25/2021 on the Gemini Trust Company, LLC's website. The website address is https://www.gemini.com/. Gemini is a Cryptocurrencies trading platform. Plaintiff reached out to Gemini customer support at support@gemini.com on the following dates/times: March 31st, 2022, April 1st, 2022, April 2nd, 2022, April 3rd, 2022, April 4th, 2022, April 5th, 2022, and April 13th, 2022. The Plaintiff has reached out to the

Gemini Trust Company's support team using the following email addresses: rkengne1@gmail.com and cianeseya2022@gmail.com. The support team members Plaintiff corresponded with were Richard, Frances, Saul, Jessica, and Isla. Plaintiff has provided Gemini with a copy of her bank statements to verify Plaintiff's account in multiple instances. Gemini claims that Plaintiff can only withdraw funds via wire, which is extremely costly to Plaintiff at the moment.

64.     Gemini has declined to withdraw funds using the debit card account that Plaintiff provided on the Gemini platform, which was successfully verified by Gemini. Gemini has refused to allow any other forms of identification to verify in order to assert the Plaintiff's ownership of the account.

65.     All the communications Plaintiff had with Gemini happened before Plaintiff was locked out of her Gemini account for requesting Plaintiff's money. Plaintiff lost full use of her Gmail account, rkengne1@gmail.com, due to the fact that Plaintiff reported BDO USA, LLP's violation of PCAOB and SEC standards.

66.     Plaintiff is unable to access her account at Gemini and Gemini refuses to provide any other way to identify Plaintiff.

67.     Plaintiff has filed a separate lawsuit in the states of Georgia and New York as well as a complaint with the Security Exchange Commission (SEC) and New York Department of Financial Services against Gemini. Gemini's website (https://www.gemini.com/legal/user-agreement#section-fdic-insurance) claims that the money users have on their platform in US Dollars is insured by the Federal Deposit Insurance Corporation ("FDIC") as long as the US Dollars are inside the United States. Below is an excerpt of their website.

"U.S. dollar deposits in your Fiat Account held in one or more Omnibus Accounts at one or more Banks located in the United States are held with the intention that they be eligible for Federal Deposit Insurance Corporation ("FDIC") "pass-through" deposit insurance, subject to the Standard Maximum Deposit Insurance Amount per FDIC regulations.

68.     The Plaintiff has notified the following authorities and agencies in relation to this case: U.S. Securities and Exchange Commission ("SEC"), ("PCAOB"), ("IC3"), the Atlanta Police Department, the Federal Bureau of Investigation ("FBI"), and the Federal Communications Commission ("FCC"). The authorities and agencies the Plaintiff contacted responded that they could not comment on the status of a case, complaint, investigation, or tip. Because the persecution and attacks have not stopped, the Plaintiff decided to file a civil lawsuit.

## I.
## PARTIES AND SERVICE OF PROCESS

### Plaintiff Raissa Djuissi Kengne

69.     Plaintiff Raissa Djuissi Kengne is a Georgia resident residing at 1280 West Peachtree ST NW Unit 2109, Atlanta, GA 30309.

70.     Plaintiff Raissa Djuissi Kengne was hired as an IT Audit Manager at BDO USA, LLP Atlanta office on September 3rd, 2019.

71.     Plaintiff Raissa Djuissi Kengne is a Certified Information Systems Auditor ("CISA"). The CISA certification attests of Plaintiff's expertise and her ability to apply a risk-based approach to planning, executing, and reporting on audit

engagements. The CISA certification proves the Plaintiff's competence in incorporating privacy by design into technology platforms, products and processes, communicating with legal professionals, and keeping the organization compliant efficiently and cost effectively. The CISA proves the Plaintiff has the technical skills and knowledge it takes to assess, build, and implement a comprehensive privacy solution.

72.     Plaintiff Raissa Djuissi Kengne is a Certified Information Security Manager ("CISM"). The CISM certification attests of the Plaintiff's technical expertise and experience in IS/IT security and control. The CISM certification proves the Plaintiffs' competence in alignment between the organization's information security program and its broader goals and objectives. The CISM certification also attest of Plaintiff's commitment to compliance, security and integrity.

73.     Plaintiff Raissa Djuissi Kengne is a Certified in Risk and Information Systems Control ("CRISC"). The CRISC certification proves the Plaintiff's skills and knowledge in using governance best practices and continuous risk monitoring and reporting.

74.     Plaintiff Raissa Djuissi Kengne is a Certified Internal Auditor ("CIA"). The CIA certification proves Plaintiff's expertise in the design, implementation, testing, and assessment of controls as well as expertise in corporate governance, risk management, and internal controls. The CIA certification also proves the Plaintiff's expertise in the areas of governmental regulations and reporting requirements.

75.     Plaintiff Raissa Djuissi Kengne is a Certified Fraud Examiner ("CFE"). The CFE credentials proves Plaintiff's expertise as a trained professional who possesses a unique set of diverse skills in preventing, detecting and investigating fraud. The CFE

credential validates the plaintiff's skills such as knowledge of complex financial transactions, understanding of investigative techniques and legal issues, the ability to resolve allegations of fraud, and the design of effective anti-fraud programs.

76.     Plaintiff Raissa Djuissi Kengne is a Lean Six Sigma Green Belt holder. The Lean Six Sigma Green Belt proves the Plaintiff possesses a thorough understanding of enhanced problem-solving skills, with an emphasis on the DMAIC (Define, Measure, Analyze, Improve and Control) model. A Lean Six Sigma Green Belt certification also denotes the Plaintiff is well-versed in the advanced elements of Lean Six Sigma Methodology, and leads improvement projects at a high level of proficiency.

77.     Plaintiff Raissa Djuissi Kengne reported a violation of SEC regulations, PCAOB Standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened at BDO USA, LLP. Plaintiff was retaliated against. Plaintiff's home was broken into. Plaintiff's life and her family's lives were threatened. Plaintiff's computers and phones were hacked.

78.     Plaintiff's Raissa Djuissi Kengne resigned on November 18th, 2021 from BDO USA, LLP after facing illegal, criminal, unlawful, horrific, and immoral retaliatory practices.

### Defendants

### Defendant Wesley Freeman

79.     Defendant Wesley Freeman is a Fulton County and Georgia resident and is the IS Assurance Director for the Southeast region at BDO USA, LLP. The Southeast includes the state of Georgia and Wesley Freeman oversees audits in the BDO USA,

LLP Atlanta, GA office. BDO USA, LLP also operates in the state of Georgia with a business address located at 1100 Peachtree Street NE, Suite 700 Atlanta, GA 30309-4516 and is subject to the jurisdiction of this court.

80. Defendant Wesley Freeman is in the business of audit and assurance in the State of Georgia. Defendant Wesley Freeman's business in Georgia includes, but is not limited to, overseeing audit and assurance engagements and audit and assurance staff.

81. Defendant Wesley Freeman can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of employment at the address listed below.

Defendant Name: Wesley Freeman

Defendant Name Address: BDO Atlanta Office 1100 Peachtree Street NE, Suite 700 Atlanta, GA 30309-4516, USA

Defendant Name Phone Number: 404-979-7103

Defendant Name Email Address: wfreeman@bdo.com

82. Service is requested at this time.

### Defendants BDO USA, LLP

83. Defendant BDO USA, LLP is a Delaware Limited Liability Partnership. BDO USA, LLP also operates in the state of Georgia with a business address located at 1100 Peachtree Street NE, Suite 700 Atlanta, GA 30309-4516 and is subject to the jurisdiction of this court.

84. BDO USA, LLP is the United States member firm of BDO International, a global accounting network. The company is headquartered in Chicago. BDO USA,

LLP Chief Executive Officer and Chairman is Wayne Berson; he sits in the BDO Potomac office.

85.      Defendant BDO USA, LLP is in the business of assurance, tax, and financial advisory services in the State of Georgia. Defendant BDO USA, LLP's business in Georgia includes, but is not limited to, auditing the accounting records of public and private organizations and to attest to compliance with generally accepted accounting principles ("GAAP") as well as providing one or more of the following accounting services: (1) auditing financial statements; (2) designing accounting systems; (3) preparing financial statements; (4) developing budgets; and (5) providing advice on matters related to accounting. BDO USA, LLP also provides related services, such as bookkeeping, tax return preparation, and payroll processing.

86.      Defendant BDO USA, LLP can be served with legal process through delivery of the Summons and Complaint in this action to his Registered Agent at the address filed with the Secretary of State and noted below:

Registered Agent Name: Illinois Corporation Service C

Registered Agent Name Address: 01 Adlai Stevenson Drive Springfield, Illinois 62703-4261, USA

Email: wberson@bdo.com

Phone Number: 301-354-2500

87.      Service is requested at this time.

### Defendant Scott Meier

88.      Defendant Scott Meier is a Virginia resident and is the Southeast IS Assurance Practice Leader at BDO USA, LLP. The BDO Southeast region includes the

state of Georgia. Scott Meier oversees audits in the BDO USA, LLP Atlanta, GA office. BDO USA, LLP also operates in the state of Georgia with a business address located at 1100 Peachtree Street NE, Suite 700 Atlanta, GA 30309-4516 and is subject to the jurisdiction of this court.

89.     Defendant Scott Meier is in the business of audit and assurance in the State of Georgia. Defendant Scott Meier's business in Fulton County, Georgia includes, but is not limited to, overseeing audit and assurance engagements and audit and assurance staff.

90.     Defendant Scott Meier can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of employment at the address listed below.

Defendant Name: Scott Meier

Defendant Name Address: BDO Richmond Office 300 Arboretum Place, Suite 520 Richmond, VA 23236, USA

Defendant Name Phone Number: 804-330-3092

Defendant Name Email Address: smeier@bdo.com

Defendant Name Fax: 804-330-7753

91.     Service is requested at this time.

### Defendant Paul Davison

92.     Defendant Paul Davison is a Florida resident and is the Assurance Office Managing Partner in the BDO Jacksonville Office. Defendant Paul Davison was the Partner in Charge of the Interface's SOX audit that was performed out of the BDO USA, LLP's Atlanta office located at 1100 Peachtree Street NE, Suite 700 Atlanta, GA 30309-

4516 Fulton County and is subject to the jurisdiction of this court. Paul Davison was the recurring Partner on the Interface's SOX engagements.

93.     Defendant Paul Davison is in the business of audit and assurance in the State of Georgia. Defendant Paul Davison's business in Georgia and Florida includes, but is not limited to, overseeing audit and assurance engagements and audit and assurance staff.

94.     Defendant Paul Davison can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of employment at the address listed below.

Defendant Name: Paul Davison

Defendant Name Address: BDO Jacksonville Office 501 Riverside Avenue, Suite 800 Jacksonville, FL 32202, USA

Defendant Name Phone Number: 904-396-4015

Defendant Name Email Address: pdavison@bdo.com

95.     Service is requested at this time.

**Defendant Justin Wilkes**

96.     Defendant Justin Wilkes is a Georgia resident and an Assurance Director and Partner at BDO USA, LLP. Defendant Justin Wilkes oversees audits in the BDO USA, LLP Atlanta, GA office. Although BDO USA, LLP is a Delaware entity headquartered in Chicago, Illinois, it also conducts business in the state of Georgia with its offices located at 1100 Peachtree Street NE, Suite 700 Atlanta, GA 30309-4516 and is, therefore, subject to the jurisdiction of this court.

97.    Defendant Justin Wilkes is in the business of audit and assurance in the State of Georgia. Defendant Justin Wilkes's business in Georgia includes, but is not limited to, overseeing audit and assurance engagements and audit and assurance staff.

98.    Defendant Justin Wilkes can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of employment at the address listed below.

Defendant Name: Justin Wilkes

Defendant Name Address: BDO Atlanta Office 1100 Peachtree Street NE, Suite 700 Atlanta, GA 30309-4516, USA

Defendant Name Phone Number: 404-688-6841

Defendant Name Email Address: jwilkes@bdo.com

Defendant Name Fax: 404-688-1075

99.    Service is requested at this time.

**Defendant Anthony Reh**

100.    Defendant Anthony Reh is a Georgia resident and the Assurance Office Managing Partner in the BDO Atlanta office. Although BDO USA, LLP is a Delaware entity headquartered in Chicago, Illinois, it also conducts business in the state of Georgia with its offices located at 1100 Peachtree Street NE, Suite 700 Atlanta, GA 30309-4516 and is, therefore, subject to the jurisdiction of this court.

101.    Defendant Anthony Reh is in the business of audit and assurance in the State of Georgia. Defendant Anthony Reh's business in Georgia includes, but is not limited to, overseeing audit and assurance engagements and audit and assurance staff.

102.   Defendant Anthony Reh can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of employment at the address listed below.

Defendant Name: Anthony Reh

Defendant Name Address: BDO Atlanta Office 1100 Peachtree Street NE, Suite 700 Atlanta, GA 30309-4516, USA

Defendant Name Phone Number: 404-979-7148

Defendant Name Email Address: areh@bdo.com

Defendant Name Fax: 404-688-1075

103.   Service is requested at this time.

### Defendant Peter Poppo

104.   Defendant Peter Poppo is a Georgia resident and an Assurance Partner in the BDO USA, LLP Atlanta office. Although BDO USA, LLP is a Delaware entity headquartered in Chicago, Illinois, it also conducts business in the state of Georgia with its offices located at 1100 Peachtree Street NE, Suite 700 Atlanta, GA 30309-4516 and is, therefore, subject to the jurisdiction of this court. Peter Poppo was the Partner in Charge of the Atlanticus' SOX audit performed out of the BDO USA, LLP Atlanta office.

105.   Defendant Peter Poppo is in the business of audit and assurance in the State of Georgia. Defendant Peter Poppo's business in Georgia includes, but is not limited to, overseeing audit and assurance engagements and audit and assurance staff.

106.    Defendant Peter Poppo can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of employment at the address listed below.

Defendant Name: Peter Poppo

Defendant Name Address: BDO Atlanta Office 1100 Peachtree Street NE, Suite 700 Atlanta, GA 30309-4516, USA

Defendant Name Phone Number: 404-979-7258

Defendant Name Email Address: ppoppo@bdo.com

Defendant Name Fax: 404-688-1075

107.    Service is requested at this time.

**Defendant Mark Davenport**

108.    Defendant Mark Davenport is a Tennessee resident and an Assurance Partner in the BDO USA, LLP Memphis office. Although BDO USA, LLP is a Delaware entity headquartered in Chicago, Illinois, it also conducts business in the state of Georgia with its offices located at 1100 Peachtree Street NE, Suite 700 Atlanta, GA 30309-4516 and is, therefore, subject to the jurisdiction of this court.

109.    Defendant Mark Davenport is in the business of audit and assurance in the State of Georgia. Defendant Mark Davenport's business in Georgia and Tennessee includes, but is not limited to, overseeing audit and assurance engagements and audit and assurance staff.

110.    Defendant Mark Davenport can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of employment at the address listed below.

Defendant Name: Mark Davenport

Defendant Name Address: BDO Memphis Office 6410 Poplar Ave, Suite 750, International Place Phase II, Memphis, TN 38119, USA

Defendant Name Phone Number: 901-684-2020

Defendant Name Email Address: mdavenport@bdo.com

Defendant Name Fax: 901-680-7601

111.   Service is requested at this time.

### Defendant Johnson Wong

112.   Defendant Johnson Wong is a New York resident and an Assurance Partner in the BDO USA, LLP New York Park Avenue office. Although BDO USA, LLP is a Delaware entity headquartered in Chicago, Illinois, it also conducts business in the state of Georgia with its offices located at 1100 Peachtree Street NE, Suite 700 Atlanta, GA 30309-4516 and is, therefore, subject to the jurisdiction of this court.

113.   Defendant Johnson Wong is in the business of audit and assurance in the State of Georgia and New York. Defendant Mark Davenport's business in Georgia and New York includes, but is not limited to, overseeing audit and assurance engagements and audit and assurance staff.

114.   Defendant Johnson Wong can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of employment at the address listed below.

Defendant Name: Johnson Wong

Defendant Name Address: BDO New York - Park Avenue Office, 100 Park Avenue, New York, NY 10017, USA

Defendant Name Phone Number: 212-885-7380

Defendant Name Email Address: jwong@bdo.com

Defendant Name Fax: 212-697-1299

115.    Service is requested at this time.

### Defendant Justin Mungal

116.    Defendant Justin Mungal is a Fulton County, Georgia resident residing at 1280 West Peachtree ST NW Unit 2108, Atlanta, GA 30309 and is subject to the jurisdiction of this court.

117.    Defendant Justin Mungal's LinkedIn profile identifies him as an Information Technology professional in the state of Georgia. Defendant Justin Mungal's has also stated to the Plaintiff that he worked for BDO USA, LLP.

118.    Defendant Justin Mungal can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of residence at the address listed below.

Defendant Name: Justin Mungal

Defendant Name Address: 1280 West Peachtree ST NW Unit 2108 Atlanta, GA 30309, USA

119.    Service is requested at this time.

### Defendant Beacon Management Services, LLC

120.    Defendant Beacon Management Services, LLC is a Georgia Limited Liability Company with a business address located at 6285 Barfield Road, Suite 150, Atlanta, GA, 30328, USA and is subject to the jurisdiction of this court. Beacon

Management Services, LLC is listed as the registered agent for the 1280 West Condominium Association. Plaintiff lives in the 1280 West Condominium building.

121.    Defendant Beacon Management Services, LLC is in the business of residential property management in the State of Georgia. Defendant Beacon Management Services, LLC's business in Georgia includes, but is not limited to, managing residential real estate for others.

122.    Defendant Beacon Management Services, LLC can be served with legal process through delivery of the Summons and Complaint in this action to his Registered Agent at the address filed with the Secretary of State at the address below:

Registered Agent Name: Steven Lynn Weibel

Registered Agent Name Address: 8535 Sentinae Chase Drive, Roswell, GA, 30076-4465, USA

Registered Agent Name Email: sweibel@beaconmanagementservices.com

123.    Service is requested at this time.

### Defendant Lisa Simmons

124.    Defendant Lisa Simmons is a Georgia resident and the President of Beacon Management Services, LLC. Beacon Management Services, LLC provides property management services such as accounting and financial services for condominiums, HOA management services, concierge services, condominium management, consulting and asset management, maintenance services, technology, and tenant tracking to the 1280 West Condominium Association and is subject to the jurisdiction of this court. Plaintiff lives in the 1280 West Condominium building.

125.    Defendant Lisa Simmons is in the business of providing property management services in the State of Georgia. Defendant Lisa Simmons's business in Georgia includes, but is not limited to, the following: accounting and financial services for condominiums, HOA management services, concierge services, condominium management, consulting and asset management, maintenance services, technology, and tenant tracking.

126.    Defendant Lisa Simmons can be served with legal process through delivery of the Summons and Complaint in this action to her at her place of employment at the address listed below.

Defendant Name: Lisa Simmons

Defendant Name Address: 6285 Barfield Road, Suite 150, Atlanta, GA 30328, USA

Defendant Name Phone Number: (404) 907-2112

Defendant Name Email Address: lsimmons@beaconmanagementservices.com

127.    Service is requested at this time.

**Defendant Steven Weibel**

128.    Defendant Steven Weibel is a Georgia resident and the Chief Executive Officer of Beacon Management Services, LLC. Beacon Management Services, LLC provides property management services such as accounting and financial services for condominiums, HOA management services, concierge services, condominium management, consulting and asset management, maintenance services, technology, and tenant tracking to the 1280 West Condominium Association and is subject to the jurisdiction of this court. Plaintiff lives in the 1280 West Condominium building.

129.   Defendant Steven Weibel is in the business of providing property management services in the State of Georgia. Defendant Steven Weibel's business in Georgia includes, but is not limited to, the following: accounting and financial services for condominiums, HOA management services, concierge services, condominium management, consulting and asset management, maintenance services, technology, and tenant tracking.

130.   Defendant Steven Weibel can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of employment at the address listed below.

Defendant Name: Steven Weibel

Defendant Name Address: 6285 Barfield Road, Suite 150, Atlanta, GA 30328, USA

Defendant Name Phone Number: (404) 907-2112

Defendant Name Email Address: sweibel@beaconmanagementservices.com

131.   Service is requested at this time.

**Defendant Michael Shinners**

132.   Defendant Michael Shinners is a Georgia resident and is the General Manager for the 1280 West Peachtree ST NW Unit 2109, Atlanta, GA 30309. Defendant Michael Shinners works for Beacon Management Services, LLC and is subject to the jurisdiction of this court.

133.   Defendant Michael Shinners' business in Georgia includes, but is not limited to, the following: accounting and financial services for condominiums, HOA management services, concierge services, condominium management, consulting and asset management, maintenance services, technology, and tenant tracking.

134. Defendant Michael Shinners can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of employment at the address listed below.

Defendant Name: Michael Shinners

Defendant Name Address: 1280 Management Office, 1280 West Peachtree ST NW Atlanta, GA 30309 USA

Defendant Name Phone Number: 404-873-2582 ext.13

Defendant Name Email Address: mshinners@1280westhoa.com

135. Service is requested at this time.

### Defendant 1280 West Condominium Association, Inc.

136. Defendant 1280 West Condominium Association, Inc. is a Georgia Domestic Nonprofit Corporation with a business address located at 6285 Barfield Road, Suite 150, Atlanta, GA, 30328, USA.

137. The 1280 West Condominium Association operates out of the 1280 West Condominium building located at 1280 West Peachtree ST NW, Atlanta, Georgia 30306 and is subject to the jurisdiction of this court.

138. Defendant 1280 West Condominium Association, Inc. is a nonprofit corporation incorporated in the State of Georgia. Defendant 1280 West Condominium Association, Inc.'s business in Georgia includes, but is not limited to, the following: administering the Condominium, establishing the means and methods of collecting the contributions to the Common Expenses, arranging for the management of the Condominium and performing all of the other acts that may be required to be performed

by the Association pursuant to the Georgia Condominium Act, the Georgia Nonprofit Corporation Code, and the 1280 West Declaration of Condominium.

139.    Defendant 1280 West Condominium Association, Inc. can be served with legal process through delivery of the Summons and Complaint in this action to his Registered Agent at the address filed with the Secretary of State at the address below:

Registered Agent Name: Beacon Management Services LLC

Registered Agent Name Address: 6285 Barfield Road, Suite 150, Atlanta, GA 30328, USA

Registered Agent Name County: Fulton

140.    Service is requested at this time.

### Defendant Micah Kurtzberg

141.    Defendant Micah Kurtzberg is a Fulton County, Georgia resident who resides at 1280 West Peachtree ST NW Unit 3905, Atlanta, GA 30309 and is subject to the jurisdiction of this court. Defendant Micah Kurtzberg is one of the five board members sitting on the 1280 West Condominium Board. Plaintiff lives in the 1280 West Condominium building.

142.    Defendant Micah Kurtzberg is in the business of financial services in the State of Georgia. Defendant Micah Kurtzberg's business in Georgia includes, but is not limited to, the following: providing banking related services for Wells Fargo.

143.    Defendant Micah Kurtzberg can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of residence at the address listed below.

Defendant Name: Micah Kurtzberg

Defendant Name Address: 1280 West Peachtree ST NW Unit 3905, Atlanta, GA 30309, USA

Defendant Email Address: micah.i.kurtzberg@wellsfargo.com

144.    Service is requested at this time.

### Defendant Ronnie Bridges

145.    Defendant Ronnie Bridges is a Fulton County, Georgia resident who resides at 1280 West Peachtree ST NW Unit 3901, Atlanta, GA 30309 and is subject to the jurisdiction of this court. Defendant Ronnie Bridges is one of the five board members sitting on the 1280 West Condominium Board. Defendant Ronnie Bridges is also the Secretary of the 1280 West Condominium Association. Plaintiff lives in the 1280 West Condominium building.

146.    Defendant Ronnie Bridges is in the business of construction in the State of Georgia. Defendant Ronnie Bridges' business in Georgia includes, but is not limited to, the following: Maintenance Manager at Strategic Materials.

147.    Defendant Ronnie Bridges can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of residence at the address listed below.

Defendant Name: Ronnie Bridges

Defendant Name Address: 1280 West Peachtree ST NW Unit 3901 Atlanta, GA 30309, USA

148.    Service is requested at this time.

### Defendant Brett Dettmering

149.    Defendant Brett Dettmering is a Georgia resident who resides at 966 Ferncliff Rd NE, Atlanta GA 30324 and is subject to the jurisdiction of this court. Defendant Brett Dettmering was one of the five board members sitting on the 1280 West Condominium Board. Defendant Brett Dettmering served as the President of the 1280 West Condominium Association for part of the year 2021 when the claims of the Plaintiffs occurred.

150.    Defendant Brett Dettmering is in the business of accounting in the State of Georgia. Defendant Brett Dettmering's business in Georgia includes, but is not limited to, the following: accounting and financial analysis for Georgia Pacific.

151.    Defendant Brett Dettmering can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of residence at the address listed below.

Defendant Name: Brett Dettmering

Defendant Name Address: 966 Ferncliff Rd NE, Atlanta GA 30324, USA

152.    Service is requested at this time.

**Defendant Michael Shaffer**

153.    Defendant Michael Shaffer is a Fulton County, Georgia resident who resides at 1280 West Peachtree ST NW Unit 3609, Atlanta, GA 30309, and is subject to the jurisdiction of this court. Defendant Michael Shaffer is one of the five board members sitting on the 1280 West Condominium Association Board. Defendant Michael Shaffer is also the Chief Financial Officer ("CFO") of the 1280 West Condominium Association. Plaintiff lives in the 1280 West Condominium building.

154.    Defendant Michael Shaffer can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of residence at the address listed below.

Defendant Name: Michael Shaffer

Defendant Name Address: 1280 West Peachtree ST NW Unit 3609, Atlanta, GA 30309, USA

155.    Service is requested at this time.

### Defendant Rohan Rupani

156.    Defendant Rohan Rupani is a Fulton County, Georgia resident who resides at 1280 West Peachtree ST NW Unit 3608 Atlanta, GA 30309 and is subject to the jurisdiction of this court. Defendant Rohan Rupani is one of the five board members sitting on the 1280 West Condominium Association Board. Defendant Rohan Rupani is also the Chief Executive Officer ("CEO") of the 1280 West Condominium Association. Plaintiff lives in the 1280 West Condominium building.

157.    Defendant Rohan Rupani is in the business of real estate law for the mortgage industry in the State of Georgia. Defendant Rohan Rupani's business in Georgia includes, but is not limited to, the following: creditor's rights and debtor collection real estate law for Albertelli Law.

158.    Defendant Rohan Rupani can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of residence at the address listed below.

Defendant Name: Rohan Rupani

Defendant Name Address: 1280 West Peachtree ST NW Unit 3608 Atlanta, GA 30309, USA

159.    Service is requested at this time.

**Defendant Finch McCranie, LLP**

160.    Defendant Finch McCranie is a Georgia Limited Liability Partnership with a business address located at 225 Peachtree St NE #1700, Atlanta, GA 30303.

161.    Defendant Finch McCranie is a Georgia trial lawyers firm handling personal injury and wrongful death cases, whistleblower cases, and federal criminal cases in the white-collar area. Finch McCranie also represents companies, boards of directors, and individuals in SEC investigations and prosecutions, and in corporate governance, internal investigations, and compliance matters.

162.    Plaintiff Raissa Djuissi Kengne signed the engagement letter with Defendant Finch McCranie on June 21st, 2021. A few months later Finch McCranie resigned as the attorney on the Plaintiff's case.

163.    Defendant Finch McCranie can be served with legal process through delivery of the Summons and Complaint in this action at its principal place of business located at the address below:

Finch McCranie Partner Name: Richard W. Hendrix Partner

Finch McCranie Address: 225 Peachtree St NE #1700, Atlanta, GA 30303, USA

Email: rhendrix@finchmccranie.com

Telephone: (404) 658-9070

164.    Service is requested at this time.

**Defendant Michael Sullivan**

165.    Defendant Michael Sullivan is a Georgia resident and attorney subject to the jurisdiction of this court. Defendant Michael Sullivan is an attorney admitted to the bar in the state of Georgia and whose area of law include health law labor and employment law. Defendant Michael Sullivan works at Finch McCranie. Plaintiff initially retained the services of Finch McCranie to represent her in her whistleblower case. Defendant Michael Sullivan breached the client-attorney privilege and divulgated the content of the conversations to BDO USA, LLP.

166.    Defendant Michael Sullivan is in the business of health law labor and employment law in the State of Georgia. Defendant Michael Sullivan's business in Georgia includes, but is not limited to, the following: Whistleblower False Claims Act (Qui Tam litigation), SEC Whistleblower and CFTC Whistleblower claims, IRS Whistleblower claims, and Whistleblower Employment Law.

167.    Defendant Michael Sullivan can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of employment at the address listed below.

Defendant Name: Michael Sullivan

Defendant Michael Sullivan Address: 225 Peachtree ST. NE, Suite 1700, Atlanta, GA 30303, USA

Defendant Michael Sullivan Phone Number: 404-658-9070

Defendant Michael Sullivan Email Address: msullivan@finchmccranie.com

Defendant Michael Sullivan Fax Number: (404) 688-0649

168.    Service is requested at this time.

**Defendant Walter Jospin**

169.    Defendant Walter Jospin is a Georgia resident and attorney subject to the jurisdiction of this court. Defendant Walter Jospin is an attorney admitted to the bar in the state of Georgia and whose area of law includes SEC and other securities regulatory enforcement matters, corporate governance, internal investigations, and SEC Whistleblower Claims. Defendant Walter Jospin is a Partner at Finch McCranie. Plaintiff initially retained the services of Finch McCranie to represent her in her whistleblower case. Defendant Walter Jospin breached the client-attorney privilege and divulgated the content of the conversations to BDO USA, LLP.

170.    Defendant Walter Jospin is in the business of corporate and securities laws in the State of Georgia. Defendant Walter Jospin's business in Georgia includes, but is not limited to, the following: white collar crime, securities law, and stockbroker and investment fraud.

171.    Defendant Walter Jospin can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of employment at the address listed below.

Defendant Name: Walter Jospin

Defendant Walter Jospin Address: 225 Peachtree St NE, Suite 1700, Atlanta, GA 30303, USA

Defendant Walter Jospin Phone Number: 404-658-9070

Defendant Walter Jospin Email Address: wjospin@finchmccranie.com

Defendant Walter Jospin Fax Number: (404) 688-0649

172.    Service is requested at this time.

**Defendant Interface, Inc.**

173.   Defendant Interface, Inc. is a Georgia Profit Corporation with a business address at 1280 West Peachtree St NW, Atlanta, GA 30309 and is subject to the jurisdiction of this court. Interface, Inc., is a global manufacturer of commercial flooring. Defendant Interface, Inc. also manufactures and sells floor coverings in the State of Georgia. Its headquarters are located in Fulton County, Georgia.

174.   Interface is a publicly traded company on the Nasdaq stock exchange under the ticker TILE. Plaintiff asserts BDO USA, LLP is the continuing public accounting firm that performs the SOX audit for Interface.

175.   A public company with a class of securities registered under either Section 12 or which is subject to Section 15(d) of the Securities Exchange Act of 1934, as amended ("Exchange Act") must file reports with the SEC. The underlying basis of the Reporting Requirements is to keep shareholders and the markets informed on a regular basis in a transparent manner. The required reports include an annual Form 10-K, quarterly Form 10Q, and current periodic Form 8-K as well as proxy reports and certain shareholder and affiliate reporting requirements. Plaintiff asserts Interface, as a public company with stocks traded on the Nasdaq stock market, must comply with these requirements.

176.   A reporting company, like Interface, also has record keeping requirements, must implement internal accounting controls and is subject to the Sarbanes-Oxley Act of 2002, including the CEO and CFO certifications requirements and independent auditor requirements. Under the CEO and CFO certification requirement, the CEO and CFO must personally certify the content of the reports filed with the SEC and the procedures established by the issuer to report disclosures and

prepare financial statements. Plaintiff asserts Interface, as a public company with stocks traded on the Nasdaq stock market, must comply with these requirements.

177.    Section 302 of the Sarbanes-Oxley Act requires that CEOs and CFOs must certify in each annual and quarterly report that the officer has reviewed the report, that based on the officer's knowledge the report does not contain any untrue statement of a material fact or omit to state a necessary material fact, and that based on the officer's knowledge, the financial statements and other financial information included in the report fairly present in all material respect the financial condition and results of operations of the issuer. Plaintiff identified material weaknesses in the internal controls when performing the relevant procedures to test Information Technology General Controls ("ITGCs"). These material weaknesses were not adequately evaluated by BDO USA, LLP's auditors and communicated to Interface's management.

178.    Section 302 of the Sarbanes-Oxley Act also requires that the assigning officers must also attest that they are responsible for establishing and maintaining internal controls, that they have designed such controls to ensure that material information is made known to the officers, that they have presented their conclusions about the effectiveness of those controls in the report, and they have disclosed both to the outside auditors and to the company's audit committee: all significant deficiencies in the design or operation of internal controls, which could adversely affect the issuer's ability to record, process, summarize and report financial data; and any fraud, whether or not material, involving any employee who has a significant role in the issuer's internal controls. The signature by the CEO and CFO on the certification should represent the end of a process that is rigorous, informed, careful, demonstrable, and dependable.

Plaintiff asserts that Interface's management signed off on certifications filed with the SEC that were materially misrepresented because several material weaknesses were not identified by Interface and BDO USA, LLP until the Plaintiff started performing the audits.

179. On September 28th, 2020, the Securities and Exchange Commission settled actions against Interface for violations that resulted in the improper reporting of quarterly earnings per share (EPS) that met or exceeded analyst consensus estimates. The SEC's order against Interface Inc., a Georgia-based modular carpet manufacturer, finds that in multiple quarters in 2015 and 2016, the company made unsupported, manual accounting adjustments that were not compliant with GAAP. These adjustments were often made when Interface's internal forecasts indicated that the company would likely fall short of analyst consensus EPS estimates. The order finds that the adjustments boosted the company's income, making it possible for Interface to consistently report earnings that met or exceeded consensus estimates. According to the order, Interface's former Controller and Chief Accounting Officer Gregory J. Bauer directed the unsupported adjustments, including those made to management bonus accruals and stock-based compensation accounts. The order also finds that Interface's former CFO Patrick C. Lynch caused Bauer to direct some of the unsupported entries." Plaintiff asserts the unethical behavior at Interface continues as evidenced by the retaliation she faced.

180. Defendant Interface, Inc. can be served with legal process through delivery of the Summons and Complaint in this action to his Registered Agent at the address filed with the Secretary of State at the address below:

Registered Agent Name: Corporation Service Company

Registered Agent Name Address: 2 Sun Court, Suite 400, Peachtree Corners, GA 30092, USA

Email: laurel.hurd@interface.com

181.   Service is requested at this time.

## Defendant Atlanticus Holdings Corporation

182.   Defendant Atlanticus is a Georgia profit corporation with a business address at 5 Concourse Pkwy, Suite 300, Atlanta, GA 30328 and is subject to the jurisdiction of this court. Atlanticus is a financial holding company, which engages in the provision of financial technology and related services. It operates through the Credit and Other Investments segment and the Auto Finance segment. The Credit and Other Investments segment includes point-of-sale and direct-to-consumer finance operations, investments in and servicing of its credit card receivables portfolios, product development, and limited investment in consumer finance technology platforms that capitalize on its credit infrastructure. The Auto Finance segment offers purchases and services loans secured by automobiles from or for a pre-qualified network of independent automotive dealers and automotive finance companies in the buy-here, pay-here used car business.

183.   Defendant Atlanticus is a publicly traded company on the Nasdaq stock exchange under the ticker ATLC. Plaintiff asserts BDO USA, LLP is the continuing public accounting firm that performs the SOX audit for Atlanticus.

184.   A public company with a class of securities registered under either Section 12 or which is subject to Section 15(d) of the Securities Exchange Act of 1934,

as amended ("Exchange Act") must file reports with the SEC. The underlying basis of the Reporting Requirements is to keep shareholders and the markets informed on a regular basis in a transparent manner. The required reports include an annual Form 10-K, quarterly Form 10Q, and current periodic Form 8-K as well as proxy reports and certain shareholder and affiliate reporting requirements. Plaintiff asserts Atlanticus, as a public company with stocks traded on Nasdaq stock market, must comply with these requirements.

185.   A reporting company, like Atlanticus, also has record keeping requirements, must implement internal accounting controls and is subject to the Sarbanes-Oxley Act of 2002, including the CEO and CFO certifications requirements and independent auditor requirements. Under the CEO and CFO certification requirement, the CEO and CFO must personally certify the content of the reports filed with the SEC and the procedures established by the issuer to report disclosures and prepare financial statements. Plaintiff asserts Atlanticus, as a public company with stocks traded on Nasdaq stock market, must comply with these requirements.

186.   Section 302 of the Sarbanes-Oxley Act requires that CEOs and CFOs must certify in each annual and quarterly report that the officer has reviewed the report, that based on the officer's knowledge the report does not contain any untrue statement of a material fact or omit to state a necessary material fact, and that based on the officer's knowledge, the financial statements and other financial information included in the report fairly present in all material respect the financial condition and results of operations of the issuer. Plaintiff identified material weaknesses in the internal controls when performing the relevant procedures to test Information Technology General

Controls. These material weaknesses were not adequately evaluated by BDO USA, LLP's auditors and communicated to Interface's management.

187.    Section 302 of the Sarbanes-Oxley Act also requires that the assigning officers must also attest that they are responsible for establishing and maintaining internal controls, that they have designed such controls to ensure that material information is made known to the officers, that they have presented their conclusions about the effectiveness of those controls in the report, and they have disclosed both to the outside auditors and to the company's audit committee: all significant deficiencies in the design or operation of internal controls, which could adversely affect the issuer's ability to record, process, summarize and report financial data; and any fraud, whether or not material, involving any employee who has a significant role in the issuer's internal controls. The signature by the CEO and CFO on the certification should represent the end of a process that is rigorous, informed, careful, demonstrable, and dependable. Plaintiff asserts that Atlanticus' management signed off on certifications filed with the SEC that were materially misrepresented because several material weaknesses were not identified by Atlanticus and BDO USA, LLP until the Plaintiff started performing the audits.

188.    Defendant Atlanticus can be served with legal process through delivery of the Summons and Complaint in this action to his Registered Agent at the address filed with the Secretary of State at the address below:

Registered Agent Name: Corporation Service Company

Registered Agent Name Address: 2 Sun Court, Suite 400, Peachtree Corners, GA 30092

Email: jeff.howard@atlanticus.com

Phone Number: (770) 828-2000

189. Service is requested at this time.

## Defendant Kas Naderi

190. Defendant Kas Naderi is the Chief Information Officer ("CIO") at Atlanticus. Defendant Kas Naderi threatened Plaintiff during the PCAOB inspection of Atlanticus.

191. Defendant Kas Naderi is in the business of Information Technology in the State of Georgia.

192. Defendant Kas Naderi can be served with legal process through delivery of the Summons and Complaint in this action to him at his place of employment at the address listed below.

Defendant Name: Kas Naderi

Defendant Kas Naderi Address: 5 Concourse Pkwy #300, Atlanta, GA 30328, USA

Defendant Kas Naderi Phone Number: (770) 828-2000

Defendant Kas Naderi Email Address: kas.naderi@atlanticus.com

193. Service is requested at this time.

## Defendant SPAR Group, Inc. (NMS SPAR) ("NMS")

194. Defendant NMS is a Georgia Profit Corporation with a business address at 350 Stonewall Ave. W., Fayetteville, GA, 30214, USA, and is subject to the jurisdiction of this court. Defendant NMS primarily operates in the merchandising consultant business industry within the engineering, accounting, research, and management services sector.

195.    National Merchandising Services, LLC ("NMS"), is a consolidated domestic subsidiary of SPAR Group, Inc. ("SPAR") and is owned jointly by SPAR through its indirect ownership of 51% of the NMS membership interests and by National Merchandising of America, Inc. ("NMA"), through its ownership of the other 49% of the NMS membership interests. Mr. Edward Burdekin is the Chief Executive Officer and President and a director of NMS and is also an executive officer and director of NMA. Ms. Andrea Burdekin, Mr. Burdekin's wife, is the sole stockholder and a director of NMA and a director of NMS. NMA is an affiliate of the Company, but is not under the control of or consolidated with the Company. Mr. Burdekin also owns 100% of National Store Retail Services ("NSRS").

196.    Defendant NMS is a subsidiary of SPAR Group, Inc ("SPAR"). SPAR's stocks are traded on the Nasdaq stock market under the ticker SGRP. SPAR provides marketing and sales solutions. SPAR serves grocery stores, drug stores, and mass merchandiser stores with retail merchandising. SPAR also offers incentive marketing, teleservices, database marketing, and marketing research services.

197.    SPAR presents consolidated financial statements with NMS and files the required statements with the SEC. Plaintiff asserts BDO USA, LLP is the continuing public accounting firm that performs the SOX audit for SPAR and NMS.

198.    Defendant NMS can be served with legal process through delivery of the Summons and Complaint in this action to his Registered Agent at the address filed with the Secretary of State at the address below:

Registered Agent Name: Edward S. Burdekin

Registered Agent Name Address: 350 Stonewall Ave. W. Ste B, Fayetteville, GA, 30214, USA

Email: ed.burdekin@nms.com

Cell Phone: (800) 401-7976

 199. Service is requested at this time.

**Defendant BioHorizons Implant Systems, Inc. (An Henry Schein Subsidiary)**

 200. Defendant BioHorizons is a Delaware corporation with a business address at 2300 Riverchase Center, Birmingham, AL 35244, USA. BioHorizons Implant Systems, Inc. manufactures and sells advanced dental implant technologies and tissue regeneration products. BioHorizons offers dental implants, restorative and laboratory components, soft and hard tissue biologic products, dental implant systems, prosthetics, dental instruments, and motors. BioHorizons Implant Systems operates in the State of Alabama and sells its products nationally, including in the state of Georgia. Plaintiff asserts that the SOX audit of BioHorizons is performed by the BDO USA, LLP's Atlanta office located in Fulton County.

 201. Defendant BioHorizons is a subsidiary of Henry Schein, Inc. Henry Schein, Inc.'s stocks are traded on the Nasdaq stock market under the ticker HSIC. Henry Schein, Inc. is an American distributor of health care products and services with headquarters located in Melville, NY.

 202. BioHorizons was a publicly traded company from 2017 to 2021.

 203. A public company with a class of securities registered under either Section 12 or which is subject to Section 15(d) of the Securities Exchange Act of 1934, as amended ("Exchange Act") must file reports with the SEC. The underlying basis of

the Reporting Requirements is to keep shareholders and the markets informed on a regular basis in a transparent manner. The required reports include an annual Form 10-K, quarterly Form 10Q, and current periodic Form 8-K as well as proxy reports and certain shareholder and affiliate reporting requirements. Plaintiff asserts BioHorizons, as a public company must comply with these requirements.

204. A reporting company like BioHorizons also has record keeping requirements, must implement internal accounting controls and is subject to the Sarbanes-Oxley Act of 2002, including the CEO and CFO certifications requirements and independent auditor requirements. Under the CEO and CFO certification requirement, the CEO and CFO must personally certify the content of the reports filed with the SEC and the procedures established by the issuer to report disclosures and prepare financial statements. Plaintiff asserts BioHorizons, as a public company must comply with these requirements.

205. Section 302 of the Sarbanes-Oxley Act requires that CEOs and CFOs must certify in each annual and quarterly report that the officer has reviewed the report, that based on the officer's knowledge the report does not contain any untrue statement of a material fact or omit to state a necessary material fact, and that based on the officer's knowledge, the financial statements and other financial information included in the report fairly present in all material respect the financial condition and results of operations of the issuer. Plaintiff identified material weaknesses in the internal controls when performing the relevant procedures to test Information Technology General Controls. These material weaknesses were not adequately evaluated by BDO USA, LLP's auditors and communicated to BioHorizons' management.

206.    Section 302 of the Sarbanes-Oxley Act also requires that the assigning officers must also attest that they are responsible for establishing and maintaining internal controls, that they have designed such controls to ensure that material information is made known to the officers, that they have presented their conclusions about the effectiveness of those controls in the report, and they have disclosed both to the outside auditors and to the company's audit committee: all significant deficiencies in the design or operation of internal controls, which could adversely affect the issuer's ability to record, process, summarize and report financial data; and any fraud, whether or not material, involving any employee who has a significant role in the issuer's internal controls. The signature by the CEO and CFO on the certification should represent the end of a process that is rigorous, informed, careful, demonstrable, and dependable. Plaintiff asserts that BioHorizons' management signed off on certifications filed with the SEC that were materially misrepresented because several material weaknesses were not identified by BioHorizons and BDO USA, LLP until the Plaintiff started performing the audits.

207.    Defendant BioHorizons can be served with legal process through delivery of the Summons and Complaint in this action to his Registered Agent at the address filed with the Secretary of State at the address below:

Registered Agent Name: Corporation Service Company

Registered Agent Name Address: 251 Little Falls Drive, Wilmington, DE 19808

Email: sboggan@biohorizons.com

Phone Number: 302-636-5401

208.    Service is requested at this time.

## II.
## JURISDICTION AND VENUE

209.     This Court has subject matter jurisdiction over this case because the Plaintiff's unlawful, illegal, and criminal claims arise under the laws of the State of Georgia and the United States. It has jurisdiction over the Plaintiff's state law claims because they are so closely related to the federal claims as to form part of the same case or controversy. See O.C.G.A § 15-6-8; 42 U.S.C.§§ 1985,1986.

Pursuant to O.C.G.A § 15-6-8, the superior courts have authority:

(1) To exercise original, exclusive, or concurrent jurisdiction, as the case may be, of all causes, both civil and criminal, granted to them by the Constitution and laws;

(2) To exercise the powers of a court of equity;

(3) To exercise appellate jurisdiction from judgments of the probate or magistrate courts as provided by law;

(4) To exercise a general supervision over all inferior tribunals and to review and correct, in the manner prescribed by law, the judgments of: (A) Magistrates; (B) Municipal courts or councils; (C) Any inferior judicature; (D) Any person exercising judicial powers; and (E) Judges of the probate courts, except in cases touching the probate of wills and the granting of letters of administration, in which a jury must be impaneled;

**(6) To exercise such other powers, not contrary to the Constitution, as are or may be given to such courts by law.**

210.     Venue is proper in this Court because all or a substantial part of the conduct and violations giving rise to the claims in the case, including the horrific

retaliatory practices and attacks against the plaintiff caused by the nature, form, and substance of the business several defendants are involved in occurred in the State of Georgia. See O.C.G.A § 14-2-510, O.C.G.A § 9-10-91, O.C.G.A § 9-10-93, O.C.G.A § 9-10-31, and O.C.G.A § 9-10-34.

211.    This Court has personal jurisdiction over all the Defendants because the Defendants committed these violations in the State of Georgia. See O.C.G.A § 14-2-510, O.C.G.A § 9-10-91, O.C.G.A § 9-10-93, O.C.G.A § 9-10-31, and O.C.G.A § 9-10-34.

212.    This Court has personal jurisdiction over all the Defendants because the Defendants in their official capacities at their place of employment and/or in their own capacity as individuals have or have had ongoing and systematic contacts with Fulton County, have maintained offices in Fulton County, and reside in Fulton County, and have committed wrongful acts, which occurred within Fulton County, and which have had and continue to have a negative impact or effect on the Plaintiff who resides Fulton County.

213.    Venue is proper in this Court because Defendant Wesley Freeman resides in Fulton County, Georgia.

214.    Venue is proper in this Court because the majority of Defendants' residence is in Fulton County, Georgia.

215.    Venue is proper in this Court because Defendant BDO USA, LLP's principal address of business is in Fulton County, Georgia.

216.    Venue is proper in this Court because Defendant Interface, Inc.'s headquarters are located in Fulton County, Georgia.

217. Plaintiff Raissa Djuissi Kengne has standing to bring this Complaint in Court because she has been, and continues to be, adversely affected by the illegal, unlawful, and criminal actions of the Defendants.

218. Accordingly, venue is proper pursuant to Georgia Civil Practice and Corporations, Partnerships, And Associations Code § 15-6-8, O.C.G.A § 14-2-510, O.C.G.A § 9-10-91, O.C.G.A § 9-10-93, O.C.G.A § 9-10-31, and O.C.G.A § 9-10-34.

## III.
## STATEMENT OF RELEVANT FACTS

### The Plaintiff's Employment Contract With BDO USA, LLP

219. Plaintiff, Raissa Djuissi Kengne, was hired at BDO USA, LLP Atlanta office as an IT Audit Manager in September 2019 in the Assurance practice.

**IBDO**

Tel: 312-856-9100
Fax: 312-856-1379
www.bdo.com

330 North Wabash, Suite 3200
Chicago, IL 60611

PERSONAL & CONFIDENTIAL

August 22, 2019

Raissa Kengne
12880 West Peachtree Street Northwest
Apartment 2109
Atlanta, Georgia 30309

Dear Raissa:

On behalf of the partners of BDO USA, LLP ("BDO" or the "Firm"), I am pleased to extend to you this offer of employment as a Manager, IT Audit in our Assurance practice located in the Atlanta office. It is anticipated you will begin your employment on September 3, 2019. The specifics of this offer are set forth below and in the accompanying attachments.

220.     The non-disclosure agreement or confidentiality agreement does not trump whistleblower rights. The public policy protecting whistleblowers from retaliation, which is reflected in the Dodd-Frank Act and the Sarbanes-Oxley Act, precludes companies from interfering with or barring whistleblowing. In particular, an SEC rule implementing the Dodd-Frank whistleblower reward program bars companies from "enforcing, or threatening to enforce, a confidentiality agreement" to impede communicating with the SEC. 17 C.F.R. § 240.21F-17.

221.     Plaintiff Raissa Djuissi Kengne obtained the evidence presented herein in the normal course of her duties. Therefore, the Computer Fraud and Abuse Act ("CFAA") was not violated because Plaintiff accessed the computer and her previous employer's documents to provide support for the whistleblower claims with authorization; the Plaintiff did not obtain information located in areas on the computer to which her access was prohibited.

### Issues with Public and Private Clients at BDO USA, LLP

222.     When Plaintiff started at BDO USA, LLP, she noticed that the workpapers for both private clients and public clients were being rolled forward year after year without doing the work or without doing the work with due professional care.

223.     The **public clients** included BlueLinx, Atlanticus, BioHorizons, and Interface. Interface had recently been under an SEC investigation and an executive employee at Interface has been suspended. In addition, to the work being mostly rolled forward on BlueLinx, Atlanticus, BioHorizons, and Interface, the IT findings severity were not properly reported on BlueLinx, Atlanticus, BioHorizons, Interface, and IZEA. When Plaintiff started performing the IT audits and noted significant deficiencies or

material weaknesses, which would have had for effect an adjustment in audit procedures, the results of the audit were disregarded by Defendant Wesley Freeman, IS Assurance Director, and intentionally removed from reporting as significant deficiencies and material weaknesses. Plaintiff noted that the issues at these **public companies** had been ongoing since 2016 because she only looked at workpaper files going back to 2016 for these clients.

224.    The audit methodology at BDO USA, LLP requires that if significant deficiencies and/or material weaknesses are identified, the risk level must be adjusted to 2.5 or 3.0 respectively. The risk level for the public company' engagements that are part of the subject matter of the whistleblower case had remained to a risk level of 2.0 throughout the audit.



225.    **Public companies** are required to have an independent audit in conformity with the SEC and PCAOB standards and regulations.

226.    The **private clients** included Janus, Dustex, FCCI, RSR Group, ProCare, Vacation Express, and many others. The issue with the IS audit work performed was

that several deficiencies that should have been identified as significant deficiencies or material weaknesses were actually identified as control deficiencies. Because they were never communicated to the financial statements audit team as significant deficiencies or material weaknesses, the financial statements audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls ("ITGCs"). Plaintiff noted that the issues at these **private companies** had been ongoing since 2017 because she only looked at workpaper files going back to 2017 for these private clients.

227.    **Private companies** usually request audit reports because the banks require an audit to loan substantial amounts of money.

228.    FCCI is a **private company**, but an insurance company that is required to comply with Section 624.424(8), Florida Statutes by having an external independent CPA firm prepare the workpapers as required by Rule 690-137.002, Florida Administrative Code. FCCI IT audit has not been performed with due professional care since 2018. Plaintiff did not look at the workpapers prepared before 2018. The right evidence was not requested and obtained in 2018. The right evidence was requested and obtained in 2019 and 2020, but the evidence was not properly tested and left out significant deficiencies and material weaknesses.

229.    Plaintiff has informed the IS Assurance Director, Defendant Wesley Freeman, of the work that was not performed in roughly 75% of the public and private engagements she oversaw in the BDO USA, LLP Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, Defendant Wesley

Freeman kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers.



230.    As Plaintiff took the stand of performing the IS Assurance work with due diligence and refused to obey Defendant Wesley Freeman's tacit command to "stop doing my job so well" as he stated one day, Defendant Wesley Freeman launched a smear campaign against Plaintiff. Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear her reputation. It went so far that a Partner, Defendant Peter Popo, asked to talk to Plaintiff and stated that he has never heard so many bad things mentioned about someone's behavior; usually what he hears is the bad work someone does. In the Plaintiff's case, it was the opposite. These associates enlisted to smear Plaintiff's reputation were part of the group who delivered such a poor work product as described above. Most of the people responsible for executing the IT audit

(Ling Tang and Dale Drushella) have left the Company, probably because they could no longer keep up with the fraud. Plaintiff refused to commit fraud and Plaintiff was targeted for it by Defendant Wesley Freeman. Defendant Wesley Freeman is not above lying to the PCAOB, the internal inspectors, and the Partners at BDO USA, LLP.

231.   During a meeting with Defendant Scott Meier, the new IS Assurance Principal, who started in 2021, Defendant Scott Meier led Plaintiff to understand that Defendant Wesley Freeman had accumulated a lot of good will with other Partners and Plaintiff may need more Partners to speak on Plaintiff's behalf.

232.   Defendant Scott Meier, the new IS Assurance Principal, has noted and stated to Plaintiff that the IT findings were not evaluated appropriately; they should have been classified as significant deficiencies and material weaknesses across the public and private engagements the Plaintiff mentioned.

233.   The severity of the IT findings on Plaintiff's engagements was inappropriately reported, and therefore, audit procedures may not have been performed to provide reasonable assurance that the financial statements were free from material misstatements due to error or fraud.

234.   The SEC, PCAOB, and AICPA standards and regulations were violated on the client's engagements that Plaintiff managed.

### Documentation of Audit Findings At BDO

235.   When performing an audit, the list of IT findings or issues identified during an audit must be documented in different documents at BDO USA, LLP. The IS Assurance team has three (3) documents where the results of the audit can be located.

The first one is the "IT Findings Summary" log, the second one is the "IC-80" form, and the third document is the "IC-81" form.

236.    These three (3) documents containing the list of IT Findings must be reviewed by the IS Assurance/IT Audit team as well as the Assurance team. Both teams must sign-off on the "IT Findings Summary" log, the "IC-80" form, and the "IC-81" form.

237.    The "IT Findings Summary" log, the "IC-80" form, and the "IC-81" form are all saved in a document repository tool called APT. APT is BDO USA, LLP's global and proprietary audit software and documentation tool. Because APT is a proprietary tool, BDO USA, LLP has access to alter the information, files, and/or data stored within APT. The information provided to regulators, including, but not limited to the SEC, the PCAOB, and the AICPA comes from the APT audit software.

238.    Copies of the "IT Findings Summary" log, the "IC-80" form, and the "IC-81" form are also located on BDO USA, LLP's network shared drive (G: Drive).

239.    BDO USA, LLP also maintains off-site data backup for redundancy, security, and compliance purposes. Plaintiff noted that BDO USA, LLP has access to alter the data.

**Material Weaknesses Identified During the Interface, Inc.'s SOX Audit**

240.    Defendant Interface, Inc. is a Georgia Profit Corporation that is publicly traded on the Nasdaq stock exchange under the ticker TILE.

241.    Defendant Interface, Inc., a public company with a class of securities registered under either Section 12 or which is subject to Section 15(d) of the Securities Exchange Act of 1934, as amended ("Exchange Act"), must file reports with the SEC

("Reporting Requirements"). The underlying basis of the Reporting Requirements is to keep shareholders and the markets informed on a regular basis in a transparent manner. Reports filed by Defendant Interface with the SEC can be viewed by the public on the SEC EDGAR website. The required reports include an annual Form 10-K, quarterly Form 10Q, and current periodic Form 8-K as well as proxy reports and certain shareholders and affiliates' reporting requirements.

242.    Defendant Interface, a reporting company, has **record keeping requirements**, must **implement internal accounting controls** and is subject to the **Sarbanes-Oxley Act of 2002**, including the CEO and CFO certifications requirements and independent auditor requirements.

Interface's Responsibility To Implement Internal Accounting Controls

243.    Defendant Interface is subject to the Foreign Corrupt Practices Act of 1977 ("FCPA"), which requires every US-traded company (regardless of size and place of operations), to create a system of "internal accounting controls". In the SEC's rules implementing the FCPA, this responsibility requires Interface to:

(1)    Maintain books, records, and accounts which, in reasonable detail, accurately and fairly reflect the company's transactions; and

(2)    Devise and maintain internal controls sufficient to provide reasonable assurance that:

a.    Transactions are executed in accordance with management authorization;

    b.      Transactions are recorded as necessary to (a) permit preparation of financial statements in conformity with GAAP and (b) maintain accountability for assets;

    c.      Access to assets is permitted only in accordance with management authorization; and

    d.      Recorded accountability for assets is compared with the existing assets at reasonable intervals, and appropriate action is taken regarding any differences.

**Interface's Responsibility To Comply With The Sarbanes-Oxley Act of 2002,**

**Including The CEO And CFO Certifications Requirements**

244.    Defendant Interface is subject to the Sarbanes-Oxley Act of 2002.



245.    Under §404(a) of the SOX Act, Interface is required to annually report on Interface's own assessment of the effectiveness of Interface's controls.

See Exhibit 1. The screenshot below is an extract from Exhibit 1.



246.    Interface's management had not identified and reported the IT findings classified as significant deficiencies and/or material weaknesses as required under §404(a) of the SOX Act.

247.    Under §302 of the SOX Act, Interface's corporate officers must (among other things) accept responsibility (as evidenced by individual signatures) for the content of Interface's annual §404(a) report. The CEO and CFO must personally certify the content of the reports filed with the SEC and the procedures established by the issuer to report disclosures and prepare financial statements.

See Exhibit 1. The screenshot below is an extract from Exhibit 1.

248.    Interface's management signed off on the financial statements filed with the SEC when IT findings classified as material weaknesses had not been identified by Interface's management as required by §302 of the SOX Act.

249.    Interface is a US-domiciled company with public float of over $75 million (also known as "accelerated filer") and is required to comply with the new reporting rules for annual reports covering fiscal years ending after November 15, 2004,

which means Interface as an accelerated filer has even more stringent reporting requirements.

BDO USA, LLP's Responsibilities As Group Auditors for Interface

250.   BDO USA, LLP was engaged to perform an audit of Internal Control Over Financial Reporting that is integrated with an audit of Financial Statements.

251.   "Internal controls" refer to those procedures within a company that are designed to reasonably ensure compliance with the company's policies. Under the framework developed in the early 1990s by the Committee on Sponsoring Organizations (COSO), there are three types of internal controls:

(1)   Those that affect a company's operations

(2)   Those that affect a company's compliance with laws and regulations

**(3)   Those that affect a company's financial reporting**

Those controls that affect a company's financial reporting are the sole focus of §404 of the Sarbanes-Oxley Act of 2002 ("SOX").

252.   The objectives of the auditor, and therefore BDO USA, LLP in an audit of ICFR are to:

(1)   obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment about the effectiveness of ICFR (as of date) and

(2)   express an opinion on the effectiveness of ICFR in a written report, and communicate with management and those charged with governance, based on the auditor's findings.

See Exhibit 1. The screenshot below is an extract from Exhibit 1.



253.   Defendant Wesley Freeman lacked independence when overseeing the IT audit for Interface. His independence was impaired by the existence of circumstances, which reasonable people might believe likely to influence independence such as the multiple calls at all times of the day and night that Defendant Wesley Freeman had with Tom Farmer, the IT Manager at Interface who failed to identified the material weaknesses as part of the SOX audit as well as the fact that Interface was one of the first client Defendant Wesley Freeman audited when he started his career at BDO USA, LLP.

254.   The screenshot below was obtained from the U.S. Securities and Exchange Commission's Financial Reporting Manual TOPIC 4 – Independent Accountants' Involvement.

4130   Independence [S-X 2-01(b) and (c), SOX 201]

**4130.1**   Questions regarding independence should be directed to OCA. Auditor reports on financial statements that refer to PCAOB standards must comply with the independence rules of both the SEC and the PCAOB. The SEC's independence rules are promulgated in S-X 2-01. The PCAOB has also issued certain independence and ethics rules, which are part of its adopted standards. See https://pcaobus.org/. Compliance with these rules is required to issue a PCAOB opinion.

**4130.2**   S-X 2-01 is designed to ensure that auditors are qualified and independent both in fact and in appearance. Accordingly, the rule sets forth restrictions, including but not limited to, on financial, employment, and business relationships between an accountant and an audit client and restrictions on an accountant providing certain non-audit services to an audit client. These restrictions are prescribed in paragraphs (c)(1) to (c)(8) of S-X 2-01. The general standard of independence is set forth in S-X 2-01(b). The rule does not purport to, and the SEC could not, consider all the circumstances that raise independence concerns, and these are subject to the general standard in paragraph 2-01(b). In considering this standard, the SEC looks in the first instance to whether a relationship or the provision of a service: (a) creates a mutual or conflicting interest between the accountant and the audit client; (b) places the accountant in the position of auditing his or her own work; (c) results in the accountant acting as management or an employee of the audit client; or (d) places the accountant in a position of being an advocate for the audit client. See also *OCA: Application of the Commission's Rules on Auditor Independence Frequently Asked Questions* available here. *(Last updated: 10/30/2020)*

**4130.3**   SEC independence rules also apply to Regulation A, except for Tier 1 offerings where the AICPA independence standards may be applied and Regulation D filings, and when separately audited financial statements of an equity investee is included in a filing under Rule 3-09 of Regulation S-X. [Form 1-A Part F/S and *Section O: Other Independence in OCA: Application of the Commission's Rules on Auditor Independence Frequently Asked Questions*.] *(Last updated: 10/30/2020)*

255.   PCAOB standard, AS 1005: Independence, states that in all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors, which requires that the auditor be independent. The auditor must be without bias with respect to the client since otherwise, the auditor would lack that impartiality necessary for the dependability of his findings, however excellent his technical proficiency may be. However, independence does not imply the attitude of a prosecutor but rather a judicial impartiality that recognizes an obligation for fairness not only to management and owners of a business, but also to creditors and those who may

otherwise rely (in part, at least) upon the independent auditor's report, as in the case of prospective owners or creditors.

### IT Findings Identified During the Interface's Audit and Source of Reports

256.    The primary audit contacts at Interface were:

(1)    Christie Lambert, the Internal Audit Director at Interface

(2)    Joseph DiBiase, the Chief Information Officer at Interface.

(3)    Tom Farmer, the IT Manager at Interface.

These three (3) Interface's employees oversaw the audit efforts and provided the relevant documents to the Plaintiff as an employee of BDO USA, LLP. Their groups were also responsible for designing and testing the controls that were identified as significant deficiencies and material weaknesses.

257.    The results of the IT audit of Interface conducted in 2018 shows a total of **two (2) IT findings**; Plaintiff was not yet employed by BDO USA, LLP. The results of IT findings of Interface conducted in 2019 shows a total of **twenty (20) IT findings**; Plaintiff was hired by BDO USA, LLP to manage the audits.

258.    Some of the material weaknesses identified included, but were not limited to, segregation of duties issues across multiple production systems, inappropriate logical security access and change management access, and incomplete key reports utilized to test key controls.

259.    The screenshot below shows Interface 2019's IT Findings identified during the Interface's audit of Internal Control Over Financial Reporting that is integrated with an audit of Financial Statements.

Only two (2) low level severity IT Findings were identified in 2019. The 2019

Interface audit engagement was <u>not</u> performed by the Plaintiff.



260.    The screenshot below shows Interface 2020 IT Findings identified during

the Interface's audit of Internal Control Over Financial Reporting that is integrated with

an audit of Financial Statements. The 2020 Interface audit engagement was performed

by Plaintiff.











261.   BDO USA, LLP issued a clean opinion on the Interface's audit report.

262.   As of September 2021, when Plaintiff resigned, the IT findings identified in 2020 had not been remediated.

263.   Additional evidence exists and will be provided at trial.

<u>Interpreting IT Findings Identified During The Interface's Audit</u>

264.   A material weakness in ICFR exists if there is some flaw within the company's overall control system such that it is at least reasonably possible that a material misstatement in the company's financial statements will not be prevented or corrected. Such a misstatement may occur on an annual basis (either before or after an audit, or through interim financial reporting. Examples may include inadequate segregation of duties (e.g. an employee who has super administrative rights across multiple systems can authorize, approve, and review a transaction causing a significant deficiency or material weakness to go undetected), inappropriate edit rights to the financial reporting production database, or inappropriate change management controls

across multiple systems. **The significant deficiencies and material weaknesses identified during the Interface's engagements were not reported.**

265.    Under existing SEC and PCAOB rules, material weaknesses in ICFR must be publicly reported. Flaws in control systems that fall below "material" are reported within the company, either to company management or the audit committee (depending upon the severity of the flaw).

266.    Plaintiff was retaliated against, persecuted, and attacked by Defendants when she tried to report the fraud.

### Material Weaknesses Identified During the Atlanticus' SOX Audit

267.    Defendant Atlanticus, Inc. is a Georgia Profit Corporation that is publicly traded on the Nasdaq stock exchange under the ticker ATLC.

268.    Defendant Atlanticus, Inc., a public company with a class of securities registered under either Section 12 or which is subject to Section 15(d) of the Securities Exchange Act of 1934, as amended ("Exchange Act"), must file reports with the SEC ("Reporting Requirements"). The underlying basis of the Reporting Requirements is to keep shareholders and the markets informed on a regular basis in a transparent manner. Reports filed by Defendant Interface with the SEC can be viewed by the public on the SEC EDGAR website. The required reports include an annual Form 10-K, quarterly Form 10Q, and current periodic Form 8-K as well as proxy reports and certain shareholders and affiliates' reporting requirements.

269.    Defendant Atlanticus, a reporting company, has **record keeping requirements**, must **implement internal accounting controls** and is subject to the

**Sarbanes-Oxley Act of 2002,** including the CEO and CFO certifications requirements and independent auditor requirements.

Atlanticus' Responsibility To Implement Internal Accounting Controls

270.     Defendant Atlanticus is subject to the Foreign Corrupt Practices Act of 1977 ("FCPA"), which requires every US-traded company (regardless of size and place of operations), to create a system of "internal accounting controls". In the SEC's rules implementing the FCPA, this responsibility requires Atlanticus to:

(1)     Maintain books, records, and accounts which, in reasonable detail, accurately and fairly reflect the company's transactions; and

(2)     Devise and maintain internal controls sufficient to provide reasonable assurance that:

a.     Transactions are executed in accordance with management authorization;

b.     Transactions are recorded as necessary to (a) permit preparation of financial statements in conformity with GAAP and (b) maintain accountability for assets;

c.     Access to assets is permitted only in accordance with management authorization; and

d.     Recorded accountability for assets is compared with the existing assets at reasonable intervals, and appropriate action is taken regarding any differences.

Atlanticus' Responsibility To Comply With The Sarbanes-Oxley Act of 2002, Including The CEO And CFO Certifications Requirements

271.    Defendant Atlanticus is subject to the Sarbanes-Oxley Act of 2002.



272.    Under §404(a) of the SOX Act, Atlanticus is required to annually report

on Atlanticus' own assessment of the effectiveness of Atlanticus' controls. See Exhibit 2.

273.    Atlanticus' management had not identified and reported the IT findings

classified as significant deficiencies and/or material weaknesses as required under

§404(a) of the SOX Act.

274.   Under §302 of the SOX Act, Atlanticus' corporate officers must (among other things) accept responsibility (as evidenced by individual signatures) for the content of Atlanticus's annual §404(a) report. The CEO and CFO must personally certify the content of the reports filed with the SEC and the procedures established by the issuer to report disclosures and prepare financial statements. See Exhibit 2.



ex_133135.htm

275.   Atlanticus' management signed off on the financial statements filed with the SEC when the IT findings classified as material weaknesses had not been identified by Atlanticus' management.

### BDO USA, LLP's Responsibilities As Group Auditors for Atlanticus

276.   BDO USA, LLP was engaged to perform an audit of Internal Control Over Financial Reporting that is integrated with an audit of Financial Statements.

277.   "Internal controls" refer to those procedures within a company that are designed to reasonably ensure compliance with the company's policies. Under the framework developed in the early 1990s by the Committee on Sponsoring Organizations (COSO), there are three types of internal controls:

> (1)   Those that affect a company's operations

> (2)   Those that affect a company's compliance with laws and regulations

> **(3)   Those that affect a company's financial reporting**

Those controls that affect a company's financial reporting are the sole focus of §404 of the Sarbanes-Oxley Act of 2002 ("SOX").

278.   The objectives of the auditor, and therefore BDO USA, LLP in an audit of ICFR are to:

> (1)   obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment about the effectiveness of ICFR and

(2)    express an opinion on the effectiveness of ICFR in a written

report, and communicate with management and those charged with governance,

based on the auditor's findings.    See Exhibit 2.



279.    BDO USA, LLP issued a clean opinion on the Atlanticus' audit report.

280.    Plaintiff asserts that BDO USA, LLP Assurance team in charge of the

Atlanticus' engagement failed to evaluate the significant deficiencies and material

weaknesses identified and their impact on the financial statements.

281.    Defendant Wesley Freeman lacked independence when overseeing the

IT audit for Atlanticus. His independence was impaired by the existence of

circumstances, which reasonable people might believe are likely to influence

independence. Ann Nieves, the Internal Controls Manager at Atlanticus, who failed to

identify the material weaknesses as part of the SOX audit has a long-standing relationship with Defendant Wesley Freeman. Ann Nieves, the Internal Controls Manager at Atlanticus, and Defendant Wesley Freeman have worked together for several years.

282. The screenshot below was obtained from the U.S. Securities and Exchange Commission's Financial Reporting Manual TOPIC 4 – Independent Accountants' Involvement and stipulates that auditors must remain independent in fact and appearance and must not advocate for the auditee.

4130   Independence [S-X 2-01(b) and (c), SOX 201]

4130.1   Questions regarding independence should be directed to OCA. Auditor reports on financial statements that refer to PCAOB standards must comply with the independence rules of both the SEC and the PCAOB. The SEC's independence rules are promulgated in S-X 2-01. The PCAOB has also issued certain independence and ethics rules, which are part of its adopted standards. See https://pcaobus.org/. Compliance with these rules is required to issue a PCAOB opinion.

4130.2   S-X 2-01 is designed to ensure that auditors are qualified and independent both in fact and in appearance. Accordingly, the rule sets forth restrictions, including but not limited to, on financial, employment, and business relationships between an accountant and an audit client and restrictions on an accountant providing certain non-audit services to an audit client. These restrictions are prescribed in paragraphs (c)(1) to (c)(8) of S-X 2-01. The general standard of independence is set forth in S-X 2-01(b). The rule does not purport to, and the SEC could not, consider all the circumstances that raise independence concerns, and these are subject to the general standard in paragraph 2-01(b). In considering this standard, the SEC looks in the first instance to whether a relationship or the provision of a service: (a) creates a mutual or conflicting interest between the accountant and the audit client; (b) places the accountant in the position of auditing his or her own work; (c) results in the accountant acting as management or an employee of the audit client; or (d) places the accountant in a position of being an advocate for the audit client. See also *OCA: Application of the Commission's Rules on Auditor Independence Frequently Asked Questions* available here. *(Last updated: 10/30/2020)*

4130.3   SEC independence rules also apply to Regulation A, except for Tier 1 offerings where the AICPA independence standards may be applied and Regulation D filings, and when separately audited financial statements of an equity investee is included in a filing under Rule 3-09 of Regulation S-X. [Form 1-A Part F/S and *Section O. Other Independence in OCA: Application of the Commission's Rules on Auditor Independence Frequently Asked Questions.*] *(Last updated: 10/30/2020)*

283. PCAOB standard, AS 1005: Independence, states that in all matters relating to the assignment, an independence in mental attitude is to be maintained by the

auditor or auditors, which requires that the auditor be independent. The auditor must be without bias with respect to the client since otherwise, the auditor would lack that impartiality necessary for the dependability of his findings, however excellent his technical proficiency may be. However, independence does not imply the attitude of a prosecutor but rather a judicial impartiality that recognizes an obligation for fairness not only to management and owners of a business, but also to creditors and those who may otherwise rely (in part, at least) upon the independent auditor's report, as in the case of prospective owners or creditors.

<u>IT Findings Identified During the Atlanticus' Audit</u>

284. The primary audit contacts at Atlanticus were:

    (1)    Ann Nieves, the Internal Audit Director at Atlanticus.

    (2)    Kas Naderi, the Chief Information Officer ███████.

These two (2) Atlanticus' employees oversaw the audit efforts and provided the relevant documents to the Plaintiff as an employee of BDO USA, LLP. Their groups were also responsible for designing, implementing, and testing the controls that were identified as significant deficiencies and material weaknesses.

285. The results of the IT audit of Atlanticus conducted in 2018 shows a total of **four (4) IT findings**; Plaintiff was <u>not</u> yet employed by BDO USA, LLP. The results of IT findings of Atlanticus conducted in 2019 shows a total of **nine (9) IT findings**; Plaintiff was hired by BDO USA, LLP to manage the audits. Defendant Wesley Freeman had deleted IT Findings from the records in 2019. The results of IT findings of Atlanticus conducted in 2020 shows a total of **twenty-one (21) IT findings**; the year 2020 was Plaintiff's second year on the engagement.

286.    Some of the material weaknesses identified included, but were not limited to, segregation of duties issues across multiple production systems, inappropriate logical security access and change management access, and incomplete key reports utilized to test key controls.

287.    The screenshot below shows Atlanticus 2019's IT Findings identified during the Atlanticus' audit. Only four (4) low level severity IT Findings were identified in 2018. The 2018 Interface audit engagement was not performed by the Plaintiff.



288.    The screenshot below shows Atlanticus 2019 IT Findings identified during the Atlanticus' audit. The 2019 Atlanticus audit engagement was performed by Plaintiff.







289.   The screenshot below shows Atlanticus 2020 IT Findings identified during the Atlanticus' audit. The 2020 Atlanticus audit engagement was also performed by Plaintiff.









290.   BDO USA, LLP issued a clean opinion on the Atlanticus' audit report.

291.   As of September 2021, when Plaintiff resigned, the IT findings identified in 2020 had <u>not</u> been remediated.

292.   Additional evidence exists and will be provided at trial.

<u>Interpreting IT Findings Identified During The Atlanticus' Audit</u>

293.   A material weakness in ICFR exists if there is some flaw within the company's overall control system such that it is at least reasonably possible that a material misstatement in the company's financial statements will not be prevented or corrected. Such a misstatement may occur on an annual basis (either before or after an audit, or through interim financial reporting. Examples may include inadequate segregation of duties (e.g., an employee who has super administrative rights across multiple systems can authorize, approve, and review a transaction causing a significant deficiency or material weakness to go undetected without the review of that employee's

access), inappropriate edit rights to the financial reporting production database, or inappropriate change management controls across one or more production systems. **The significant deficiencies and material weaknesses identified during the Atlanticus' engagements were not reported.**

294.    Under existing SEC and PCAOB rules, material weaknesses in ICFR must be publicly reported. Flaws in control systems that fall below "material" are reported within the company, either to company management or the audit committee (depending upon the severity of the flaw).

295.    Plaintiff was retaliated against, persecuted, and attacked by Defendants when she tried to report the fraud.

<u>Unethical Behavior During a PCAOB Inspection</u>

296.    The PCAOB decided in 2021 to inspect the audit work performed by BDO USA, LLP for the 2020 audit of Atlanticus.



297. During the 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was pressured by Scott Meier, BDO IS Assurance Principal, and Kas Naderi, Chief Information Officer of Atlanticus, to provide misleading information to the PCAOB inspectors in order to address the questions.





298.   Meetings were held with Defendant Kas Naderi in order to obtain evidence that should not have been admitted or considered in the audit because the 2020 Atlanticus audit report had already been filed.





299.   Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff

if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

300.    Plaintiff was late during that call. Defendant Scott Meier, BDO IS Assurance Principal, told Defendant Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home due to the Pandemic. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

301.    During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Defendant Mark Davenport (Audit Partner), Defendant Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept using the word "dead" with emphasis in different meetings held to discuss responses to the PCAOB questions.

## Significant Deficiencies and Material Weaknesses Identified During the BioHorizons' SOX Audit

302.    Defendant BioHorizons is a Delaware Corporation that is publicly traded on the Nasdaq stock exchange under the ticker BHZN. Defendant BioHorizons is a subsidiary of Henry Schein, Inc. ("Henry Schein"). **BioHorizons and Henry Schein together are referred to herein as BioHorizons.**

303.    Henry Schein, Inc.'s stocks are traded on the Nasdaq stock market under the ticker HSIC. Henry Schein, Inc. is an American distributor of health care products and services with headquarters located in Melville, NY.

304.    Defendant BioHorizons was a publicly traded company from 2017 to 2020.

305.    Henry Schein, Inc., a public company with a class of securities registered under either Section 12 or which is subject to Section 15(d) of the Securities Exchange Act of 1934, as amended ("Exchange Act"), must file reports with the SEC ("Reporting Requirements"). The underlying basis of the Reporting Requirements is to keep shareholders and the markets informed on a regular basis in a transparent manner. Reports filed by Defendant BioHorizons and its holding company, Henry Schein, with the SEC can be viewed by the public on the SEC EDGAR website. The required reports include an annual Form 10-K, quarterly Form 10Q, and current periodic Form 8-K as well as proxy reports and certain shareholders and affiliates' reporting requirements.

306.    Defendant BioHorizons, a reporting company, has **record keeping requirements**, must **implement internal accounting controls** and is subject to the **Sarbanes-Oxley Act of 2002,** including the CEO and CFO certifications requirements and independent auditor requirements.

Defendant BioHorizons' Responsibility To Implement Internal Accounting Controls

307.    Defendant BioHorizons is subject to the Foreign Corrupt Practices Act of 1977 ("FCPA"), which requires every US-traded company (regardless of size and place of operations), to create a system of "internal accounting controls". In the SEC's rules implementing the FCPA, this responsibility requires BioHorizons to:

(1)    Maintain books, records, and accounts which, in reasonable detail, accurately and fairly reflect the company's transactions; and

(2)    Devise and maintain internal controls sufficient to provide reasonable assurance that:

a.   Transactions are executed in accordance with management authorization;

b.   Transactions are recorded as necessary to (a) permit preparation of financial statements in conformity with GAAP and (b) maintain accountability for assets;

c.   Access to assets is permitted only in accordance with management authorization; and

d.   Recorded accountability for assets is compared with the existing assets at reasonable intervals, and appropriate action is taken regarding any differences.

### Defendant BioHorizons' Responsibility To Comply With The Sarbanes-Oxley Act of 2002, Including The CEO And CFO Certifications Requirements

308.   Defendant BioHorizons is subject to the Sarbanes-Oxley Act of 2002.

BioHorizons, Inc.
SEC CIK:0001492464

BioHorizons, Inc. is incorporated in the state of Delaware  BioHorizons, Inc is primarily in the business of orthopedic, prosthetic & surgical appliances & suppliers. For financial reporting, their fiscal year ends on December 31st. This page includes all SEC registration details as well as a list of all documents (S-1, Prospectus, Current Reports, 8-K, 10-K Annual Reports) filed by BioHorizons, Inc.



309. Under §404(a) of the SOX Act, BioHorizons is required to annually report on BioHorizons' own assessment of the effectiveness of BioHorizons' controls.

See Exhibit 3. The screenshots below were extracted from Exhibit 3.



**ITEM 9.  Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**ITEM 9A.  Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

Under the supervision and with the participation of management, including our principal executive officer and principal financial officer, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this annual report as such term is defined in Rules 13a-15(e) and 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Based on this evaluation, our management, including our principal executive officer and principal financial officer, concluded that our disclosure controls and procedures were effective as of December 26, 2020 to ensure that all material information required to be disclosed by us in reports that we file or submit under the Exchange Act is accumulated and communicated to them as appropriate to allow timely decisions regarding required disclosure and that all such information is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.

*Changes in Internal Control over Financial Reporting*

The combination of acquisitions and continued acquisition integrations undertaken during the quarter and carried over from prior quarters as well as changes to the operating methods of some of our internal controls over financial reporting due to the COVID-19 pandemic, when considered in the aggregate, represents a material change in our internal control over financial reporting.

During the quarter ended December 26, 2020, we completed the acquisition of a dental business in North America with approximately aggregate annual revenues of approximately $30 million.  In addition, post-acquisition integration related activities continued for our global dental and North American medical businesses acquired during prior quarters, representing aggregate annual revenues of approximately $370 million.  These acquisitions, the majority of which utilize separate information and financial accounting systems, have been included in our consolidated financial statements since their respective dates of acquisition.

All acquisitions and continued acquisition integrations involve necessary and appropriate change-management controls that are considered in our annual assessment of the design and operating effectiveness of our internal control over financial reporting.

In addition, as a result of a combination of continued governmental imposed and Company directed closures of some of our facilities due to the COVID-19 pandemic, we have had to maintain a number of changes to the operating methods of some of our internal controls. For example, moving from manual sign-offs and in-person meetings to electronic sign-offs and electronic communications such as email and telephonic or video conference due to out-of-office working arrangements. However, the design of our internal control framework and objectives over financial reporting remains unchanged and we do not believe that these changes have materially affected, or are reasonably likely to materially affect, the effectiveness of our internal control over financial reporting.

*Management's Report on Internal Control over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Our internal control system is designed to provide reasonable assurance to our management and Board of Directors regarding the preparation and fair presentation of published financial statements. Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control-Integrated Framework (2013), updated and reissued by the Committee of Sponsoring Organizations, or the COSO Framework. Based on our

124

Table of Contents

evaluation under the COSO Framework, our management concluded that our internal control over financial reporting was effective at a reasonable assurance level as of December 26, 2020.

The effectiveness of our internal control over financial reporting at December 26, 2020 has been independently audited by BDO USA, LLP, an independent registered public accounting firm, and their attestation is included herein.

310.    BioHorizons Implant Systems, Inc. is a smaller subsidiary of Henry Schein, Inc. The Assurance team may decide that BioHorizons Implant Systems, Inc is too small a subsidiary to be material to Henry Schein, Inc and plan the audit accordingly. However, the IT findings identified as significant deficiencies and/or material weaknesses were never reported, and therefore, appropriately evaluated by the Assurance team.

311.    BioHorizons' management had not identified and reported the IT findings classified as significant deficiencies and/or material weaknesses as required under §404(a) of the SOX Act.

312.    Under §302 of the SOX Act, BioHorizons' corporate officers must (among other things) accept responsibility (as evidenced by individual signatures) for the content of BioHorizons's annual §404(a) report. The CEO and CFO must personally certify the content of the reports filed with the SEC and the procedures established by the issuer to report disclosures and prepare financial statements.

See Exhibit 3. The screenshots below were extracted from Exhibit 3.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Henry Schein, Inc.

By: /s/ STANLEY M. BERGMAN
Stanley M. Bergman
Chairman and Chief Executive Officer
February 17, 2021

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signatures | Capacity | Date |
|---|---|---|
| /s/ STANLEY M. BERGMAN<br>Stanley M. Bergman | Chairman, Chief Executive Officer and Director (principal executive officer) | February 17, 2021 |
| /s/ STEVEN PALADINO<br>Steven Paladino | Executive Vice President, Chief Financial Officer and Director (principal financial and accounting officer) | February 17, 2021 |
| /s/ JAMES P. BRESLAWSKI<br>James P. Breslawski | Vice Chairman, President and Director | February 17, 2021 |
| /s/ GERALD A. BENJAMIN<br>Gerald A. Benjamin | Director | February 17, 2021 |
| /s/ MARK E. MLOTEK<br>Mark E. Mlotek | Director | February 17, 2021 |
| /s/ MOHAMAD ALI<br>Mohamad Ali | Director | February 17, 2021 |
| /s/ BARRY J. ALPERIN<br>Barry J. Alperin | Director | February 17, 2021 |
| /s/ PAUL BRONS<br>Paul Brons | Director | February 17, 2021 |
| /s/ DEBORAH DERBY<br>Deborah Derby | Director | February 17, 2021 |
| /s/ SHIRA GOODMAN<br>Shira Goodman | Director | February 17, 2021 |
| /s/ JOSEPH L. HERRING<br>Joseph L. Herring | Director | February 17, 2021 |
| /s/ KURT P. KUEHN<br>Kurt P. Kuehn | Director | February 17, 2021 |
| /s/ PHILIP A. LASKAWY<br>Philip A. Laskawy | Director | February 17, 2021 |
| /s/ ANNE H. MARGULIES<br>Anne H. Margulies | Director | February 17, 2021 |
| /s/ CAROL RAPHAEL<br>Carol Raphael | Director | February 17, 2021 |
| /s/ E. DIANNE REKOW<br>E. Dianne Rekow, DDS, Ph.D. | Director | February 17, 2021 |
| /s/ BRADLEY T. SHEARES, PH.D.<br>Bradley T. Sheares, Ph. D. | Director | February 17, 2021 |

137

EX-32.1

Exhibit 31.1

CERTIFICATION PURSUANT TO RULE 13a-14(a) OR 15d-14(a) OF THE SECURITIES
EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE
SARBANES-OXLEY ACT OF 2002

I, Stanley M. Bergman, certify that:

1.      I have reviewed this annual report on Form 10-K of Henry Schein, Inc. (the "registrant");

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state material fact necessary to make the statements made, in light of the circumstances under which such statements were, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, present fairly material respects the financial condition, results of operations and cash flows of the registrant as of, and for, periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have;

        a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

        a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

        b)      any fraud, whether or not material, that involves management or other employees who have a role in the registrant's internal control over financial reporting.

Dated: February 17, 2021                          /s/ Stanley M. Bergman
                                                  Stanley M. Bergman
                                                  Chairman and Chief Executive Officer

Exhibit 31.2

**CERTIFICATION PURSUANT TO RULE 13a-14(a) OR 15d-14(a) OF THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Steven Paladino, certify that:

1.      I have reviewed this annual report on Form 10-K of Henry Schein, Inc. (the "registrant");

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state material fact necessary to make the statements made, in light of the circumstances under which such statements made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, present fairly material respects the financial condition, results of operations and cash flows of the registrant as of, and the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)      any fraud, whether or not material, that involves management or other employees who have a role in the registrant's internal control over financial reporting.

Dated: February 17, 2021

/s/ Steven Paladino
Steven Paladino
Executive Vice President and
Chief Financial Officer

Exhibit 32.1

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the annual report on Form 10-K of Henry Schein, Inc. (the "Company") for the period ended December 26, 2020, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Stanley M. Bergman, the Chairman and Chief Executive Officer of the Company, and I, Steven Paladino, Executive Vice President and Chief Financial Officer of the Company, do hereby certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge and belief that:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 17, 2021    /s/ Stanley M. Bergman
                                      Stanley M. Bergman
                                      Chairman and Chief Executive Officer

Dated: February 17, 2021    /s/ Steven Paladino
                                        Steven Paladino
                                      Executive Vice President and
                                        Chief Financial Officer

This certification accompanies each Report pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by the Sarbanes-Oxley Act of 2002, be deemed filed by the Company for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

313.    BioHorizons' management signed off on the financial statements filed with the SEC when IT findings classified as significant deficiencies and/or material weaknesses had not been identified by BioHorizons' management.

**BDO USA, LLP's Responsibilities As Group Auditors for Interface**

314.    BDO USA, LLP was engaged to perform the audit of BioHorizons.

315.    "Internal controls" refer to those procedures within a company that are designed to reasonably ensure compliance with the company's policies. Under the framework developed in the early 1990s by the Committee on Sponsoring Organizations (COSO), there are three types of internal controls:

    (1)   Those that affect a company's operations

    (2)   Those that affect a company's compliance with laws and regulations

    **(3)**   **Those that affect a company's financial reporting**

Those controls that affect a company's financial reporting are the sole focus of §404 of the Sarbanes-Oxley Act of 2002 ("SOX").

316.   The objectives of the auditor, and therefore BDO USA, LLP in an audit are to:

    (1)   obtain reasonable assurance about whether material weaknesses exist and

    (2)   express an opinion on the effectiveness of the controls in a written report, and communicate with management and those charged with governance, based on the auditor's findings.

See Exhibit 3. The screenshots below were extracted from Exhibit 3.

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Stockholders and Board of Directors
Henry Schein, Inc.
Melville, NY

Opinion on Internal Control over Financial Reporting

We have audited Henry Schein, Inc.'s (the "Company's") internal control over financial reporting as of December 26, 2019, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO criteria"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 26, 2019, based on the COSO criteria.

The we have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets of the Company as of December 26, 2019 and December 28, 2018, the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 26, 2019, and the related notes and schedule and our report dated February 26, 2020 expressed an unqualified opinion thereon.

Basis for Opinion

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying "Item 9A. Management's Report on Internal Control over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

Definition and Limitations of Internal Control over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Stockholders and Board of Directors
Henry Schein, Inc.
Melville, NY

### Opinion on Internal Control over Financial Reporting

We have audited Henry Schein, Inc.'s (the "Company's") internal control over financial reporting as of December 26, 2020, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO criteria"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 26, 2020, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets of the Company as of December 26, 2020 and December 28, 2019, the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 26, 2020, and the related notes and schedule and our report dated February 17, 2021 expressed an unqualified opinion thereon.

### Basis for Opinion

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying "Item 9A. Management's Report on Internal Control over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of internal control over financial reporting in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

### Definition and Limitations of Internal Control over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ BDO USA, LLP
New York, NY
February 17, 2021

106 of 407

317.   BDO USA, LLP issued a clean opinion on the BioHorizons' audit report.

IT Findings Identified During the BioHorizons' Audit

318.   The primary audit contacts at BioHorizons were:

(1)    Jay Knight, Director of Treasury, Compensation, and Risk at BioHorizons.

(2)    Elbert Jenkins, Vice-President of IT at BioHorizons.

(3)    Wanda Dobbins, Financial Systems Manager at BioHorizons.

(4)    Sandra Feagans, Human Resources Director at BioHorizons.

These three (3) BioHorizons' employees oversaw the audit efforts and provided the relevant documents to the Plaintiff as an employee of BDO USA, LLP. Their groups were also responsible for designing, implementing, and testing the controls that were identified as significant deficiencies and material weaknesses.

319.    The results of the IT audit of BioHorizons conducted in 2018 shows a total of **one (1) IT findings**; Plaintiff was <u>not</u> yet employed by BDO USA, LLP. The results of IT findings of BioHorizons conducted in 2019 shows a total of **seven (7) IT findings**; Plaintiff was hired by BDO USA, LLP to manage the audits. The results of IT findings of BioHorizons conducted in 2020 shows a total of **five (5) IT findings**; the year 2020 was Plaintiff's second year on the BioHorizons' engagement.

320.    Some of the material weaknesses identified included, but were not limited to, segregation of duties issues on financial reporting production system, inappropriate logical security access and change management access, and incomplete or missing key reports utilized to test key controls.

321.    The screenshot below shows BioHorizons 2019's IT Findings identified during the BioHorizons' audit.

Only one (1) low level severity IT Findings was identified in 2018. The 2018 BioHorizons audit engagement was <u>not</u> performed by the Plaintiff.

**BDO Roles and Responsibilities**

Roles and responsibilities for the assessment of the IT general controls on this engagement are as follows.

| Entity | Name | Office | Role | Responsibilities |
|---|---|---|---|---|
| BioHorizons | Wesley Freeman | BDO USA Atlanta | Director | Manage day to day responsibilities of the engagement to ensure that audit objectives are achieved on a timely basis. Provide open communications between the BDO team, client and Partner. Provide support to the team and detailed review of workpapers. |
| | Dale Druskella | BDO USA Atlanta | Senior Manager | Supervisor and perform the day to day responsibilities of the engagement to ensure that audit objectives are achieved. Communicate control gaps and engagement issues to the managers and review the work of less experienced staff members. |
| | Shalvi Patel | BDO USA Atlanta | Associate | Perform the testing of controls and putting together the workpaper documentation. Assist the IS Assurance Senior Manager in the day to day responsibility of the engagement. |

**Engagement Timing**

The IS Assurance team participated in meetings with the financial audit to discuss the timing of our 404 audit procedures. In conjunction with our financial statements audit, based on the risk meeting and availability of Company management, BDO will perform an initial walkthrough procedures and tests of operating effectiveness during the week of November 16, 2018 and timing of the tests of effectiveness of high risk controls within 30 days of the end of the audit period will provide sufficient assurance that controls are operating correctly throughout the period.

322.    The screenshot below shows BioHorizons 2019 IT Findings identified during the BioHorizons' audit. The 2019 BioHorizons' audit engagement was performed by Plaintiff. Seven (7) IT findings were identified.





323.     The screenshot below shows BioHorizons 2020 IT Findings identified during the BioHorizons audit. The 2020 Interface's audit engagement was also performed by Plaintiff. Five (5) IT findings were identified.





324.    BDO USA, LLP issued a clean opinion on the BioHorizons' audit report.

325.    As of September 2021, when Plaintiff resigned, most of the IT findings identified in 2020 had been remediated.

326. Additional evidence exists and will be provided at trial.

<u>Interpreting IT Findings Identified During The BioHorizons Audit</u>

327. A material weakness exists if there is some flaw within the company's overall control system such that it is at least reasonably possible that a material misstatement in the company's financial statements will not be prevented or corrected. Such a misstatement may occur on an annual basis (either before or after an audit, or through interim financial reporting. Examples may include inadequate segregation of duties (e.g., an employee who has super administrative rights across multiple systems can authorize, approve, and review a transaction causing a significant deficiency or material weakness to go undetected without reviewing that employee's access), inappropriate edit rights to the financial reporting production database, or inappropriate change management controls across the Board. **The significant deficiencies and material weaknesses identified during the BioHorizons' engagement were not reported.**

328. Under existing SEC and PCAOB rules, material weaknesses must be publicly reported. Flaws in control systems that fall below "material" are reported within the company, either to company management or the audit committee (depending upon the severity of the flaw).

329. Plaintiff was retaliated against, persecuted, and attacked by Defendants when she tried to report the fraud.

**Material Weaknesses Identified During the BlueLinx's SOX Audit**

330. BlueLinx Holdings Inc. ("BlueLinx") is a Delaware Profit Corporation that is publicly traded on the Nasdaq stock exchange under the ticker BXC.

331.   BDO USA, LLP stopped performing the audit of BlueLinx in 2021.

332.   BlueLinx, a public company with a class of securities registered under either Section 12 or which is subject to Section 15(d) of the Securities Exchange Act of 1934, as amended ("Exchange Act"), must file reports with the SEC ("Reporting Requirements"). The underlying basis of the Reporting Requirements is to keep shareholders and the markets informed on a regular basis in a transparent manner. Reports filed by Defendant Interface with the SEC can be viewed by the public on the SEC EDGAR website. The required reports include an annual Form 10-K, quarterly Form 10Q, and current periodic Form 8-K as well as proxy reports and certain shareholders and affiliates' reporting requirements.

333.   BlueLinx, a reporting company, has **record keeping requirements**, must **implement internal accounting controls,** and is subject to the **Sarbanes-Oxley Act of 2002**, including the CEO and CFO certifications requirements and independent auditor requirements.

<u>Interface's Responsibility To Implement Internal Accounting Controls</u>

334.   Defendant BlueLinx is subject to the Foreign Corrupt Practices Act of 1977 ("FCPA"), which requires every US-traded company (regardless of size and place of operations), to create a system of "internal accounting controls". In the SEC's rules implementing the FCPA, this responsibility requires BlueLinx to:

(1)   Maintain books, records, and accounts which, in reasonable detail, accurately and fairly reflect the company's transactions; and

(2)   Devise and maintain internal controls sufficient to provide reasonable assurance that:

a.     Transactions are executed in accordance with management authorization;

b.     Transactions are recorded as necessary to (a) permit preparation of financial statements in conformity with GAAP and (b) maintain accountability for assets;

c.     Access to assets is permitted only in accordance with management authorization; and

d.     Recorded accountability for assets is compared with the existing assets at reasonable intervals, and appropriate action is taken regarding any differences.

BlueLinx's Responsibility To Comply With The Sarbanes-Oxley Act of 2002,

Including The CEO And CFO Certifications Requirements

335.   Defendant BlueLinx is subject to the Sarbanes-Oxley Act of 2002.

BlueLinx Holdings Inc.
SEC-CIK #0001301787

[illegible small text]

BlueLinx Holdings Inc. is incorporated in the state of Delaware. BlueLinx Holdings Inc. is primarily in the business of wholesale lumber, plywood, millwork & wood panels. For financial reporting, their fiscal year ends on December 28th. This page includes all SEC registration details as well as a list of all documents (S-1, Prospectus, Current Reports, 8-K, 10K, Annual Reports) filed by BlueLinx Holdings Inc.

BlueLinx Holdings Inc is a United States-based distributor of building products. It operates through a network of warehouse and distribution centers. Its business products are split into two categories: structural products and specialty products. Structural products include plywood, lumber, lumber and other wood products used for structural support, walls, and flooring in construction projects. Specialty products which generate a higher portion of the revenues, include engineered wood products, moulding, siding, cedar, metal products and insulation.

Company Details

| | |
|---|---|
| Standard Industrial Number | 5031000 |
| State of Incorporation | DELAWARE |
| Fiscal Year End | 12-28 |
| Date of Filing/File Update | 2015-05-06 |
| SIC | 5031 WHOLESALE-LUMBER, PLYWOOD, MILLWORK & WOOD PANELS |
| Business Address | 4300 WILDWOOD PARKWAY MARIETTA GA 30067 |
| Business Phone | 770 551 5410 |
| Mailing Address | 4300 WILDWOOD PARKWAY MARIETTA GA 30067 |
| LEI | 549300RGFU2VXGFUF | [illegible] |

336.   Under §404(a) of the SOX Act, BlueLinx is required to annually report on BlueLinx's own assessment of the effectiveness of its controls.

See Exhibit 4. Screenshots below were extracted from Exhibit 4.

337. BlueLinx's management had not identified and reported the IT findings classified as significant deficiencies and/or material weaknesses as required under §404(a) of the SOX Act.

115 of 407

338.   Under §302 of the SOX Act, BlueLinx's corporate officers must (among other things) accept responsibility (as evidenced by individual signatures) for the content of Interface's annual §404(a) report. The CEO and CFO must personally certify the content of the reports filed with the SEC and the procedures established by the issuer to report disclosures and prepare financial statements.

See Exhibit 4. Screenshots below were extracted from Exhibit 4.

339.    BlueLinx's management signed off on the financial statements filed with the SEC when IT findings classified as significant deficiencies and/or material weaknesses had not been identified by BlueLinx's management as required under §302 of the SOX Act.

### BDO USA, LLP's Responsibilities As Auditors for BlueLinx

340.    BDO USA, LLP was engaged to perform an audit of Internal Control Over Financial Reporting that is integrated with an audit of Financial Statements.

341.    "Internal controls" refer to those procedures within a company that are designed to reasonably ensure compliance with the company's policies. Under the framework developed in the early 1990s by the Committee on Sponsoring Organizations (COSO), there are three types of internal controls:

        (1)    Those that affect a company's operations

        (2)    Those that affect a company's compliance with laws and regulations

        **(3)    Those that affect a company's financial reporting**

Those controls that affect a company's financial reporting are the sole focus of §404 of the Sarbanes-Oxley Act of 2002 ("SOX").

342.    The objectives of the auditor, and therefore BDO USA, LLP in an audit of ICFR are to:

(1)    obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment about the effectiveness of ICFR (as of date) and

(2)    express an opinion on the effectiveness of ICFR in a written report, and communicate with management and those charged with governance, based on the auditor's findings.



343.    BDO USA, LLP issued a clean opinion on the BlueLinx's audit report.

<u>IT Findings Identified During the BlueLinx's Audit</u>

344.    The primary audit contacts at BlueLinx included, but were not limited to:

(1)    Adam Bowen, the Internal Audit Director at BlueLinx.

(2)    Tim Falkins, the IT Director at BlueLinx.

(3)    Bob Cross, the Director of IT Operations at BlueLinx.

These three (3) Interface's employees oversaw the audit efforts and provided the relevant documents to the Plaintiff as an employee of BDO USA, LLP. Their groups were also responsible for designing, implementing, and testing the controls that were identified as significant deficiencies and/or material weaknesses.

345.    The results of the IT audit of BlueLinx conducted in 2017 shows a total of **seventeen (17) IT findings**; Plaintiff was <u>not</u> yet employed by BDO USA, LLP. The results of IT findings of BlueLinx conducted in 2018 shows a total of **seventeen (17) IT findings**; Plaintiff was <u>not</u> hired by BDO USA, LLP to manage the audits. The results of IT findings of BlueLinx conducted in 2019 shows a total of **twenty-six (26) IT findings**; Plaintiff was hired by BDO USA, LLP to manage the audits.

346.    Some of the material weaknesses identified included, but were not limited to, segregation of duties issues across multiple financial reporting production systems, inappropriate logical security access and change management access, and incomplete key reports utilized to test key controls.

347.    The screenshot below shows BlueLinx 2017's IT Findings identified during the BlueLinx's audit of Internal Control Over Financial Reporting that is

integrated with an audit of Financial Statements. Seventeen (17) low to medium level severity IT Findings were identified in 2017. The 2017 BlueLinx audit engagement was not performed by the Plaintiff.

348.    The screenshots below show BlueLinx 2018's IT Findings identified during the BlueLinx audit. The 2018 BlueLinx audit engagement was <u>not</u> performed by the Plaintiff.



349.   The screenshot below shows BlueLinx 2019's IT Findings identified during the BlueLinx audit. The 2019 BlueLinx audit engagement was performed by Plaintiff.







350.     BDO USA, LLP issued a clean opinion on the BlueLinx audit report.

351.     The BlueLinx 2020 audit was performed by Meldrick Wilson and Defendant Wesley Freeman. Plaintiff had started being retaliated against by Wesley Freeman in 2020 due to the Plaintiff highlighting material issues associated with the IT audits Defendant Wesley Freeman oversaw.

352.     Additional evidence exists and will be provided at trial.

<u>Interpreting IT Findings Identified During The BlueLinx Audit</u>

353.     A material weakness in ICFR exists if there is some flaw within the company's overall control system such that it is at least reasonably possible that a material misstatement in the company's financial statements will not be prevented or corrected. Such a misstatement may occur on an annual basis (either before or after an audit, or through interim financial reporting. Examples may include inadequate segregation of duties (e.g., an employee who has super administrative rights across

multiple systems can authorize, approve, and review a transaction causing a significant deficiency or material weakness to go undetected without reviewing that employee's access), inappropriate edit rights to the financial reporting production database, or inappropriate change management controls across one or more financial reporting production systems. **The significant deficiencies and material weaknesses identified during the BlueLinx's engagements were not reported.**

354.    Under existing SEC and PCAOB rules, material weaknesses in ICFR must be publicly reported. Flaws in control systems that fall below "material" are reported within the company, either to company management or the audit committee (depending upon the severity of the flaw).

355.    Plaintiff was retaliated against, persecuted, and attacked by Defendants when she tried to report the fraud. BlueLinx is not listed as a Defendants. The evidence is provided to demonstrate a pattern of fraud in the BDO USA, LLP Atlanta office.

### Material Weaknesses Identified During the NMS's SOX Audit

356.    Defendant NMS is a Georgia limited liability company and a consolidated domestic subsidiary of SPAR. NMS is owned jointly by SPAR through its indirect ownership of 51% of the NMS membership interests and by National Merchandising of America, Inc. ("NMA"), through its ownership of the other 49% of the NMS membership interests. Defendant Edward Burdekin is the Chief Executive Officer and President and a director of NMS and also is an executive officer and director of NMA.

357.    SPAR, a public company with a class of securities registered under either Section 12 or which is subject to Section 15(d) of the Securities Exchange Act of 1934,

as amended ("Exchange Act"), must file reports with the SEC ("Reporting Requirements"). The underlying basis of the Reporting Requirements is to keep shareholders and the markets informed on a regular basis in a transparent manner. Reports filed by Defendant SPAR and NMS with the SEC can be viewed by the public on the SEC EDGAR website. The required reports include an annual Form 10-K, quarterly Form 10Q, and current periodic Form 8-K as well as proxy reports and certain shareholders and affiliates' reporting requirements.

358.   SPAR, a reporting company, has **record keeping requirements**, must **implement internal accounting controls** and is subject to the **Sarbanes-Oxley Act of 2002**, including the CEO and CFO certifications requirements and independent auditor requirements.

### NMS and SPAR's Responsibility To Implement Internal Accounting Controls

359.   Defendant NMS and SPAR are subject to the Foreign Corrupt Practices Act of 1977 ("FCPA"), which requires every US-traded company (regardless of size and place of operations), to create a system of "internal accounting controls". In the SEC's rules implementing the FCPA, this responsibility requires NMS and SPAR to:

(1)   Maintain books, records, and accounts which, in reasonable detail, accurately and fairly reflect the company's transactions; and

(2)   Devise and maintain internal controls sufficient to provide reasonable assurance that:

a.   Transactions are executed in accordance with management authorization;

b. Transactions are recorded as necessary to (a) permit preparation of financial statements in conformity with GAAP and (b) maintain accountability for assets;

c. Access to assets is permitted only in accordance with management authorization; and

d. Recorded accountability for assets is compared with the existing assets at reasonable intervals, and appropriate action is taken regarding any differences.

NMS and SPAR's Responsibility To Comply With The Sarbanes-Oxley Act of 2002, Including The CEO And CFO Certifications Requirements

360. NMS and SPAR are subject to the Sarbanes-Oxley Act of 2002.



361. Under §404(a) of the SOX Act, SPAR is required to annually report on SPAR's own assessment of the effectiveness of its controls.

**See Exhibit 5. The screenshots below were extracted from Exhibit 5.**

*[Two screenshot images of financial disclosure documents appear here — text illegible.]*

362.    NMS and SPAR's management had not identified and reported the IT findings classified as significant deficiencies and/or material weaknesses as required under §404(a) of the SOX Act.

363.    Under §302 of the SOX Act, NMS and SPAR's corporate officers must (among other things) accept responsibility (as evidenced by individual signatures) for the content of Interface's annual §404(a) report. The CEO and CFO must personally certify the content of the reports filed with the SEC and the procedures established by the issuer to report disclosures and prepare financial statements.

## See Exhibit 5. The screenshots below were extracted from Exhibit 5.

ex_140226.htm

364.   NMS and SPAR's management signed off on the financial statements filed with the SEC when IT findings classified as material weaknesses had not been identified by NMS and SPAR's management as required under §302 of the SOX Act.

### BDO USA, LLP's Responsibilities As Group Auditors for NMS and SPAR

365.   BDO USA, LLP was engaged to perform an audit of Internal Control Over Financial Reporting that is integrated with an audit of Financial Statements.

366.   "Internal controls" refer to those procedures within a company that are designed to reasonably ensure compliance with the company's policies. Under the framework developed in the early 1990s by the Committee on Sponsoring Organizations (COSO), there are three types of internal controls:

(1)   Those that affect a company's operations

(2)   Those that affect a company's compliance with laws and regulations

**(3)   Those that affect a company's financial reporting**

Those controls that affect a company's financial reporting are the sole focus of §404 of the Sarbanes-Oxley Act of 2002 ("SOX").

367.   The objectives of the auditor, and therefore BDO USA, LLP in an audit of ICFR are to:

(1)     obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment about the effectiveness of ICFR (as of date) and

(2)     express an opinion on the effectiveness of ICFR in a written report, and communicate with management and those charged with governance, based on the auditor's findings.

<u>IT Findings Identified During the NMS and SPAR's Audit</u>

368.    The primary audit contact at NMS was Edward S. Burdekin.

369.    Defendant Ed Burdekin oversaw the audit efforts and provided the relevant documents to the Plaintiff as an employee of BDO USA, LLP. Defendant Ed Burdekin is also responsible for designing, implementing, and testing the controls that were identified as significant deficiencies and/or material weaknesses.

370.    Some of the material weaknesses identified included, but were not limited to, segregation of duties issues across the financial reporting production systems and the lack of monitoring controls.

See Exhibit 5. The screenshots below were extracted from Exhibit 5.





371.    BDO USA, LLP issued a clean opinion on the SPAR audit report.

372.    Additional evidence exists and will be provided at trial.

<u>Interpreting IT Findings Identified During The NMS and SPAR's Audit</u>

373.    A material weakness exists if there is some flaw within the company's overall control system such that it is at least reasonably possible that a material misstatement in the company's financial statements will not be prevented or corrected. Such a misstatement may occur on an annual basis (either before or after an audit, or through interim financial reporting. Examples may include inadequate segregation of duties (e.g., an employee who has super administrative rights across multiple systems can authorize, approve, and review a transaction causing a significant deficiency or material weakness to go undetected without reviewing that employee's access), inappropriate edit rights to the financial reporting production database, or inappropriate change management controls across the Board. **The significant deficiencies and material weaknesses identified during the NMS and SPAR's engagements were not reported.**

374.   Under existing SEC and PCAOB rules, material weaknesses must be publicly reported. Flaws in control systems that fall below "material" are reported within the company, either to company management or the audit committee (depending upon the severity of the flaw).

375.   Plaintiff was retaliated against, persecuted, and attacked by Defendants when she tried to report the fraud.

### Burglary At Plaintiff's Home And In Her Storage Unit

376.   Plaintiff left her home to meet with her then attorney Michael Sullivan and Walter Jospin from Finch McCranie on July 29th, 2021 to discuss the whistleblower case. When Plaintiff returned, she noted that her home had been broken into because her safe was opened.

377.   Plaintiff notes that the only parties with knowledge of her whereabouts or that she had left her unit on July 29th, 2022 were Walter Jospin, Michael Sullivan, Beacon Management's employees and contractors as well as the 1280 West's Board members, management, the building's employees/contractors, and Plaintiff's neighbors living on the same floor (21st floor).

378.   In order to access the 1280 West building, visitors must stop by the concierge desk. The concierge will call the homeowner and ask whether the guest should be let up to the unit. In addition, the elevators at 1280 West are "smart" elevators. Smart elevators operate by passengers first selecting the floor they wish to travel to, instead of pressing an up or down button. Passengers are then directed to an elevator that will transport them to their destination with the fewest number of stops on the way. The 1280 West elevators prevent tailgating because a guest cannot access the residential area and

move between floors without an access card. Access cards are reserved for residents, 1280 West Management, authorized Beacon Management's employees and contractors, as well as authorized third-parties. Access cards are not issued lightly and a list of people with an access card is maintained in the 1280 West Management office located at 1280 West Peachtree ST NW Atlanta, GA 30309. Furthermore, it is impossible to access the 1280 West building through the parking without an access card.

379. Plaintiff claims that the following individuals and entities listed below: Beacon Management Services, Lisa Simmons, Steven Weibel, Michael Shinners, Nadia Taylor, 1280 West Condominium Association, 1280 West Board of Directors (Micah Kurtzberg, Ronnie Bridges, Michael Shaffer, Brett Dettmering, and Rohan Rupani), and Justin Mungal are responsible for allowing unauthorized individuals or have broken into Plaintiff's home themselves in order to facilitate the harassment and retaliation perpetuated by BDO USA, LLP and as retaliatory act for suing the 1280 West Board members in a separate class action lawsuit.

380. Plaintiff's privacy was violated. Plaintiff's personal information such as bank account information, social security number, HIPAA protected health information, life insurance, health insurance information, and passwords to websites had been accessed and stolen.

381. Plaintiff called the non-emergency line of the police the next day of the break-in because it was already late when Plaintiff noticed the crime. Officer Caleb responded to the call. Upon her arrival at the scene of the crime on June 31st, 2021, Officer Caleb had already decided that she was not going to write a police statement for

the crime Plaintiff was reporting. In addition, Officer Caleb had declined to look at the cameras.

382.   Plaintiff had to wait several days to discover that the police report was classified as a non-crime. As soon as Plaintiff realized the enormous mistake, Plaintiff went to the Precinct at CNN. Plaintiff talked to Officer Caleb who refused to update the report. Plaintiff talked to Officer Caleb's supervisor who referred her to Detective Finney at Precinct 1. Officer Caleb's Supervisor told Plaintiff that only Detective Finney at Precinct 1 could update the police report.

383.   Plaintiff then visited Precinct 1 in order to talk to Officer Finney. Unfortunately, Officer Finney was not present. An officer at Precinct 1 sent Plaintiff to the main police station in Downtown Atlanta.

384.   Plaintiff talked to Officer Derrell at the main police station in Downtown Atlanta and Officer Derrell explained that the responding officer at Zone 5 would be responsible for updating the police report.

385.   Plaintiff reached out to Officer Finney again and he refused to update the report. Plaintiff then talked to Officer Finney's supervisor, Lieutenant Dawson.

386.   Lieutenant Dawson called Precinct 5 and arranged for Officer Caleb to go back to the Plaintiff's unit on September 2nd, in order to retake Plaintiff's full statement, dust for fingerprints, and review the camera footage.

387.   Plaintiff's unit was accessed by someone with the keys to her unit. Only the building management has a copy of the Plaintiff's keys because it is required by the 1280 West Governing documents, which Plaintiff explained to Officer Caleb.

388.    Despite the fact that Plaintiff had explained to Officer Caleb that someone in the management's office could be involved, Officer Caleb was not discreet enough when talking with the building management. Officer Caleb laid down the scope of her activities in Plaintiff's unit and what Officer Caleb would do or would not do in front of the 1280 West management who are listed as Defendants in this lawsuit.

389.    Officer Caleb took Plaintiff's updated statement, dusted for fingerprints, and refused to look at the camera footage. Officer Caleb stated "I am not being paid the big bucks."

390.    Plaintiff's unit was again accessed on August 28th, 2021. During Officer Caleb's second visit to Plaintiff's unit, Plaintiff explained to Officer Caleb that Plaintiff had video footage showing that someone had accessed Plaintiff's unit again on August 28th, 2021 when Plaintiff was away from home. Officer Caleb did not request Plaintiff to provide a copy of the video.

391.    Officer Caleb took notes of the new security system Plaintiff had installed during her second visit.

392.    On September 3rd, 2021, Plaintiff's unit was again accessed without her authorization. The intruders knew how to enter the premises and where the cameras were located because the cameras were turned away from whoever accessed Plaintiff's unit.

393.    Officer Caleb indicated a Detective would be in touch with Plaintiff, but has not provided a contact information. Plaintiff has not heard back from the police since then.

394.    Plaintiff's storage unit was also broken into by members of the management's team in order to access information about Plaintiff's personal life.



395.   Plaintiff's relationship with Beacon Management and the 1280 West Board of Directors are strenuous. Plaintiff is part of a separate balcony lawsuit against 1280 West Board of Directors and Beacon Management.

396.   Plaintiff has also moved to stop a multi-million dollars renovation project started by the 1280 West Board of Directors at the height of the pandemic in 2020 and 2021.

397.    Unfortunately, Plaintiff is required to have a copy of her home's key on file with the 1280 West management as shown in this excerpt taken from the 1280 West Bylaws.

> (d)    Unit Keys. At the request of the Association, each Residential Unit Owner, by acceptance of a deed to a Unit, agrees to provide the Association with a key to the Unit (and the security alarm code, if any) to be used by the Association for maintenance, emergency, security or safety purposes as provided in subparagraph 9(a) of this Declaration (and for pest control, if necessary, as provided in subparagraph 21(e) of this Declaration). Neither Declarant nor the Association shall be liable for any loss or damage due to its holding such key, or use of such key for the purposes described above and each Owner shall indemnify and hold harmless Declarant, the Association and its officers and directors against any and all expenses, including attorneys' fees, reasonably incurred by or imposed upon Declarant, the Association or its officers or directors in connection with any action, suit, or other proceeding (including settlement of any such action, suit or proceeding) brought by the Owner or the

- 41 -

371449_3.DOC / 11061.004
1280 West Condominium

:SKOT(776286), Rq:412,46

Deed Bk 39318 Pg  475

Owner's family, tenants, guests, employees, invitees, or licensees against Declarant, the Association, its officers or directors arising out of or relating to its holding or use of such key for the purposes described above.

398.    Plaintiff reviewed the 1280 West video tapes and noted that one neighbor living in Unit 2110 had a "management" key in his hand as evidenced by the special type of key chain he was holding in his hand.



399.   Plaintiff requested a meeting with the 1280 West Board of Directors.

 Gmail

Raisaa Kengna <rkengna1@gmail.com>

## 1280 West: Illegal Entry In My Unit - Board Meeting Request

15 messages

Michael Shinners <mshinners@1280westhoa.com>
To: Raisaa Kengna <rkengna1@gmail.com>

Wed, Sep 1, 2021 at 6:11 PM

Raesaa

The Board will meet next Wednesday September 8th at 7:00PM via zoom. Will that date work for you? If so, I will let the Board know and confirm back to you with the zoom link.

I look forward to your reply

Regards

Michael



Michael Shinners; CMCA, AMS, PCAM

General Manager, 1280 West.

Phone: 404-873-2582, ext. 13

Email: mshinners@1280westhoa.com



From: Raissa Kengne <rkengne1@gmail.com>
Sent: Wednesday, September 1, 2021 7:45 PM
To: Michael Shinners <mshinners@1280westhoa.com>
Subject: Re: 1280 West: Illegal Entry In My Unit - Board Meeting Request

Michael,

I will call in once I have the link.

Sincerely,

Raissa -

[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]

Michael Shinners, CMCA, AMS, PCAM

[Quoted text hidden]

Raissa Kengne <rkengne1@gmail.com>                          Wed, Sep 1, 2021 at 10:04 PM
To: Michael Shinners <mshinners@1280westhoa.com>

Michael,

Thank you for scheduling the meeting with the board. I appreciate your prompt action.
As we discussed on the call, no one has access to my unit. No one is authorized to access my unit without my
permission, not even my father, Jean-Raphael. When my father visits, he is a guest and his key card is only activated
at that time. My father has not visited for more than two years and lives on a different continent; it is therefore unlikely
that he has accessed my unit in my absence.

Should you have any questions, please do not hesitate to contact me.

Thank you again for your time and assistance.

Sincerely,

400.    Plaintiff noted that Defendant Michael Shinners had gone to extra lengths

in order to block Plaintiff access to information to determine who broke into Plaintiff's

unit.

1280 West: Illegal Entry In My Unit 2109                    https://mail.google.com/mail/u/0?ik=bad1e090&view=pt&search=a

 Gmail                                     Raissa Kengne <rkengne1@gmail.com>

## 1280 West: Illegal Entry In My Unit 2109
1 message

Michael Shinners <mshinners@1280westhoa.com>          Fri, Sep 3, 2021 at 9:08 AM
To: Raissa Kengne <rkengne1@gmail.com>

Raissa,

I will send this onto the Board of Directors.

Regards,

Michael



Michael Shinners, CMCA, AMS, PCAM

General Manager, 1280 West

Phone: 404-873-2582, ext. 13

Email: mshinners@1280westhoa.com

From: Raissa Kengne <rkengne1@gmail.com>
Sent: Friday, September 3, 2021 8:25 AM
To: Michael Shinners <mshinners@1280westhoa.com>
Subject: Illegal Entry in My Unit 2109

Dear Michael:

I would like you to forward this email to the board.

9/6/2021, 2:20 ˈ

149 of 407

: Illegal Entry in My Unit 2109                    https://mail.google.com/mail/u/0?ik/6b1d/94905x&view-pt&&search=...

Michael Shinners and the staff at 1280 West have been uncooperative in fulfilling my request to the Board.

My request to the Board was to support my efforts and the police efforts by authorizing the release of information, including cameras and logs to help identify the criminals who have entered my unit.

There has been a willful effort by Michael Shinners to prevent the identification of the person who entered my unit by limiting my access to evidence that will help protect me and keep me safe:

I can only guess there is a material conflict of interest because Michael Shinners and some members of his staff are complicit in the violation of my privacy and the destruction of evidence in a federal matter. I would say Spencer went above and beyond to stop me from looking at the cameras claiming he had a law enforcement background. Spencer interrogated me on 09/03 and asked me why the police had not provided a copy of the report in the most rude tone. I responded to me that if he had really been in law enforcement he would have known that it may take up to 10 days for the police report to be available. A police report is not issued on site.

In addition, the unprofessionalism that Michael Shinners exhibited by not keeping the details of the crime confidential and stating to my face that "there was nothing confidential in what I had said to the Board" is highly proof that he is not taking his task if helping me or the police seriously.

I was only provided access to hallway footage for August 29th and was denied access to elevator cameras and system generated logs to identify the criminals.

Please note that the video for August 29th I looked at was edited. In addition, the system does not record the motions automatically. Someone had to watch the video and create bookmarks, which are ultimately what they refer to as motions. Therefore, by only allowing me to look at motions and not the full timeframe, they are restricting the access to evidence and hiding who the perpetrators are.

It is crucial that the recordings do not get deleted and blamed on ineptitude.

I want to remind the board that it is my life that is in danger and that I have received death threats. By not fully assisting me and the police, the Board is putting itself in a legal liability situation unlike any you have seen before at 1280 and as usual it is because of Beacon management.

My requests during the meeting stands, I would ask the Board to put their response in writing,

401.    Plaintiff met with the Board Members, but no satisfying resolutions were achieved.

402.    Plaintiff tried to follow-up on the investigation with Deputy Chief Peek, but has not received a response.

Peek, Timothy D <TPeek@atlantaga.gov>
To: Rai Kengne <rakengne@gmail.com>, "Hampton, Charles" <CRHampton@atlantaga.gov>, "West, Kisha"
<KDWest@atlantaga.gov>                                                                    Sat, Sep 4, 2021 at 8:43 PM
Good evening Ms. Kengne,

I am in receipt of your concern, I will look into your case and follow up with you.

Sincerely,
Deputy Chief T. D. Peek

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

From: Rai Kengne <rakengne@gmail.com>
Sent: Saturday, September 4, 2021 5:26:24 PM
To: Peek, Timothy D <TPeek@AtlantaGa.Gov>; Hampton, Charles <CRHampton@AtlantaGa.Gov>
Subject: [EXTERNAL] Police Report #212110752 - Meeting Request

[Quoted text hidden]

403.    Plaintiff also tried to follow-up on the investigation by contacting Major

Spann to no avail.

Re: Police Report #212110752 - Meeting Request          https://mail.google.com/mail/u/0/...lsksdei42&esimpl=p&search=all&...

**M** Gmail                                                   Rai Kengne <rakengne@gmail.com>

**Police Report #212110752 - Meeting Request**
3 messages

Rai Kengne <rakengne@gmail.com>                             Sat, Sep 4, 2021 at 5:19 PM
To: apdwebmaster@atlantaga.gov
Cc: rakengne@gmail.com
Dear Major Spann:

My name is Raissa Kengne and I live in Midtown Atlanta, GA 30309. I am writing you because my home was accessed
without my authorization and because the handling of the case by Officer Caleb and her Supervisor led to evidence being
inadmissible.

On July 29th, 2021 after I left my home around 1:30 pm someone accessed my unit. I called the non-emergency line of the
police the next day because it was already late when I noticed the crime. Evidence from my safe had been deleted. In
addition, my personal information had been stolen, including health information, bank account information, business files,
and personal identification.

404.    Plaintiff reached out directly to the Chairman of the SEC because the

crime was no longer only a white-collar crime.



405. Because of the Burglary, Plaintiff has also been obligated to, urgently and via Express mail, reach out to all the businesses with a relationship to her as shown on the screenshot below.

STATE OF GEORGIA        §

COUNTY OF FULTON        §

THE UNDERSIGNED HEREBY DECLARES THAT

I, Raissa Djuissi Kengne, with a mailing address of 1280 West Peachtree, ST NW Unit 2109 City of Atlanta, State Georgia hereby revoke all Powers of Attorney executed prior to the 21 day of August, 2021, made by me or on my behalf. No appointments are hereby made. My bank Account numbers are:
- Account Number 0116616186
- Loan Number 2020004139

By the present letter, I request that any actions and decisions made by your institution, using a Power of Attorney and/or other Authorization forms that appear to be signed by me, be reversed.

Due to the fact that my computer and phones have been hacked and my domicile has been broken into, the unauthorized access to my personal information may have been utilized in order to defraud my person.

Could you please notify me of any actions and/or inquiries that have been taken or requested using a Power of Attorney and/or any other Authorization Forms that appear to be signed by me? My contact information is below.

IN WITNESS WHEREOF, I have hereunto set my hand on this the 22 day of August, 2021.

RAISSA DSUISSI KENGNE
Printed Name of Principal                    08/22/2021

Signature of Principal

1280 West Peachtree ST NW Unit 2109
Atlanta, GA 30309
Telephone: 470-807-3298
Email: rkengne1@gmail.com

406.    In addition, to the retaliatory practices and attacks presented herein, Plaintiff was fearing for her life and her family's lives because Defendant Antony Reh, an Assurance Partner at BDO, had stated that Plaintiff "and her family should be careful".

407.    Plaintiff also feared for her and her family's lives because Defendant Mark Davenport, an Assurance Partner at BDO, and Defendant Peter Poppo, an Assurance Partner at BDO, kept using the word "Dead" with emphasis during the PCAOB inspection when BDO was committing fraudulent actions and was advocating for the client Atlanticus.

408.   Plaintiff had lost contact with her family during this time. Plaintiff's

phones have been spoofed. Plaintiff's computers had been hacked during the several

break-ins, including the one in the Month of June 2021.

### Harassment And Intimidation

409.   Plaintiff received several harassing communications on her personal cell

phone and filed multiple police reports.

ATLANTA POLICE DEPARTMENT SUMMARY SUPPLEMENT REPORT

REPORT NUMBER: 212125012



**INCIDENT INFORMATION**

| INCIDENT CODE | INCIDENT TYPE | | INITIAL | DATE/TIME STARTED | DATE/TIME ENDED | DATE/TIME REPORTED |
|---|---|---|---|---|---|---|
| SUPPLEMENT | SUPPLEMENTAL REPORT | | SUPP  X | 08/05/2021 12:13 PM | 08/05/2021 12:13 PM | 08/19/2021 10:51 AM |
| REPORT FILED FROM | TRACKING NUMBER | | LOCATION OF OCCURRENCE | | | APPROVED BY |
| ••• | 121006655 | | 1230 West PEACHTREE ST NW Street, 2109, Atlanta, GA | | | 3565/Joe Wagner |
| LOCATION TYPE | THEFT TYPE | | METHOD OF ENTRY | METHOD OF EXIT | PT OF ENTRY | PT OF EXIT | ENTRY LOG |

**PERSON LISTINGS**

| | TYPE | LAST NAME | FIRST NAME | MIDDLE NAME | DOB | RACE | | SEX | DRIVER LIC NO | LIC ST |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | VICTI | KENGNE | RAISSA | | ••• | ••• | | | | |
| | SSN | ETHNICITY | RESIDENT | EYE COLOR | HAIR COLOR | AGE | HEIGHT | WEIGHT | CELL PHONE | |
| | EMAIL | | RESIDENCE ADDRESS | | | | | HOME PHONE | | |
| | raissa.kengne@atapouse.com | | ••• | | | | | | | |
| | EMPLOYER NAME | | BUSINESS ADDRESS | | | | | WORK PHONE | | |
| | | | ••• | | | | | | | |

**NARRATIVE**

Dear Mrs., Mr.:
I keep receiving unwanted and unsolicited communication text messages and calls from the same people who have been texting me and calling me. I keep blocking their phone numbers, but they keep calling with different numbers. I am on a "do not call list", but apparently criminals do not respect that law.
I would like this harassment to stop and I would appreciate your assistance.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

Raissa Kengne

**INCIDENT IMAGE**

ATLANTA POLICE DEPARTMENT SUMMARY INCIDENT REPORT

REPORT NUMBER: 212125012



### INCIDENT INFORMATION

| INCIDENT CODE | INCIDENT TYPE | | INITIAL X | DATE/TIME STARTED | DATE/TIME ENDED | DATE/TIME REPORTED |
|---|---|---|---|---|---|---|
| HARASSING | All Other Offenses (90Z) | | SUPP | 07/30/2021 10:12 PM | 07/30/2021 10:12 PM | 07/30/2021 10:36 PM |
| REPORT FILED FROM | TRACKING NUMBER | | LOCATION OF OCCURRENCE | | | APPROVED BY |
| | T2100SS66 | | 1280 West Peachtree ST NW Street, 2109, Atlanta, GA | | | 3963\Joe Wagner |
| LOCATION TYPE | THEFT TYPE | | METHOD OF ENTRY | METHOD OF EXIT | PT OF ENTRY PT OF EXIT | ENTRY LOC |
| Cyberspace | | | | | | |

### PERSON LISTINGS

| | TYPE | LAST NAME | FIRST NAME | MIDDLE NAME | DOB | RACE | | SEX | DRIVER LIC NO | LIC ST |
|---|---|---|---|---|---|---|---|---|---|---|
| | VICTI | Kengne | Raissa | | | | | | | |
| 1 | SSN | ETHNICITY | RESIDENCY | EYE COLOR | HAIR COLOR | AGE | HEIGHT | WEIGHT | CELL PHONE | |
| | EMAIL raissa.kengne@alapousse.com | | | RESIDENCE ADDRESS | | | | HOME PHONE | | |
| | EMPLOYER NAME | | | BUSINESS ADDRESS | | | | WORK PHONE | | |

### NARRATIVE

Dear Mrs., Mr.:

I have been receiving unwanted and unsolicited communication text messages and calls from the phone numbers 1(704)270-6622 and 1(833)702-7047. The same people have been texting me and calling me, I keep blocking their phone numbers, but they keep calling with different numbers. I am on a "do not call list", but apparently they do not respect that law. I would like this harassment to stop.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

Raissa Kengne

### INCIDENT IMAGE

410.   Plaintiff communicated with Investigator Stroner about the harassing communication who first appeared dismissive about the complaint.

8/19/2021 RAISSA DJUISSI KENGNE Mail - your police report- harassing communications

 Gmail

Raissa Kengno <raissa.kengne@alapousse.com>

## your police report- harassing communications

Raissa Kengne <raissa.kengne@alapousse.com>
To: "Stroner, Kevin W." <KWStroner@atlantaga.gov>

Tue, Aug 3, 2021 at 8:25 PM

Dear Officer Stroner:

I hope this email finds you well.

Thank you for your prompt response.

Under Georgia law, it is illegal to contact another person repeatedly via phone, email, text message, or any other form of electronic communication for the purpose of harassing, threatening, or intimidating a person or family of such. The state of Georgia has criminalized the offense of making harassing communications to another. There are several different acts that fall under this statute at O.C.G.A.§ 16-11-39.1. Harassing communications is a misdemeanor offense in Georgia, which means the maximum punishment is 12 months and a $1,000 fine for each offense.

The messages are not at first impression physically threatening, but they are definitely harassing and cause a threat to my mental health and well being.
The purpose of the communication is without a doubt to harass me. There is intent and repetition. These text messages are not random and I believe I am being harassed by the same group of individuals.

I would greatly appreciate your assistance with investigating my complaint.

Should you have any questions or need further information from me, please do not hesitate to contact me.

Sincerely,

Raissa –

Raissa Kengno
A La Pousse
www.alapousse.com
Email: raissa.kengne@alapousse.com
Tel: 404-932-6576


À LA POUSSE

On Mon, Aug 2, 2021 at 5:52 PM Stroner, Kevin W. <KWStroner@atlantaga.gov> wrote:
Hello Ms. Kengne-   I'm sorry you are getting too many unwanted communications.   I think all of us do. If they are threatening in any way, please advise us.   Blocking the unwanted numbers is the best suggestion I have:

Thank you,.

https://mail.google.com/mail/u/0?ik=0f73e3275&view=pt&search=all&permmsgid=msg-a%3Ar783301213390753234&&dsqt=1&simpl=msg-a%3A/76...   1/2

8/19/2021 RAISSA DJUISSI KENGNE Mail - your police report- harassing communications

Inv. K. Stroner
Atlanta Police General Crimes Unit
404-546-5726
KWStroner@atlantaga.gov

411.   Plaintiff then received another communication from Detective Stroner

who indicated that the incidents were being investigated



### CITY OF ATLANTA

Keisha Lance Bottoms
Mayor

226 Peachtree St. SW
Atlanta, Georgia 30303
(404) 546-6000

Atlanta Police Department
Rodney Bryant
Chief of Police

Case # 212125012

Dear Mr. Kengne,

This notice is to inform you a report you made to the Atlanta Police Department is being investigated by the Zone 6 Criminal Investigations Unit.

Feel free to call me, or e-mail me about your case, especially if you have further evidence or information regarding your case. There might be a clue or piece of evidence that the responding officer did not document in his / her report, and I want to make sure we have examined all possible leads.

Please call between 4 pm to midnight, Sunday through Thursday, or send an email. My contact information is as follows:

Investigator K. Stroner
City of Atlanta Police Department
General Crimes Unit
Office Phone: 404-546-5726
Email: KWStroner@atlantaga.gov

Thank you.

Inv. K. Stroner

APD
711 Fulton Ind. Blvd.
Atlanta, GA 30336

Raissa Kengne
1280 West Peachtree St. NW # 2109
Atlanta, GA 30309

412.    Plaintiff also filed a complaint against her neighbor Defendant Justin Mungal who lives in unit 2108 at 1280 West Peachtree ST NW Atlanta, GA 30309.

413.    According to Defendant Justin Mungal, he mistakenly received a USCIS letter addressed to the Plaintiff. The USCIS letter in question was an immigration letter that the Plaintiff needed as she was in the process of becoming a United States ("US") Citizen. Defendant Justin Mungal turned over the letter to the Plaintiff and stated he was waiting to hear the Plaintiff come home at night in order to deliver the letter to the Plaintiff. Plaintiff believes that it was an intimidation technic from the Defendants since the Plaintiff needed the letter from the USCIS as a step to become a US Citizen.

414.    Defendant Justin Mungal stated to the Plaintiff "Raissa do you need any help because I am busy and I have a job". Plaintiff had recently resigned from her position at BDO USA, LLP and had not shared her job status with Defendant Justin Mungal.

415.    Thereafter, Defendant Justin Mungal repeatedly told the Plaintiff that he worked for BDO USA, LLP. Plaintiff believes that Justin Mungal was spying on Plaintiff and may have himself broken into the Plaintiff's unit.

416.    Defendant Justin Mungal also stated to the Plaintiff that "she should not let her important documents lay around. Banks have lockboxes." The Plaintiff had her $1,000,000 State Farm life insurance policy documents in plain sight in her living room for several weeks. Plaintiff believes that Justin Mungal was one of the perpetrators who broke into her unit.

417.    Defendant Justin Mungal has knocked on Plaintiff's door at all times of

the day and night over several months starting in February 2022. Plaintiff has called 911

and filed a report with the Atlanta Police department.



418.    Plaintiff owns two parking spaces at 1280 West condominium. The 1280

West management has left several unwarranted notices on her car, sometimes with the

threat of towing the vehicle.



419.    Plaintiff was subject to overt and subtle persecutions at BDO USA as well. As Plaintiff took the stand of performing the IS Assurance work with due diligence and refused to obey Wesley Freeman's tacit command to "stop doing my job so well" as Wesley Freeman stated one day, Wesley Freeman launched a smear campaign against Plaintiff.

420.    Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation. These junior associates included Shaivi Patel, Meldrick Wilson, and Dylan Lee.

421.    It went so far that a Partner, Peter Popo, asked to talk to Plaintiff and stated that he has never heard so many bad things mentioned about someone's behavior; usually what he hears is the bad work someone does. In the Plaintiff's case, it was the opposite. These associates enlisted to smear Plaintiff's reputation were part of the group who delivered such a poor work product as described herein.

422.    Plaintiff's performance goals were changed in the system without her consent. Plaintiff notified Human Resources at BDO USA, LLP.



423.    Plaintiff received an unwarranted disciplinary warning for duplicate CPE attendance. Plaintiff contacted Human Resources and fought to have the disciplinary removed from her file. Plaintiff believes that it was also a form of intimidation technic she faced while reporting the fraud in the Atlanta office of BDO USA, LLP.

### Computer and Phone Hacking

424.    Plaintiff's home was accessed multiple times without her authorization and her data was compromised.

425.    Plaintiff reached out to Google Support to let them know of the unauthorized access on the Gmail account rkengne1@gmail.com.

426.    Plaintiff is now unable to access her Gmail account rkengne1@gmail.com.

8/20/2021                        RAISSA OLEMGO KENGNE Mail - Your chat transcript for Case #35170429

 Gmail                              Raissa Kengne <raissa.kengne@slapousso.com>

## Your chat transcript for Case #35170429
1 message

Google Workspace Support <workspace-support@google.com>          Fri, Aug 20, 2021 at 2:11 PM
To: "raissa.kengne@slapousso.com" <raissa.kengne@slapousso.com>

## Google Workspace

Hello there,

Thank you for contacting the Google Workspace Support team. This is an
automated email to confirm support case 35170429 has been created from your
recent chat. If you have anything additional you would like to add, simply reply to
this email.

Here are some details about your case:

Subject: I have noted that a third party access app was connected to my account
and was able to read the data. I removed that app today. The app was Microsoft
Global Careers. Could you please provide me with more information about when
was that third-party allowed
Chat transcript:
Chat started: Fri, 20 Aug 2021 10:36:50 -0700
Google Workspace Support, Geraldine: Thank you for contacting Google
Workspace Support. My name is Geraldine and I'll be working with you today. While
I read over your message, is there anything else you'd like to add?
Raissa Kengne: No.
Google Workspace Support, Geraldine: Hello Raissa, It's a pleasure to have you
with us today! I hope you are doing great.
Raissa Kengne: Hello Geraldine: Thank you.
Raissa Kengne: I have noted that a third party access app was connected to my
account and was able to read the data. I removed that app today. The app was
Microsoft Global Careers. Could you please provide me with more information
about when was that third-party allowed to connect to my account and who

https://mail.google.com/mail/u/0?ik=b073e3275&view=pt&search=cat=all&permthid=thread-f%3A1706636595624437418&simpl=msg-f%3A1706636595...

RAISSA [t address] Mail - Your chat transcript for Case #15(10425

approved the connection? I would also like to have a copy of all the information that
application was able to obtain and see.

Google Workspace Support, Geraldine: Thank you for that information

Google Workspace Support, Geraldine: I understand that you need assistance
about the information on how the 3rd party applications allowed to connect to your
account and who can be approved it. No worries, I'll do my best to help you with
your concern.

Raissa Kengne: Thank you.

Google Workspace Support, Geraldine: May I know the device that you are using?

Raissa Kengne: I am currently on a laptop.

Raissa Kengne: Lenovo laptop

Google Workspace Support, Geraldine: Thank you, Raissa.

Google Workspace Support, Geraldine: Allow me to check this for you.

Google Workspace Support, Geraldine: Please bear with me here.

Google Workspace Support, Geraldine: Thank you for patiently waiting, Raissa!

Raissa Kengne: Yes.

Google Workspace Support, Geraldine: Regarding to this concern, the only way we
can check those 3rd- party services that was access by your account is by going to
the Admin console > Security > API controls.

Google Workspace Support, Geraldine: This will show up all the applications which
includes your Google Services and 3rd party application services.

Google Workspace Support, Geraldine: As of the moment, we can't determine
when was the 3rd party allowed to connect to your account. It only shows under
API control that there's a service that was recently access by your account which is
not Google-verified. Based on the settings you have, I confirmed that you set to
"Trust Internal, domain-owned apps". Which is allowed the Google Workspace
account to use to login on any 3rd party application.

Google Workspace Support, Geraldine: When you access a service or a 3rd party
application this will trigger an prompt message that this service will be accessing
some data to your account and if we allowed or accept it this will show up from your
API list control and if you click the application, it will show up the requested
services. This can be found in the Admin console under Security > API controls >
Manage third party app access.

Google Workspace Support, Geraldine: For reference, here's the link
https://support.google.com/a/answer/7281227

Raissa Kengne: That app was not "Internal or domain-owned".

Raissa Kengne: I am trying to say that I did not allow the app to connect to my
computer.

Raissa Kengne: What information can you provide about that app? Please note that
the email associated with the app was msglobalcareersppe@gmail.com.

427.    Plaintiff claims that BDO USA, LLP had not fully removed the Intune
application from Plaintiff's personal cell phone she utilized for work as Plaintiff had

requested at the height of the attacks. Plaintiff contacted IT support at BDO USA, LLP to ask them to remove the software several times, including on November 21st, 2021. BDO USA, LLP was still able to access information on Plaintiff's cell phone and read her data afterwards.



428.  Plaintiffs noted that the following neighbors had a remote desktop connection on her personal laptop:

(1)  Jamie Johnson, living in unit 2009 at 1280 West Peachtree ST NW Atlanta, GA 30309.

(2)  Silvia Calloway, living in unit 2209 at 1280 West Peachtree ST NW Atlanta, GA 30309.

(3)  Sirocus Barnes, living in unit 2010 at 1280 West Peachtree ST NW Atlanta, GA 30309.

**Bribery Attempt**

164 of 407

429.    Plaintiff claims that the high increase in salary was an attempt at a bribe.
When Defendant Anthony Reh, Assurance Partner in the BDO USA, LLP Atlanta office,
met with Plaintiff Raissa Djuissi Kengne to discuss her performance evaluation, and
announced her pay increase, Defendant Anthony Reh stated "you should take it".



430.    Plaintiff advised Defendant Finch McCranie that she had received a pay
increase of approximately 12% and that Plaintiff was up for promotion. Defendant
Michael Sullivan stated "well, that is a good thing".

**The Plaintiff's Contract With Finch McCranie**

431.    Defendant Finch McCranie is a Georgia Limited Liability Partnership
with a business address located at 225 Peachtree St NE #1700, Atlanta, GA 30303.

432.    Plaintiff Raissa Djuissi Kengne signed the engagement letter with
Defendant Finch McCranie in June of 2021. A few months later Finch McCranie
resigned as the attorney firm on the Plaintiff's case.

# Finch McCranic, LLP

Attorneys at Law
225 Peachtree Street, N.E.
1100 South Tower
Atlanta, Georgia 30303

(404) 658-9070
(800) 228-9159
Facsimile: (404) 688-0619
www.finchmccranie.com

June 20, 2021

BY EMAIL
Ms. Raissa Kengne
1280 W. Peachtree St. NW
Unit 2109
Atlanta, GA  30309
rkengne1@gmail.com

Re:   SEC Whistleblower Claims; BDO USA, LLP, and related persons/entities
("BDO")

Dear Ms. Kengne:

I am pleased to confirm that Finch McCranie, LLP ("Attorneys") will represent you ("you" or "Client") in the SEC Whistleblower Program in presenting the above-described claims, and will provide employment advice related to the SEC Whistleblower claims. Our firm will be pleased to represent Client on the terms stated below.

Attorneys will represent Client in the matters described above. Our representation of Client will be limited to evaluating and submitting claims on Client's behalf under the SEC Whistleblower Program pursuant to Section 922 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), and to providing employment advice relating to the issues raised in the SEC Whistleblower claims. We will also advise you in connection with any communications with the Public Company Accounting Oversight Board (PCAOB) relating to the issues raised in SEC Whistleblower claims. Any other existing or future matters in which we may be asked to represent Client will be reflected by separate letters of engagement.

By entering into this representation agreement, Client agrees to provide to Attorneys all information pertaining to any of these claims through their final resolution with the SEC, and authorizes Attorneys to provide to and receive from the SEC all information pertaining to any of these claims through their final resolution with the SEC.

Walter Jospin and I will be the attorneys primarily responsible for representing Client in dealings with the SEC Office of the Whistleblower and in pursuing Client's claims in the SEC Whistleblower Program. Other lawyers at our firm may work on this matter from time to time.

433.    The Plaintiff claims that her then attorneys Finch and McCranie disclosed the content of their conversation to BDO USA, LLP and did not disclose a conflict of interest they had with any of the Defendants.

434.    Plaintiff uploaded several documents she had in Defendant's Finch McCranie's data room per their request. Defendant's Finch McCranie took several months to review the evidence provided by the client and asked many questions about BDO USA, LLP, the clients Plaintiff was working on, and the Plaintiff's family.

435. The Plaintiff was at a meeting at Defendant's Finch McCranie's offices located at 225 Peachtree St NE #1700, Atlanta, GA 30303 for many hours when her home was broken into on June 29th, 2021.

436. During the meeting on June 29th, 2021 at Defendant Finch McCranie, an accountant was brought in to look at the evidence provided by Plaintiff. The accountant asked the Plaintiff whether she believed that Defendant Wesley Freeman was drugged and that was why he could not deliver on the engagements. Plaintiff responded by asking if "Defendant Wesley Freeman had been drugged for the past five (5) years" while overseeing the public company's engagements.

437. Plaintiff claims that the question asked by Defendant Finch McCranie's accountant is the same one Defendant Scott Meier, the Southeast IS Audit Partner at BDO USA, LLP had asked Plaintiff during their face-to-face meeting at the "Establishment" restaurant in Midtown Atlanta in early 2021.

438. Plaintiff advised Defendant Finch McCranie that she had received a pay increase of approximately 12%. Defendant Michael Sullivan stated "well, that is a good thing".

439. While leaving the meeting, Defendant Finch McCranie's accountant stated to the Plaintiff "Nobody is safe".

440. Plaintiff had several phone calls thereafter with Finch McCranie. During one of these calls, Defendant Michael Sullivan explained that they did not have enough evidence to pursue the case. Plaintiff notes that it took Defendant Finch McCranie more than 6 months to determine whether they had enough evidence for the whistleblower case. Upon informing the Plaintiff on the phone that Defendant Finch McCranie could

no longer represent her, Defendant Michael Sullivan asked if Plaintiff wanted to drop the case. Plaintiff responded "No". Plaintiff noted that there was a long pause on the phone. After a few minutes, there was a few laughs on the call. Defendant Michael Sullivan then told the Plaintiff that his firm would send her an email to withdraw from the case.

441.    Plaintiff claims that after the phone call with Defendant Finch McCranie, the retaliation practices and attacks she faced, both at work and in her personal life, had increased.

442.    When Finch McCranie resigned from representing the Plaintiff, Plaintiff attempted to hire another attorney.

443.    Not finding any attorney in Georgia, Plaintiff flew to Washington, DC several times to meet with attorneys as evidenced by the flight tickets.



444.   Plaintiff also met with Attorney Richard Renner in Washington, DC who

explained he could not take the case and was very familiar with Michael Sullivan.

445.   When Plaintiff was in Washington, DC, Plaintiff had parked her car at the airport. Upon her return, Plaintiff had noted that the car had been moved. A double of the Plaintiff's car key was located in the safe at Plaintiff's home that was broken into.

Department of Aviation
P.O. Box 20509
Atlanta GA 30320

Date: September 6th, 2021

Subject: Request for Investigation into Unauthorized Used of Vehicle Parked at Hartsfield-Jackson Airport

Dear Mrs., Mr.:

My name is Raissa Kengne. I am writing to request an investigation on the unauthorized use of my vehicle while parked in the Hartsfield-Jackson Airport Parking located at 6000 N Terminal Pkwy, Atlanta, GA 30320.

On Tuesday, August 24th, 2021, I arrived at the airport at around 8:00 am in the morning. I parked on level 2. I was driving a Silver VW Jetta with tag number BWS7623. I went to Washington, DC in the morning and came back the same day, on Tuesday, August 24th, 2021. Upon my return, my car could not be found in the location I left it. I called the assistance number. I waited for about an hour and a half on the emergency call line located in the parking because the customer representative's computer did not work. I ended up calling 911. It is only when I called 911 than the customer representative reached out to her supervisor to meet me in the parking lot. The Supervisor drove me around the parking; however, my car was not to be found. Finally, we drove past the parking space where I had parked and my car was there. Someone had returned it.

Similarly, I traveled to Washington, DC on Friday, August 27th, 2021 and came back to Atlanta the same day. Again, my car had been moved.

My home was broken into many times this year and a copy of my car key may have been duplicated.

I would like to request an investigation into the unauthorized used of my vehicle while parked at Jackson-Hartsfield Airport on the dates listed above. If you are not the right department to look into the matter, could you please forward this request to the appropriate department and notify me?

Should you have any questions or concerns, please do not hesitate to contact me. Email address is my preferred method of communication.

Sincerely,
Raissa Kengne
rakengne@gmail.com
Tel: 202-868-1107
1280 West Peachtree ST NW Unit 3309

446.   Because Plaintiff was unable to find legal representation, she decided to represent herself in this lawsuit as a pro se party.

**Defendant Wesley Freeman's View on Audit and LinkedIn Account**

447.   Defendant Wesley Freeman was responsible for overseeing all the IT audits, for both public and private clients, in support of the opinion on the financial

statements that are the subject matter of the whistleblowing protected activity and the primary reason Plaintiff was retaliated against.

448.    Defendant Wesley Freeman exhibited a lack of independence, ethics, integrity, and a tendency to misrepresent the facts or outright lie by hiding IT findings that were assessed at a level of significant deficiencies or material weaknesses from both, the core BDO Assurance team and the client's management, to hide the poor quality of audits that he performed and by trying to shift the narrative by telling his supervisors and colleagues, including upper management at BDO, that Plaintiff was doing way more than necessary on all the engagements. Hereby depriving and impacting for two (2) years, Plaintiff's opportunity for promotion, growth, higher salary, and higher bonuses.

449.    Defendant Wesley Freeman wrote in the Plaintiff's annual performance review the following

> "Some feedback on areas to help her grow as she progresses into the next level and works toward that Senior Manager role would be to work on our client "bed side manner". She is one of those auditors clients either love her or not, but I think that especially on the private companies if she could change up her communications style to fit the client's it will make her work life so much easier. If I can give an example of this, it would be the way she works with the private clients and her expectations there. […] That usually seem to be where the issue is. […] I have received a few calls that felt the expectations were too high, and while supporting Raissa, I could that for a $40k audit, they may have a point".

450.    The annual performance review is read by Defendant Wesley Freeman's

supervisor, including people at BDO who approve promotions and other incentives.



451.    Defendant Wesley Freeman in his review of the Plaintiff's performance

is referring to private clients that are part of the subject matter of the whistleblower case.

452.    Plaintiff claims that IT audits performed on several private clients in the

BDO USA, LLP Atlanta office can be factually demonstrated by comparing the results

of the work performed by Defendant Wesley Freeman and his prior team (who have all

resigned except for one associate who chose to transfer to a different department) to the

results of the work performed by Plaintiff Raissa Djuissi Kengne when she started at

BDO USA, LLP Atlanta office.

453.    Defendant Wesley Freeman's statement to Plaintiff in her Annual

Performance review related to looking at the revenue generated by BDO on private

clients as a mean of "customizing" the audits of private clients is in direct contradiction with the AICPA standards. The AICPA is committed to a private company financial reporting constituency and therefore, the auditors must follow the AICPA standards when auditing private companies.

454.    The AICPA's Clarified Statements on Auditing Standards ("AU-C") Section 330 titled "Performing Audit Procedures in Response to Assessed Risks and Evaluating the Audit Evidence Obtained" addresses the auditor's responsibility to design and implement responses to the risks of material misstatement identified and assessed by the auditor in accordance with section 315, titled "Understanding the Entity and Its Environment and Assessing the Risks of Material Misstatement", and to evaluate the audit evidence obtained in an audit of financial statements.

455.    AICPA's AU-C Section 330 states that **"the objective of the auditor is to obtain <u>sufficient appropriate audit evidence</u> regarding the assessed risks of material misstatement through designing and implementing appropriate responses to those risks."**

456.    AICPA's AU-C Section 330 paragraph .A76 states that the auditor's professional judgment about what constitutes <u>sufficient appropriate audit evidence</u> is influenced by such factors as the:

> (1)    significance of the potential misstatement in the relevant assertion and the likelihood of its having a material effect, individually or aggregated with other potential misstatements, on the financial statements (see section 450, Evaluation of Misstatements Identified During the Audit).

(2)    effectiveness of management's responses and controls to address the risks.

(3)    experience gained during previous audits with respect to similar potential misstatements.

(4)    results of audit procedures performed, including whether such audit procedures identified specific instances of fraud or error.

(5)    source and reliability of the available information.

(6)    persuasiveness of the audit evidence.

(7)    understanding of the entity and its environment, including its internal control.

457.    Plaintiff claims that **nowhere** in the AICPA standards there is a requirement to forgo further audit procedures when one or more significant deficiencies or material weaknesses are identified **because of economic factors**.

458.    Plaintiff also claims that the evaluation performed by Defendant Wesley Freeman was biased for all the reasons listed herein, including the fact that Plaintiff started the best practice of having "kick-off" meetings with clients unless the clients refused to do so due to the clients' prior experience with the audit process. A kick-off meeting in audit is the first meeting between the audit team and the client; there can be a separate introductory meeting prior to the kick-off meeting, but the kick-off meeting provides an opportunity to prepare the client that will be assisting with the audit process, allowing for a timely and efficient audit. The kick-off meeting should not happen without the auditor having a general understanding of the client if it is a recurring

engagement. That understanding can be obtained during one or more pre-planning meeting(s). The kick-off meeting can also provide management an opportunity to:

       (1)     define the type of audit that is being performed,

       (2)     explain the scope of the audit, the timing of the audit, the audit steps, the relevant controls to be tested, the prior year findings and remediation status, confirm the name of the relevant control areas' owners,

       (3)     determine whether there were any changes in the clients' management and controls,

       (4)     discuss the content of the PBC list to be provided and obtain client's availability to schedule additional meeting for both clarification and conduct the audit,

       (5)     any other relevant topics specific to the client's industry and environment.

459.    Defendant Wesley Freeman was not clear in his review about whether or not he was referring to a pre-planning meeting or a kick-off meeting. In either case, the Plaintiff performed pre-planning and kick-off meetings internally with the core audit team and externally with the client on all Plaintiff's engagements as allowed by the circumstances.

460.    Plaintiff claims that Defendant Wesley Freeman's review is an indicator of the type of comments he has made to BDO USA, LLP's upper management in order to hide his fraudulent acts and negatively impact Plaintiff's career.

461.    Defendant Wesley Freeman has shown a lack of ethics and integrity towards applying the SEC, PCAOB, or AICPA standards and regulations in other

instances. Defendant Wesley Freeman had an audit in 2020 that thoroughly failed the PCAOB inspection and had to spend approximately the budget of the initial audit in the remediation process. Defendant Wesley Freeman then stated to the Plaintiff that the PCAOB's comments were unnecessary and he did not know why he had to perform testing over high-risk control areas he knew would not give rise to significant deficiencies or material weakness.

462.    Plaintiff claims that it is nearly impossible to know that a high-risk control area does not have a significant deficiency or a material weakness if the relevant control is not tested.

463.    Plaintiff claims that Defendant Wesley Freeman has advocated for the clients and lacks independence when overseeing audits of both private and public engagements.

464.    AICPA's AU Section 220 titled "Independence" paragraph 01 states that "the auditor must maintain independence in mental attitude in all matters relating to the audit."

### Resignation

465.    Plaintiff resigned from her position at BDO USA, LLP on November 18th, 2021 because she feared for her life and her family's life. However, the retaliation and persecution she faced in her personal and professional life did not stop.

466.    Plaintiff claims that Defendant Wesley Freeman had stated, in a now deleted tweet posted after her resignation, that the Partners at BDO USA, LLP did the right choice by standing with him.

**The 1280 West Governing Documents – Required Hearing With The Board**

**Before Lawsuit**

467.    The Bylaws of 1280 West Condominium Association, Inc. ("1280 West Bylaws") stipulates that no homeowners can file a lawsuit against the 1280 West Association and the Board Members without attending a hearing with the Board of Directors.

> (b)    Dispute Resolution. Prior to filing a lawsuit against the Association, the Board, or any officer, director, or property manager of the Association, an Owner or Occupant must request and attend a hearing with the Board of Directors. Any such request shall be in writing and shall be personally delivered to any member of the Board of Directors or the property manager, if any, of the Association. The Owner or Occupant shall, in such request and at the hearing, make a good faith effort to explain the grievance to the Board and resolve the dispute in an amicable fashion, and shall give the Board a reasonable opportunity to address the Owner or Occupant's grievance before filing suit. Upon receiving a request for a hearing, the Board shall give notice of the date, time and place of the hearing to the person requesting the hearing. The Board shall schedule this hearing for a date not less than seven (7) or more than twenty-one (21) days from the date of receipt of the request.

468.    Plaintiff has already requested and obtained a hearing with the 1280 West Board of Directors in September of 2021 as stipulated in the 1280 West Bylaws and evidenced on the screenshot below.

469.    Plaintiff can legally sue the defendants listed as part of Group 4.

From: Raissa Kengne <rkengne1@gmail.com>
Sent: Wednesday, September 1, 2021 8:05 PM
To: Michael Shinners <mshinners@1280westhoa.com>
Subject: Illegal Entry in My Unit _ Board Meeting Request

**e: Illegal Entry in My Unit - Board Meeting Request**    https://mail.google.com/mail/u/0?ik=b61df7b9c&view=pt&search=all...

Michael:

I would like to request a formal meeting with the Board as per the condominium's governing documents.

Over the past 12 weeks, my unit has been accessed several times without my authorization.

I have requested to look at the camera footage and you have refused.

Please note that any deletion of camera footage (evidence) since my initial email will be construed as destruction of evidence.

Since this is an important matter, I would appreciate a meeting as soon as possible.

Sincerely,

Raissa -

---

Raissa Kengne <rkengne1@gmail.com>                    Wed, Sep 1, 2021 at 8:15 PM
To: Michael Shinners <mshinners@1280westhoa.com>

Michael,

Can the Board meet with me before this date? The proposed date is a week away and it is my safety at stake.

Sincerely,

Raissa -
[Quoted text hidden]

**1280 WEST** CONDOMINIUM    image001.jpg
.5K

---

Michael Shinners <mshinners@1280westhoa.com>          Wed, Sep 1, 2021 at 8:24 PM
To: Raissa Kengne <rkengne1@gmail.com>

Raissa,

I'll see if they can meet with you this evening via zoom. I'll send you a link if the Board is available and we'll set the time at 7:30pm. Would that work for you if the Board can confirm?

[Quoted text hidden]

---

9/6/2021, 4:23 AM

## Withholding and Reading Mail

470.   The Defendants listed as part of Group 4 have withheld mail from the Plaintiff including mail from the Georgia Department of Driver Services and the

Department of State. The mail withheld from Plaintiff included Plaintiff's Georgia Driver License, Georgia Identification Card, and United States passport.

471.     Plaintiff has also been delayed for months from responding to her banks and other public services letters because the letters were withheld.

472.     The Defendants in Group 4 have access to or have significant influence over the people with access to the back of the mailbox where the post office would deliver the mail.

473.     Plaintiff has been obligated to open a mailbox at a USPS location.

### Impact on Plaintiff

474.     Plaintiff reported a violation of SEC regulations, PCAOB standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened at BDO USA, LLP. Plaintiff was retaliated against. Her home was broken into, her life and her family's lives were threatened, and her computers and phones were hacked.

475.     The unlawful, illegal, criminal, and horrific actions perpetrated by the Defendants were to intentionally cause undue financial hardship and emotional distress to the Plaintiff and to prevent Plaintiff from reporting the fraud as a Whistleblower.

476.     Plaintiff was blacklisted from relevant jobs and has had no income ($0.00) for the entire year 2022.

477.     Plaintiff was prevented from filing for unemployment claims.

478.     Plaintiff was prevented from having access to public resources such as the Georgia Homeowner Assistance Fund or the Georgia Supplemental Nutrition Assistance Program ("SNAP").

479.    Defendants have also made it impossible for Plaintiff to obtain health, dental, and vision insurance through the Health Insurance Marketplace.

480.    Defendants have made it hard for Plaintiff to find similar job opportunities by not only blacklisting the Plaintiff, but by providing negative job references.

481.    Defendants have engaged in a mental and financial warfare against the Plaintiff in the hope Plaintiff would not report the fraud and their criminal activities.

482.    Plaintiff has decided to provide a public service to the community, the profession, and the United States by reporting illegal, unlawful, criminal, and horrific actions perpetrated by the Defendants.

## IV.

### CAUSES OF ACTION AND CLAIMS FOR RELIEF

### COUNT ONE:

### Violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act

(Against All Defendants)

483.    The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

484.    A violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") occurs when employers retaliate against whistleblowers who, inter alia, "mak[e] disclosures that are required or protected under the Sarbanes–Oxley Act of 2002 (15 U.S.C. 7201 et seq.) ... and any other law, rule, or regulation subject to the jurisdiction of the" SEC. See 15 U.S.C. 78u–6(h)(1)(A)(iii).

485. This generally means that employers may not discharge, demote, suspend, harass, or in any way discriminate against an employee in the terms and conditions of employment who has reported conduct to the Commission that the employee reasonably believed violated the federal securities laws.

486. Under Dodd-Frank, which applies to **both public and privately held companies**, an employer cannot retaliate against an employee for disclosing any information that is protected or required under SOX.

487. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

488. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

489. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

490. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

491.  As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

492.  As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

493.  As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

494.  As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

495.  As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

496.  The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

497.    Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

498.   Plaintiff noticed that the workpapers for both private clients and public clients were being rolled forward year after year without actually doing the work. The public clients included BlueLinx, Atlanticus, IZEA, BioHorizons, and Interface. Interface has recently been under an SEC investigation and an executive employee at Interface has been suspended. The private clients included Janus, Dustex, FCCI, RSR Group, ProCare, Vacation Express, and many others.

499.   The issue with the IT audit work performed was that several deficiencies that should have been identified as significant deficiencies or material weaknesses were actually identified as only control deficiencies. Because they were never communicated to the financial statements audit team as control deficiencies, the financial statements audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls (ITGCs).

500.   Plaintiff informed the Defendant Wesley Freeman of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, he kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

501.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

502.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being

promoted. These associates enlisted to smear Plaintiff's reputation were part of the group who delivered such a poor work product.

503.    Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground, harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

504.    During internal meetings in 2020 and early 2021, Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

505.    Plaintiff was blacklisted from relevant job opportunities by Defendants from engaging in protected activities.

506.    Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

507.    Plaintiff's home was broken into at multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart elevators that require a key card in order to both enter the building and access the residential areas. Intruders must have had a double of the Plaintiff's key and a building access card in order to enter the Plaintiff's home.

508.   Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

509.   Defendant Finch McCranie utilized the information provided by Plaintiff and then client to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

510.   Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

511.   Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

512.   Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

513.   Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in order to cause harm to Plaintiff.

514.   Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a relationship with the 1280 West Condominium Association, the 1280 West Board of

Directors, and other members in Group 4. Several Interface's employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

515.    The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

516.    Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

517.    Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

518.    During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Defendant Mark Davenport (Audit Partner), Defendant Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

519.    During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

520.    During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

521.    Plaintiff noted that recordings and evidence gathered during that same meeting in September of 2021 with Edward Burdekin were deleted from her laptop in an attempt to present her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

522.    Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

523.    The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and conditions of employment, and broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law.

524.    Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

### COUNT TWO:

### Violation of Commission Rule 21F-17(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act

(Against All Defendants)

525.    The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

526.   A violation of Rule 21F-17(a) occurs when a "person takes any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing or threatening to enforce a confidentiality agreement…with respect to such communications."

527.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

528.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

529.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

530.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

531.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well

as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

532.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

533.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

534.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

535.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

536.   The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

537.    Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

538.    Plaintiff noticed that the workpapers for both private clients and public clients were being rolled forward year after year without actually doing the work. The public clients included BlueLinx, Atlanticus, IZEA, BioHorizons, and Interface.

Interface has recently been under an SEC investigation and an executive employee at Interface has been suspended. The private clients included Janus, Dustex, FCCI, RSR Group, ProCare, Vacation Express, and many others.

539.   The issue with the IT audit work performed was that several deficiencies that should have been identified as significant deficiencies or material weaknesses were actually identified as only control deficiencies. Because they were never communicated to the financial statements audit team as control deficiencies, the financial statements audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls (ITGCs).

540.   Plaintiff informed the Defendant Wesley Freeman of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, he kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

541.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

542.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted. These associates enlisted to smear my reputation were part of the group who delivered such a poor work product.

543.   Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground, harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

544.   During internal meetings in 2020 and early 2021, Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

545.   Plaintiff was blacklisted from relevant job opportunities by Defendants from engaging in protected activities.

546.   Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

547.   Plaintiff's home was broken into multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart elevators that require a key card in order to both, enter the building and access the residential areas. Intruders must have had a double of the Plaintiff's key and a building access card in order to enter the Plaintiff's home.

548.   Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

549.    Defendant Finch McCranie utilized the information provided by Plaintiff and then client to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

550.    Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

551.    Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

552.    Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

553.    Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in order to cause harm to Plaintiff.

554.    Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4. Several Interface's employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

555.    The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

556.    Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

557.    Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

558.    During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Mark Davenport (Audit Partner), Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

559.    During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

560.   During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

561.   Plaintiff noted that recordings and evidence gathered during that same meeting in September of 2021 with Edward Burdekin were deleted from her laptop in an attempt to place her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

562.   Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

563.   The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and conditions of employment, broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law. Thereby, by Defendants' actions, impeding Plaintiff from communicating directly with the SEC staff about a possible securities law violation.

564.   Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

### COUNT THREE:

### Violation of the Sarbanes Oxley Act ("SOX") Act

18 U.S.C. §1514A

(Against All Defendants)

196 of 407

565.    The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

566.    A violation of 18 U.S.C. §1514A occurs when a company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)) including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, or nationally recognized statistical rating organization (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c), or any officer, employee, contractor, subcontractor, or agent of such company or nationally recognized statistical rating organization, discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee--

(1)    to provide information, cause information to-be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by--

a.    a Federal regulatory or law enforcement agency;

b.    any Member of Congress or any committee of Congress; or

      c.     a person with supervisory authority over the employee (or such other person working for the employer who has     the authority to investigate, discover, or terminate

      misconduct); or

    (2)    to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

567.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

568.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

569.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

570.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and

bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

571.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

572.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

573.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

574.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

575.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

576.    The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

577.    Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting

employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

578.    Plaintiff noticed that the workpapers for both private clients and public clients were being rolled forward year after year without actually doing the work. The public clients included BlueLinx, Atlanticus, IZEA, BioHorizons, and Interface. Interface has recently been under an SEC investigation and an executive employee at Interface has been suspended. The private clients included Janus, Dustex, FCCI, RSR Group, ProCare, Vacation Express, and many others.

579.    The issue with the IT audit work performed was that several deficiencies that should have been identified as significant deficiencies or material weaknesses were actually identified as only control deficiencies. Because they were never communicated to the financial statements audit team as control deficiencies, the financial statements audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls (ITGCs).

580.    Plaintiff informed the Defendant Wesley Freeman of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, he kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

581.    Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

582.     Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted. These associates enlisted to smear my reputation were part of the group who delivered such a poor work product.

583.     Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground, harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

584.     During internal meetings in 2020 and early 2021, Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

585.     Plaintiff was blacklisted from relevant job opportunities by Defendants from engaging in protected activities.

586.     Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

587.     Plaintiff's home was broken into at multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart elevators that require a key card in order to both, enter the building and access the residential areas. Intruders must have had a double of the Plaintiff's key and a building access card in order to enter the Plaintiff's home.

588.    Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

589.    Defendant Finch McCranie utilized the information provided by Plaintiff and then client to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

590.    Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

591.    Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

592.    Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

593.    Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in other to cause harm to Plaintiff.

594.    Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a relationship with the 1280 West Condominium Association, the 1280 West Board of

Directors, and other members in Group 4. Several Interface's employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

595.    The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

596.    Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

597.    Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

598.    During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Mark Davenport (Audit Partner), Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

599.    During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

600.    During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

601.    Plaintiff noted that recordings and evidence gathered during that same meeting in September of 2021 with Edward Burdekin were deleted from her laptop in an attempt to present her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

602.    Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

603.    The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and conditions of employment, broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law.

604.    Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

## COUNT FOUR:

### Violation of Title VII of the Civil Rights Act of 1964 (Title VII)

(Against All Defendants)

605.    The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

606.   A violation of Title VII of the Civil Rights Act of 1964 occurs when there is harassment, which becomes unlawful where:

(1)   enduring the offensive conduct becomes a condition of continued employment,

(2)   the conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

607.   Offensive conduct may include, but is not limited to, offensive jokes, slurs, epithets or name calling, physical assaults or threats, intimidation, ridicule or mockery, insults or put-downs, offensive objects or pictures, and interference with work performance. Harassment can occur in a variety of circumstances, including, but not limited to, the following:

(1)   The harasser can be the victim's supervisor, a supervisor in another area, an agent of the employer, a co-worker, or a non-employee.

(2)   The victim does not have to be the person harassed, but can be anyone affected by the offensive conduct.

(3)   Unlawful harassment may occur without economic injury to, or discharge of, the victim.

608.   Anti-discrimination laws also prohibit harassment against individuals in retaliation for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding, or lawsuit under these laws; or opposing employment practices that they reasonably believe discriminate against individuals, in violation of these laws.

609.  The employer is automatically liable for harassment by a supervisor that results in a negative employment action. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

610.  As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

611.  As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

612.  As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

613.  As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter Plaintiff's responsibilities and duties in order to prevent her from reporting the fraud.

614.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

615.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

616.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

617.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

618.   The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of

management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

619.   Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

620.   Plaintiff noticed that the workpapers for both private clients and public clients were being rolled forward year after year without actually doing the work. The public clients included BlueLinx, Atlanticus, IZEA, BioHorizons, and Interface. Interface has recently been under an SEC investigation and an executive employee at

Interface has been suspended. The private clients included Janus, Dustex, FCCI, RSR Group, ProCare, Vacation Express, and many others.

621.   The issue with the IT audit work performed was that several deficiencies that should have been identified as significant deficiencies or material weaknesses were actually identified as only control deficiencies. Because they were never communicated to the financial statements audit team as control deficiencies, the financial statements audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls (ITGCs).

622.   Plaintiff informed Defendant Wesley Freeman of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, he kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

623.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

624.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted. These associates enlisted to smear my reputation were part of the group who delivered such a poor work product.

625.   Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground,

harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

626.   During internal meetings in 2020 and early 2021, Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

627.   Defendant Antony Reh, an Assurance Partner at BDO, had also stated that Plaintiff "and her family should be careful".

628.   Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

629.   Plaintiff's home was broken into multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart elevators that require a key card in order to both, enter the building and access the residential areas. The intruders must have had the building access card and the residential floors as well as a copy of the keys to the Plaintiff's home in order to have access to the 1280 West building and the Plaintiff's home respectively.

630.   Plaintiff resigned and was blacklisted from relevant job opportunities by Defendants because she engaged in protected activities.

631.   Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

632.    Defendant Finch McCranie utilized the information provided by Plaintiff and then client to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

633.    Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

634.    Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

635.    Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

636.    Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in order to cause harm to Plaintiff.

637.    Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4. Several Interface's employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

638.   The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

639.   Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

640.   Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

641.   During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Mark Davenport (Audit Partner), Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

642.   During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

643. During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

644. Plaintiff noted that recordings and evidence gathered during that same meeting in September of 2021 with Edward Burdekin were deleted from her laptop in an attempt to place her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

645. Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

646. The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and conditions of employment, broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law.

647. Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

648. Defendants committed the crime of influencing Plaintiff with intent to deter Plaintiff from testifying freely, fully, and truthfully to any matter pending in any court, in any administrative proceeding, or before a grand jury, by communicating, directly and indirectly, to Plaintiff any threat of injury or damage to the person, property, or employment of the Plaintiff or to the person, property, or employment of Plaintiff's relative.

649.    Defendants knowingly used intimidation and threats, attempted to persuade Plaintiff by means of corruption, and engaged in misleading conduct toward Plaintiff with intent to hinder, delay, and/or prevent the communication to a law enforcement officer, prosecuting attorney, or judge of the United States of information relating to the commission or possible commission of a Federal offense.

650.    Defendants violated Title VII of the Civil Rights Act of 1964 by harassing Plaintiff. Plaintiff was forced to endure the Defendants' offensive conduct as a condition of continued employment. The Defendants' conduct was severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive. Plaintiff, as a reasonable person, resigned as a result of the Defendants' harassment and offensive conduct and her work environment that had become hostile and abusive.

## COUNT FIVE:

### Violation of section 11(c) of the Occupational Safety and Health Act

### (Against All Defendants)

651.    The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

652.    A violation of section 11(c) of the Occupational Safety and Health Act ("OSHA") occurs when an employer (through a manager, supervisor, or administrator) fires an employee or takes any other type of adverse action against an employee for engaging in protected activity.

653.    An adverse action, under OSHA, is an action which would dissuade a reasonable employee from raising a concern about a possible violation or engaging in

other related protected activity. Retaliation harms individual employees and can have a negative impact on overall employee morale. Because an adverse action can be subtle, such as excluding employees from important meetings, it may not always be easy to recognize. Adverse actions may include actions such as:

(1)   Disciplining

(2)   Denying benefits

(3)   Intimidation or harassment

(4)   Making threats

(5)   Reassignment to a less desirable position or actions affecting prospects for promotion (such as excluding an employee from training meetings)

(6)   More subtle actions, such as isolating, ostracizing, mocking, or falsely accusing the employee of poor performance

(7)   Blacklisting (intentionally interfering with an employee's ability to obtain future employment)

(8)   Constructive discharge (quitting when an employer makes working conditions intolerable due to the employee's protected activity)

(9)   Reporting or threatening to report an employee to the police or immigration authorities.

654.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

655.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

656.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

657.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

658.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

659.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

660.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well

as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

661.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

662.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

663.    The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

664.    Plaintiff reported a violation of SEC regulations, PCAOB standards, AJCPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

665.    Plaintiff noticed that the workpapers for both private clients and public clients were being rolled forward year after year without actually doing the work. The public clients included BlueLinx, Atlanticus, IZEA, BioHorizons, and Interface. Interface has recently been under an SEC investigation and an executive employee at Interface has been suspended. The private clients included Janus, Dustex, FCCI, RSR Group, ProCare, Vacation Express, and many others.

666.    The issue with the IT audit work performed was that several deficiencies that should have been identified as significant deficiencies or material weaknesses were actually identified as only control deficiencies. Because they were never communicated to the financial statements audit team as control deficiencies, the financial statements

audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls (ITGCs).

667.    Plaintiff informed Defendant Wesley Freeman of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, he kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

668.    Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

669.    Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted. These associates enlisted to smear my reputation were part of the group who delivered such a poor work product.

670.    Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground, harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

671.    During internal meetings in 2020 and early 2021, Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and

PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

672.    Defendant Antony Reh, an Assurance Partner at BDO, had also stated that Plaintiff "and her family should be careful".

673.    Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

674.    Plaintiff's home was broken into at multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart elevators that require a key card in order to both, enter the building and access the residential areas. The intruders must have had the building access card and the residential floors as well as a copy of the keys to the Plaintiff's home in order to have access to the 1280 West building and the Plaintiff's home respectively.

675.    Plaintiff resigned and was blacklisted from relevant job opportunities by Defendants because she engaged in protected activities.

676.    Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

677.    Defendant Finch McCranie utilized the information provided by Plaintiff and then client to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

678. Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

679. Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

680. Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

681. Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in order to cause harm to Plaintiff.

682. Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4. Several Interface's employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

683. The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

684.    Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

685.    Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

686.    During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Defendant Mark Davenport (Audit Partner), Defendant Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

687.    During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

688.    During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

689.    Plaintiff noted that recordings and evidence gathered during that same meeting in September of 2021 with Edward Burdekin were deleted from her laptop in

an attempt to place her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

690. Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

691. The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and conditions of employment, broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law.

692. Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

693. Defendants committed a violation of section 11(c) of the Occupational Safety and Health Act ("OSHA") when Defendants (through a manager, supervisor, or administrator) took adverse actions against Plaintiff for engaging in protected activity.

## COUNT SIX:

### Violation of the Anti-SLAPP Statute

### O.C.G.A. § 9-11-11.1

### (Against All Defendants)

694. The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

695. A violation of the Anti-SLAPP Statute occurs when an entity prevents an individual to "act in furtherance of the right of free speech or the right to petition

government for a redress of grievances under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern" includes any written or oral statement, writing, or petition made before or to a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, or any written or oral statement, writing, or petition made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." § 9-11-11.1(c)

696.    The parties protected by the Anti-SLAPP Statute include "a person or entity [who performed] an act by that person or entity which could reasonably be construed as an act in furtherance of the right of free speech or the right to petition government for a redress of grievances under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern . . ." § 9-11-11.1(b)

697.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

698.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

699.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well

as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

700. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

701. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

702. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

703. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

704. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

705.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

706.   The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon

Management Services, LLC has served as the management company for the 1280 West
Condominium Association where the Plaintiff resides for many years.

707.    Plaintiff reported a violation of SEC regulations, PCAOB standards,
AICPA standards, the Antitrust law, and a circumvention of the law prohibiting
employers from asking about an applicant's pay history in the state of Georgia. The
misconduct happened while working for Defendant BDO USA, LLP.

708.    Plaintiff noticed that the workpapers for both private clients and public
clients were being rolled forward year after year without actually doing the work. The
public clients included BlueLinx, Atlanticus, IZEA, BioHorizons, and Interface.
Interface has recently been under an SEC investigation and an executive employee at
Interface has been suspended. The private clients included Janus, Dustex, FCCI, RSR
Group, ProCare, Vacation Express, and many others.

709.    The issue with the IT audit work performed was that several deficiencies
that should have been identified as significant deficiencies or material weaknesses were
actually identified as only control deficiencies. Because they were never communicated
to the financial statements audit team as control deficiencies, the financial statements
audit teams never adjusted their audit strategy and therefore, never addressed the risk of
material misstatements due to ineffective IT general controls (ITGCs).

710.    Plaintiff informed Defendant Wesley Freeman of the work that was not
performed in roughly 75% of the public and private engagements he oversaw in the
Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues
going forward, he kept misreporting the IT findings to hide the significant deficiencies

and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

711.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

712.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted. These associates enlisted to smear my reputation were part of the group who delivered such a poor work product.

713.   Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground, harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

714.   During internal meetings in 2020 and early 2021, Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

715.   Defendant Antony Reh, an Assurance Partner at BDO, had also stated that Plaintiff "and her family should be careful".

716.   Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

717.   Plaintiff's home was broken into at multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart elevators that require a key card in order to both, enter the building and access the residential areas. The intruders must have had the building access card and the residential floors as well as a copy of the keys to the Plaintiff's home in order to have access to the 1280 West building and the Plaintiff's home respectively.

718.   Plaintiff resigned and was blacklisted from relevant job opportunities by Defendants because she engaged in protected activities.

719.   Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

720.   Defendant Finch McCranie utilized the information provided by Plaintiff and then client to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

721.   Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

722.   Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

723.   Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous

in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

724. Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in other to cause harm to Plaintiff.

725. Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4. Several Interface's employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

726. The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

727. Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

728. Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

729.   During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Mark Davenport (Audit Partner), Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

730.   During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

731.   During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

732.   Plaintiff noted that recordings and evidence gathered during that same meeting in September of 2021 with Edward Burdekin were deleted from her laptop in an attempt to place her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

733.   Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

734.   The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and

conditions of employment, broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law.

735.    Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

736.    Defendants committed the crime of influencing Plaintiff with intent to deter Plaintiff from testifying freely, fully, and truthfully to any matter pending in any court, in any administrative proceeding, or before a grand jury, by communicating, directly and indirectly, to Plaintiff any threat of injury or damage to the person, property, or employment of the Plaintiff or to the person, property, or employment of Plaintiff's relative.

737.    Defendants knowingly used intimidation and threats, attempted to persuade Plaintiff by means of corruption, and engaged in misleading conduct toward Plaintiff with intent to hinder, delay, and/or prevent the communication to a law enforcement officer, prosecuting attorney, or judge of the United States of information relating to the commission or possible commission of a Federal offense.

738.    Defendants violated Georgia Anti-SLAPP Statute when they attempted to prevent Plaintiff from "act[ing] in furtherance of the right of free speech or the right to petition government for a redress of grievances under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern", which includes any official proceeding authorized by law, or any written or oral statement, writing, or petition made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law.

**COUNT SEVEN:**

**Violation of Duties of Attorney**

**O.C.G.A. 15-19-4**

**(Against All Defendants)**

739.   The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

740.   A violation of Attorney-Client Privilege occurs when the attorney fails to maintain inviolate the confidence and, at every peril to themselves, to preserve the secrets of their clients. See O.C.G.A. § 15-19-4;

741.   The following elements are required for attorney-client privilege to apply:

    (1)   The disclosures and communication occurred between an attorney and client or potential client.

    (2)   The purpose of the disclosures and communication was to obtain legal advice from the attorney.

    (3)   The attorney was acting in their professional capacity when receiving the information.

    (4)   The client or potential client reasonably expected that the information disclosed to the attorney would remain confidential.

742.   An attorney-client relationship must exist before information disclosed to the attorney becomes privileged.

743.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well

as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

744.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

745.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

746.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

747.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

748.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

749.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

750.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

751.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

752.   The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West

Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

753.    Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

754.    Plaintiff noticed that the workpapers for both private clients and public clients were being rolled forward year after year without actually doing the work. The public clients included BlueLinx, Atlanticus, IZEA, BioHorizons, and Interface. Interface has recently been under an SEC investigation and an executive employee at Interface has been suspended. The private clients included Janus, Dustex, FCCI, RSR Group, ProCare, Vacation Express, and many others.

755.    The issue with the IT audit work performed was that several deficiencies that should have been identified as significant deficiencies or material weaknesses were actually identified as only control deficiencies. Because they were never communicated

to the financial statements audit team as control deficiencies, the financial statements audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls (ITGCs).

756.    Plaintiff informed Defendant Wesley Freeman of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, he kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

757.    Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

758.    Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted. These associates enlisted to smear my reputation were part of the group who delivered such a poor work product.

759.    Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground, harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

760.    During internal meetings in 2020 and early 2021, Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and

PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

761.    Defendant Antony Reh, an Assurance Partner at BDO, had also stated that Plaintiff "and her family should be careful".

762.    Plaintiff Raissa Djuissi Kengne signed the engagement letter with Defendant Finch McCranie in June of 2021. A few months later Finch McCranie resigned as the attorney firm on the Plaintiff's case. Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

763.    Defendants Finch and McCranie, Michael Sullivan, and Walter Jospin disclosed the content of their conversation to BDO USA, LLP and did not disclose the conflict of interest they had with any of the other Defendants.

764.    Plaintiff uploaded several documents she had in Defendant's Finch McCranie's data room per their request. Defendant's Finch McCranie took several months to review the evidence provided by the client and asked many questions about BDO USA, LLP, the clients Plaintiff was working on, and the Plaintiff's family.

765.    The Plaintiff was at a meeting at Defendant's Finch McCranie's offices located at 225 Peachtree St NE #1700, Atlanta, GA 30303 for many hours when her home was broken into on June 29th, 2021.

766.    During the meeting on June 29th, 2021 at Defendant Finch McCranie, an accountant was brought in to look at the evidence provided by Plaintiff. The accountant asked the Plaintiff whether she believed that Defendant Wesley Freeman was drugged and that was why he could not deliver on the engagements. Plaintiff responded by asking

if "Defendant Wesley Freeman had been drugged for the past five (5) years" while overseeing the public company's engagements.

767.    The question asked by Defendant Finch McCranie's accountant is the same one Defendant Scott Meier, the Southeast IS Audit Partner at BDO USA, LLP had asked Plaintiff during their face-to-face meeting at the "Establishment" restaurant in Midtown Atlanta in early 2021.

768.    Plaintiff advised Defendant Finch McCranie that she had received a pay increase of approximately 12% and that Plaintiff was up for promotion. Defendant Michael Sullivan stated "well, that is a good thing".

769.    While leaving the meeting, Defendant Finch McCranie's accountant stated to the Plaintiff "Nobody is safe".

770.    Plaintiff had several phone calls thereafter with Finch McCranie. During one of these calls, Defendant Michael Sullivan explained that they did not have enough evidence to pursue the case. Plaintiff notes that it took Defendant Finch McCranie more than 6 months to determine whether they had enough evidence for the whistleblower case. Upon informing the Plaintiff on the phone that Defendant Finch McCranie could no longer represent her, Defendant Michael Sullivan asked if Plaintiff wanted to drop the case. Plaintiff responded "No". Plaintiff noted that there was a long pause on the phone. After a few minutes, there was a few laughs on the call. Defendant Michael Sullivan then told the Plaintiff that his firm would send her an email to withdraw from the case.

771.    Plaintiff claims that after the phone call with Defendant Finch McCranie, the retaliation practices and attacks she faced, both at work and in her personal life, had increased.

772.    Plaintiff's home was broken into at multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart elevators that require a key card in order to both, enter the building and access the residential areas. The intruders must have had the building access card and the residential floors as well as a copy of the keys to the Plaintiff's home in order to have access to the 1280 West building and the Plaintiff's home respectively.

773.    Plaintiff resigned and was blacklisted from relevant job opportunities by Defendants because she engaged in protected activities.

774.    Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

775.    Defendant Finch McCranie utilized the information provided by Plaintiff, client at the time, to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

776.    Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

777.    Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

778.    Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

779.    Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in other to cause harm to Plaintiff.

780.    Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4. Several Interface's' employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

781.    The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

782.    Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

783.     Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

784.     During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Mark Davenport (Audit Partner), Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

785.     During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

786.     During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

787.     Plaintiff noted that recordings and evidence gathered during that same meeting in September of 2021 with Edward Burdekin were deleted from her laptop in an attempt to place her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

788.     Plaintiff informed Finch McCranie, her then attorneys, of all the retaliatory practices she was facing.

789.    Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

790.    The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and conditions of employment, broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law.

791.    Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

792.    Defendants committed the crime of influencing Plaintiff with intent to deter Plaintiff from testifying freely, fully, and truthfully to any matter pending in any court, in any administrative proceeding, or before a grand jury, by communicating, directly and indirectly, to Plaintiff any threat of injury or damage to the person, property, or employment of the Plaintiff or to the person, property, or employment of Plaintiff's relative.

793.    Defendants knowingly used intimidation and threats, attempted to persuade Plaintiff by means of corruption, and engaged in misleading conduct toward Plaintiff with intent to hinder, delay, and/or prevent the communication to a law enforcement officer, prosecuting attorney, or judge of the United States of information relating to the commission or possible commission of a Federal offense.

794.    Finch McCranie, Michael Sullivan, and Walter Jospin violated the Attorney-Client Privilege when they failed to maintain inviolate the confidence and, at every peril to themselves, to preserve the secrets of Plaintiff, their then client.

## COUNT EIGHT:

### Violation of Client's Communications To Attorney Privileged

### O.C.G.A. § 24-9-24

### (Against All Defendants)

795.    The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

796.    A violation of Client's communications to attorney privileged occurs when the Attorney discloses the advice or counsel he may give to his client, nor produce or deliver up title deeds or other papers, except evidences of debt left in his possession by his client. See O.C.G.A. § 24-9-24.

797.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

798.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

799.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well

as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

800.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

801.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

802.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

803.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

804.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

805.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

806.    The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon

Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

807. Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

808. Plaintiff noticed that the workpapers for both private clients and public clients were being rolled forward year after year without actually doing the work. The public clients included BlueLinx, Atlanticus, IZEA, BioHorizons, and Interface. Interface has recently been under an SEC investigation and an executive employee at Interface has been suspended. The private clients included Janus, Dustex, FCCI, RSR Group, ProCare, Vacation Express, and many others.

809. The issue with the IT audit work performed was that several deficiencies that should have been identified as significant deficiencies or material weaknesses were actually identified as only control deficiencies. Because they were never communicated to the financial statements audit team as control deficiencies, the financial statements audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls (ITGCs).

810. Plaintiff informed Defendant Wesley Freeman of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, he kept misreporting the IT findings to hide the significant deficiencies

and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

811.    Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

812.    Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted. These associates enlisted to smear my reputation were part of the group who delivered such a poor work product.

813.    Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground, harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

814.    During internal meetings in 2020 and early 2021, Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

815.    Defendant Antony Reh, an Assurance Partner at BDO, had also stated that Plaintiff "and her family should be careful".

816.    Plaintiff Raissa Djuissi Kengne signed the engagement letter with Defendant Finch McCranie in June of 2021. A few months later Finch McCranie resigned as the attorney firm on the Plaintiff's case. Plaintiff started being persecuted

and retaliated against at home when she signed the contract with Defendant Finch McCranie.

817.     Defendants Finch and McCranie, Michael Sullivan, and Walter Jospin disclosed the content of their conversation to BDO USA, LLP and did not disclose the conflict of interest they had with any of the other Defendants.

818.     Plaintiff uploaded several documents she had in Defendant's Finch McCranie's data room per their request. Defendant's Finch McCranie took several months to review the evidence provided by the client and asked many questions about BDO USA, LLP, the clients Plaintiff was working on, and the Plaintiff's family.

819.     The Plaintiff was at a meeting at Defendant's Finch McCranie's offices located at 225 Peachtree St NE #1700, Atlanta, GA 30303 for several hours when her home was broken into on June 29th, 2021.

820.     During the meeting on June 29th, 2021 at Defendant Finch McCranie, an accountant was brought in to look at the evidence provided by Plaintiff. The accountant asked the Plaintiff whether she believed that Defendant Wesley Freeman was drugged and that was why he could not deliver on the engagements. Plaintiff responded by asking if "Defendant Wesley Freeman had been drugged for the past five (5) years" while overseeing the public company's engagements.

821.     The question asked by Defendant Finch McCranie's accountant is the same one Defendant Scott Meier, the Southeast IS Audit Partner at BDO USA, LLP had asked Plaintiff during their face-to-face meeting at the "Establishment" restaurant in Midtown Atlanta in early 2021.

822.    Plaintiff advised Defendant Finch McCranie that she had received a pay increase of approximately 12% and that Plaintiff was up for promotion. Defendant Michael Sullivan stated "well, that is a good thing".

823.    While leaving the meeting, Defendant Finch McCranie's accountant stated to the Plaintiff "Nobody is safe".

824.    Plaintiff had several phone calls thereafter with Finch McCranie. During one of these calls, Defendant Michael Sullivan explained that they did not have enough evidence to pursue the case. Plaintiff notes that it took Defendant Finch McCranie more than six (6) months to determine whether they had enough evidence for the whistleblower case. Upon informing the Plaintiff on the phone that Defendant Finch McCranie could no longer represent her, Defendant Michael Sullivan asked if Plaintiff wanted to drop the case. Plaintiff responded "No". Plaintiff noted that there was a long pause on the phone. After a few minutes, there was a few laughs on the call. Defendant Michael Sullivan then told the Plaintiff that his firm would send her an email to withdraw from the case.

825.    Plaintiff claims that after the phone call with Defendant Finch McCranie, the retaliation practices and attacks she faced, both at work and in her personal life, had increased.

826.    Plaintiff's home was broken into at multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart elevators that require a key card in order to both, enter the building and access the residential areas. The intruders must have had the building access card and the

residential floors as well as a copy of the keys to the Plaintiff's home in order to have access to the 1280 West building and the Plaintiff's home respectively.

827.   Plaintiff resigned and was blacklisted from relevant job opportunities by Defendants because she engaged in protected activities.

828.   Defendant Finch McCranie breached the attorney–client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

829.   Defendant Finch McCranie utilized the information provided by Plaintiff, client at the time, to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

830.   Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

831.   Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

832.   Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

833.    Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in other to cause harm to Plaintiff.

834.    Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4. Several Interface's employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

835.    The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

836.    Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

837.    Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

838.    During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Mark Davenport (Audit Partner), Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept

using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

839.    During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

840.    During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

841.    Plaintiff noted that recordings and evidence gathered during that same meeting in September of 2021 with Edward Burdekin were deleted from her laptop in an attempt to place her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

842.    Plaintiff informed Finch McCranie, her then attorneys, of all the retaliatory practices she was facing.

843.    Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

844.    The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and conditions of employment, broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law.

845.   Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

846.   Defendants committed the crime of influencing Plaintiff with intent to deter Plaintiff from testifying freely, fully, and truthfully to any matter pending in any court, in any administrative proceeding, or before a grand jury, by communicating, directly and indirectly, to Plaintiff any threat of injury or damage to the person, property, or employment of the Plaintiff or to the person, property, or employment of Plaintiff's relative.

847.   Defendants knowingly used intimidation and threats, attempted to persuade Plaintiff by means of corruption, and engaged in misleading conduct toward Plaintiff with intent to hinder, delay, and/or prevent the communication to a law enforcement officer, prosecuting attorney, or judge of the United States of information relating to the commission or possible commission of a Federal offense.

848.   Finch McCranie, Michael Sullivan, and Walter Jospin violated the Client's communications to attorney privileged agreement by disclosing the advice or counsel they have given to Plaintiff, their then client.

## COUNT NINE:

### Tampering with a witness, victim, or an informant

### 18 U.S. Code § 1512

### (Against All Defendants)

849.   The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

850.   The offense of tampering with a witness, victim, or an informant occurs when:

(1)   An entity or individual uses physical force or the threat of physical force against any person, or attempts to do so, with intent to—

a.   influence, delay, or prevent the testimony of any person in an official proceeding;

b.   cause or induce any person to—

i.   withhold testimony, or withhold a record, document, or other object, from an official proceeding;

ii.   alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding;

iii.   evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

iv.   be absent from an official proceeding to which that person has been summoned by legal process; or

c.   hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

(2)    An entity or individual knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

    a.    influence, delay, or prevent the testimony of any person in an official proceeding;

    b.    cause or induce any person to—

        i.    Withhold testimony, or withhold a record, document, or other object, from an official proceeding;

        ii.    alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

        iii.    evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

        iv.    be absent from an official proceeding to which such person has been summoned by legal process; or

    c.    hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

(3)    An entity or individual corruptly—

    a.     alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

    b.     otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

(4)     An entity or individual intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—

    a.     attending or testifying in an official proceeding;

    b.     reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation 1 supervised release,1 parole, or release pending judicial proceedings;

    c.     arresting or seeking the arrest of another person in connection with a Federal offense; or

    d.     causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;

851.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

852.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

853.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

854.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

855.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

856.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

857.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well

as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

858.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

859.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

860.    The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

861.    Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

862.    Plaintiff noticed that the workpapers for both private clients and public clients were being rolled forward year after year without actually doing the work. The public clients included BlueLinx, Atlanticus, IZEA, BioHorizons, and Interface. Interface has recently been under an SEC investigation and an executive employee at Interface has been suspended. The private clients included Janus, Dustex, FCCI, RSR Group, ProCare, Vacation Express, and many others.

863.    The issue with the IT audit work performed was that several deficiencies that should have been identified as significant deficiencies or material weaknesses were actually identified as only control deficiencies. Because they were never communicated to the financial statements audit team as control deficiencies, the financial statements

audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls (ITGCs).

864.    Plaintiff informed Defendant Wesley Freeman of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, he kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

865.    Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

866.    Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted. These associates enlisted to smear her reputation were part of the group who delivered such a poor work product.

867.    Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground, harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

868.    During internal meetings in 2020 and early 2021, Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and

PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

869.   Defendant Antony Reh, an Assurance Partner at BDO, had also stated that Plaintiff "and her family should be careful".

870.   Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

871.   Plaintiff's home was broken into multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart elevators that require a key card in order to both, enter the building and access the residential areas. The intruders must have had the building access card and the residential floors as well as a copy of the keys to the Plaintiff's home in order to have access to the 1280 West building and the Plaintiff's home respectively.

872.   Plaintiff resigned and was blacklisted from relevant job opportunities by Defendants because she engaged in protected activities.

873.   Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

874.   Defendant Finch McCranie utilized the information provided by Plaintiff and then client to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

875.    Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

876.    Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

877.    Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

878.    Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in order to cause harm to Plaintiff.

879.    Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4. Several Interface's employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

880.    The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

881.   Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

882.   Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

883.   During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Mark Davenport (Audit Partner), Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

884.   During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

885.   During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

886.   Plaintiff noted that recordings and evidence gathered during that same meeting in September of 2021 with Edward Burdekin were deleted from her laptop in

an attempt to place her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

887.    Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

888.    The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and conditions of employment, broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law.

889.    Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

890.    Defendants committed the crime of influencing Plaintiff with intent to deter Plaintiff from testifying freely, fully, and truthfully to any matter pending in any court, in any administrative proceeding, or before a grand jury, by communicating, directly and indirectly, to Plaintiff any threat of injury or damage to the person, property, or employment of the Plaintiff or to the person, property, or employment of Plaintiff's relative.

891.    Defendants knowingly used intimidation and threats, attempted to persuade Plaintiff by means of corruption, and engaged in misleading conduct toward Plaintiff with intent to hinder, delay, and/or prevent the communication to a law enforcement officer, prosecuting attorney, or judge of the United States of information relating to the commission or possible commission of a Federal offense.

## COUNT TEN:

### Influencing Witness

### O.C.G.A. §16-10-93

### (Against All Defendants)

892.    The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

893.    The offense of influencing a witness occurs when:

(1)    a person who, with intent to deter a witness from testifying freely, fully, and truthfully to any matter pending in any court, in any administrative proceeding, or before a grand jury, communicates, directly or indirectly, to such witness any threat of injury or damage to the person, property, or employment of the witness or to the person, property, or employment of any relative or associate of the witness or who offers or delivers any benefit, reward, or consideration for such witness or to a relative or associate of the witness shall will be guilty of influencing witnesses.

(2)    any person knowingly to use intimidation, physical force, or threats; to persuade another person by means of corruption or to attempt to do so; or to engage in misleading conduct toward another person with intent to:

a.    Influence, delay, or prevent the testimony of any person in an official proceeding;

b.    Cause or induce any person to withhold testimony or a record, document, or another object from an official proceeding, alter, destroy, mutilate, or conceal an object with intent to impair the object's

integrity or availability for use in an official proceeding, evade legal process summoning that person to appear as a witness or to produce a record, document, or other object in an official proceeding; or be absent from an official proceeding to which such person has been summoned by legal process; or

      c.     Hinder, delay, or prevent the communication to a law enforcement officer, prosecuting attorney, or judge of this state of information relating to the commission or possible commission of a criminal offense or a violation of conditions of probation, parole, or release pending judicial proceedings.

894.    Pursuant to O.C.G.A. §16-10-93, a witness can be influenced with or without force.

895.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

896.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

897.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

898.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

899.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

900.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

901.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

902.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

903.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well

as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

904.    The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

905.   Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

906.   Plaintiff noticed that the workpapers for both private clients and public clients were being rolled forward year after year without actually doing the work. The public clients included BlueLinx, Atlanticus, IZEA, BioHorizons, and Interface. Interface has recently been under an SEC investigation and an executive employee at Interface has been suspended. The private clients included Janus, Dustex, FCCI, RSR Group, ProCare, Vacation Express, and many others.

907.   The issue with the IT audit work performed was that several deficiencies that should have been identified as significant deficiencies or material weaknesses were actually identified as only control deficiencies. Because they were never communicated to the financial statements audit team as control deficiencies, the financial statements audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls ("ITGCs").

908.   Plaintiff informed Defendant Wesley Freeman of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, he kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

909.    Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

910.    Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted. These associates enlisted to smear my reputation were part of the group who delivered such a poor work product.

911.    Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground, harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

912.    During internal meetings in 2020 and early 2021, Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

913.    Defendant Antony Reh, an Assurance Partner at BDO, had also stated that Plaintiff "and her family should be careful".

914.    Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

915.    Plaintiff's home was broken into at multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart

elevators that require a key card in order to both, enter the building and access the residential areas. The intruders must have had the building access card and the residential floors as well as a copy of the keys to the Plaintiff's home in order to have access to the 1280 West building and the Plaintiff's home respectively.

916.    Plaintiff resigned and was blacklisted from relevant job opportunities by Defendants because she engaged in protected activities.

917.    Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

918.    Defendant Finch McCranie utilized the information provided by Plaintiff and then client to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

919.    Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

920.    Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

921.    Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

922. Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in other to cause harm to Plaintiff.

923. Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4. Several Interface's employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

924. The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

925. Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

926. Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

927. During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Mark Davenport (Audit Partner), Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept

using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

928.    During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

929.    During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

930.    Plaintiff noted that recordings and evidence gathered during that same meeting in September of 2021 with Edward Burdekin were deleted from her laptop in an attempt to place her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

931.    Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

932.    The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and conditions of employment, broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law.

933.    Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

934.   Defendants committed the crime of influencing Plaintiff with intent to deter Plaintiff from testifying freely, fully, and truthfully to any matter pending in any court, in any administrative proceeding, or before a grand jury, by communicating, directly and indirectly, to Plaintiff any threat of injury or damage to the person, property, or employment of the Plaintiff or to the person, property, or employment of Plaintiff's relative.

935.   Defendants knowingly used intimidation and threats, attempted to persuade Plaintiff by means of corruption, and engaged in misleading conduct toward Plaintiff with intent to hinder, delay, and/or prevent the communication to a law enforcement officer, prosecuting attorney, or judge of this state of information relating to the commission or possible commission of a criminal offense.

**COUNT ELEVEN:**

**Conspiracy to Commit a Crime**

**O.C.G.A. § 16-4-8**

**(Against All Defendants)**

936.   The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

937.   The offense of conspiracy to commit a crime occurs when a person together with one or more persons conspires to commit any crime and any one or more of such persons does any overt act to effect the object of the conspiracy. See GA Code § 16-4-8.

938.   After conspiracy is formed, if a party joins therein, knowing of its existence and purpose, that party becomes as much a party thereto as if the person had

been an original member. Willson v. Appalachian Oak Flooring & Hdwe. Co., 220 Ga. 599, 140 S.E.2d 830 (1965) (decided under prior law)

939.   If in carrying out design of conspirators, overt acts are done, causing legal damage, the person so damaged has a right of action. Patterson-Pope Motor Co. v. Ford Motor Co., 66 Ga. App. 41, 16 S.E.2d 877 (1941).

940.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

941.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

942.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

943.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

944.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well

as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

945.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

946.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

947.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

948.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

949.   The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

<u>Group 1 – Plaintiff</u>: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

950.    Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

951.    Plaintiff noticed that the workpapers for both private clients and public clients were being rolled forward year after year without actually doing the work. The public clients included BlueLinx, Atlanticus, IZEA, BioHorizons, and Interface.

Interface has recently been under an SEC investigation and an executive employee at Interface has been suspended. The private clients included Janus, Dustex, FCCI, RSR Group, ProCare, Vacation Express, and many others.

952.    The issue with the IT audit work performed was that several deficiencies that should have been identified as significant deficiencies or material weaknesses were actually identified as only control deficiencies. Because they were never communicated to the financial statements audit team as control deficiencies, the financial statements audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls (ITGCs).

953.    Plaintiff informed the Defendant Wesley Freeman of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, he kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

954.    Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

955.    Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted. These associates enlisted to smear my reputation were part of the group who delivered such a poor work product.

956.   Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground, harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

957.   During internal meetings in 2020 and early 2021; Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

958.   Plaintiff was blacklisted from relevant job opportunities by Defendants from engaging in protected activities.

959.   Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

960.   Plaintiff's home was broken into at multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart elevators that require a key card in order to both, enter the building and access the residential areas. Intruders must have had a double of the Plaintiff's key and a building access card in order to enter the Plaintiff's home.

961.   Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

962.    Defendant Finch McCranie utilized the information provided by Plaintiff and then client to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

963.    Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

964.    Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

965.    Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

966.    Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in order to cause harm to Plaintiff.

967.    Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4. Several Interface's employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

968. The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

969. Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

970. Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

971. During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Mark Davenport (Audit Partner), Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

972. During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

973.    During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

974.    Plaintiff noted that recordings and evidence gathered during that same meeting in September of 2021 with Edward Burdekin were deleted from her laptop in an attempt to place her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

975.    Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

976.    The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and conditions of employment, broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law.

977.    Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

978.    Defendants committed the act of conspiracy when together, Group 2, Group 3, and Group 4 committed the crimes described herein against Plaintiff and did the overt acts described herein to effect the object of the conspiracy.

**COUNT TWELVE:**

**Violations of Computer Crimes Laws**

**O.C.G.A. §§ 16-9-90 - 16-9-94**

**(Against All Defendants)**

979.   The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

980.   A violation of computer crimes law occurs, among other circumstances, when:

(1)   any person uses a computer or computer network with knowledge that such use is without authority and with the intention of:

a.   Deleting or in any way removing, either temporarily or permanently, any computer program or data from a computer or computer network;

b.   Obstructing, interrupting, or in any way interfering with the use of a computer program or data; or

c.   Altering, damaging, or in any way causing the malfunction of a computer, computer network, or computer program, regardless of how long the alteration, damage, or malfunction persists shall be guilty of the crime of computer trespass.

(2)   any person uses a computer or computer network with the intention of examining any employment, medical, salary, credit, or any other financial or personal data relating to any other person with knowledge that such examination is without authority shall be guilty of the crime of computer invasion of privacy.

981.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well

as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

982.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

983.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

984.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

985.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

986.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

987.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

988.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

989.    As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

990.    The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West

Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

991.    Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

992.    Plaintiff informed Defendant Wesley Freeman of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, he kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

993.    Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

994.    Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted. These associates enlisted to smear my reputation were part of the group who delivered such a poor work product.

995.    Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground, harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

996.    During internal meetings in 2020 and early 2021, Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

997.    Defendant Antony Reh, an Assurance Partner at BDO, had also stated that Plaintiff "and her family should be careful".

998.    Plaintiff Raissa Djuissi Kengne signed the engagement letter with Defendant Finch McCranie in June of 2021. A few months later Finch McCranie resigned as the attorney firm on the Plaintiff's case. Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

999.    Defendants Finch and McCranie, Michael Sullivan, and Walter Jospin disclosed the content of their conversation to BDO USA, LLP and did not disclose the conflict of interest they had with any of the other Defendants.

1000. Plaintiff uploaded several documents she had in Defendant's Finch McCranie's data room per their request. Defendant's Finch McCranie took several months to review the evidence provided by the client and asked many questions about BDO USA, LLP, the clients Plaintiff was working on, and the Plaintiff's family.

1001. The Plaintiff was at a meeting at Defendant's Finch McCranie's offices located at 225 Peachtree St NE #1700, Atlanta, GA 30303 for many hours when her home was broken into on June 29th, 2021.

1002. During the meeting on June 29th, 2021 at Defendant Finch McCranie, an accountant was brought in to look at the evidence provided by Plaintiff. The accountant asked the Plaintiff whether she believed that Defendant Wesley Freeman was drugged and that was why he could not deliver on the engagements. Plaintiff responded by asking if "Defendant Wesley Freeman had been drugged for the past five (5) years" while overseeing the public company's engagements.

1003. The question asked by Defendant Finch McCranie's accountant is the same one Defendant Scott Meier, the Southeast IS Audit Partner at BDO USA, LLP had asked Plaintiff during their face-to-face meeting at the "Establishment" restaurant in Midtown Atlanta in early 2021.

1004. Plaintiff advised Defendant Finch McCranie that she had received a pay increase of approximately 12% and that Plaintiff was up for promotion. Defendant Michael Sullivan stated "well, that is a good thing".

1005. While leaving the meeting, Defendant Finch McCranie's accountant stated to the Plaintiff "Nobody is safe".

1006.   Plaintiff had several phone calls thereafter with Finch McCranie. During one of these calls, Defendant Michael Sullivan explained that they did not have enough evidence to pursue the case. Plaintiff notes that it took Defendant Finch McCranie more than 6 months to determine whether they had enough evidence for the whistleblower case. Upon informing the Plaintiff on the phone that Defendant Finch McCranie could no longer represent her, Defendant Michael Sullivan asked if Plaintiff wanted to drop the case. Plaintiff responded "No". Plaintiff noted that there was a long pause on the phone. After a few minutes, there were a few laughs on the call. Defendant Michael Sullivan then told the Plaintiff that his firm would send her an email to withdraw from the case.

1007.   Plaintiff claims that after the phone call with Defendant Finch McCranie, the retaliation practices and attacks she faced, both at work and in her personal life, had increased.

1008.   Plaintiff's home was broken into at multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart elevators that require a key card in order to both, enter the building and access the residential areas. The intruders must have had the building access card and the residential floors as well as a copy of the keys to the Plaintiff's home in order to have access to the 1280 West building and the Plaintiff's home respectively.

1009.   Plaintiff's home was accessed multiple times without her authorization and her data was compromised.

1010. Plaintiff reached out to Google Support to let them know of the unauthorized access on the Gmail account rkengne1@gmail.com.

1011. Plaintiff is now unable to access her Gmail account rkengne1@gmail.com.

1012. Defendant BDO USA, LLP had not fully removed the Intune application from Plaintiff's personal cell phone she utilized for work as Plaintiff had requested at the height of the attacks. Plaintiff contacted IT support at BDO USA, LLP to ask them to remove the software several times, including on November 21st, 2021. BDO USA, LLP was still able to access information on Plaintiff's cell phone and read her data afterwards.

1013. Plaintiffs noted that the following neighbors had a remote desktop connection on her personal laptop:

      1.     Jamie Johnson, living in unit 2009 at 1280 West Peachtree ST NW Atlanta, GA 30309.

      2.     Silvia Calloway, living in unit 2209 at 1280 West Peachtree ST NW Atlanta, GA 30309.

      3.     Sirocus Barnes, living in unit 2010 at 1280 West Peachtree ST NW Atlanta, GA 30309.

1014. Plaintiff resigned because of constructive discharge and was blacklisted from relevant job opportunities by Defendants because she engaged in protected activities. OSHA defines constructive discharge as quitting when an employer makes working conditions intolerable due to the employee's protected activity.

1015.  Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests. Thereby, causing harm to their then client.

1016.  Defendant Finch McCranie, Michael Sullivan utilized the information provided by Plaintiff, their client at the time, to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

1017.  Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

1018.  Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

1019.  Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

1020.  Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in order to cause harm to Plaintiff.

1021.  Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a

relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4. Several Interface's employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

1022. The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

1023. Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

1024. Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

1025. During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Mark Davenport (Audit Partner), Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

1026. During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and

attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

1027.   During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

1028.   Plaintiff noted that recordings and evidence gathered during that same meeting in September of 2021 with Edward Burdekin were deleted from her laptop in an attempt to place her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

1029.   Plaintiff informed Finch McCranie, her then attorneys, of all the retaliatory practices she was facing.

1030.   Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

1031.   The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and conditions of employment, broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law.

1032.   Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

1033.   Defendants committed the crime of influencing Plaintiff with intent to deter Plaintiff from testifying freely, fully, and truthfully to any matter pending in any

court, in any administrative proceeding, or before a grand jury, by communicating, directly and indirectly, to Plaintiff any threat of injury or damage to the person, property, or employment of the Plaintiff or to the person, property, or employment of Plaintiff's relative.

1034. Defendants knowingly used intimidation and threats, attempted to persuade Plaintiff by means of corruption, and engaged in misleading conduct toward Plaintiff with intent to hinder, delay, and/or prevent the communication to a law enforcement officer, prosecuting attorney, or judge of the United States of information relating to the commission or possible commission of a Federal offense.

1035. Finch McCranie, Michael Sullivan, and Walter Jospin violated the Client's communications to attorney privileged agreement by disclosing the advice or counsel they have given to Plaintiff, their then client.

1036. Defendants committed a violation of computer crimes by utilizing a computer or computer network with knowledge that such use is without authority and with the intention of:

      1.    Deleting or in any way removing, either temporarily or permanently, any computer program or data from a computer or computer network;

      2.    Obstructing, interrupting, or in any way interfering with the use of a computer program or data; or

      3.    Altering, damaging, or in any way causing the malfunction of a computer, computer network, or computer program, regardless of how long the

alteration, damage, or malfunction persists shall be guilty of the crime of computer trespass.

1037. Defendants committed computer invasion of privacy by utilizing Plaintiff's computer and/or computer network with the intention of examining Plaintiff's employment, medical, salary, credit, and/or financial or personal data relating to Plaintiff with knowledge that such examination is without authority.

**COUNT THIRTEEN:**

**Violations of Computer Security Laws**

**O.C.G.A. §§ 16-9-150 - 16-9-157**

**(Against All Defendants)**

1038. The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

1039. A violation of computer security laws occurs, among other actions, when:

(1)     a person or entity that is not an authorized user, as defined in Code Section 16-9-151, of a computer in this state to knowingly, willfully, or with conscious indifference or disregard cause computer software to be copied onto such computer and use the software to do any of the following:

a.     Modify, through intentionally deceptive means, any of the following settings related to the computer's access to, or use of, the Internet:

i.     The page that appears when an authorized user launches an Internet browser or similar software program used to access and navigate the Internet;

297 of 407

ii.      The default provider or web proxy the authorized user uses to access or search the Internet; or

iii.     The authorized user's list of bookmarks used to access web pages;

b.     Collect, through intentionally deceptive means, personally identifiable information that meets any of the following criteria:

i.     It is collected through the use of a keystroke-logging function that records all keystrokes made by an authorized user who uses the computer and transfers that information from the computer to another person;

ii.     It includes all or substantially all of the websites visited by an authorized user, other than websites of the provider of the software, if the computer software was installed in a manner designed to conceal from all authorized users of the computer the fact that the software is being installed; or

iii.     It is a data element described in subparagraph (B), (C), or (D) of paragraph (12) of Code Section 16-9-151, or in division (12)(E)(i) or (12)(E)(ii) of Code Section 16-9-151, that is extracted from the consumer's or business entity's computer hard drive for a purpose wholly unrelated to any of the purposes of the software or service described to an authorized user;

iv. Prevent, without the authorization of an authorized user, through intentionally deceptive means, an authorized user's reasonable efforts to block the installation of, or to disable, software, by causing software that the authorized user has properly removed or disabled to automatically reinstall or reactivate on the computer without the authorization of an authorized user;

v. Intentionally misrepresent that software will be uninstalled or disabled by an authorized user's action, with knowledge that the software will not be so uninstalled or disabled; or

vi. Through intentionally deceptive means, remove, disable, or render inoperative security, antispyware, or antivirus software installed on the computer.

1040. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

1041. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

1042. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well

as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

1043. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

1044. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

1045. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

1046. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

1047. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

1048. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

1049. The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon

Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

1050.   Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

1051.   Plaintiff informed Defendant Wesley Freeman of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, he kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

1052.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

1053.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted. These associates enlisted to smear my reputation were part of the group who delivered such a poor work product.

1054.   Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground, harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

1055. During internal meetings in 2020 and early 2021, Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

1056. Defendant Antony Reh, an Assurance Partner at BDO, had also stated that Plaintiff "and her family should be careful".

1057. Plaintiff Raissa Djuissi Kengne signed the engagement letter with Defendant Finch McCranie in June of 2021. A few months later Finch McCranie resigned as the attorney firm on the Plaintiff's case. Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

1058. Defendants Finch and McCranie, Michael Sullivan, and Walter Jospin disclosed the content of their conversation to BDO USA, LLP and did not disclose the conflict of interest they had with any of the other Defendants.

1059. Plaintiff uploaded several documents she had in Defendant's Finch McCranie's data room per their request. Defendant's Finch McCranie took several months to review the evidence provided by the client and asked many questions about BDO USA, LLP, the clients Plaintiff was working on, and the Plaintiff's family.

1060. The Plaintiff was at a meeting at Defendant's Finch McCranie's offices located at 225 Peachtree St NE #1700, Atlanta, GA 30303 for many hours when her home was broken into on June 29th, 2021.

1061.  During the meeting on June 29th, 2021 at Defendant Finch McCranie, an accountant was brought in to look at the evidence provided by Plaintiff. The accountant asked the Plaintiff whether she believed that Defendant Wesley Freeman was drugged and that was why he could not deliver on the engagements. Plaintiff responded by asking if "Defendant Wesley Freeman had been drugged for the past five (5) years" while overseeing the public company's engagements.

1062.  The question asked by Defendant Finch McCranie's accountant is the same one Defendant Scott Meier, the Southeast IS Audit Partner at BDO USA, LLP had asked Plaintiff during their face-to-face meeting at the "Establishment" restaurant in Midtown Atlanta in early 2021.

1063.  Plaintiff advised Defendant Finch McCranie that she had received a pay increase of approximately 12% and that Plaintiff was up for promotion. Defendant Michael Sullivan stated "well, that is a good thing".

1064.  While leaving the meeting, Defendant Finch McCranie's accountant stated to the Plaintiff "Nobody is safe".

1065.  Plaintiff had several phone calls thereafter with Finch McCranie. During one of these calls, Defendant Michael Sullivan explained that they did not have enough evidence to pursue the case. Plaintiff notes that it took Defendant Finch McCranie more than 6 months to determine whether they had enough evidence for the whistleblower case. Upon informing the Plaintiff on the phone that Defendant Finch McCranie could no longer represent her, Defendant Michael Sullivan asked if Plaintiff wanted to drop the case. Plaintiff responded "No". Plaintiff noted that there was a long pause on the phone. After a few minutes, there was a few laughs on the call. Defendant Michael

Sullivan then told the Plaintiff that his firm would send her an email to withdraw from the case.

1066.   Plaintiff claims that after the phone call with Defendant Finch McCranie, the retaliation practices and attacks she faced, both at work and in her personal life, had increased.

1067.   Plaintiff's home was broken into at multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart elevators that require a key card in order to both, enter the building and access the residential areas. The intruders must have had the building access card and the residential floors as well as a copy of the keys to the Plaintiff's home in order to have access to the 1280 West building and the Plaintiff's home respectively.

1068.   Plaintiff's home was accessed multiple times without her authorization and her data was compromised.

1069.   Plaintiff reached out to Google Support to let them know of the unauthorized access on the Gmail account rkengne1@gmail.com.

1070.   Plaintiff is now unable to access her Gmail account rkengne1@gmail.com.

1071.   Defendant BDO USA, LLP had not fully removed the Intune application from Plaintiff's personal cell phone she utilized for work as Plaintiff had requested at the height of the attacks. Plaintiff contacted IT support at BDO USA, LLP to ask them to remove the software several times, including on November 21st, 2021. BDO USA,

LLP was still able to access information on Plaintiff's cell phone and read her data afterwards.

1072.   Plaintiffs noted that the following neighbors had a remote desktop connection on her personal laptop:

1.   Jamie Johnson, living in unit 2009 at 1280 West Peachtree ST NW Atlanta, GA 30309.

2.   Silvia Calloway, living in unit 2209 at 1280 West Peachtree ST NW Atlanta, GA 30309.

3.   Sirocus Barnes, living in unit 2010 at 1280 West Peachtree ST NW Atlanta, GA 30309.

1073.   Plaintiff resigned because of constructive discharge and was blacklisted from relevant job opportunities by Defendants because she engaged in protected activities. OSHA defines constructive discharge as quitting when an employer makes working conditions intolerable due to the employee's protected activity.

1074.   Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests. Thereby, causing harm to their then client.

1075.   Defendant Finch McCranie, Michael Sullivan utilized the information provided by Plaintiff, their client at the time, to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

1076. Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

1077. Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

1078. Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

1079. Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in other to cause harm to Plaintiff.

1080. Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4. Several Interface's employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

1081. The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

1082.   Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

1083.   Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

1084.   During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Mark Davenport (Audit Partner), Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

1085.   During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

1086.   During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

1087.   Plaintiff noted that recordings and evidence gather during that same meeting in September of 2021 with Edward Burdekin were been deleted from her laptop

in an attempt to place her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

1088. Plaintiff informed Finch McCranie, her then attorneys, of all the retaliatory practices she was facing.

1089. Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

1090. The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and conditions of employment, broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law.

1091. Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

1092. Defendants committed the crime of influencing Plaintiff with intent to deter Plaintiff from testifying freely, fully, and truthfully to any matter pending in any court, in any administrative proceeding, or before a grand jury, by communicating, directly and indirectly, to Plaintiff any threat of injury or damage to the person, property, or employment of the Plaintiff or to the person, property, or employment of Plaintiff's relative.

1093. Defendants knowingly used intimidation and threats, attempted to persuade Plaintiff by means of corruption, and engaged in misleading conduct toward Plaintiff with intent to hinder, delay, and/or prevent the communication to a law

enforcement officer, prosecuting attorney, or judge of the United States of information relating to the commission or possible commission of a Federal offense.

1094. Finch McCranie, Michael Sullivan, and Walter Jospin violated the Client's communications to attorney privileged agreement by disclosing the advice or counsel they have given to Plaintiff, their then client.

1095. Defendants committed a violation of computer crimes by utilizing a computer or computer network with knowledge that such use is without authority and with the intention of:

    1.    Deleting or in any way removing, either temporarily or permanently, any computer program or data from a computer or computer network;

    2.    Obstructing, interrupting, or in any way interfering with the use of a computer program or data; or

    3.    Altering, damaging, or in any way causing the malfunction of a computer, computer network, or computer program, regardless of how long the alteration, damage, or malfunction persists shall be guilty of the crime of computer trespass.

1096. Defendants committed computer invasion of privacy by utilizing Plaintiff's computer and/or computer network with the intention of examining Plaintiff's employment, medical, salary, credit, and/or financial or personal data relating to Plaintiff with knowledge that such examination is without authority.

1097. Defendants committed a violation of computer security laws, when they, without authorization, knowingly, willfully, or with conscious indifference or disregard

caused computer software to be copied onto Plaintiff's computer and used the software to do the following:

(1)  Modify, through intentionally deceptive means, any of the settings related to the computer's access to, or use of, the Internet:

(2)  Collect, through intentionally deceptive means, personally identifiable information.

## COUNT FOURTEEN:

### Bribery

### O.C.G.A. §16-10-2

### (Against All Defendants)

1098.  The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

1099.  The offense of bribery occurs in one of the following two ways:

(1)  when a person gives or offers to give to any person acting for or on behalf of the state or any political subdivision thereof, or of any agency of either, any benefit, reward, or consideration to which he or she is not entitled with the purpose of influencing him or her in the performance of any act related to the functions of his or her office or employment.

(2)  when a public official, elected or appointed, or an employee of this state or any agency, authority, or entity of the state, or any county or municipality or any agency, authority, or entity thereof, directly or indirectly solicits, receives, accepts, or agrees to receive a

thing of value by inducing the reasonable belief that the giving of the thing will influence his or her performance or failure to perform any official action.

1100. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

1101. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

1102. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

1103. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

1104. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

1105. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

1106. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

1107. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

1108. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

1109. The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of

management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

1110.   Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

1111.   Plaintiff noticed that the workpapers for both private clients and public clients were being rolled forward year after year without actually doing the work. The public clients included BlueLinx, Atlanticus, IZEA, BioHorizons, and Interface. Interface has recently been under an SEC investigation and an executive employee at

Interface has been suspended. The private clients included Janus, Dustex, FCCI, RSR Group, ProCare, Vacation Express, and many others.

1112.   The issue with the IT audit work performed was that several deficiencies that should have been identified as significant deficiencies or material weaknesses were actually identified as only control deficiencies. Because they were never communicated to the financial statements audit team as control deficiencies, the financial statements audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls (ITGCs).

1113.   Plaintiff informed Defendant Wesley Freeman of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, he kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

1114.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

1115.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted. These associates enlisted to smear my reputation were part of the group who delivered such a poor work product.

1116.   Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground,

harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

1117. During internal meetings in 2020 and early 2021, Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

1118. Defendant Antony Reh, an Assurance Partner at BDO, had also stated that Plaintiff "and her family should be careful".

1119. Plaintiff Raissa Djuissi Kengne signed the engagement letter with Defendant Finch McCranie in June of 2021. A few months later Finch McCranie resigned as the attorney firm on the Plaintiff's case. Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

1120. Defendants Finch and McCranie, Michael Sullivan, and Walter Jospin disclosed the content of their conversation to BDO USA, LLP and did not disclose the conflict of interest they had with any of the other Defendants.

1121. Plaintiff uploaded several documents she had in Defendant's Finch McCranie's data room per their request. Defendant's Finch McCranie took several months to review the evidence provided by the client and asked many questions about BDO USA, LLP, the clients Plaintiff was working on, and the Plaintiff's family.

1122.  The Plaintiff was at a meeting at Defendant's Finch McCranie's offices located at 225 Peachtree St NE #1700, Atlanta, GA 30303 for many hours when her home was broken into on June 29th, 2021.

1123.  During the meeting on June 29th, 2021 at Defendant Finch McCranie, an accountant was brought in to look at the evidence provided by Plaintiff. The accountant asked the Plaintiff whether she believed that Defendant Wesley Freeman was drugged and that was why he could not deliver on the engagements. Plaintiff responded by asking if "Defendant Wesley Freeman had been drugged for the past five (5) years" while overseeing the public company's engagements.

1124.  The question asked by Defendant Finch McCranie's accountant is the same one Defendant Scott Meier, the Southeast IS Audit Partner at BDO USA, LLP had asked Plaintiff during their face-to-face meeting at the "Establishment" restaurant in Midtown Atlanta in early 2021.

1125.  Plaintiff advised Defendant Finch McCranie that she had received a pay increase of approximately 12% and that Plaintiff was up for promotion. Defendant Michael Sullivan stated "well, that is a good thing".

1126.  While leaving the meeting, Defendant Finch McCranie's accountant stated to the Plaintiff "Nobody is safe".

1127.  Plaintiff had several phone calls thereafter with Finch McCranie. During one of these calls, Defendant Michael Sullivan explained that they did not have enough evidence to pursue the case. Plaintiff notes that it took Defendant Finch McCranie more than 6 months to determine whether they had enough evidence for the whistleblower case. Upon informing the Plaintiff on the phone that Defendant Finch McCranie could

no longer represent her, Defendant Michael Sullivan asked if Plaintiff wanted to drop the case. Plaintiff responded "No". Plaintiff noted that there was a long pause on the phone. After a few minutes, there was a few laughs on the call. Defendant Michael Sullivan then told the Plaintiff that his firm would send her an email to withdraw from the case.

1128.   Plaintiff claims that after the phone call with Defendant Finch McCranie, the retaliation practices and attacks she faced, both at work and in her personal life, had increased.

1129.   Plaintiff's home was broken into multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart elevators that require a key card in order to both, enter the building and access the residential areas. The intruders must have had the building access card and the residential floors as well as a copy of the keys to the Plaintiff's home in order to have access to the 1280 West building and the Plaintiff's home respectively.

1130.   Plaintiff resigned and was blacklisted from relevant job opportunities by Defendants because she engaged in protected activities.

1131.   Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

1132.   Defendant Finch McCranie utilized the information provided by Plaintiff, client at the time, to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

1133. Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

1134. Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

1135. Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

1136. Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in order to cause harm to Plaintiff.

1137. Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4. Several Interface's employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

1138. The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

1139. Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

1140. Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

1141. During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Mark Davenport (Audit Partner), Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

1142. During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

1143. During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

1144. Plaintiff noted that recordings and evidence gathered during that same meeting in September of 2021 with Edward Burdekin were deleted from her laptop in

an attempt to place her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

1145. Plaintiff informed Finch McCranie, her then attorneys, of all the retaliatory practices she was facing.

1146. Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

1147. The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and conditions of employment, broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law.

1148. Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

1149. Defendants committed the crime of influencing Plaintiff with intent to deter Plaintiff from testifying freely, fully, and truthfully to any matter pending in any court, in any administrative proceeding, or before a grand jury, by communicating, directly and indirectly, to Plaintiff any threat of injury or damage to the person, property, or employment of the Plaintiff or to the person, property, or employment of Plaintiff's relative.

1150. Defendants knowingly used intimidation and threats, attempted to persuade Plaintiff by means of corruption, and engaged in misleading conduct toward Plaintiff with intent to hinder, delay, and/or prevent the communication to a law

enforcement officer, prosecuting attorney, or judge of the United States of information relating to the commission or possible commission of a Federal offense.

1151.  Finch McCranie, Michael Sullivan, and Walter Jospin violated the Attorney-Client Privilege when they failed to maintain inviolate the confidence and, at every peril to themselves, to preserve the secrets of Plaintiff, their then client.

1152.  Defendants committed the offense of bribery when they attempted to give or offer the Plaintiff an unusual increase in salary and inducing the reasonable belief that the giving of the salary increase will influence her performance or failure to perform her civic duty of reporting the fraud to the proper authorities.

## COUNT FIFTEEN:

### Burglary

### O.C.G.A. § 16-7-1

### (Against All Defendants)

1153.  The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

1154.  The offense of burglary occurs when an entity or a person breaks and enters into any structure with the intent to commit a felony therein; there must be intent to commit an underlying offense. See O.C.G.A. §16-7-1.

1155.  An entity or person can be convicted of burglary even if he or she obtained permission to enter into a house through fraud, deceit or false pretenses.

1156.  An entity or person does not have to take any personal property items to be convicted of burglary.

1157. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

1158. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

1159. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

1160. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

1161. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

1162. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well

as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

1163. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

1164. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

1165. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

1166. The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong,

Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

1167.  Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

1168.  Plaintiff noticed that the workpapers for both private clients and public clients were being rolled forward year after year without actually doing the work. The public clients included BlueLinx, Atlanticus, IZEA, BioHorizons, and Interface. Interface has recently been under an SEC investigation and an executive employee at Interface has been suspended. The private clients included Janus, Dustex, FCCI, RSR Group, ProCare, Vacation Express, and many others.

1169.   The issue with the IT audit work performed was that several deficiencies that should have been identified as significant deficiencies or material weaknesses were actually identified as only control deficiencies. Because they were never communicated to the financial statements audit team as control deficiencies, the financial statements audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls (ITGCs).

1170.   Plaintiff informed the Defendant Wesley Freeman of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, he kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

1171.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

1172.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted. These associates enlisted to smear my reputation were part of the group who delivered such a poor work product.

1173.   Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground, harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

1174.   During internal meetings in 2020 and early 2021, Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

1175.   Plaintiff was blacklisted from relevant job opportunities by Defendants from engaging in protected activities.

1176.   Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

1177.   Plaintiff's home was broken into multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart elevators that require a key card in order to both, enter the building and access the residential areas. Intruders must have had a double of the Plaintiff's key and a building access card in order to enter the Plaintiff's home.

1178.   Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

1179.   Defendant Finch McCranie utilized the information provided by Plaintiff and then client to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

1180. Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

1181. Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

1182. Plaintiff left her home to meet with her then attorney Michael Sullivan and Walter Jospin from Finch McCranie on July 29th, 2022 to discuss the whistleblower case. When Plaintiff returned, she noted that her home had been broken into because her safe was opened.

1183. Plaintiff notes that the only parties with knowledge of her whereabouts or that she had left her unit on July 29th, 2022 were Walter Jospin, Michael Sullivan, Beacon Management's employees and contractors as well as the 1280 West's Board members, management, the building's employees/contractors, and her Plaintiff's neighbors living on the same floor (21st floor).

1184. Plaintiff's privacy was violated. Plaintiff's personal information such as bank account information, social security number, HIPAA protected health information, life insurance, health insurance information, and passwords to websites had been accessed.

1185. Plaintiff called the non-emergency line of the police the next day of the noted break-in because it was already late when Plaintiff noticed the crime. Officer Caleb responded to the call. Upon her arrival at the scene of the crime on June 31st, 2021, Officer Caleb had already decided that she was not going to write a police statement for

the crime Plaintiff was reporting. In addition, Officer Caleb had declined to look at the cameras.

1186.  Plaintiff had to wait several days to discover that the police report was classified as a non-crime. As soon as Plaintiff realized the enormous mistake, Plaintiff went to the Precinct at CNN. Plaintiff talked to Officer Caleb who refused to update the report. Plaintiff talked to Officer Caleb's supervisor who referred her to Detective Finney at Precinct 1. Officer Caleb's Supervisor told Plaintiff that only Detective Finney at Precinct 1 could update the police report.

1187.  Plaintiff then visited Precinct 1 in order to talk to Officer Finney. Unfortunately, Officer Finney was not present. An officer at Precinct 1 sent Plaintiff to the main police station in Downtown Atlanta.

1188.  Plaintiff talked to Officer Derrell at the main police station in Downtown Atlanta and Officer Derrell explained that the responding officer at Zone 5 would be responsible for updating the police report.

1189.  Plaintiff reached out to Officer Finney again and he refused to update the report. Plaintiff then talked to Officer Finney's supervisor, Lieutenant Dawson.

1190.  Lieutenant Dawson called Precinct 5 and arranged for Officer Caleb to go back to the Plaintiff's unit on September 2nd, in order to retake Plaintiff's full statement, dust for fingerprints, and review the footage.

1191.  Plaintiff's unit was accessed by someone with the keys to her unit. Only the building management has a copy of the Plaintiff's keys because it is required by the 1280 West Governing documents, which Plaintiff explained to Officer Caleb.

1192.   Despite the fact that Plaintiff has explained to Officer Caleb that someone in the management's office could be involved, Officer Caleb was not discreet enough when talking with the building management. Officer Caleb laid down the scope of her activities in Plaintiff's unit and what Officer Caleb would do or would not do in front of management.

1193.   Officer Caleb took Plaintiff's updated statement, dusted for fingerprints, and refused to look at the camera footage. Officer Caleb stated "I am not being paid the big bucks."

1194.   Plaintiff's unit was again accessed on August 28th, 2021. During Officer Caleb's second visit to Plaintiff's unit, Plaintiff explained to Officer Caleb that Plaintiff had a video footage showing that someone had accessed my unit again on August 28th, 2021 when Plaintiff was away from home. Office Caleb did not request Plaintiff to provide a copy of the video.

1195.   Officer Caleb took notes of the new security system Plaintiff had installed during her second visit.

1196.   On September 3rd, 2021, Plaintiff's unit was again accessed while Plaintiff was sleeping. The intruders knew how to enter the premises and where the cameras were located because the cameras were turned away from whoever accessed Plaintiff's unit.

1197.   Officer Caleb indicated a Detective would be in touch with Plaintiff, but has not provided a contact information. Plaintiff has not heard back from the police since then.

1198.  Plaintiff's storage unit was also broken into by members of the management's team in order to access information about Plaintiff's personal life.

1199.  Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

1200.  Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in order to cause harm to Plaintiff.

1201.  Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4. Several Interface's employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

1202.  The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

1203.  Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

1204.  Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

1205.  During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Mark Davenport (Audit Partner), Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

1206.  During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

1207.  During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

1208.  Plaintiff noted that recordings and evidence gathered during that same meeting in September of 2021 with Edward Burdekin were deleted from her laptop in an attempt to place her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

1209.  Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order

to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

1210.   The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and conditions of employment, broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law.

1211.   Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

1212.   Defendants committed the offense of burglary when they broke and / or arranged for a person to break and enter into Plaintiff's home with the intent to commit the felony therein. Defendants permitted burglary even if they obtained permission to enter into Plaintiff's house through fraud, deceit or false pretenses. Defendants did not obtain permission to enter into Plaintiff's home. Defendants did not have to take any personal property items for their crimes to be considered burglary.

**COUNT SIXTEEN:**

**Theft By Possession Of Stolen Mail**

**O.C.G.A. § 16-8-24**

**(Against All Defendants)**

1213.   The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

1214.   The offense of theft by possession of stolen Mail occurs when an entity or person:

(1)    Possesses stolen mail addressed to three or more different mailboxes or addresses; and

(2)    Possesses a minimum of ten separate pieces of stolen mail.

1215. The fact that the person who stole the mail has not been convicted, apprehended, or identified shall not be a defense to the charge of theft by possession of stolen mail.

1216. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

1217. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

1218. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

1219. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

1220.  As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

1221.  As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

1222.  As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

1223.  As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

1224.  As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

1225.  The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

1226.  Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

1227. Plaintiff Raissa Djuissi Kengne signed the engagement letter with Defendant Finch McCranie in June of 2021. A few months later Finch McCranie resigned as the attorney firm on the Plaintiff's case. Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

1228. During the meeting on June 29th, 2021 at Defendant Finch McCranie, an accountant was brought in to look at the evidence provided by Plaintiff. The accountant asked the Plaintiff whether she believed that Defendant Wesley Freeman was drugged and that was why he could not deliver on the engagements. Plaintiff responded by asking if "Defendant Wesley Freeman had been drugged for the past five (5) years" while overseeing the public company's engagements.

1229. The question asked by Defendant Finch McCranie's accountant is the same one Defendant Scott Meier, the Southeast IS Audit Partner at BDO USA, LLP had asked Plaintiff during their face-to-face meeting at the "Establishment" restaurant in Midtown Atlanta in early 2021.

1230. While leaving the meeting, Defendant Finch McCranie's accountant stated to the Plaintiff "Nobody is safe".

1231. Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

1232. Defendant Finch McCranie utilized the information provided by Plaintiff, client at the time, to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

1233.   Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

1234.   Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

1235.   Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in order to cause harm to Plaintiff.

1236.   The Defendants listed as part of Group 4 have withheld mail from the Plaintiff including mail from the Georgia Department of Driver Services and the Department of State.

1237.   The mail withheld from Plaintiff included Plaintiff's Georgia Driver License, Georgia Identification Card, and United States passport.

1238.   Plaintiff has also been delayed for months from responding to her banks and other public services letters because the letters were withheld.

1239.   The Defendants in Group 4 have access to or have significant influence over the people with access to the back of the mailbox where the post office would deliver the mail. Plaintiff has been obligated to open a mailbox at a USPS location.

1240. Defendants committed the offense of theft by possession of stolen mail when they intentionally withdrew mail from the Plaintiff's mailbox several times in order to cause Plaintiff's harm.

## COUNT SEVENTEEN:

## Obstruction of Mails Generally

## 18 U.S. Code § 1701

## (Against All Defendants)

1241. The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

1242. The offense of obstruction of mails generally occurs when an entity or person knowingly and willfully obstructs or retards the passage of the mail, or any carrier or conveyance carrying the mail, shall be fined under this title or imprisoned not more than six months, or both.

1243. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

1244. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

1245. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well

as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

1246. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

1247. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

1248. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

1249. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

1250. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

1251.  As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

1252.  The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon

Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

1253.   Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

1254.   Plaintiff Raissa Djuissi Kengne signed the engagement letter with Defendant Finch McCranie in June of 2021. A few months later Finch McCranie resigned as the attorney firm on the Plaintiff's case. Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

1255.   During the meeting on June 29th, 2021 at Defendant Finch McCranie, an accountant was brought in to look at the evidence provided by Plaintiff. The accountant asked the Plaintiff whether she believed that Defendant Wesley Freeman was drugged and that was why he could not deliver on the engagements. Plaintiff responded by asking if "Defendant Wesley Freeman had been drugged for the past five (5) years" while overseeing the public company's engagements.

1256.   The question asked by Defendant Finch McCranie's accountant is the same one Defendant Scott Meier, the Southeast IS Audit Partner at BDO USA, LLP had asked Plaintiff during their face-to-face meeting at the "Establishment" restaurant in Midtown Atlanta in early 2021.

1257.   While leaving the meeting, Defendant Finch McCranie's accountant stated to the Plaintiff "Nobody is safe".

1258.   Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

1259.   Defendant Finch McCranie utilized the information provided by Plaintiff, client at the time, to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

1260.   Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

1261.   Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

1262.   Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in order to cause harm to Plaintiff.

1263.   The Defendants listed as part of Group 4 have withheld mail from the Plaintiff including mail from the Georgia Department of Driver Services and the Department of State.

1264.   The mail withheld from Plaintiff included Plaintiff's Georgia Driver License, Georgia Identification Card, and United States passport.

1265.  Plaintiff has also been delayed for months from responding to her banks and other public services letters because the letters were withheld.

1266.  The Defendants in Group 4 have access to or have significant influence over the people with access to the back of the mailbox where the post office would deliver the mail.  Plaintiff has been obligated to open a mailbox at a USPS location.

1267.  Defendants committed the offense of theft by possession of stolen mail when they intentionally withdrew mail from the Plaintiff's mailbox several times in order to cause Plaintiff's harm.

1268.  Defendants committed the offense of obstruction of mails generally when they knowingly and willfully obstructed and/or retarded the passage of the Plaintiff's mail, or any carrier or conveyance carrying Plaintiff's mail.

**COUNT EIGHTEEN:**

**Obstruction of Correspondence**

**18 U.S. Code § 1702**

**(Against All Defendants)**

1269.  The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

1270.  The offense of obstruction of correspondence occurs when an entity or a person takes any letter, postal card, or package out of any post office or any authorized depository for mail matter, or from any letter or mail carrier, or which has been in any post office or authorized depository, or in the custody of any letter or mail carrier, before it has been delivered to the person to whom it was directed, with design to obstruct the correspondence, or to pry into the business or secrets of another, or opens, secretes,

344 of 407

embezzles, or destroys the same, shall be fined under this title or imprisoned not more than five years, or both.

1271. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

1272. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

1273. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

1274. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

1275. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

1276. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

1277. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

1278. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

1279. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

1280. The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of

management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

1281. Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

1282. Plaintiff Raissa Djuissi Kengne signed the engagement letter with Defendant Finch McCranie in June of 2021. A few months later Finch McCranie resigned as the attorney firm on the Plaintiff's case. Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

1283.  During the meeting on June 29th, 2021 at Defendant Finch McCranie, an accountant was brought in to look at the evidence provided by Plaintiff. The accountant asked the Plaintiff whether she believed that Defendant Wesley Freeman was drugged and that was why he could not deliver on the engagements. Plaintiff responded by asking if "Defendant Wesley Freeman had been drugged for the past five (5) years" while overseeing the public company's engagements.

1284.  The question asked by Defendant Finch McCranie's accountant is the same one Defendant Scott Meier, the Southeast IS Audit Partner at BDO USA, LLP had asked Plaintiff during their face-to-face meeting at the "Establishment" restaurant in Midtown Atlanta in early 2021.

1285.  While leaving the meeting, Defendant Finch McCranie's accountant stated to the Plaintiff "Nobody is safe".

1286.  Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

1287.  Defendant Finch McCranie utilized the information provided by Plaintiff, client at the time, to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

1288.  Defendant 1280 West Condominium Association and 1280 West Board of Directors other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

1289.  Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous

in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

1290. Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in other to cause harm to Plaintiff.

1291. The Defendants listed as part of Group 4 have withheld mail from the Plaintiff including mail from the Georgia Department of Driver Services and the Department of State.

1292. The mail withheld from Plaintiff included Plaintiff's Georgia Driver License, Georgia Identification Card, and United States passport.

1293. Plaintiff has also been delayed for months from responding to her banks and other public services letters because the letters were withheld.

1294. The Defendants in Group 4 have access to or have significant influence over the people with access to the back of the mailbox where the post office would deliver the mail. Plaintiff has been obligated to open a mailbox at a USPS location.

1295. Defendants committed the offense of theft by possession of stolen mail when they intentionally withdrew mail from the Plaintiff's mailbox several times in order to cause Plaintiff's harm.

1296. Defendants committed the offense of obstruction of correspondence when they took Plaintiff's letter, postal card, and/or package out of the authorized depository for mail matter, or from any letter or mail carrier, or which has been in any authorized depository, or in the custody of any letter or mail carrier, before it has been

delivered to the Plaintiff, with design to obstruct the correspondence, or to pry into the business or secrets of Plaintiff, or opens, secretes, embezzles, or destroys the same.

## COUNT NINETEEN:

### Violation of Telephone Number Portability

### 61 FR 38687 (47 CFR 20, 47 CFR 52) (CC Docket No. 95-116, FCC 96-286)

### (Against All Defendants)

1297.   The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

1298.   A violation of the telephone number portability regulations occurs when Once an entity or a person requests service from a new company, and the old company refuses to port the person or entity's number, even if the entity or person owes money for an outstanding balance or termination fee.

1299.   FCC rules require simple ports, which generally do not involve more than one line or more complex adjustments to telephone switching equipment, to be processed in one business day. An entity or a person may be able to use their phone within a few hours for changes among wireless service providers. However, porting from wireline to wireless service may still take a few days.

1300.   As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

1301. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

1302. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

1303. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

1304. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

1305. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

1306. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well

as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

1307. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

1308. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

1309. The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

1310. <u>Group 1 – Plaintiff</u>: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

1311. <u>Group 2 – Defendant</u>: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

1312. <u>Group 3 – Defendant</u>: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

1313. <u>Group 4 – Defendant</u>: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

1314. Plaintiff's primary phone number has been blocked and Plaintiff has been unable to port her number to a different carrier effectively preventing plaintiff from communication with family, friends, and business partners.

1315. Phone companies are required by law to port your number out when you start service with a new carrier. According to the FCC, a company cannot refuse to port your number even if you have an outstanding balance or unpaid termination fees.

1316. Plaintiff has had five (5) different phone numbers since she was retaliated against and attacked at work and in her private life. Plaintiff's phones were been hacked and spoofed by Defendants. Plaintiff could not communicate her new phone numbers to all her contacts causing isolation and facilitating the persecution and intentional emotional distress caused by the Defendants' actions.

1317. Plaintiff believes that her inability to port her phone number is also a retaliatory practice against her from Defendants

### COUNT TWENTY:

### Interference With Plaintiff's Access To Funds

**(Against All Defendants)**

1318. The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

1319. By withholding the Plaintiffs' access to funds in her Gemini cryptocurrency trading account, the Defendants have engaged in outright theft. Intentional misappropriation of funds, or unlawful conversion, as it is also known, is a direct violation of FINRA Rule 2150.

1320. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

1321. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

1322. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

1323. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

1324. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

1325. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

1326. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

1327. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

1328. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

1329. The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

1330.   Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

1331.   Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

1332.   Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

1333.   Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

1334.   Plaintiff's access to her funds in her Gemini account has been blocked. Plaintiff created an account online on 05/25/2021 on the Gemini Trust Company, LLC's website. Plaintiff reached out to Gemini customer support at support@gemini.com on

the following dates/times: March 31st, 2022, April 1st, 2022, April 2nd, 2022, April 3rd, 2022, April 4th, 2022, April 5th, 2022, and April 13th, 2022.

1335.   The Plaintiff has reached out to the Gemini Trust Company's support team using the following email addresses: rkengne1@gmail.com and cianeseya2022@gmail.com. The support team members Plaintiff corresponded with were Richard, Frances, Saul, Jessica, and Isla. Plaintiff has provided Gemini with a copy of my bank statements to verify Plaintiff's account in multiple instances. Gemini claims that Plaintiff can only withdraw funds via wire, which is extremely costly to Plaintiff at the moment.

1336.   Gemini has declined to withdraw funds using the debit card account that Plaintiff provided on the Gemini platform, which was successfully verified by Gemini. Gemini has refused to allow any other forms of identification to verify in order to assert the Plaintiff's ownership of the account.

1337.   All the communications Plaintiff had with Gemini happened before Plaintiff was locked out of her Gemini account for requesting Plaintiff's money. Plaintiff lost full use of her Gmail account, rkengne1@gmail.com, due to the fact that Plaintiff reported BDO USA, LLP's violation of PCAOB and SEC standards.

1338.   Plaintiff is unable to access her account at Gemini and Gemini refuses to provide any other way to identify Plaintiff.

1339.   Plaintiff lack of access to her funds caused further isolation with her contacts and facilitated the persecution and intentional emotional distress caused by the Defendants' actions.

1340.  Plaintiff believes that her inability to access funds on the Gemini cryptocurrency platform is also a retaliatory practice against her from Defendants.

1341.  Defendants have engaged in outright theft by withholding the Plaintiffs' access to funds in her Gemini cryptocurrency trading account as well as violated FINRA Rule 2150 by intentionally misappropriating funds and/or practicing unlawful conversion.

**COUNT TWENTY-ONE**

**Intentional Infliction of Emotional Distress**

**(Against all Defendants)**

1342.  The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

1343.  The offense of intentional infliction of emotional distress ("IIED") occurs when the employer purposely causes severe emotional distress to the employee as a result of extreme and outrageous conduct. Examples of Intentional Infliction of Emotional Distress claims can include racial insults, sex discrimination, false imprisonment, and conduct that threaten your physical security (a physical injury is not necessary).

1344.  To show that IIED occurred in the workplace, all of the following must be present:

(1)  Extreme and Outrageous conduct by the employer or a representative of the employer. Courts have interpreted this to mean conduct that exceeds what is tolerated in a civilized society or that has gone beyond all reasonable bounds of decency.  Outrageous conduct does not include

annoyances, hurt feelings, insults, rough language, or bad manners that a reasonable person is expected to endure.

(2)      The employer must have intended to cause the employee to suffer extreme emotional distress, or must have known that such distress was substantially likely to result.

(3)      The employee suffered severe or extreme emotional distress. Severe emotional distress is that which is substantial or enduring. It has also been defined as a kind of distress no reasonable person is expected to endure. It may consist of any highly unpleasant reaction such as fright, grief, shame, humiliation, embarrassment, anger, or worry. Both the intensity and the duration of the employee's emotional distress are factors to be considered in determining whether it is severe. Your emotional distress need not have been so bad that you were unable to function in business or personal relationships.

(4)      The employer's conduct caused the employee's distress.

1345. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to create a hostile work environment, a toxic climate at work, and unsafe work conditions for the Plaintiff in order to stop her from reporting the fraud.

1346. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to reprimand Plaintiff without just cause.

1347. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well

as took separate action to harass the Plaintiff in order to stop her from reporting the fraud.

1348. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to deny the Plaintiff a promotion, advancement, and salary and bonuses associated with a promotion in order to prevent the Plaintiff from reporting the fraud.

1349. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to alter the employee's responsibilities and duties in order to prevent the Plaintiff from reporting the fraud.

1350. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to break into Plaintiff's home in order to prevent the Plaintiff from reporting the fraud.

1351. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others as well as took separate action to hack into Plaintiff's personal computer and phones in order to prevent the Plaintiff from reporting the fraud.

1352. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home for engaging in a protected activity.

1353. As described more in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others, as well as took separate action, to retaliate and persecute Plaintiff at work and at home in order to force Plaintiff to resign from her position.

1354. The parties in this case can be divided into four (4) main groups, together referred to as the "Defendants".

Group 1 – Plaintiff: is comprised of Raissa Djuissi Kengne, the Plaintiff, and former employee of BDO USA, LLP. The Plaintiff worked for BDO USA, LLP in the capacity of Experienced IT Audit Manager.

Group 2 – Defendant: is comprised of BDO USA, LLP, the public accounting firm where the Plaintiff was formerly employed, as well as Partners and members of management at BDO USA, LLP including Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, Interface, Atlanticus, Kas Naderi, BioHorizons, and NMS. Group 2 also includes Justin Mungal, a homeowner who lives directly across the Plaintiff's unit at the 1280 West Condominium in Atlanta, GA who admittedly stated that he worked for BDO USA, LLP.

Group 3 – Defendant: is comprised of the attorney's firms and its representatives who were previously retained by Plaintiff for representation in the whistleblower case. The attorney's firm was Finch McCranie and its representatives were Michael Sullivan and Walter Jospin.

Group 4 – Defendant: is comprised of the 1280 West Condominium and its Board of Directors as well as Beacon Management Services, LLC and its agents. Beacon

Management Services, LLC has served as the management company for the 1280 West Condominium Association where the Plaintiff resides for many years.

1355.  Plaintiff reported a violation of SEC regulations, PCAOB standards, AICPA standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened while working for Defendant BDO USA, LLP.

1356.  Plaintiff noticed that the workpapers for both private clients and public clients were being rolled forward year after year without actually doing the work. The public clients included BlueLinx, Atlanticus, IZEA, BioHorizons, and Interface. Interface has recently been under an SEC investigation and an executive employee at Interface has been suspended. The private clients included Janus, Dustex, FCCI, RSR Group, ProCare, Vacation Express, and many others.

1357.  The issue with the IT audit work performed was that several deficiencies that should have been identified as significant deficiencies or material weaknesses were actually identified as only control deficiencies. Because they were never communicated to the financial statements audit team as control deficiencies, the financial statements audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls (ITGCs).

1358.  Plaintiff informed the Defendant Wesley Freeman of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Defendant Wesley Freeman did not deny it. Instead of fixing the issues going forward, he kept misreporting the IT findings to hide the significant deficiencies

and/or material weaknesses in the IS Assurance workpapers from both the core Assurance team and the clients.

1359.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted.

1360.   Defendant Wesley Freeman enlisted the assistance of junior associates to attempt to smear Plaintiff's reputation; thereby preventing Plaintiff from being promoted. These associates enlisted to smear my reputation were part of the group who delivered such a poor work product.

1361.   Plaintiff started being retaliated against at work. Retaliation practices included, but were not limited to reprimanding Plaintiff in reviews without ground, harassing Plaintiff, creating a hostile work environment for Plaintiff, making subtle threats to Plaintiff, and using intimidation tactics against Plaintiff.

1362.   During internal meetings in 2020 and early 2021, Anthony Reh, a Partner at BDO USA, LLP in the firm's Atlanta office stated that the mid-tier public accounting firms (primarily BDO and Grant Thornton) and the big 4 (E&Y, Deloitte, KPMG, and PWC) were going to reach an agreement to stop employees from switching firms and asking for higher salary.

1363.   Plaintiff was blacklisted from relevant job opportunities by Defendants from engaging in protected activities.

1364.   Plaintiff started being persecuted and retaliated against at home when she signed the contract with Defendant Finch McCranie.

1365. Plaintiff's home was broken into at multiple times. Plaintiff lives in a condominium that has concierge services, which include, but are not limited to, trained staff who keep watch over the whole building, visitors screening process, and smart elevators that require a key card in order to both, enter the building and access the residential areas. Intruders must have had a double of the Plaintiff's key and a building access card in order to enter the Plaintiff's home.

1366. Defendant Finch McCranie breached the attorney-client privilege by reporting the attorney-client protected conversations it had with Defendant BDO USA, LLP and failed to disclose to Plaintiff a conflict of interests.

1367. Defendant Finch McCranie utilized the information provided by Plaintiff and then client to cause her harm and solidify relationship with Defendant BDO USA, LLP and other members of Group 2.

1368. Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 facilitated and participated in the illegal entry and trespass into the Plaintiff's unit.

1369. Defendant 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have persecuted Plaintiff at home by claiming she owed HOA fees and attempting to deny her homeowner's privileges.

1370. Plaintiff's relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 have been strenuous in the past. Plaintiff is part of a class action lawsuit against the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4 for breach of fiduciary duty, among other counts.

1371.  Defendants 1280 West Condominium Association and 1280 West Board of Directors and other members in Group 4 have been in contact with Defendant BDO USA, LLP and other members of Group 2 in order to cause harm to Plaintiff.

1372.  Defendant Interface, Inc's headquarters are located in 1280 West at 1280 W Peachtree St NW, Atlanta, GA 30309. Members of Interface's management have a relationship with the 1280 West Condominium Association, the 1280 West Board of Directors, and other members in Group 4. Several Interface's employees also live at 1280 W Peachtree St NW in the same condominium as Plaintiff.

1373.  The clients of BDO USA, LLP, particularly the clients who are mentioned as part of the subject matter of the whistleblowing case, have threatened and engaged in retaliatory practices against the Plaintiff.

1374.  Kas Naderi, Chief Information Officer of Atlanticus, threatened Plaintiff during a meeting held between Atlanticus and BDO USA, LLP and asked the Plaintiff if Plaintiff was "now willing to work with Atlanticus" and if Plaintiff was the one "asking for additional evidence to provide to the PCAOB" inspectors.

1375.  Plaintiff was late during that call. Scott Meier, BDO IS Assurance Principal, told Kas Naderi in the call that Plaintiff was in the bathroom. At the time of the said meeting, Plaintiff was working from home. Plaintiff was indeed in the bathroom. Scott Meier had no way of knowing the Plaintiff was indeed in the bathroom unless the Plaintiff was under surveillance by BDO USA, LLP, its agents, and/or the Defendants.

1376.  During the same 2021 PCAOB inspection of Atlanticus Holdings Corporation, Plaintiff was indirectly threatened by Mark Davenport (Audit Partner), Peter Poppo (Audit Partner), and Monica Burgess (Senior Audit Manager) who kept

using the word "dead" in many meetings held to discuss responses to the PCAOB questions.

1377.  During the 2021, IT audit of BioHorizons, Elbert Jenkins, VP of IT, at BioHorizons had postponed several meetings with Plaintiff, was missing calls, and attempted to blame Plaintiff for the missing calls and meetings in order to provide negative feedback to Plaintiff's supervisor.

1378.  During the 2021 IT audit of NMS, Edward Burdekin, President of NMS had made a pointed reference to the Family Dollar store as one of their clients. The Plaintiff was at a Family Dollar store the day before with her mother.

1379.  Plaintiff noted that recordings and evidence gathered during that same meeting in September of 2021 with Edward Burdekin were deleted from her laptop in an attempt to place her in a bad light. Plaintiff's IT experience allowed her to recover the data and prevent a possible by performance evaluation comment.

1380.  Defendant BDO USA, LLP and other entities and individuals listed in Group 2 conspired with entities and individuals listed in Group 3 and Group 4 in order to cause intentional harm to the Plaintiff as retaliation for reporting the fraud to the proper authorities.

1381.  The Defendants, singly and together, retaliated against Plaintiff by failing to promote Plaintiff, harassing Plaintiff, discriminating against Plaintiff in the terms and conditions of employment, broke into Plaintiff's home, for reporting conduct to the SEC that the Plaintiff reasonably believed violated the federal securities law.

1382.  Defendants, singly and together, retaliated against Plaintiff for disclosing information that is protected or required under SOX and under Dodd-Frank.

1383.   Defendants engaged in extreme and outrageous conduct and intended to cause Plaintiff to suffer extreme emotional distress or knew that such distress was substantially likely to result. As a result of Defendants' actions and conduct, Plaintiff suffered severe or extreme emotional distress.

## COUNT TWENTY-TWO:

### Attorney's Or Per Se's Fees And Expenses of Litigation

### (Against all Defendants)

1384.   The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint and the facts as if set forth here in full for all purposes.

1385.   Plaintiff Raissa Djuissi Kengne has standing to bring this Complaint in Court because she has been, and continues to be, adversely affected by the illegal, unlawful, and criminal actions of the Defendants.

1386.   As described herein, Defendants have retaliated against Plaintiff, have engaged in criminal, unlawful, illegal, and atrocious activities in order to prevent Plaintiff from reporting the fraudulent actions at BDO USA, LLP, including intentional violations of the SEC and PCAOB standards as well as cause intentional emotional distress, and financial harm. Several Defendants have acted illegally, criminally, and unlawfully in concert in order to hide their responsibilities in the fraudulent actions by causing intentional emotional distress and financial harm to the Plaintiff.

1387.   For the prosecution of this claim, Plaintiff has been compelled to spend resources. Plaintiff is entitled to recover a sum for the reasonable and necessary services performed per se and/or services of Plaintiff's attorneys in the preparation and trial of this action, including any appeals to the Court of Appeals and/or the Supreme Court.

1388.   Therefore, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recover their expenses of litigation, including, without limitation, its reasonable per se's and/or attorney's fees, from Defendants.

## V.

## KNOWLEDGE

1389.   Each of the acts described above, together and singly, was done "knowingly" by Defendants and was a producing cause of Plaintiff's damages described herein.

## VI.

## DAMAGES

1390.   Plaintiff would show that all of the aforementioned acts, together and singly, were done "knowingly" by Defendants and constitute the proximate and producing causes of Plaintiff's damages sustained and described herein.

1391.   For intimidation, Plaintiff is entitled to compensatory damages, including all forms of loss, resulting from the Defendants' illegal, criminal, and unlawful actions, such as additional costs and economic hardship pursuant to O.C.G.A. § 51-12-4, to exemplary damages, to general and special damages pursuant to O.C.G.A. 51-12-2, and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1392.   For slander, Plaintiff is entitled to general damages pursuant to O.C.G.A. 51-12-2 and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1393.   For burglary, Plaintiff is entitled to compensatory damages, including all forms of loss, resulting from the Defendants' illegal, criminal, and unlawful actions, such as additional costs and economic hardship pursuant to O.C.G.A. § 51-12-4, to exemplary damages, to general and special damages pursuant to O.C.G.A. 51-12-2, and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1394.   For invasion of privacy, Plaintiff is entitled to compensatory damages, including all forms of loss, resulting from the Defendants' illegal, criminal, and unlawful actions, such as additional costs and economic hardship pursuant to O.C.G.A. § 51-12-4, to exemplary damages, to general and special damages pursuant to O.C.G.A. 51-12-2, and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1395.   For computer crimes, Plaintiff is entitled to compensatory damages, including all forms of loss, resulting from the Defendants' illegal, criminal, and unlawful actions, such as additional costs and economic hardship pursuant to O.C.G.A. § 51-12-4, to exemplary damages, to general and special damages pursuant to O.C.G.A. 51-12-2, and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1396.   For computer security crimes, Plaintiff is entitled to compensatory damages, including all forms of loss, resulting from the Defendants' illegal, criminal, and unlawful actions, such as additional costs and economic hardship pursuant to O.C.G.A. § 51-12-4, to exemplary damages, to general and special damages pursuant to O.C.G.A. 51-12-2, and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1397. For bribery, Plaintiff is entitled to general damages pursuant to O.C.G.A. 51-12-2 and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1398. For retaliation, Plaintiff is entitled to compensatory damages, including all forms of loss, resulting from the Defendants' illegal, criminal, and unlawful actions, such as additional costs and economic hardship pursuant to O.C.G.A. § 51-12-4, to exemplary damages, to general and special damages pursuant to O.C.G.A. 51-12-2, and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1399. For breach of client-attorney privileges, Plaintiff is entitled to compensatory damages, including all forms of loss, resulting from the Defendants' illegal, criminal, and unlawful actions, such as additional costs and economic hardship pursuant to O.C.G.A. § 51-12-4, to exemplary damages, to general and special damages pursuant to O.C.G.A. 51-12-2, and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1400. For theft by possession of stolen mail, Plaintiff is entitled to compensatory damages, including all forms of loss, resulting from the Defendants' illegal, criminal, and unlawful actions, such as additional costs and economic hardship pursuant to O.C.G.A. § 51-12-4, to exemplary damages, to general and special damages pursuant to O.C.G.A. 51-12-2, and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1401. For obstruction of mails generally, Plaintiff is entitled to compensatory damages, including all forms of loss, resulting from the Defendants' illegal, criminal, and unlawful actions, such as additional costs and economic hardship pursuant to

O.C.G.A. § 51-12-4, to exemplary damages, to general and special damages pursuant to O.C.G.A. 51-12-2, and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1402. For obstruction of mail correspondence, Plaintiff is entitled to compensatory damages, including all forms of loss, resulting from the Defendants' illegal, criminal, and unlawful actions, such as additional costs and economic hardship pursuant to O.C.G.A. § 51-12-4, to exemplary damages, to general and special damages pursuant to O.C.G.A. 51-12-2, and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1403. For violation of telephone number portability, Plaintiff is entitled to general damages pursuant to O.C.G.A. 51-12-2 and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1404. For interference with plaintiff's access to funds, Plaintiff is entitled to compensatory damages, including all forms of loss, resulting from the Defendants' illegal, criminal, and unlawful actions, such as additional costs and economic hardship pursuant to O.C.G.A. § 51-12-4, to exemplary damages, to general and special damages pursuant to O.C.G.A. 51-12-2, and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1405. For blacklisting the Plaintiff and for providing negative job references, Plaintiff is entitled to compensatory damages, including all forms of loss, resulting from the Defendants' illegal, criminal, and unlawful actions, such as additional costs and economic hardship pursuant to O.C.G.A. § 51-12-4, to exemplary damages, to general

and special damages pursuant to O.C.G.A. 51-12-2, and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1406. For civil conspiracy to commit a crime, Plaintiff is entitled to compensatory damages, including all forms of loss, resulting from the Defendants' illegal, criminal, and unlawful actions, such as additional costs and economic hardship pursuant to O.C.G.A. § 51-12-4, to exemplary damages, to general and special damages pursuant to O.C.G.A. 51-12-2, and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1407. For intentional infliction of emotional distress, Plaintiff is entitled to compensatory damages, including all forms of loss, resulting from the Defendants' illegal, criminal, and unlawful actions, such as additional costs and economic hardship pursuant to O.C.G.A. § 51-12-4, to exemplary damages, to general and special damages pursuant to O.C.G.A. 51-12-2, punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury, and actual damages, which include the loss of the benefits that should have been earned pursuant to the Plaintiff's Policies with State Farm Insurance company but for the retaliation, persecution, court costs, consequential damages not covered by Plaintiff's Policy and attorney's fees. For knowing conduct of the acts described above, Plaintiff asks for damages as determined by a jury.

1408. For negligent infliction of emotional distress, Plaintiff is entitled to compensatory damages, including all forms of loss, resulting from the Defendants' illegal, criminal, and unlawful actions, such as additional costs and economic hardship pursuant to O.C.G.A. § 51-12-4, to exemplary damages, to general and special damages

pursuant to O.C.G.A. 51-12-2, and punitive damages pursuant to O.C.G.A. 51-12-5.1 in an amount as determined by a jury.

1409. The acts of each Defendant were committed knowingly, willfully, intentionally, with actual awareness, and/or with actual malice. In order to punish defendants for such unconscionable overreaching and to deter such actions and/or omissions in the future, Plaintiff seeks recovery from all Defendants of exemplary damages as provided by Title 51 Chapter 12 of the Georgia Torts for Punitive damages and Additional Damages for Aggravating Circumstances Code § 51-12-5.1; § 51-12-5.

## VII.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court that Defendants be cited to appear and answer herein; that, on final hearing, the Court enters a judgment against Defendants in Plaintiff's favor and grants relief to Plaintiff against the Defendants as follows:

(1)   Declare that the Defendants violated the law as set forth above;

(2)   Order the Defendants to pay actual money damages to the Plaintiff in an amount to be determined at trial;

(3)   Order the Defendants to pay punitive damages to the Plaintiff in an amount to be determined at trial;

(4)   Order the Defendants to pay compensatory damages to the Plaintiff in an amount to be determined at trial;

(5)     Order the Defendants to stop blacklisting the Plaintiff and to stop providing negative job references;

(6)     Award the Plaintiff reasonable attorneys' fees and costs and/or pro se fees and costs for her investigation and prosecution of this action; and

(7)     Grant any such additional relief to Plaintiff in law or equity as the Court deems just and proper under the circumstances.

## VIII.

### REQUEST FOR DISCLOSURES

1410. Pursuant to the Georgia Civil Practice Act Article 5 Depositions and Discovery code and/or the Federal Rules of Civil Procedure Rule 26 Duty to Disclose; General Provisions Governing Discover, Plaintiff requests that Defendants each provide the information required in a Request for Disclosures.

<u>Definitions and Instructions</u>

1411. The following definitions and rules of construction apply to this attachment:

(1)     The term **"document"** includes, but is not limited to, all records, materials and other tangible forms of expression in your possession or custody, or under your control, whether originals, copies, annotated copies, drafts or final versions, and however created, produced, stored or maintained, including, but not limited to, working papers, audit documentation, charts, lists, logs, spreadsheets, financial information or analyses, books, papers, files, notes, memoranda, reports, schedules, charts, lists, transcriptions, correspondence,

telegrams, telexes, wire messages, telephone messages, calendars, diaries, budgets, invoices, audio and video recordings, electronic mail, text messages, electronic data compilations, computer disks (or hard copy of the data contained on such disks), and other electronic media, microfilm, microfiche, and storage devices. The term "document" includes furnished versions and drafts of documents; it also includes original documents (or copies thereof if the originals are not available), annotations, non-conforming copies, and all copies that differ in any respect from the original, as well as attachments, appendices, amendments, and any other materials created or transmitted in connection with a responsive document.

(2)    The term "**communication**" includes any transmittal or receipt of information, whether by chance or prearranged, formal or informal,        oral, written or electronic, and includes without limitation: conversations, meetings and discussions in person; conversations, meetings and discussions by telephone; and written correspondence through the use of the mails, courier services, electronic media (such as electronic mail), and telephone lines and wires.

(3)    A communication or document "**concerning**," "**involving**," or "**related to**" any given subject means any communication or document that constitutes, contains, discusses, embodies, evidences, reflects, identifies, states, refers to, deals with, bears upon, or is in any way pertinent to that subject, including documents concerning the preparation of other documents.

(4)    Reference to an entity shall also include that entity's parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees,

agents, partners, and independent contractors, and all other persons or entities acting or purporting to act on its behalf.

(5)     The disjunctive ("**or**") shall be deemed to include the conjunctive ("**and**"), and the conjunctive ("**and**") shall be deemed to include the disjunctive ("**or**"); and each of the functional words "**each**," "**every**," "**any**" and "**all**" shall be deemed to include each of the other functional words.

(6)     "**BDO USA, LLP**" refers to BDO USA, LLP and all present and former subsidiaries, affiliates, predecessors, successors, officers, directors, agents, employees, shareholders, partnerships, general and limited partners thereof, and all other persons or entities acting or purporting to act on its behalf.

(7)     The term "**Clients**" refers to a person or organization using the services of BDO USA, LLP and all of their officers, commissioners, employees, representatives, and agents, and all other persons or entities acting or purporting to act on their behalf, including any special or independent committees of their Boards of Directors, and any successor audit firms.

(8)     The term "**SEC**" means the U.S. Securities and Exchange Commission, all divisions thereof, all of its officers, board members, employees, representatives, agents, and all other persons or entities acting or purporting to act on its behalf.

(9)     The term "**Working papers**" or "**Work papers**" refers to records kept by the auditor of the procedures applied, the tests performed, the information obtained, and the pertinent conclusions reached in the engagement. Examples of working papers are pre-planning and planning documentation, audit

programs, analyses, memoranda, letters of confirmation, prepared by client "PBC" list, and representation, abstracts of company documents, and schedules or commentaries prepared or obtained by the auditor. Working papers also include financial audit work papers, IT audit workpapers, Employee Benefit Plan ("EBP") work papers, and any other audit or tax engagement work papers created through all the phases of the audit process.

1412.   Documents produced pursuant to this request shall be produced in the order in which they appear in Defendants' files and shall not be shuffled or otherwise rearranged. Documents that in their original condition were stapled, clipped, or otherwise fastened together shall be produced in that form.

1413.   Electronic mail produced pursuant to this request for disclosures shall be provided in its original electronic format on a USB Flash Drive with a label clearly identifying the drive as containing material responsive to this attachment and indicating the request to which the documents are responsive or uploaded to a document management tool.

1414.   Provide a list of the documents Defendants produce, indicating in each instance the request to which the document is responsive. Also, identify and generally describe all requested documents that Defendants do not produce and indicate the location of each such document and Defendant's reason for not producing it.

1415.   If Defendants withhold any document based on a claim of privilege, please provide the following information as to each such document: (a) the author(s); (b) the date the document was created; (c) each person who received a copy of the document or was informed of its contents; (d) the person who now has the document or

was last known to have it; (e) the general subject matter of the document; and (f) the privilege asserted.

1416. If any documents responsive to this document request were in Defendants' possession, custody, or control at some time in the past, but are no longer available, provide a list of such documents, indicating in each instance the request to which the document was responsive. Please provide the following information with respect to each such document: (a) the author(s); (b) the date the document was created; (c) each person who received a copy of the document or was informed of its contents; (d) the person who now has the document or was last known to have it; (e) the general subject matter of the document; (f) a detailed description of the document; 4 and (g) a detailed and complete explanation of why such document is no longer in Defendants' possession, custody, or control.

1417. All system generated reports created as part of the request for disclosures should be accompanied with evidence showing how the reports were generated by providing dated screenshots of queries, parameters, etc ...

1418. Current and previous 1280 West Board of Directors are Brett Dettmering, Jill Byers, Jonathan Byers, Wayne Johnson, Victor Roth, Micah Kurtzberg, Ronnie Bridges, Rohan Rupani, Kimberly Bennett, Michael Shaffer, and Daniel Vasquez.

## IX.

**FIRST REQUEST FOR PRODUCTION TO DEFENDANT BDO USA, LLP, SCOTT MEIER, WESLEY FREEMAN, PAUL DAVISON, JASON CUDA, JUSTIN WILKES,**

**ANTHONY REH, PETER POPPO, MARK DAVENPORT, JOHNSON WONG, AND**

**JUSTIN MUNGAL**

<u>Document Request – Group 2: BDO USA, LLP</u>

1419. Produce all emails, paper documentation, Jabber communication, Yammer communication, Instantaneous Messages ("IM"), Microsoft Teams IM, and other forms of communications **between and among** BDO USA, LLP, Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, and Justin Mungal, their agents, employees, or representatives and relating to, mentioning, concerning or evidencing Plaintiff Raissa Kengne, her work, and her performance.

1420. Produce all emails, paper documentation, Jabber, Yammer, Instantaneous Messages ("IM"), Microsoft Teams IM, and other forms of communications **from and to** BDO USA, LLP, Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, and Justin Mungal, their agents, employees, or representatives **to and from** Plaintiff Raissa Kengne.

1421. Produce all emails and other forms of communications between and among BDO USA, LLP's employees in the Atlanta, New York, Tennessee, Florida, and Potomac offices referencing Plaintiff Raissa Kengne.

1422. Any partnership agreements or contracts between and among BDO USA, LLP, Interface, BioHorizons, Atlanticus, NMS, and/or 1280 West Condominium Association.

1423.  Report showing Plaintiff Raissa Djuissi Kengne's hours entered into the billing system with the details of the engagement she worked on and the cost per hour of her services from her date of hire (September 3rd, 2019) to the date she resigned (November 18th, 2022). To be provided in an excel format.

1424.  Report showing Defendant Wesley Freeman's hours entered into the billing system (client and non-client) with the details of the engagement he worked on and the cost per hour of his services from September 3rd, 2019 to November 18th, 2021. To be provided in an excel format.

1425.  Report showing BDO USA, LLP's employee Meldrick Wilson's hours entered into the billing system (client and non-client) with the details of the engagement he worked on and the cost per hour of his services from September 3rd, 2019 to November 18th, 2021. To be provided in an excel format.

1426.  Report showing BDO USA, LLP's employee-manager Alex Goetz's hours entered into the billing system (client and non-client) with the details of the engagement he worked on and the cost per hour of his services from September 3rd, 2019 to November 18th, 2021. To be provided in an excel format.

1427.  Report showing BDO USA, LLP's employee-manager Ashley Brooks' hours entered into the billing system (client and non-client) with the details of the engagement he worked on and the cost per hour of his services from the date he was hired to November 18th, 2021. To be provided in an excel format.

1428.  Report showing BDO USA, LLP's employee-manager Jose Urbaez's hours entered into the billing system (client and non-client) with the details of the

engagement he worked on and the cost per hour of his services from the date he was hired to November 18th, 2021. To be provided in an excel format.

1429.   List of private clients in the Atlanta office of BDO USA, LLP that were audited for the fiscal year 2018, 2019, 2020, and 2021.

1430.   List of public clients in the Atlanta office of BDO USA, LLP that were audited for the fiscal year 2018, 2019, 2020, and 2021.

1431.   List of private clients in the Atlanta office of BDO USA, LLP that were audited for the fiscal year 2018, 2019, 2020, and 2021 showing management and staff on each engagement and the number of hours charged.

1432.   List of public clients in the Atlanta office of BDO USA, LLP that were audited for the fiscal year 2018, 2019, 2020, and 2021 showing management and staff on each engagement and the number of hours charged.

1433.   All help desk tickets in their entirety created by Plaintiff Raissa Djuissi Kengne and the responses from IT Support at BDO USA, LLP.

1434.   All documents constituting or reflecting communications between BDO USA, LLP and their clients Interface, Atlanticus, BioHorizons, NMS, and FCCI related to (a) any requests from the SEC or PCAOB or other government bodies, or regulatory bodies seeking audit workpapers and/or related documents, or (b) producing audit workpapers to the SEC or the PCAOB, either on a general basis or in response to a specific request or subpoena.

1435.   All documents constituting or reflecting communications between and among BDO USA, LLP and their clients Interface, Atlanticus, BioHorizons, NMS, and FCCI concerning Plaintiff Raissa Djuissi Kengne.

1436.  All documents constituting or reflecting communications between BDO USA, LLP and Beacon Management, Lisa Simmons, Steven Weibel, Michael Shinners, 1280 West Condominium Association, and 1280 West Board of Directors concerning Plaintiff Raissa Djuissi Kengne.

1437.  Contract between BDO USA, LLP and Justin Mungal.

1438.  Disclosures of any relationships between BDO USA, LLP and residents at 1280 West Peachtree ST NW Atlanta, GA 30309.

1439.  Disclosures of any relationships between BDO USA, LLP and the 1280 West Association Condominium and its Board of Directors for the years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1440.  Disclosures of any relationships between BDO USA, LLP and Beacon Management, Lisa Simmons, and Steven Weibel for the years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1441.  Disclosures of any relationships between BDO USA, LLP and Rohan Rupani.

1442.  Disclosures of any relationships between BDO USA, LLP and T-Mobile.

1443.  Disclosures of any relationships between BDO USA, LLP and Gemini.

1444.  Phone records of Defendant Wesley Freeman from September 3rd, 2019 to date.

1445.  Phone records of Defendant Scott Meier from January 1st, 2021 to date.

1446.  Phone records of Defendant Anthony Reh from September 3rd, 2019 to date.

1447. Phone records of Defendant Mark Davenport from September 3rd, 2019 to date.

1448. Phone records of Defendant Paul Davison from September 3rd, 2019 to date.

1449. Phone records of Defendant Justin Wilkes from September 3rd, 2019 to date.

1450. Phone records of Defendant Jose Urbaez from January 1st, 2021 to date.

1451. Phone records of Defendant Peter Poppo from September 3rd, 2019 to date.

1452. Phone records of Defendant Johnson Wong from September 3rd, 2019 to date.

1453. Copy of text messages sent from and to Defendant Wesley Freeman's phone number from September 3rd, 2022 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1454. Copy of text messages sent from and to Defendant Scott Meier's phone number from September 3rd, 2022 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1455. Copy of text messages sent from and to Defendant Justin Wilkes' phone number from September 3rd, 2022 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1456. Copy of text messages sent from and to Defendant Jose Urbaez's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1457. Copy of text messages sent from and to Defendant Anthony Reh's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1458. Copy of text messages sent from and to Defendant Paul Davison's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1459. Copy of text messages sent from and to Defendant Mark Davenport's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1460. Copy of text messages sent from and to Defendant Peter Poppo's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1461. All contracts and agreements between and among BDO USA, LLP and Roedl & Partner from 2016 to 2022.

1462. All contracts and agreements between and among BDO USA, LLP and Finch McCranie, Michael Sullivan, and Walter Jospin from 2016 to 2022.

1463. All documents and emails between BDO USA, LLP and Roedl & Partner discussing Plaintiff Raissa Djuissi Kengne from 2016 to 2022.

1464. All contracts and agreements between and among BDO USA, LLP and Beacon Management from 2016 to 2022.

1465. All contracts and agreements between and among BDO USA, LLP and 1280 West Condominium Association and its Board of Directors from 2016 to 2021.

1466.  All work papers created for Interface for the following years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1467.  All work papers created for Atlanticus for the following years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1468.  All work papers, created for BioHorizons for the following years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1469.  All work papers created for NMS for the following years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1470.  All workpapers created for the following clients Janus, Dustex, FCCI, RSR Group, ProCare for the years 2016, 2017, 2018, 2019, 2020, and 2021.

1471.  BDO USA, LLP Audit Manual.

1472.  BDO USA, LLP's Ethics standards, policies, and procedures.

1473.  BDO USA, LLP's Whistleblower standards, policies, and procedures documents.

## X.

**FIRST REQUEST FOR PRODUCTION TO THIRD-PARTY DEFENDANTS:**

**INTERFACE, INC., ATLANTICUS HOLDINGS CORPORATION, KAS NADERI,**

**SPAR GROUP, INC. (NMS SPAR), AND BIOHORIZONS IMPLANT SYSTEMS, INC.**

**(AN HENRY SCHEIN SUBSIDIARY)**

<u>Document Requests – Group 2: Interface</u>

1474.  Produce all emails, paper documentation, Jabber communication, Yammer communication, Instantaneous Messages ("IM"), Microsoft Teams IM, and

other forms of communications **between and among** Interface, its agents, employees, or representatives and BDO USA, LLP, Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, and Justin Mungal, their agents, employees, or representatives and relating to, mentioning, concerning or evidencing Plaintiff Raissa Kengne, her work, and her performance.

1475. Produce all emails, paper documentation, Jabber, Yammer, Instantaneous Messages ("IM"), Microsoft Teams IM, and other forms of communications **from and to** Interface, its agents, employees, or representatives **to and from** Plaintiff Raissa Kengne.

1476. Produce all emails and other forms of communications between and among Interface's employees referencing or related to Plaintiff Raissa Kengne.

1477. Any partnership agreements or contracts between and among BDO USA, LLP, Interface, BioHorizons, Atlanticus, NMS, Beacon Management, Lisa Simmons, Steven Weibel, 1280 West Condominium Association, and/or 1280 West Board of Directors.

1478. All documents constituting or reflecting communications between BDO USA, LLP and Interface related to (a) any requests from the SEC or PCAOB or other government bodies, or regulatory bodies seeking audit workpapers and/or related documents, or (b) producing audit workpapers to the SEC or the PCAOB, either on a general basis or in response to a specific request or subpoena.

1479. All documents constituting or reflecting communications between and among BDO USA, LLP and Interface concerning Plaintiff Raissa Djuissi Kengne.

1480. All documents constituting or reflecting communications between Interface and Beacon Management, Lisa Simmons, Steven Weibel, Michael Shinners, 1280 West Condominium Association, and 1280 West Board of Directors concerning Plaintiff Raissa Djuissi Kengne.

1481. Contract between Interface and Justin Mungal.

1482. Disclosures of relationship between Interface and residents at 1280 West Peachtree ST NW Atlanta, GA 30309.

1483. Disclosures of relationship between Interface and the 1280 West Association Condominium and its Board of Directors for the years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1484. Disclosures of relationship between Interface and Beacon Management, Lisa Simmons, and Steven Weibel for the years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1485. Disclosures of any relationships between Interface and Atlanticus.

1486. Disclosures of any relationships between Interface and NMS.

1487. Disclosures of any relationships between Interface and BioHorizons.

1488. Disclosures of any relationships between Interface and Rohan Rupani.

1489. Disclosures of any relationships between Interface and T-Mobile.

1490. Disclosures of any relationships between Interface and Gemini.

1491. Phone records of Defendant Interface's employee Tom Farmer from January 1st, 2021 to date.

1492. Phone records of Defendant Interface's employee Christie Lambert from January 1st, 2021 to date.

1493.  Phone records of Defendant Interface's employee Joe DiBiase from January 1st, 2021 to date.

1494.  Copy of text messages sent from and to Defendant Interface's employee Tom Farmer's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1495.  Copy of text messages sent from and to Defendant Christie Lambert's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1496.  Copy of text messages sent from and to Defendant Interface's employee Joe DiBiase's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1497.  All contracts and agreements between and among Interface and Finch McCranie, Michael Sullivan, Walter Jospin, Beacon Management, Lisa Simmons, Steven Weibel, Michael Shinners, 1280 West Condominium Association, and/or 1280 West Board of Directors, LLP from 2016 to 2022.

1498.  All contracts and agreements between and among Interface and Finch McCranie, Michael Sullivan, and Walter Jospin from 2016 to 2022.

1499.  All documents and emails between BDO USA, LLP and Roedl & Partner discussing Plaintiff Raissa Djuissi Kengne from 2016 to 2022.

1500.  All contracts and agreements between and among Interface and Atlanticus from 2016 to 2022.

1501.  All contracts and agreements between and among Interface and BioHorizons from 2016 to 2022.

1502.  All contracts and agreements between and among Interface and NMS from 2016 to 2022.

<u>Documents Request – Group 2: Atlanticus</u>

1503.  Produce all emails, paper documentation, Jabber communication, Yammer communication, Instantaneous Messages ("IM"), Microsoft Teams IM, and other forms of communications **between and among** Atlanticus, its agents, employees, or representatives and BDO USA, LLP, Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, and Justin Mungal, their agents, employees, or representatives and relating to, mentioning, concerning or evidencing Plaintiff Raissa Kengne, her work, and her performance.

1504.  Produce all emails, paper documentation, Jabber, Yammer, Instantaneous Messages ("IM"), Microsoft Teams IM, and other forms of communications **from and to** Atlanticus, its agents, employees, or representatives **to and from** Plaintiff Raissa Kengne.

1505.  Produce all emails and other forms of communications between and among Atlanticus' employees referencing or related to Plaintiff Raissa Kengne.

1506.  Any partnership agreements or contracts between and among BDO USA, LLP, Interface, BioHorizons, Atlanticus, NMS, Beacon Management, Lisa Simmons, Steven Weibel, 1280 West Condominium Association, and/or 1280 West Board of Directors.

1507.  All documents constituting or reflecting communications between BDO USA, LLP and Atlanticus related to (a) any requests from the SEC or PCAOB or other

government bodies, or regulatory bodies seeking audit workpapers and/or related documents, or (b) producing audit workpapers to the SEC or the PCAOB, either on a general basis or in response to a specific request or subpoena.

1508. All documents constituting or reflecting communications between and among BDO USA, LLP and Atlanticus concerning Plaintiff Raissa Djuissi Kengne.

1509. All documents constituting or reflecting communications between Atlanticus and Beacon Management, Lisa Simmons, Steven Weibel, Michael Shinners, 1280 West Condominium Association, and 1280 West Board of Directors concerning Plaintiff Raissa Djuissi Kengne.

1510. Contract between Atlanticus and Justin Mungal.

1511. Disclosures of relationship between Atlanticus and residents at 1280 West Peachtree ST NW Atlanta, GA 30309.

1512. Disclosures of relationship between Atlanticus and the 1280 West Association Condominium and its Board of Directors for the years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1513. Disclosures of relationship between Atlanticus and Beacon Management, Lisa Simmons, and Steven Weibel for the years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1514. Disclosures of any relationships between Atlanticus and Interface.

1515. Disclosures of any relationships between Atlanticus and NMS.

1516. Disclosures of any relationships between Atlanticus and BioHorizons.

1517. Disclosures of any relationships between Atlanticus and Rohan Rupani.

1518. Disclosures of any relationships between Atlanticus and T-Mobile.

1519.   Disclosures of any relationships between Atlanticus and Gemini.

1520.   Phone records of Defendant Atlanticus' employee Kas Naderi from January 1st, 2021 to date.

1521.   Phone records of Defendant Atlanticus' employee Ann Nieves from January 1st, 2021 to date.

1522.   Phone records of Defendant Atlanticus' employee Jonathan Harte from January 1st, 2021 to date.

1523.   Copy of text messages sent from and to Defendant Atlanticus' employee Kas Naderi's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1524.   Copy of text messages sent from and to Defendant Atlanticus' Ann Nieves' phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1525.   Copy of text messages sent from and to Defendant Atlanticus' employee Jonathan Harte's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1526.   Copy of text messages sent from and to Defendant Atlanticus' employee Sri Navudu's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1527.   All contracts and agreements between and among Atlanticus and Beacon Management, Lisa Simmons, Steven Weibel, Michael Shinners, 1280 West Condominium Association, and/or 1280 West Board of Directors, LLP from 2016 to 2022.

1528.   All contracts and agreements between and among Atlanticus and Finch McCranie, Michael Sullivan, and Walter Jospin from 2016 to 2022.

1529.   All contracts and agreements between and among Atlanticus and Interface from 2016 to 2022.

1530.   All contracts and agreements between and among Atlanticus and BioHorizons from 2016 to 2022.

1531.   All contracts and agreements between and among Atlanticus and NMS from 2016 to 2022.

Documents Request – Group 2: BioHorizons

1532.   Produce all emails, paper documentation, Jabber communication, Yammer communication, Instantaneous Messages ("IM"), Microsoft Teams IM, and other forms of communications **between and among** BioHorizons, its agents, employees, or representatives and BDO USA, LLP, Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, and Justin Mungal, their agents, employees, or representatives and relating to, mentioning, concerning or evidencing Plaintiff Raïssa Kengne, her work, and her performance.

1533.   Produce all emails, paper documentation, Jabber, Yammer, Instantaneous Messages ("IM"), Microsoft Teams IM, and other forms of communications **from and to** BioHorizons, its agents, employees, or representatives **to and from** Plaintiff Raissa Kengne.

1534.   Produce all emails and other forms of communications between and among BioHorizons' employees referencing or related to Plaintiff Raissa Kengne.

392 of 407

1535.   Any partnership agreements or contracts between and among BDO USA, LLP, Interface, BioHorizons, Atlanticus, NMS, Beacon Management, Lisa Simmons, Steven Weibel, 1280 West Condominium Association, and/or 1280 West Board of Directors.

1536.   All documents constituting or reflecting communications between BDO USA, LLP and BioHorizons related to (a) any requests from the SEC or PCAOB or other government bodies, or regulatory bodies seeking audit workpapers and/or related documents, or (b) producing audit workpapers to the SEC or the PCAOB, either on a general basis or in response to a specific request or subpoena.

1537.   All documents constituting or reflecting communications between and among BDO USA, LLP and BioHorizons concerning Plaintiff Raissa Djuissi Kengne.

1538.   All documents constituting or reflecting communications between BioHorizons and Beacon Management, Lisa Simmons, Steven Weibel, Michael Shinners, 1280 West Condominium Association, and 1280 West Board of Directors concerning Plaintiff Raissa Djuissi Kengne.

1539.   Contract between BioHorizons and Justin Mungal.

1540.   Disclosures of relationship between BioHorizons and residents at 1280 West Peachtree ST NW Atlanta, GA 30309.

1541.   Disclosures of relationship between BioHorizons and the 1280 West Association Condominium and its Board of Directors for the years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1542. Disclosures of relationship between BioHorizons and Beacon Management, Lisa Simmons, and Steven Weibel for the years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1543. Disclosures of relationship between BioHorizons and Interface.

1544. Disclosures of relationship between BioHorizons and NMS.

1545. Disclosures of any relationships between BioHorizons and Atlanticus.

1546. Disclosures of any relationships between BioHorizons and Rohan Rupani.

1547. Disclosures of only relationships between BioHorizons and T-Mobile.

1548. Disclosures of any relationships between BioHorizons and Gemini.

1549. Phone records of Defendant BioHorizons' employee Elbert Jenkins from January 1st, 2021 to date.

1550. Phone records of Defendant BioHorizons' employee Wanda Dobbins from January 1st, 2021 to date.

1551. Phone records of Defendant BioHorizons' employee Sandra Feagans from January 1st, 2021 to date.

1552. Copy of text messages sent from and to Defendant BioHorizons' employee Elbert Jenkins's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1553. Copy of text messages sent from and to Defendant BioHorizons' employee Wanda Dobbins' phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1554. Copy of text messages sent from and to Defendant BioHorizons' employee Jay Knight's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1555. All contracts and agreements between and among BioHorizons and Beacon Management, Lisa Simmons, Steven Weibel, Michael Shinners, 1280 West Condominium Association, and/or 1280 West Board of Directors, LLP from 2016 to 2022.

1556. All contracts and agreements between and among BioHorizons and Finch McCranie, Michael Sullivan, and Walter Jospin from 2016 to 2022.

1557. All contracts and agreements between and among BioHorizons and Interface from 2016 to 2022.

1558. All contracts and agreements between and among BioHorizons and Atlanticus from 2016 to 2022.

1559. All contracts and agreements between and among BioHorizons and NMS from 2016 to 2022.

<u>Documents Request – Group 2: NMS</u>

1560. Produce all emails, paper documentation, Jabber communication, Yammer communication, Instantaneous Messages ("IM"), Microsoft Teams IM, and other forms of communications **between and among** NMS, its agents, employees, or representatives and BDO USA, LLP, Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, and Justin Mungal, their agents, employees, or representatives and relating to, mentioning, concerning or evidencing Plaintiff Raissa Kengne, her work, and her performance.

1561.   Produce all emails, paper documentation, Jabber, Yammer, Instantaneous Messages ("IM"), Microsoft Teams IM, and other forms of communications **from and to** NMS, its agents, employees, or representatives **to and from** Plaintiff Raissa Kengne.

1562.   Produce all emails and other forms of communications between and among NMS' employees referencing or related to Plaintiff Raissa Kengne.

1563.   Any partnership agreements or contracts between and among BDO USA, LLP, Interface, BioHorizons, Atlanticus, NMS, Beacon Management, Lisa Simmons, Steven Weibel, 1280 West Condominium Association, and/or 1280 West Board of Directors.

1564.   All documents constituting or reflecting communications between BDO USA, LLP and NMS related to (a) any requests from the SEC or PCAOB or other government bodies, or regulatory bodies seeking audit workpapers and/or related documents, or (b) producing audit workpapers to the SEC or the PCAOB, either on a general basis or in response to a specific request or subpoena.

1565.   All documents constituting or reflecting communications between and among BDO USA, LLP and NMS concerning Plaintiff Raissa Djuissi Kengne.

1566.   All documents constituting or reflecting communications between NMS and Beacon Management, Lisa Simmons, Steven Weibel, Michael Shinners, 1280 West Condominium Association, and 1280 West Board of Directors concerning Plaintiff Raissa Djuissi Kengne.

1567.   Contract between NMS and Justin Mungal.

1568.   Disclosures of any relationships between NMS and residents at 1280 West Peachtree ST NW Atlanta, GA 30309.

1569.   Disclosures of any relationships between NMS and the 1280 West Association Condominium and its Board of Directors for the years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1570.   Disclosures of any relationships between NMS and Beacon Management, Lisa Simmons, and Steven Weibel for the years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1571.   Disclosures of any relationships between NMS and Interface.

1572.   Disclosures of any relationships between NMS and BioHorizons.

1573.   Disclosures of any relationships between NMS and Atlanticus.

1574.   Disclosures of any relationships between NMS and Rohan Rupani.

1575.   Disclosures of any relationships between NMS and T-Mobile.

1576.   Disclosures of any relationships between NMS and Gemini.

1577.   Phone records of Defendant NMS' President Edward Burdekin from January 1st, 2021 to date.

1578.   Copy of text messages sent from and to Defendant NMS' employee Edward Burdekin's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1579.   All contracts and agreements between and among NMS and Beacon Management, Lisa Simmons, Steven Weibel, Michael Shinners, 1280 West Condominium Association, and/or 1280 West Board of Directors, LLP from 2016 to 2022.

1580.  All contracts and agreements between and among NMS and Finch McCranie, Michael Sullivan, and Walter Jospin from 2016 to 2022.

1581.  All contracts and agreements between and among NMS and Interface from 2016 to 2022.

1582.  All contracts and agreements between and among NMS and Atlanticus from 2016 to 2022.

1583.  All contracts and agreements between and among NMS and BioHorizons from 2016 to 2022.

## XI.

### FIRST REQUEST FOR PRODUCTION TO DEFENDANTS FINCH MCCRANIE, MICHAEL SULLIVAN, AND WALTER JOSPIN

### Documents Request – Group 3

1584.  Produce copy of the contract between Plaintiff Raissa Djuissi Kengne and Defendants Finch McCranie, Michael Sullivan, and Walter Jospin.

1585.  Produce all emails, paper documentation, Jabber communication, Yammer communication, Instantaneous Messages ("IM"), Microsoft Teams IM, and other forms of communications **between and among** Defendants Finch McCranie, Michael Sullivan, and Walter Jospin, their agents, employees, or representatives and BDO USA, LLP, Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, and Justin Mungal, their agents, employees, or representatives and relating to, mentioning, concerning or evidencing Plaintiff Raissa Kengne, her work, and her performance.

1586. Produce all emails, paper documentation, Jabber, Yammer, Instantaneous Messages ("IM"), Microsoft Teams IM, and other forms of communications **from and to** Defendants Finch McCranie, Michael Sullivan, and Walter Jospin, their agents, employees, or representatives **to and from** Plaintiff Raissa Kengne.

1587. Produce all emails and other forms of communications between and among Defendants Finch McCranie, Michael Sullivan, and Walter Jospin, and Finch McCranie's employees referencing or related to Plaintiff Raissa Kengne.

1588. Produce all evidence provided by Plaintiff Raissa Djuissi Kengne in the Finch McCranie data room.

1589. Any partnership agreements or contracts between and among Defendants Finch McCranie, Michael Sullivan, Walter Jospin, BDO USA, LLP, Interface, BioHorizons, Atlanticus, NMS, Beacon Management, Lisa Simmons, Steven Weibel, 1280 West Condominium Association, and/or 1280 West Board of Directors.

1590. All documents constituting or reflecting communications between BDO USA, LLP and Defendants Finch McCranie, Michael Sullivan, and Walter Jospin related to (a) any requests from the SEC or PCAOB or other government bodies, or regulatory bodies seeking audit workpapers and/or related documents, or (b) producing audit workpapers to the SEC or the PCAOB, either on a general basis or in response to a specific request or subpoena that is the subject matter of this case.

1591. All documents constituting or reflecting communications between and among Defendant BDO USA, LLP and Defendants Finch McCranie, Michael Sullivan, and Walter Jospin concerning Plaintiff Raissa Djuissi Kengne.

1592. All documents constituting or reflecting communications between Defendants Finch McCranie and its agents, Michael Sullivan, Walter Jospin, and Beacon Management, Lisa Simmons, Steven Weibel, Michael Shinners, 1280 West Condominium Association, and 1280 West Board of Directors concerning Plaintiff Raissa Djuissi Kengne.

1593. Contract between Defendants Finch McCranie, Michael Sullivan, Walter Jospin and Justin Mungal.

1594. Disclosures of relationship between Defendants Finch McCranie, Michael Sullivan, Walter Jospin and residents at 1280 West Peachtree ST NW Atlanta, GA 30309.

1595. Disclosures of any relationship between Defendants Finch McCranie, Michael Sullivan, Walter Jospin and the 1280 West Association Condominium and its Board of Directors for the years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1596. Disclosures of any relationships between Defendants Finch McCranie, Michael Sullivan, Walter Jospin, and Beacon Management, Lisa Simmons, and Steven Weibel for the years 2016, 2017, 2018, 2019, 2020, 2021, and 2022.

1597. Disclosures of any relationships between Defendants Finch McCranie, Michael Sullivan, Walter Jospin, and Interface.

1598. Disclosures of any relationships between Defendants Finch McCranie, Michael Sullivan, Walter Jospin and NMS.

1599. Disclosures of any relationships between Defendants Finch McCranie, Michael Sullivan, Walter Jospin and Atlanticus.

1600.  Disclosures of any relationships between Defendants Finch McCranie, Michael Sullivan, Walter Jospin and Rohan Rupani.

1601.  Disclosures of any relationships between Defendants Finch McCranie, Michael Sullivan, Walter Jospin and T-Mobile.

1602.  Disclosures of any relationships between Defendants Finch McCranie, Michael Sullivan, Walter Jospin and Gemini.

1603.  Phone records of Defendant Michael Sullivan from January 1st, 2021 to date.

1604.  Phone records of Defendant Walter Jospin from January 1st, 2021 to date.

1605.  Phone records of Defendant Finch McCranie from January 1st, 2021 to date.

1606.  Copy of text messages sent from and to Defendant Michael Sullivan's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1607.  Copy of text messages sent from and to Defendant Walter Jospin's phone number from January 1st, 2021 to date. The scope is limited to BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1608.  Copy of text messages sent from and to Defendant Michael Sullivan's phone number(s) to Defendant Walter Jospin's phone number(s) from January 1st, 2021 to date. The scope is limited to communication concerning or related to Plaintiff Raissa Djuissi Kengne, Atlanticus, Interface, NMS, BioHorizons, BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1609.  All contracts and agreement between and among Defendants Finch McCranie, Michael Sullivan, Walter Jospin and Beacon Management, Lisa Simmons, Steven Weibel, Michael Shinners, 1280 West Condominium Association, and/or 1280 West Board of Directors, LLP from 2016 to 2022.

1610.  All contracts and agreements between and among Defendants Finch McCranie, Michael Sullivan, Walter Jospin and Defendants BioHorizons from 2016 to 2022.

1611.  All contracts and agreement between and among Defendants Finch McCranie, Michael Sullivan, Walter Jospin and Interface from 2016 to 2022.

1612.  All contracts and agreements between and among Defendants Finch McCranie, Michael Sullivan, Walter Jospin and Atlanticus from 2016 to 2022.

1613.  All contracts and agreements between and among Defendants Finch McCranie, Michael Sullivan, Walter Jospin and NMS from 2016 to 2022.


## XII.

## FIRST REQUEST FOR PRODUCTION TO DEFENDANTS BEACON MANAGEMENT SERVICES, LLC, LISA SIMMONS, STEVEN WEIBEL, 1280 WEST ASSOCIATION, MICHAEL SHINNERS, MICAH KURTZBERG, RONNIE BRIDGES, BRETT DETTMERING, MICHAEL SHAFFER, AND ROHAN RUPANI

### Documents Request – Group 4

1614.  Produce copy of the 1280 West Declaration of Condominium.

1615.  Produce copy of the 1280 West Condominium Association Bylaws.

1616. Produce all emails, paper documentation, Jabber communication, Yammer communication, Instantaneous Messages ("IM"), Microsoft Teams IM, and other forms of communications **between and among** Defendants in Group 4, their agents, employees, or representatives and Finch McCranie, Michael Sullivan, Walter Jospin, BDO USA, LLP, Scott Meier, Wesley Freeman, Paul Davison, Jason Cuda, Justin Wilkes, Anthony Reh, Peter Poppo, Mark Davenport, Johnson Wong, and Justin Mungal, their agents, employees, or representatives and relating to, mentioning, concerning or evidencing Plaintiff Raissa Kengne, her work, and her performance.

1617. Produce all emails, paper documentation, Jabber, Yammer, Instantaneous Messages ("IM"), Microsoft Teams IM, and other forms of communications **from and to** Defendants in Group 4, their agents, employees, or representatives **to and from** Plaintiff Raissa Kengne.

1618. Produce all emails and other forms of communications between and among Defendants in Group 4, and Defendants in Group 4's employees referencing or related to Plaintiff Raissa Kengne.

1619. Any partnership agreements or contracts between and among Defendants Finch McCranie, Michael Sullivan, Walter Jospin, BDO USA, LLP, Interface, BioHorizons, Atlanticus, NMS, Beacon Management, Lisa Simmons, Steven Weibel, 1280 West Condominium Association, and/or 1280 West Board of Directors.

1620. All documents constituting or reflecting communications between BDO USA, LLP and Defendants in Group 4 related to (a) any requests from the SEC or PCAOB or other government bodies, or regulatory bodies seeking audit workpapers and/or related documents, or (b) producing audit workpapers to the SEC or the PCAOB,

either on a general basis or in response to a specific request or subpoena that is the subject matter of this case.

1621. All documents constituting or reflecting communications between and among Defendant BDO USA, LLP and Defendants in Group 4 concerning Plaintiff Raissa Djuissi Kengne.

1622. All documents constituting or reflecting communications between Defendants in Group 4 and Beacon Management, Lisa Simmons, Steven Weibel, Michael Shinners, 1280 West Condominium Association, and 1280 West Board of Directors concerning Plaintiff Raissa Djuissi Kengne.

1623. Contract between Defendants in Group 4 and Justin Mungal.

1624. Disclosures of relationship between Defendants in Group 4 and Defendants Finch McCranie, Michael Sullivan, and Walter Jospin.

1625. Disclosures of any relationships between Defendants in Group 4 and Interface.

1626. Disclosures of any relationships between Defendants in Group 4 and NMS.

1627. Disclosures of any relationships between Defendants in Group 4 and Atlanticus.

1628. Disclosures of any relationships between Defendants in Group 4 and T-Mobile.

1629. Disclosures of any relationships between Defendants in Group 4 and Gemini.

1630. Phone records of Defendants in Group 4 from January 1st, 2021 to date.

1631.   Copy of text messages sent from and to Defendants in Group 4's phone number from January 1st, 2021 to date. The scope is limited to communication concerning or related to Plaintiff Raissa Djuissi Kengne, Atlanticus, Interface, NMS, BioHorizons, BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1632.   Copy of text messages sent from and to as well as between and among Defendants in Group 4's phone number(s) from January 1st, 2021 to date. The scope is limited to communication concerning or related to Plaintiff Raissa Djuissi Kengne, Atlanticus, Interface, NMS, BioHorizons, BDO USA, LLP's partners, employees, and BDO USA, LLP's clients.

1633.   All contracts and agreement between and among Defendants Finch McCranie, Michael Sullivan, Walter Jospin and Beacon Management, Lisa Simmons, Steven Weibel, Michael Shinners, 1280 West Condominium Association, and/or 1280 West Board of Directors, LLP from 2016 to 2022.

1634.   All contracts and agreements between and among Defendants in Group 4 and Defendants BioHorizons from 2016 to 2022.

1635.   All contracts and agreements between and among Defendants in Group 4 and Interface from 2016 to 2022.

1636.   All contracts and agreements between and among Defendants in Group 4 and Atlanticus from 2016 to 2022.

1637.   All contracts and agreements between and among Defendants in Group 4 and NMS from 2016 to 2022.

1638.   Produce all tax returns filed with the Internal Revenue Service ("IRS") from the date the Plaintiff became a homeowner to 2021.

1639.   Produce all compiled, reviewed, and/or audited financial statements and accompanying reports from the date the Plaintiff became a homeowner to 2021.

## XIII.

## DISCOVERY CONTROL PLAN

Plaintiff intends for discovery to be conducted under Article 5 Depositions and Discovery of the Georgia Civil Practice code. This case involves complex issues and will require extensive discovery. Therefore, Plaintiff will ask the Court to order that discovery be conducted in accordance with a discovery control plan tailored to the particular circumstances of this suit.

## XIV.

## JURY DEMAND

Pursuant to Article 5 Trial Juries of the Georgia Code of Courts, Plaintiff demands a trial by jury on all issues triable as such and by the maximum number of jurors permitted by law.

## XV.

## PLACE OF TRIAL

Pursuant to O.C.G.A. § 9-11-40, Plaintiff hereby requests that trial of this case takes place in Atlanta, Georgia.

## XVI.

406 of 407

## CERTIFICATION

Under Federal Rule of Civil Procedure 11, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated: _May 23_, 2022

Respectfully submitted,

Physical Address:                                      Raissa Djuissi Kengne
1280 W. Peachtree ST NW. Unit 2109         Pro Se
Atlanta, GA 30309

Telephone: (404) 932-1561                        Mailing Address:
Email: cianeseya2022@gmail.com             570 Piedmont Ave. NE #55166
                                                              Atlanta, GA 30308

Marvin Wooley

MARVIN WOOLEY
NOTARY
PUBLIC
COMMISSION
EXPIRES
Sep. 21, 2025
DEKALB COUNTY, GA

407 of 407

Fulton County Superior Court
***EFILED***QW
Date: 5/25/2022 2:30 PM
Cathelene Robinson, Clerk

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

RAISSA NJUISSI KENGNE

_____
Plaintiff

Case No.: 2022CV365268

vs.

WESLEY FREEMAN,
BDO USA, LLP ET AL.
_____
Defendant

## NOTICE OF FILING

# EXHIBITS 1 TO 5.

Signature: _____

RAISSA NJUISSI KENGNE
Print Name

570 PIEDMONT AVE NE #55166
Address                    ATLANTA GA
                           30309
402-932-1651
Phone Number

CLINNESEYA2022@GMAIL.COM
Email-Address

# EXHIBIT 1

# ATTACHMENT TO PLAINTIFF'S ORIGINAL COMPLAINT

## EXCERPTS FROM THE 2019 AND 2020 INTERFACE 10K REPORTS

### Source: https://sec.report/CIK/0000715787

Exhibit 1 - Reference 245; Page 66 of 407

245. Under §404(a) of the SOX Act, Interface is required to annually report on Interface's own assessment of the effectiveness of Interface's controls.

### Year 2019

 Companies Documents Forms Alerts                      internal controls over financ

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

Not applicable. **ITEM 9A. CONTROLS AND PROCEDURES**

*Disclosure Controls and Procedures.* As of the end of the period covered by this Annual Report on Form 10-K, an evaluation was performed under the supervision and with the participation of our management, including our principal executive officer and our principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, pursuant to Rule 13a-14(e) under the Act. Based on that evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Annual Report. *Changes in Internal Control over Financial Reporting.* There were no changes in our internal control over financial reporting that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. *Management's Annual Report on Internal Control over Financial Reporting.* The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Securities Exchange Act of 1934. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Our management assessed the effectiveness of our internal control over financial reporting as of December 29, 2019 based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in "Internal Control - Integrated Framework

 Companies Documents Forms Alerts                      internal controls over financ

provide only reasonable assurance with respect to financial statement preparation and presentation. Our management assessed the effectiveness of our internal control over financial reporting as of December 29, 2019 based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in "Internal Control - Integrated Framework (2013)." Based on that assessment, management concluded that, as of December 29, 2019, our internal control over financial reporting was effective based on those criteria. Our independent auditors have issued an audit report on the effectiveness of our internal control over financial reporting. This report immediately precedes Item 9 of this Report. **ITEM 9B. OTHER INFORMATION**

**Report of Independent Registered Public Accounting Firm**

Shareholders and Board of Directors
Interface, Inc. and Subsidiaries
Atlanta, Georgia

**Opinion on Internal Control over Financial Reporting**

We have audited Interface, Inc. and Subsidiaries' (the "Company's") internal control over financial reporting as of December 29, 2019, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO criteria"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 29, 2019, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets of the Company as of December 29, 2019 and December 30, 2018, the related consolidated statements of operations, comprehensive income, and cash flows for each of the three years in the period ended December 29, 2019, and the related notes and schedules and our report dated February 26, 2020 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Item 9A, Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Item 9A, Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of internal control over financial reporting in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ BDO USA, LLP

Atlanta, Georgia

February 26, 2020

98

Year 2020

Companies   Documents   Forms   Alerts                                                      Ticker: TILE

FINANCIAL DISCLOSURE

Not applicable. ITEM 9A. CONTROLS AND PROCEDURES

*Disclosure Controls and Procedures.* As of the end of the period covered by this Annual Report on Form 10-K, an evaluation was performed under the supervision and with the participation of our management, including our principal executive officer and our principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, pursuant to Rule 13a-14(c) under the Act. Based on that evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Annual Report. *Changes in Internal Control over Financial Reporting.* There were no changes in our internal control over financial reporting that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. *Management's Annual Report on Internal Control over Financial Reporting.* The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Securities Exchange Act of 1934. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Our management assessed the effectiveness of our internal control over financial reporting as of January 3, 2021 based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in "Internal Control – Integrated Framework (2013)." Based on that assessment, management concluded that, as of January 3, 2021, our internal control over financial reporting was effective based on those criteria. Our independent

Companies   Documents   Forms   Alerts                                                      Ticker: TILE

Exchange Act of 1934. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Our management assessed the effectiveness of our internal control over financial reporting as of January 3, 2021 based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in "Internal Control – Integrated Framework (2013)." Based on that assessment, management concluded that, as of January 3, 2021, our internal control over financial reporting was effective based on those criteria. Our independent auditors have issued an audit report on the effectiveness of our internal control over financial reporting. This report immediately precedes Item 9 of this Report. ITEM 9B. OTHER INFORMATION

None

**Report of Independent Registered Public Accounting Firm**

Shareholders and Board of Directors
Interface, Inc. and Subsidiaries
Atlanta, Georgia

**Opinion on Internal Control over Financial Reporting**

We have audited Interface, Inc. and Subsidiaries' (the "Company's") internal control over financial reporting as of January 3, 2021, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO criteria"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of January 3, 2021, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets of the Company as of January 3, 2021 and December 29, 2019, the related consolidated statements of operations, comprehensive income (loss), and cash flows for each of the three years in the period ended January 3, 2021, and the related notes and schedule and our report dated March 3, 2021 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Item 9A, Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Item 9A. Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of internal control over financial reporting in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of

timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ BDO USA, LLP

Atlanta, Georgia

March 3, 2021

## Exhibit 1 - Reference 247; Page 67 of 407

247. Under §302 of the SOX Act, Interface's corporate officers must (among other things) accept responsibility (as evidenced by individual signatures) for the content of Interface's annual §404(a) report. The CEO and CFO must personally certify the content of the reports filed with the SEC and the procedures established by the issuer to report disclosures and prepare financial statements.

Year 2019

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: February 26, 2020

INTERFACE, INC.

By:   /s/ DANIEL T. HENDRIX
     Daniel T. Hendrix
     *President and Chief Executive Officer*

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Daniel T. Hendrix as attorney-in-fact, with power of substitution, for him or her in any and all capacities, to sign any amendments to this Report on Form 10-K, and to file the same, with exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that said attorney-in-fact may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Capacity | Date |
|---|---|---|
| /s/ DANIEL T. HENDRIX<br>Daniel T. Hendrix | President, Chief Executive Officer and Chairman of the Board and Director | February 26, 2020 |
| /s/ BRUCE A. HAUSMANN<br>Bruce A. Hausmann | Vice President and Chief Financial Officer (Principal Financial Officer) | February 26, 2020 |
| /s/ JOHN P. BURKE<br>John P. Burke | Director | February 26, 2020 |
| /s/ ANDREW B. COGAN<br>Andrew B. Cogan | Director | February 26, 2020 |
| /s/ DWIGHT GIBSON<br>Dwight Gibson | Director | February 26, 2020 |
| Jay D. Gould | Director | February 26, 2020 |
| /s/ CHRISTOPHER G. KENNEDY | Director | February 26, 2020 |
| /s/ CHRISTOPHER G. KENNEDY<br>Christopher G. Kennedy | Director | February 26, 2020 |
| /s/ JOSEPH KEOUGH<br>Joseph Keough | Director | February 26, 2020 |
| /s/ CATHERINE M. KILBANE<br>Catherine M. Kilbane | Director | February 26, 2020 |
| /s/ DAVID KOHLER<br>K. David Kohler | Director | February 26, 2020 |
| /s/ JAMES B. MILLER, JR.<br>James B. Miller, Jr. | Director | February 26, 2020 |
| /s/ SHERYL D. PALMER<br>Sheryl D. Palmer | Director | February 26, 2020 |

**2019 Certification of Chief Executive Officer with respect to the Company's Annual Report on Form 10-K for the fiscal year ended December 29, 2019.**

Exhibit 31.1

### CERTIFICATION

I, Dan Hendrix, certify that:

1. I have reviewed this annual report on Form 10-K of Interface, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 26, 2020

/s/ Daniel T. Hendrix
Daniel T. Hendrix
Chief Executive Officer

**2019 Certification of Chief Financial Officer with respect to the Company's Annual Report on Form 10-K for the fiscal year ended December 29, 2019.**

Exhibit 31.2

## CERTIFICATION

I, Bruce A. Hausmann, certify that:

1. I have reviewed this annual report on Form 10-K of Interface, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 26, 2020

/s/ Bruce A. Hausmann
Bruce A. Hausmann
Chief Financial Officer

## 2019 Certification Pursuant to Section 1350 of Chapter 63 of Title 18 of United States Code by Chief Executive Officer with respect to the Company's Annual Report on Form 10-K for the fiscal year ended December 29, 2019.

EX-32.1 9 ex-321.htm EXHIBIT 32.1

Exhibit 32.1

## CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350

I, Daniel T. Hendrix, Chief Executive Officer of Interface, Inc. (the "Company"), certify, pursuant to 18 U.S.C. § 1350 as adopted by § 906 of the Sarbanes-Oxley Act of 2002, that:

   (1) the Annual Report on Form 10-K of the Company for the year ended December 29, 2019 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
   (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 26, 2020

/s/ Daniel T. Hendrix
Daniel T. Hendrix
Chief Executive Officer

2019 Certification Pursuant to Section 1350 of Chapter 63 of Title 18 of United States Code by Chief Financial Officer with respect to the Company's Annual Report on Form 10-K for the fiscal year ended December 29, 2019.

EX-32.2 10 ex-322.htm EXHIBIT 32.2

Exhibit 32.2

### CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350

I, Bruce A. Hausmann, Chief Financial Officer of Interface, Inc. (the "Company"), certify, pursuant to 18 U.S.C. § 1350 as adopted by § 906 of the Sarbanes-Oxley Act of 2002, that:

    (1)  the Annual Report on Form 10-K of the Company for the year ended December 29, 2019 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    (2)  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 26, 2020

/s/ Bruce A. Hausmann
Bruce A. Hausmann
Chief Financial Officer

## Year 2020



Companies   Documents   Forms   Alerts

SIGNATURE

Table of Contents SIGNATURES Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: March 3, 2021

INTERFACE, INC.

By:   /s/ DANIEL T. HENDRIX

Daniel T. Hendrix

*President and Chief Executive Officer*

POWER OF ATTORNEY KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Daniel T. Hendrix as attorney-in-fact, with power of substitution, for him or her in any and all capacities, to sign any amendments to this Report on Form 10-K, and to file the same, with exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that said attorney-in-fact may do or cause to be done by virtue hereof. Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated. 113

2020 Certification of Chief Executive Officer with respect to the Company's Annual Report on Form 10-K for the fiscal year ended January 3, 2021.

 Companies  Documents  Forms  Alerts                    Ticker: TILE

Exhibit 31.1

**CERTIFICATION**

I, Daniel T. Hendrix, certify that:

1.  I have reviewed this annual report on Form 10-K of Interface, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have;

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation

---

Companies  Documents  Forms  Alerts                    Ticker: TILE

known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;   (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and   (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and   (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 3, 2021

---

Companies  Documents  Forms  Alerts                    Ticker: TILE

Date: March 3, 2021

                                        /s/ Daniel T. Hendrix
                                        Daniel T. Hendrix
                                        Chief Executive Officer

2020 Certification of Chief Financial Officer with respect to the Company's Annual Report on Form 10-K for the fiscal year ended January 3, 2021.

Companies · Documents · Forms · Alerts                    Ticker: TILE

**Exhibit 31.2**

**CERTIFICATION**

I, Bruce A. Hausmann, certify that:

1.  I have reviewed this annual report on Form 10-K of Interface, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation



Companies · Documents · Forms · Alerts                    Ticker: TILE

known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:March 3, 2021

Companies   Documents   Forms   Alerts                    Ticker: TILE

financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and     (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 3, 2021

                    /s/ Bruce A. Hausmann

                    Bruce A. Hausmann
                    Chief Financial Officer

---

2020 Certification Pursuant to Section 1350 of Chapter 63 of Title 18 of United States Code by Chief Executive Officer with respect to the Company's Annual Report on Form 10-K for the fiscal year ended January 3, 2021.

Companies   Documents   Forms   Alerts                    Ticker: TILE

Exhibit 32.1

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350

I, Daniel T. Hendrix, Chief Executive Officer of Interface, Inc. (the "Company"), certify, pursuant to 18 U.S.C. § 1350 as adopted by § 906 of the Sarbanes-Oxley Act of 2002, that:

     (1)  the Annual Report on Form 10-K of the Company for the year ended January 3, 2021 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and     (2)  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 3, 2021

                    /s/ Daniel T. Hendrix

                    Daniel T. Hendrix
                    Chief Executive Officer

---

2020 Certification Pursuant to Section 1350 of Chapter 63 of Title 18 of United States Code by Chief Financial Officer with respect to the Company's Annual Report on Form 10-K for the fiscal year ended January 3, 2021.

| Companies Documents Forms Alerts | Ticker: TILE |
|---|---|

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350**

I, Bruce A. Hausmann, Chief Financial Officer of Interface, Inc. (the "Company"), certify, pursuant to 18 U.S.C. § 1350 as adopted by § 906 of the Sarbanes-Oxley Act of 2002, that:

(1) the Annual Report on Form 10-K of the Company for the year ended January 3, 2021 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and        (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 3, 2021

/s/ Bruce A. Hausmann

Bruce A. Hausmann
Chief Financial Officer

## Exhibit 1 - Reference 252; Page 69 of 407

252. The objectives of the auditor, and therefore BDO USA, LLP in an audit

of ICFR are to:

(1) obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment about the effectiveness of ICFR (as of date) and

(2) express an opinion on the effectiveness of ICFR in a written report, and communicate with management and those charged with governance, based on the auditor's findings

Year 2019

**Report of Independent Registered Public Accounting Firm**

Shareholders and Board of Directors
Interface, Inc. and Subsidiaries
Atlanta, Georgia

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Interface, Inc. and Subsidiaries (the "Company") as of December 29, 2019 and December 30, 2018, the related consolidated statements of operations, comprehensive income, and cash flows for each of the three years in the period ended December 29, 2019, and the related notes and financial statement schedule listed in the accompanying index (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 29, 2019 and December 30, 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 29, 2019, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 29, 2019, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated February 26, 2020 expressed an unqualified opinion thereon.

**Change in Accounting Principle**

the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated February 26, 2020 expressed an unqualified opinion thereon.

**Change in Accounting Principle**

As discussed in Note 1 to the consolidated financial statements, the Company has changed its method of accounting for leases during the year ended December 29, 2019 due to the adoption of the Accounting Standards Codification ("ASC") Topic 842, *Leases* ("ASC 842").

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing separate opinions on the critical audit matter or on the accounts or disclosures to which it relates.

96

Year 2020

**Report of Independent Registered Public Accounting Firm**

Shareholders and Board of Directors
Interface, Inc. and Subsidiaries
Atlanta, Georgia

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Interface, Inc. and Subsidiaries (the "Company") as of January 3, 2021 and December 29, 2019, the related consolidated statements of operations, comprehensive income (loss), and cash flows for each of the three years in the period ended January 3, 2021, and the related notes and financial statement schedule listed in the accompanying index (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at January 3, 2021 and December 29, 2019, and the results of its operations and its cash flows for each of the three years in the period ended January 3, 2021, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of January 3, 2021, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated March 3, 2021 expressed an unqualified opinion thereon.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that: (i) relates to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

# EXHIBIT 2

# ATTACHMENT TO PLAINTIFF'S ORIGINAL COMPLAINT

## EXCERPTS FROM THE 2018, 2019, AND 2020 ATLANTICUS 10K REPORTS

### Source: https://sec.report/Ticker/ATLC

Exhibit 2 - Reference 272; Page 78 of 407

272. Under §404(a) of the SOX Act, Atlanticus is required to annually report on Atlanticus' own assessment of the effectiveness of Atlanticus' controls.

Year 2018

Companies  Documents  Forms  Alerts                        Ticker: FICO

that these disclosure controls and procedures were effective as of December 31, 2018.

*Management's Report on Internal Control over Financial Reporting*

Management of Atlanticus Holdings Corporation is responsible for establishing and maintaining adequate internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Act) for Atlanticus Holdings Corporation and our subsidiaries. Our management conducted an evaluation of the effectiveness of internal control over financial reporting as of December 31, 2018, based on the framework in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") *Internal Control-Integrated Framework (2013 framework)*.

Based on our evaluation under the COSO 2013 framework, management has concluded that internal control over financial reporting was effective as of December 31, 2018.

This Annual Report does not include an attestation report of our independent public accounting firm regarding internal control over financial reporting. Management's report is not subject to attestation by our independent public accounting firm pursuant to SEC rules that permit us to provide only management's report in this Annual Report. 

Year 2019

| Companies   Documents   Forms   Alerts | Ticker: ATLC |
|---|---|

that these disclosure controls and procedures were effective as of December 31, 2019.

*Management's Report on Internal Control over Financial Reporting*

Management of Atlanticus Holdings Corporation is responsible for establishing and maintaining adequate internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Act) for Atlanticus Holdings Corporation and our subsidiaries. Our management conducted an evaluation of the effectiveness of internal control over financial reporting as of December 31, 2019, based on the framework in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") *Internal Control-Integrated Framework (2013 framework)*.

Based on our evaluation under the COSO 2013 framework, management has concluded that internal control over financial reporting was effective as of December 31, 2019.

This Annual Report does not include an attestation report of our independent public accounting firm regarding internal control over financial reporting. Management's report is not subject to attestation by our independent public accounting firm pursuant to SEC rules that permit us to provide only management's report in this Annual Report.

Year 2020

| Companies   Documents   Forms   Alerts | Ticker: ATLC |
|---|---|

that these disclosure controls and procedures were effective as of December 31, 2020.

*Management's Report on Internal Control over Financial Reporting*

Management of Atlanticus Holdings Corporation is responsible for establishing and maintaining adequate internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Act) for Atlanticus Holdings Corporation and our subsidiaries. Our management conducted an evaluation of the effectiveness of internal control over financial reporting as of December 31, 2020, based on the framework in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") *Internal Control-Integrated Framework (2013 framework)*.

Based on our evaluation under the COSO 2013 framework, management has concluded that internal control over financial reporting was effective as of December 31, 2020.

This Annual Report does not include an attestation report of our independent public accounting firm regarding internal control over financial reporting. Management's report is not subject to attestation by our independent public accounting firm pursuant to SEC rules that permit us to provide only management's report in this Annual Report.

## Exhibit 2 - Reference 274; Page 79 of 407

274. Under §302 of the SOX Act, Atlanticus' corporate officers must (among other things) accept responsibility (as evidenced by individual signatures) for the content of Atlanticus's annual §404(a) report. The CEO and CFO must personally certify the content of the reports filed with the SEC and the procedures established by the issuer to report disclosures and prepare financial statements.

Year 2018

| | Ticker: FICO |
|---|---|
| Companies  Documents  Forms  Alerts | |

Table of Contents

### SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Atlanta, State of Georgia, on March 26, 2019.

Atlanticus Holdings Corporation

/s/ Da

| | Ticker: FICO |
|---|---|
| Companies  Documents  Forms  Alerts | |

/s/
David G. Hanna

By:

Da
vid
G.
Ha
nn
a
Ch
ief
Ex
ecu
tiv

Companies  Documents  Forms  Alerts          Ticker: FICO

Ch
ief
Ex
ecu
tiv
e
Off
ice
r
an
d
Ch
air
ma
n
of
the
Bo

Companies  Documents  Forms  Alerts          Ticker: FICO

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Report has been signed below by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/David G. Hanna<br>David G. Hanna | Chief Executive Officer and Chairman of the Board<br>(Principal Executive Officer) | March 26, 2019 |
| /s/William R. McCamey<br>William R. McCamey | Chief Financial Officer (Principal Financial Officer) | March 26, 2019 |
| /s/Mitchell C. Saunders<br>Mitchell C. Saunders | Chief Accounting Officer (Principal Accounting Officer) | March 26, 2019 |
| /s/Jeffrey A. Howard | | |

Companies  Documents  Forms  Alerts  Ticker: FICO

| /s/Jeffrey A. Howard | | |
| Jeffrey A. Howard | Director | March 26, 2019 |
| /s/Deal W. Hudson | | |
| Deal W. Hudson | Director | March 26, 2019 |
| /s/Mack F. Mattingly | | |
| Mack F. Mattingly | Director | March 26, 2019 |
| /s/Thomas G. Rosencrants | | |
| Thomas G. Rosencrants | Director | March 26, 2019 |

38

---

## 2018 Certification of Principal Executive Officer pursuant to Rule 13a-14(a)

Companies  Documents  Forms  Alerts  Ticker: FICO

Exhibit 31.1

### CERTIFICATIONS

I, David G. Hanna, certify that:

1. I have reviewed this Report on Form 10-K of Atlanticus Holdings Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report; and

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

 Companies   Documents   Forms   Alerts                     Ticker: FICO

Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred

---

Companies   Documents   Forms   Alerts                     Ticker: FICO

d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the fourth fiscal period in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Companies    Documents    Forms    Alerts                                      Ticker: FICO

and report financial information; and

b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 26, 2019

/s/ DAVID G. HANNA

David G. Hanna

*Chief Executive Officer and Chairman of the Board*

## 2018 Certification of Principal Financial Officer pursuant to Rule 13a-14(a)

Companies  Documents  Forms  Alerts                                      Ticker: FICO

Exhibit 31.2

### CERTIFICATIONS

I, William R. McCamey, certify that:

1. I have reviewed this Report on Form 10-K of Atlanticus Holdings Corporation:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report; and

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in

Companies  Documents  Forms  Alerts                    Ticker: FICO

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

Companies  Documents  Forms  Alerts                    Ticker: FICO

d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the fourth fiscal period in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 26, 2019

| Companies   Documents   Forms   Alerts | | Ticker: FICO |

b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 26, 2019

/s/ WILLIAM R. McCAMEY
William R. McCamey
*Chief Financial Officer*

## 2018 Certification of Principal Executive Officer and Principal Financial Officer pursuant to 18 U.S.C. Section 1350

| Companies   Documents   Forms   Alerts | | Ticker: FICO |

Exhibit 32.1

### CERTIFICATION

The undersigned, as the Chief Executive Officer and Chairman of the Board, and as the Chief Financial Officer, respectively, of Atlanticus Holdings Corporation, certify that, to the best of their knowledge and belief, the Annual Report on Form 10-K for the year ended December 31, 2018, which accompanies this certification fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and the information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of Atlanticus Holdings Corporation at the dates and for the periods indicated. The foregoing certifications are made pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350) and shall not be relied upon for any other purpose.

This 26th day of March, 2019.

/s/ DAVID G. HANNA
David G. Hanna
*Chief Executive Officer and*

| Companies  Documents  Forms  Alerts | Ticker: FICO |
| --- | --- |

This 26th day of March, 2019.

/s/ DAVID G. HANNA
David G. Hanna
*Chief Executive Officer and*
*Chairman of the Board*

/s/ WILLIAM R. McCAMEY
William R. McCamey
*Chief Financial Officer*

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to Atlanticus Holdings Corporation and will be retained by Atlanticus Holdings Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

## Year 2019

| Companies  Documents  Forms  Alerts | Ticker: ATLC |
| --- | --- |

### SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Atlanta, State of Georgia, on March 30, 2020.

Atlanti
cus
Holdin
gs
Corpor
ation

/s/
Da
vid

Companies  Documents  Forms  Alerts                    Ticker: ATLC

Da
vid
G.
Ha
By nn
: a
Da
vid
G.
Ha
nn
a
Ch
ief
Ex
ec
uti
ve

Companies  Documents  Forms  Alerts                    Ticker: ATLC

Ch
ief
Ex
ec
uti
ve
Of
fic
er
an
d
Ch
air
ma
n
of
the
Bo
ard

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Report has been signed below by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/David G. Hanna<br>David G. Hanna | Chief Executive Officer and Chairman of the Board (Principal Executive Officer) | March 30, 2020 |
| /s/William R. McCamey<br>William R. McCamey | Chief Financial Officer (Principal Financial Officer) | March 30, 2020 |
| /s/Mitchell C. Saunders<br>Mitchell C. Saunders | Chief Accounting Officer (Principal Accounting Officer) | March 30, 2020 |
| /s/Jeffrey A. Howard | | |

| | | |
|---|---|---|
| /s/Jeffrey A. Howard<br>Jeffrey A. Howard | Director | March 30, 2020 |
| /s/Deal W. Hudson<br>Deal W. Hudson | Director | March 30, 2020 |
| /s/Mack F. Mattingly<br>Mack F. Mattingly | Director | March 30, 2020 |
| /s/Thomas G. Rosencrants<br>Thomas G. Rosencrants | Director | March 30, 2020 |

39

2019 Certification of Principal Executive Officer pursuant to Rule 13a-14(a)

  Companies Documents Forms Alerts | Ticker: ATLC

Exhibit 31.1

## CERTIFICATIONS

I, David G. Hanna, certify that:

1. I have reviewed this Report on Form 10-K of Atlanticus Holdings Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report; and

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:



Companies Documents Forms Alerts | Ticker: ATLC

periods presented in this report.

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period

| Companies  Documents  Forms  Alerts | | | | Ticker: ATLC |

c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the fourth fiscal period in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

| Companies  Documents  Forms  Alerts | | | | Ticker: ATLC |

summarize and report financial information; and

b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 30, 2020

/s/ DAVID G. HANNA
David G. Hanna
*Chief Executive Officer and Chairman of the Board*

2019 Certification of Principal Financial Officer pursuant to Rule 13a-14(a)

 Companies  Documents  Forms  Alerts                    Ticker: ATLC

Exhibit 31.2

## CERTIFICATIONS

I, William R. McCamey, certify that:

1. I have reviewed this Report on Form 10-K of Atlanticus Holdings Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report; and

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined

 Companies  Documents  Forms  Alerts                    Ticker: ATLC

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;



c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation: and

    d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the fourth fiscal period in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)    any fraud, whether or not material, that involves management or other employees who have a significant role

    b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 30, 2020

/s/ WILLIAM R. McCAMEY
William R. McCamey
*Chief Financial Officer*

2019 Certification of Principal Executive Officer and Principal Financial Officer pursuant to 18 U.S.C. Section 1350

Companies · Documents · Forms · Alerts     Ticker: ATLC

**Exhibit 32.1**

### CERTIFICATION

The undersigned, as the Chief Executive Officer and Chairman of the Board, and as the Chief Financial Officer, respectively, of Atlanticus Holdings Corporation, certify that, to the best of their knowledge and belief, the Annual Report on Form 10-K for the year ended December 31, 2019, which accompanies this certification fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and the information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of Atlanticus Holdings Corporation at the dates and for the periods indicated. The foregoing certifications are made pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350) and shall not be relied upon for any other purpose.

This 30th day of March, 2020..

/s/ DAVID G. HANNA
David G. Hanna

Companies · Documents · Forms · Alerts     Ticker: ATLC

/s/ DAVID G. HANNA
David G. Hanna
*Chief Executive Officer and*
*Chairman of the Board*

/s/ WILLIAM R. McCAMEY
William R. McCamey
*Chief Financial Officer*

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to Atlanticus Holdings Corporation and will be retained by Atlanticus Holdings Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

Year 2020



Companies  Documents  Forms  Alerts                    Ticker: ATLC

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Atlanta, State of Georgia, on March 31, 2021.

Atlanticus Holdings Corporation

/s/ Jeffrey A. Howard

By: /s/ Jeffrey A. Howard
Jeffrey A. Howard
President an

Companies  Documents  Forms  Alerts                    Ticker: ATLC



wa
rd
Pre
sid
ent
an
d
Ch
ief
Ex
ecu
tiv
e
Off
ice
r

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Report has been signed below by

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Report has been signed below by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
| --- | --- | --- |
| /s/Jeffrey A. Howard<br>Jeffrey A. Howard | President. Chief Executive Officer and Director (Principal Executive Officer) | March 31, 2021 |
| /s/William R. McCamey<br>William R. McCamey | Chief Financial Officer (Principal Financial Officer) | March 31, 2021 |
| /s/Mitchell C. Saunders<br>Mitchell C. Saunders | Chief Accounting Officer (Principal Accounting Officer) | March 31, 2021 |
| /s/David G. Hanna | | |

| Companies  Documents  Forms  Alerts | | Ticker: ATLC |
|---|---|---|
| Mitchell C. Saunders | Chief Accounting Officer (Principal Accounting Officer) | March 31, 2021 |
| /s/David G. Hanna | | |
| David G. Hanna | Executive Chairman of the Board | March 31, 2021 |
| /s/Denise M. Harrod | | |
| Denise M. Harrod | Director | March 31, 2021 |
| /s/Deal W. Hudson | | |
| Deal W. Hudson | Director | March 31, 2021 |
| /s/Joann G. Jones | | |
| Joann G. Jones | Director | March 31, 2021 |
| /s/Mack F. Mattingly | | |
| Mack F. Mattingly | Director | March 31, 2021 |

| Companies  Documents  Forms  Alerts | | Ticker: ATLC |
|---|---|---|
| Joann G. Jones | Director | March 31, 2021 |
| /s/Mack F. Mattingly | | |
| Mack F. Mattingly | Director | March 31, 2021 |
| /s/Thomas G. Rosencrants | | |
| Thomas G. Rosencrants | Director | March 31, 2021 |

41

2020 Certification of Principal Executive Officer pursuant to Rule 13a-14(a)

 Companies  Documents  Forms  Alerts | Ticker: ATLC

Exhibit 31.1

## CERTIFICATIONS

I, Jeffrey A. Howard, certify that:

1. I have reviewed this Report on Form 10-K of Atlanticus Holdings Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report; and

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have: 

 Companies  Documents  Forms  Alerts | Ticker: ATLC

Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the fourth fiscal period in the case of an annual report) that has



Companies   Documents   Forms   Alerts                          Ticker: ATLC

    d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the fourth fiscal period in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

    5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 31, 2021

Companies   Documents   Forms   Alerts                          Ticker: ATLC

    b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 31, 2021

                                          /s/ JEFFREY A. HOWARD
                                               Jeffrey A. Howard
                             *President and Chief Executive Officer*

2020 Certification of Principal Financial Officer pursuant to Rule 13a-14(a)

 Companies  Documents  Forms  Alerts        Ticker: ATLC

Exhibit 31.2

## CERTIFICATIONS

I, William R. McCamey, certify that:

1. I have reviewed this Report on Form 10-K of Atlanticus Holdings Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report; and

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in

 Companies  Documents  Forms  Alerts        Ticker: ATLC

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

Companies  Documents  Forms  Alerts                    Ticker: ATLC

covered by this report based on such evaluation; and

d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the fourth fiscal period in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Companies  Documents  Forms  Alerts                    Ticker: ATLC

and report financial information; and

b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 31, 2021

/s/ WILLIAM R. McCAMEY
William R. McCamey
Chief Financial Officer

2020 Certification of Principal Executive Officer and Principal Financial Officer pursuant to 18 U.S.C. Section 1350



| Companies | Documents | Forms | Alerts | | Ticker: ATLC |

Exhibit 32.1

**CERTIFICATION**

The undersigned, as the President and Chief Executive Officer, and as the Chief Financial Officer, respectively, of Atlanticus Holdings Corporation, certify that, to the best of their knowledge and belief, the Annual Report on Form 10-K for the year ended December 31, 2020, which accompanies this certification fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and the information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of Atlanticus Holdings Corporation at the dates and for the periods indicated. The foregoing certifications are made pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350) and shall not be relied upon for any other purpose.

This 31st day of March, 2021.

/s/ JEFFREY A. HOWARD
Jeffrey A. Howard

| Companies | Documents | Forms | Alerts | | Ticker: ATLC |

/s/ JEFFREY A. HOWARD
Jeffrey A. Howard
*President and*
*Chief Executive Officer*

/s/ WILLIAM R. McCAMEY
William R. McCamey
*Chief Financial Officer*

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to Atlanticus Holdings Corporation and will be retained by Atlanticus Holdings Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

## Exhibit 2 - Reference 278; Page 83 of 407

278. The objectives of the auditor, and therefore BDO USA, LLP in an audit of ICFR are to:

(1) obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment about the effectiveness of ICFR and

(2) express an opinion on the effectiveness of ICFR in a written report, and communicate with management and those charged with governance, based on the auditor's findings.

Year 2018

 Companies  Documents  Forms  Alerts                Ticker: FICO

Report of Independent Registered Public Accounting Firm

Shareholders and Board of Directors
Atlanticus Holdings Corporation
Atlanta, Georgia

Opinion on the consolidated Financial Statements

We have audited the accompanying consolidated balance sheets of Atlanticus Holdings Corporation (the "Company") and
subsidiaries as of December 31, 2018 and 2017, the related consolidated statements of operations, comprehensive income (loss),
shareholders' deficit, and cash flows for each of the two years in the period ended December 31, 2018, and the related notes
(collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present
fairly, in all material respects, the financial position of the Company and subsidiaries at December 31, 2018 and 2017, and the
results of their operations and their cash flows for each of the two years in the period ended December 31, 2018, in conformity
with accounting principles generally accepted in the United States of America.

Basis for Opinion

 Companies  Documents  Forms  Alerts                Ticker: FICO

Basis for Opinion

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an
opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with
the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to
the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and
Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the
audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement,
whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal
control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial
reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial
reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements,
whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a
test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included
evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall

 Companies   Documents   Forms   Alerts                                  Ticker: FICO

reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ BDO USA, LLP

We have served as the Company's auditor since 2002.
Atlanta, Georgia
March 26, 2019

F-1

## Year 2019

 Companies   Documents   Forms   Alerts                                  Ticker: ATLC

### Report of Independent Registered Public Accounting Firm

Shareholders and Board of Directors
Atlanticus Holdings Corporation
Atlanta, Georgia

**Opinion on the consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Atlanticus Holdings Corporation (the "Company") and subsidiaries as of December 31, 2019 and 2018, the related consolidated statements of operations, comprehensive income, shareholders' equity (deficit), and cash flows for each of the two years in the period ended December 31, 2019, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company and subsidiaries at December 31, 2019 and 2018, and the results of their operations and their cash flows for each of the two years in the period ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

The consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an

 Companies  Documents  Forms  Alerts                     Ticker: ATLC

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall

 Companies  Documents  Forms  Alerts                     Ticker: ATLC

whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ BDO USA, LLP

We have served as the Company's auditor since 2002.
Atlanta, Georgia
March 30, 2020

Year 2020

 Companies  Documents  Forms  Alerts | Ticker: ATLC

**Report of Independent Registered Public Accounting Firm**

Shareholders and Board of Directors
Atlanticus Holdings Corporation
Atlanta, Georgia

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Atlanticus Holdings Corporation (the "Company") and subsidiaries as of December 31, 2020 and 2019, the related consolidated statements of operations, comprehensive income, shareholders' equity, and cash flows for the two years in the period ended December 31, 2020, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company and subsidiaries at December 31, 2020 and 2019, and the results of their operations and their cash flows for each of the two years in the period ended December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an

 Companies  Documents  Forms  Alerts | Ticker: ATLC

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall



 Companies  Documents  Forms  Alerts                                        Ticker: ATLC

reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

F-1

 Companies  Documents  Forms  Alerts                                        Ticker: ATLC

*Allowance for Loan Losses*

As described in Note 2 to the Company's consolidated financial statements, the Company has outstanding loans of $574.4 million at gross amortized cost within its Credit and Other Investments Segment and a related allowance for loan losses of $123.3 million at December 31, 2020. The loans are revolving credit facilities (credit cards) or installment loans. The allowance represents management's best estimate of the incurred losses inherent in the portfolio as of the balance sheet date. Management considers both observable and unobservable inputs in its determination of the adequacy of the allowance. The calculation of the allowance uses methods and assumptions based upon historical loss rate; current delinquency and roll-rate trends; vintage analyses based on the number of months an account has been in existence; effects of changes in the economy on consumers; changes in underwriting criteria; and estimated recoveries. Changes in the assumptions can have a material effect on the Company's financial results.

We identified the significant judgmental assumptions by management in determining the adequacy of the allowance for loan losses to be a critical audit matter. The judgmental assumptions impacting the recorded allowance are the effects of changes in the economy on consumers and the changes in underwriting criteria. Auditing these complex judgments involved especially challenging auditor judgment due to the nature and extent of audit evidence and effort required to address these matters.

The primary procedures we performed to address this critical audit matter included:

 Companies  Documents  Forms  Alerts     Ticker: ATLC

The primary procedures we performed to address this critical audit matter included:

- Evaluating the judgmental assumptions used by management by comparing to historical results, current economic data, and changes to underwriting criteria to determine if such assumptions were relevant, reliable, and reasonable for the purpose used.
- Testing the relevance and reliability of the data used in determining the judgmental assumptions by testing the completeness and accuracy of data used including internal and external third-party sources.
- Evaluating any evidence (e.g. external economic data, peer data, internal company data) that is contradictory to the conclusions reached by management in establishing the judgmental assumptions supporting the allowance for loan losses.

*Loans, Interest and Fees Receivable, at Fair Value*

As described in Note 2 and Note 6 to the Company's consolidated financial statements, the Company has outstanding loans of $417.1 million at fair value within the Credit and Other Investments Segment at December 31, 2020. The loans are revolving credit facilities (credit cards) or installment loans. The Company elected to report accounts originating on and after January 1, 2020 at fair value on a recurring basis in the financial statements. The assets are recorded at fair value based upon performance expectations of the underlying loans. The discounted cash flow model assumptions used to determine the performance expectation include yield, timing of expected payments, servicing costs and discount rate. The impact of changes in the fair value of loans, 

 Companies  Documents  Forms  Alerts     Ticker: ATLC

expectations of the underlying loans. The discounted cash flow model assumptions used to determine the performance expectation include yield, timing of expected payments, servicing costs and discount rate. The impact of changes in the fair value of loans, interest and fees receivable, at fair value is reflected within the period incurred and can have a material impact on the financial results of the Company.

We identified the significant assumptions by management used in the discounted cash flow model to be a critical audit matter. The assumptions impacting the fair value calculation included timing of expected cashflows and discount rates. Auditing these complex assumptions involved especially challenging auditor judgment due to the nature and extent of audit evidence and effort required to address these matters including the extent of specialized skill or knowledge needed.

The primary procedures we performed to address this critical audit matter included:

- Testing the relevance and reliability of data related to the assumptions by agreeing data to internal and external third-party sources.
- Evaluating the assumptions used for the timing of expected cash flows by comparing to historical performance to determine if such assumptions were relevant, reliable and reasonable for the purpose used, including consideration of evidence (e.g. external economic data and peer data) that may be contradictory to the conclusions reached by management. 
- Evaluating the discount rates used by comparing to market-based discount rates to determine if such assumption were

| Companies | Documents | Forms | Alerts | | Ticker: ATLC |
|---|---|---|---|---|---|

external economic data and peer data) that may be contradictory to the conclusions reached by management.

- Evaluating the discount rates used by comparing to market-based discount rates to determine if such assumption were relevant, reliable and reasonable for the purpose used, including consideration of evidence (e.g. external economic data, peer data, internal company data) that may be contradictory to the conclusion reached by management.
- Involving professionals with specialized skills and knowledge to evaluate the reasonableness of the timing of cash flows and discount rate assumptions used by management to determine the fair value.

/s/ BDO USA, LLP

We have served as the Company's auditor since 2002.
Atlanta, Georgia
March 31, 2021

F-2

# EXHIBIT 3

# ATTACHMENT TO PLAINTIFF'S ORIGINAL COMPLAINT

## EXCERPTS FROM THE 2018, 2019, AND 2020 BIOHORIZONS AND HENRY SCHEIN 10K REPORTS

### Source: https://sec.report/CIK/0001000228

Exhibit 3 - Reference 309; Page 97 of 407

309. Under §404(a) of the SOX Act, BioHorizons is required to annually report on BioHorizons' own assessment of the effectiveness of BioHorizons' controls.

### Year 2018

*Management's Report on Internal Control over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Our internal control system is designed to provide reasonable assurance to our management and Board of Directors regarding the preparation and fair presentation of published financial statements. Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control-Integrated Framework (2013), updated and reissued by the Committee of Sponsoring Organizations, or the COSO Framework. Based on our

124

Table of Contents

evaluation under the COSO Framework, our management concluded that our internal control over financial reporting was effective at a reasonable assurance level as of December 26, 2020.

The effectiveness of our internal control over financial reporting as of December 26, 2020 has been independently audited by BDO USA, LLP, an independent registered public accounting firm, and their attestation is included herein.

### Year 2019

 Companies  Documents  Forms  Alerts | Ticker: HSIC

All continued acquisitions integrations and systems implementations involved necessary and appropriate change-management controls that are considered in our annual assessment of the design and operating effectiveness of our internal control over financial reporting.

*Management's Report on Internal Control over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Our internal control system is designed to provide reasonable assurance to our management and Board of Directors regarding the preparation and fair presentation of published financial statements. Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control-Integrated Framework (2013), updated and reissued by the Committee of Sponsoring Organizations, or the COSO Framework. Based on our evaluation under the COSO Framework, our management concluded that our internal control over financial reporting was effective at a reasonable assurance level as of December 28, 2019.

146

## Year 2020

 Companies  Documents  Forms  Alerts | Ticker: CVET

All acquisitions integrations and systems implementations involved necessary and appropriate change-management controls that are considered in our annual assessment of the design and operating effectiveness of our internal control over financial reporting.

*Management's Report on Internal Control over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Our internal control system is designed to provide reasonable assurance to our management and Board of Directors regarding the preparation and fair presentation of published financial statements. Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control-Integrated Framework (2013), updated and reissued by the Committee of Sponsoring Organizations, or the COSO Framework. Based on our evaluation under the COSO Framework, our management concluded that our internal control over financial reporting was effective at a reasonable assurance level as of December 29, 2018.

The effectiveness of our internal control over financial reporting as of December 29, 2018 has been independently audited by BDO USA, LLP, an independent registered public accounting firm, and their attestation is included herein.

133

## Exhibit 3 - Reference 312; Page 99 of 407

312. Under §302 of the SOX Act, BioHorizons' corporate officers must (among other things) accept responsibility (as evidenced by individual signatures) for the content of BioHorizons's annual §404(a) report. The CEO and CFO must personally certify the content of the reports filed with the SEC and the procedures established by the issuer to report disclosures and prepare financial statements.

## Year 2018

**SIGNATURES**

Table of Contents

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Henry Schein, Inc.

By: /s/ STANLEY M. BERGMAN

Stanley M. Bergman
Chairman and Chief Executive Officer
February 20, 2019

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Capacity | Date |
| --- | --- | --- |

| Signature | Capacity | Date |
| --- | --- | --- |
| /s/ STANLEY M. BERGMAN<br>Stanley M. Bergman | Chairman, Chief Executive Officer and Director (principal executive officer) | February 20, 2019 |
| /s/ STEVEN PALADINO<br>Steven Paladino | Executive Vice President, Chief Financial Officer and Director (principal financial and accounting officer) | February 20, 2019 |
| /s/ JAMES P. BRESLAWSKI<br>James P. Breslawski | Director | February 20, 2019 |
| /s/ GERALD A. BENJAMIN<br>Gerald A. Benjamin | Director | February 20, 2019 |
| /s/ MARK E. MLOTEK<br>Mark E. Mlotek | Director | February 20, 2019 |
| /s/ BARRY J. ALPERIN | Director | February 20, 2019 |

Companies  Documents  Forms  Alerts                                    Ticker: CVET

Mark E. Mlotek

/s/ BARRY J. ALPERIN          Director                    February 20, 2019
Barry J. Alperin

/s/ PAUL BRONS                Director                    February 20, 2019
Paul Brons

/s/ SHIRA GOODMAN             Director                    February 20, 2019
Shira Goodman

/s/ JOSEPH L. HERRING         Director                    February 20, 2019
Joseph L. Herring

/s/ KURT P. KUEHN             Director                    February 20, 2019
Kurt P. Kuehn

/s/ PHILIP A. LASKAWY         Director                    February 20, 2019
Philip A. Laskawy

---

Companies  Documents  Forms  Alerts                                    Ticker: CVET

/s/ PHILIP A. LASKAWY         Director                    February 20, 2019
Philip A. Laskawy

/s/ ANNE H. MARGULIES         Director                    February 20, 2019
Anne H. Margulies

/s/ CAROL RAPHAEL             Director                    February 20, 2019
Carol Raphael

/s/ E. DIANNE REKOW           Director                    February 20, 2019
E. Dianne Rekow, DDS, Ph.D.

/s/ BRADLEY T. SHEARES, PH. D.  Director                  February 20, 2019
Bradley T. Sheares, Ph. D.

146

2018 Certification of our Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.



| Companies  Documents  Forms  Alerts | Ticker: CVET |

Exhibit 31.1

### CERTIFICATION PURSUANT TO RULE 13a-14(a) OR 15d-14(a) OF THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Stanley M. Bergman, certify that:

1. I have reviewed this annual report on Form 10-K of Henry Schein, Inc. (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have;

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to

| Companies  Documents  Forms  Alerts | Ticker: CVET |

the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 20, 2019

/s/ Stanley M. Bergman
Stanley M. Bergman

2018 Certification of our Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

 Companies  Documents  Forms  Alerts

Ticker: CVET

Exhibit 31.2

**CERTIFICATION PURSUANT TO RULE 13a-14(a) OR 15d-14(a) OF THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Steven Paladino, certify that:

1. I have reviewed this annual report on Form 10-K of Henry Schein, Inc. (the "registrant");

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to

---

Companies  Documents  Forms  Alerts

Ticker: CVET

material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 20, 2019

/s/ Steven Paladino

Steven Paladino

---

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 20, 2019.

/s/ Steven Paladino

Steven Paladino
Executive Vice President and Chief Financial Officer

Year 2019

 Companies   Documents   Forms   Alerts                     Ticker: HSIC

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Henry Schein, Inc.

By: /s/ STANLEY M. BERGMAN
Stanley M. Bergman
Chairman and Chief Executive Officer
February 20, 2020

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Capacity | Date |
|-----------|----------|------|

Companies   Documents   Forms   Alerts                     Ticker: HSIC

| Signature | Capacity | Date |
|-----------|----------|------|
| /s/ STANLEY M. BERGMAN<br>Stanley M. Bergman | Chairman, Chief Executive Officer<br>and Director (principal executive officer) | February 20, 2020 |
| /s/ STEVEN PALADINO<br>Steven Paladino | Executive Vice President, Chief Financial<br>Officer and Director (principal financial and<br>accounting officer) | February 20, 2020 |
| /s/ JAMES P. BRESLAWSKI<br>James P. Breslawski | Vice Chairman, Director | February 20, 2020 |
| /s/ GERALD A. BENJAMIN<br>Gerald A. Benjamin | Director | February 20, 2020 |
| /s/ MARK E. MLOTEK<br>Mark E. Mlotek | Director | February 20, 2020 |

| | | | Ticker: HSIC |
|---|---|---|---|
| Companies  Documents  Forms  Alerts | | | |
| /s/ BARRY J. ALPERIN | Director | | February 20, 2020 |
| Barry J. Alperin | | | |
| /s/ PAUL BRONS | Director | | February 20, 2020 |
| Paul Brons | | | |
| /s/ SHIRA GOODMAN | Director | | February 20, 2020 |
| Shira Goodman | | | |
| /s/ JOSEPH L. HERRING | Director | | February 20, 2020 |
| Joseph L. Herring | | | |
| /s/ KURT P. KUEHN | Director | | February 20, 2020 |
| Kurt P. Kuehn | | | |
| /s/ PHILIP A. LASKAWY | Director | | February 20, 2020 |
| Philip A. Laskawy | | | |

| | | | Ticker: HSIC |
|---|---|---|---|
| Companies  Documents  Forms  Alerts | | | |
| /s/ PHILIP A. LASKAWY | Director | | February 20, 2020 |
| Philip A. Laskawy | | | |
| /s/ ANNE H. MARGULIES | Director | | February 20, 2020 |
| Anne H. Margulies | | | |
| /s/ CAROL RAPHAEL | Director | | February 20, 2020 |
| Carol Raphael | | | |
| /s/ E. DIANNE REKOW | Director | | February 20, 2020 |
| E. Dianne Rekow, DDS, Ph.D. | | | |
| /s/ BRADLEY T. SHEARES, PH. D. | Director | | February 20, 2020 |
| Bradley T. Sheares, Ph. D. | | | |

160

2019 Certification of our Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

Companies  Documents  Forms  Alerts Ticker: HSIC

Exhibit 31.1

## CERTIFICATION PURSUANT TO RULE
### 13a-14(a) OR 15d-14(a) OF THE SECURITIES

### EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE
### SARBANES-OXLEY ACT OF 2002

I, Stanley M. Bergman, certify that:

1.   I have reviewed this annual report on

Form 10-K of Henry Schein, Inc. (the "registrant");

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules

13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

---

 Companies  Documents  Forms  Alerts Ticker: HSIC

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules

13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's  auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

---

Companies  Documents  Forms  Alerts Ticker: HSIC

quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 20, 2020

/s/ Stanley M. Bergman
Stanley M. Bergman
Chairman and Chief Executive Officer

2019 Certification of our Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

---

Companies   Documents   Forms   Alerts   Ticker: HSIC

Exhibit 31.2

CERTIFICATION PURSUANT TO RULE
13a-14(a) OR 15d-14(a) OF THE SECURITIES

EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE
SARBANES-OXLEY ACT OF 2002

I, Steven Paladino, certify that:

1.  I have reviewed this annual report on

Form 10-K of Henry Schein, Inc. (the "registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules
13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

---

Companies   Documents   Forms   Alerts   Ticker: HSIC

Rules
13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and



registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: February 20, 2020

/s/ Steven Paladino
Steven Paladino
Executive Vice President and
Chief Financial Officer

## Year 2020

### SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Henry Schein, Inc.

By: /s/ STANLEY M. BERGMAN
Stanley M. Bergman
Chairman and Chief Executive Officer
February 17, 2021

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Capacity | Date |
| --- | --- | --- |
| /s/ STANLEY M. BERGMAN<br>Stanley M. Bergman | Chairman, Chief Executive Officer<br>and Director (principal executive officer) | February 17, 2021 |
| /s/ STEVEN PALADINO<br>Steven Paladino | Executive Vice President, Chief Financial Officer<br>and Director (principal financial and accounting officer) | February 17, 2021 |
| /s/ JAMES P. BRESLAWSKI<br>James P. Breslawski | Vice Chairman, President and Director | February 17, 2021 |
| /s/ GERALD A. BENJAMIN<br>Gerald A. Benjamin | Director | February 17, 2021 |
| /s/ MARK E. MLOTEK<br>Mark E. Mlotek | Director | February 17, 2021 |
| /s/ MOHAMAD ALI<br>Mohamad Ali | Director | February 17, 2021 |
| /s/ BARRY J. ALPERIN | Director | February 17, 2021 |

| | | |
|---|---|---|
| /s/ MOHAMAD ALI | Director | February 17, 2021 |
| Mohamad Ali | | |
| /s/ BARRY J. ALPERIN | Director | February 17, 2021 |
| Barry J. Alperin | | |
| /s/ PAUL BRONS | Director | February 17, 2021 |
| Paul Brons | | |
| /s/ DEBORAH DERBY | Director | February 17, 2021 |
| Deborah Derby | | |
| /s/ SHIRA GOODMAN | Director | February 17, 2021 |
| Shira Goodman | | |
| /s/ JOSEPH L. HERRING | Director | February 17, 2021 |
| Joseph L. Herring | | |
| /s/ KURT P. KUEHN | Director | February 17, 2021 |
| Kurt P. Kuehn | | |
| /s/ PHILIP A. LASKAWY | Director | February 17, 2021 |
| Philip A. Laskawy | | |
| /s/ ANNE H. MARGULIES | Director | February 17, 2021 |
| Anne H. Margulies | | |
| /s/ CAROL RAPHAEL | Director | February 17, 2021 |
| Carol Raphael | | |
| /s/ E. DIANNE REKOW | Director | February 17, 2021 |
| E. Dianne Rekow, DDS, Ph.D. | | |
| /s/ BRADLEY T. SHEARES, PH. D. | Director | February 17, 2021 |
| Bradley T. Sheares. Ph. D. | | |

## 2020 Certification of our Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

**CERTIFICATION PURSUANT TO RULE 13a-14(a) OR 15d-14(a) OF THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Stanley M. Bergman, certify that:

1.     I have reviewed this annual report on Form 10-K of Henry Schein, Inc. (the "registrant");

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state material fact necessary to make the statements made, in light of the circumstances under which such statements made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, present fairly material respects the financial condition, results of operations and cash flows of the registrant as of, and the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and, internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

     a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     b)     designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     c)     evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of period covered by this report based on such evaluation; and

b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability financial reporting and the preparation of financial statements for external purposes in accordance with generally accounting principles;

c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of period covered by this report based on such evaluation; and

d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of control internal financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process summarize and report financial information; and

b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated:  February 17, 2021                            /s/ Stanley M. Bergman
                                                     Stanley M. Bergman
                                                     Chairman and Chief Executive Officer

# 2020 Certification of our Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

Exhibit 31.2

## CERTIFICATION PURSUANT TO RULE 13a-14(a) OR 15d-14(a) OF THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Steven Paladino, certify that:

1.      I have reviewed this annual report on Form 10-K of Henry Schein, Inc (the "registrant"):

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state material fact necessary to make the statements made, in light of the circumstances under which such statements made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, present fairly in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability financial reporting and the preparation of financial statements for external purposes in accordance with generally accounting principles;

c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of period covered by this report based on such evaluation; and

d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   any fraud, whether or not material, that involves management or other employees who have a role in the registrant's internal control over financial reporting.

Dated: February 17, 2021

/s/ Steven Paladino
Steven Paladino
Executive Vice President and
Chief Financial Officer


2020 Certification of our Chief Executive Officer and Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

Exhibit 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the annual report on Form 10-K of Henry Schein, Inc. (the "Company") for the period ended December 26, 2020, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Stanley M. Bergman, the Chairman and Chief Executive Officer of the Company, and I, Steven Paladino, Executive Vice President and Chief Financial Officer of the Company, do hereby certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge and belief that:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Dated: February 17, 2021

/s/ Stanley M. Bergman
Stanley M. Bergman
Chairman and Chief Executive Officer

Dated:  February 17, 2021       /s/ Steven Paladino
                                Steven Paladino
                                Executive Vice President and
                                Chief Financial Officer

This certification accompanies each Report pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by the Sarbanes-Oxley Act of 2002, be deemed filed by the Company for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

## Exhibit 3 - Reference 316; Page 105 of 407

316. The objectives of the auditor, and therefore BDO USA, LLP, in an audit are to:

(1) obtain reasonable assurance about whether material weaknesses exist and

(2) express an opinion on the effectiveness of the controls in a written report, and communicate with management and those charged with governance, based on the auditor's findings.

## Year 2018

| Companies  Documents  Forms  Alerts | Ticker: CVET |
| --- | --- |

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

### Table of Contents

Stockholders and Board of Directors
Henry Schein, Inc.
Melville, NY

Opinion on the Consolidated Financial Statements

We have audited the accompanying consolidated balance sheets of Henry Schein, Inc. (the "Company") and subsidiaries as of December 29, 2018 and December 30, 2017, the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 29, 2018, and the related notes and schedule presented in Item 15 (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company and subsidiaries at December 29, 2018 and December 30, 2017, and the results of their operations and their cash flows for each of the three years in the period ended December 29, 2018, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"),

 Companies  Documents  Forms  Alerts                                    Ticker: CVET

We also have audited, In accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 29, 2018, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated February 20, 2019 expressed an unqualified opinion thereon.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable

 Companies  Documents  Forms  Alerts                                    Ticker: CVET

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ BDO USA, LLP

We have served as the Company's auditor since 1984.

 Companies  Documents  Forms  Alerts

Ticker: CVET

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

## Table of Contents

Stockholders and Board of Directors
Henry Schein, Inc.
Melville, NY

**Opinion on Internal Control over Financial Reporting**

We have audited Henry Schein Inc.'s (the "Company's") internal control over financial reporting as of December 29, 2018, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO criteria"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 29, 2018, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets of the Company as of December 29, 2018 and December 30, 2017, the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 29, 2018, and the related notes and schedule and our report dated February 20, 2019 expressed an unqualified opinion thereon.

 Companies  Documents  Forms  Alerts

Ticker: CVET

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying "Item 9A, Management's Report on Internal Control over Financial Reporting." Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of internal control over financial reporting in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

135

Year 2019



Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Stockholders and Board of Directors
Henry Schein, Inc.
Melville, NY

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Henry Schein, Inc. (the "Company") as of December 28, 2019 and December 29, 2018, the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 28, 2019, the related notes and schedule (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 28, 2019 and December 29, 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 28, 2019, in conformity with accounting principles generally accepted in the United States of America.



conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 28, 2019, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated February 20, 2020 expressed an unqualified opinion thereon.

**Change in Accounting Principle**

As discussed in Note 1 to the consolidated financial statements, effective on December 30, 2019, the Company changed its method of accounting for leases due to the adoption of Accounting Standards Codification Topic 842, *Leases*.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities

 Companies  Documents  Forms  Alerts                                    Ticker: HSIC

Go

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**



The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were

---

Companies  Documents  Forms  Alerts                                    Ticker: HSIC

Go

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the Audit Committee of the Board of Directors and that: (1) relate to accounts or disclosures that are material to the consolidated financial statements; and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit

85

Table of Contents

matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

**Business Combinations**


matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

**Business Combinations**

As described in Note 11 of the consolidated financial statements, the Company acquired several companies in the current year. As a result of the acquisitions, management was required to determine estimated fair values of the assets acquired and liabilities assumed, including certain identifiable intangible assets. In some instances, management utilized third-party valuation specialists to assist in the preparation of the valuation of certain identifiable intangible assets.

We identified the determination of fair values of certain identifiable intangible assets, which primarily included customer relationships, as a critical audit matter. Management exercised significant judgment to develop and select assumptions in the measurement of the fair value of the identifiable intangible assets. Significant assumptions included discount rates, customer attrition, and projected revenue growth rates. These assumptions are forward-looking and could be affected by future economic and market conditions. The principal considerations for our determination included the following: (i) changes in the significant assumptions could have a significant impact on the fair value of the assets acquired, (ii) significant unobservable inputs and assumptions utilized by management in determining the fair value of the identifiable intangible assets acquired, and (iii) appropriateness of use of various valuation models to determine the fair value of the identifiable intangible assets acquired. Auditing these elements

 Companies  Documents  Forms  Alerts

Ticker: HSIC

Go

appropriateness of use of various valuation models to determine the fair value of the identifiable intangible assets acquired. Auditing these elements involved especially subjective auditor judgment due to the nature and extent of audit effort required to address these matters, including the extent of specialized skill or knowledge needed.

The primary procedures we performed to address this critical audit matter included:

- Assessing the design and testing operating effectiveness of certain controls over the development of significant assumptions used to determine the fair values of certain identifiable intangible assets, and controls over the selection of the valuation models used by management.

- Assessing the reasonableness of significant underlying assumptions through: (i) evaluating historical performance of target entities, (ii) assessing financial projections against industry metrics and peer-group companies, and (iii) performing sensitivity analyses and evaluating the potential effect of changes in the significant assumptions.

- Utilizing personnel with specialized knowledge and skill with valuation to assist in: (i) assessing the reasonableness of certain significant assumptions incorporated into the various valuation models, and (ii) assessing the appropriateness of various valuation models utilized by management to determine the fair values of the assets acquired.

**Uncertain Tax Position**

 Companies  Documents  Forms  Alerts

Ticker: HSIC

Go

**Uncertain Tax Position**

As described in Note 14 of the consolidated financial statements the Company operates in multiple jurisdictions and is subject to transfer pricing compliance for intercompany transactions that are subject to audit by taxing authorities. The resolution of these audits may span multiple years.

We identified the determination of uncertain tax positions related to transfer pricing from intercompany transactions as a critical audit matter. The principal considerations for our determination included complex judgments related to: (i) auditing the measurement of the liability for unrecognized tax benefits related to certain intercompany transactions because of assumptions applied to the interpretation of tax laws and legal rulings in multiple tax paying jurisdictions, (ii) determining whether a transfer pricing tax position's technical merits are more-likely-than-not to be sustained when measuring the amount of tax benefits that qualifies for recognition, and (iii) assessing whether intercompany transactions are based on the arm's length standard that may produce a range of arm's length outcomes. Auditing these elements involved subjective auditor judgment, including involvement of



Table of Contents

our tax professionals with specialized skills and knowledge.

The primary procedures we performed to address this critical audit matter included:

- Assessing the design and testing operating effectiveness of certain controls over the recognition and measurement of uncertain tax positions.

- Evaluating the appropriateness of management's methods and assumptions used to estimate uncertain transfer pricing positions related to: (i) evaluating the ranges of arm's length outcomes and pricing conclusions reached within management's transfer pricing studies, (ii) verifying our understanding of the relevant facts by reading the Company's correspondence with the relevant tax authorities and third-party advice obtained by the Company, and (iii) reviewing historical settlement activity from income tax authorities.

- Utilizing personnel with specialized knowledge and skill in taxation to assist in evaluating the reasonableness of technical merits, management's judgments and assumptions used in uncertain tax position calculations related to transfer pricing, and assessing the overall reasonableness of



by the Company, and (iii) reviewing historical settlement activity from income tax authorities.

- Utilizing personnel with specialized knowledge and skill in taxation to assist in evaluating the reasonableness of technical merits, management's judgments and assumptions used in uncertain tax position calculations related to transfer pricing, and assessing the overall reasonableness of conclusions reached.

/s/ BDO USA, LLP

We have served as the Company's auditor since 1984.

New York, NY

February 20, 2020

87

Year 2020

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Stockholders and Board of Directors
Henry Schein, Inc.
Melville, NY

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Henry Schein, Inc. (the "Company") as of December 26, 2020 and December 28, 2019, the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 26, 2020, the related notes and schedule (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 26, 2020 and December 28, 2019, and the results of its operations and its cash flows for each of the three years in the period ended December 26, 2020, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 26, 2020, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated February 17, 2021 expressed an unqualified opinion thereon.

**Change in Accounting Principle**
As discussed in Note 1 to the consolidated financial statements, effective on December 30, 2018, the Company changed its method of accounting for leases due to the adoption of Accounting Standards Codification Topic

**Change in Accounting Principle**
As discussed in Note 1 to the consolidated financial statements, effective on December 30, 2018, the Company changed its method of accounting for leases due to the adoption of Accounting Standards Codification Topic 842, *Leases.*

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the Audit Committee of the Board of Directors and that: (1) relates to accounts or disclosures that are material to the consolidated financial

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the Audit Committee of the Board of Directors and that: (1) relates to accounts or disclosures that are material to the consolidated financial statements; and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

70

Table of Contents

**Uncertain Tax Position**

As described in Note 14 of the consolidated financial statements the Company operates in multiple jurisdictions and is subject to transfer pricing compliance for intercompany transactions that are subject to audit by taxing authorities. The resolution of these audits may span multiple years.

We identified the determination of uncertain tax positions related to transfer pricing from intercompany transactions as a critical audit matter. The principal considerations for our determination included complex judgments related to: (i) auditing assumptions applied to the interpretation of tax laws and legal rulings in multiple tax paying jurisdictions, (ii) determining whether a transfer pricing tax position's technical merits are more-likely-than-not to be sustained when measuring the amount of tax benefits that qualifies for recognition, (iii) assessing whether intercompany transactions are based on the arm's length standard that may produce a range of arm's length outcomes, and (iv) assessing the adjustments to the liability for unrecognized tax benefits associated with tax settlements or agreements. Auditing these elements involved especially subjective auditor judgment and an increased level of audit effort, including involvement of personnel with specialized skills and knowledge.

The primary procedures we performed to address this critical audit matter included:

- Assessing the design and implementation and testing operating effectiveness of certain controls over the recognition and measurement of uncertain tax positions related to transfer pricing.

- Utilizing personnel with specialized knowledge and skill in taxation to evaluate the appropriateness of management's methods and assumptions used to estimate uncertain tax positions related to transfer pricing by: (i) verifying our understanding of the relevant facts by reading the Company's correspondence with the relevant tax authorities and third-party advice obtained by the Company, (ii) evaluating the reasonableness of technical merits, management's judgments and assumptions and assessing the overall reasonableness of conclusions reached, (iii) evaluating the ranges of arm's length outcomes and pricing conclusions reached within management's transfer pricing studies, and (iv) reviewing settlement activity or agreements with income tax authorities.

- Utilizing personnel with specialized knowledge and skill in taxation to evaluate the appropriateness of management's methods and assumptions used to estimate uncertain tax positions related to transfer pricing by: (i) verifying our understanding of the relevant facts by reading the Company's correspondence with the relevant tax authorities and third-party advice obtained by the Company, (ii) evaluating the reasonableness of technical merits, management's judgments and assumptions and assessing the overall reasonableness of conclusions reached, (iii) evaluating the ranges of arm's length outcomes and pricing conclusions reached within management's transfer pricing studies, and (iv) reviewing settlement activity or agreements with income tax authorities.

/s/ BDO USA, LLP

We have served as the Company's auditor since 1984.

New York, NY
February 17, 2021

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Stockholders and Board of Directors
Henry Schein, Inc.
Melville, NY

### Opinion on Internal Control over Financial Reporting

We have audited Henry Schein, Inc.'s (the "Company's") internal control over financial reporting as of December 26, 2020, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO criteria"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 26, 2020, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets of the Company as of December 26, 2020 and December 28, 2019, the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 26, 2020, and the related notes and schedule and our report dated February 17, 2021 expressed an unqualified opinion thereon.

### Basis for Opinion

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying "Item 9A. Management's Report on Internal Control over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of internal control over financial reporting in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ BDO USA, LLP
New York, NY

# EXHIBIT 4

# ATTACHMENT TO PLAINTIFF'S ORIGINAL COMPLAINT

## EXCERPTS FROM THE 2018 AND 2019 BLUELINX 10K REPORTS

### Source: https://sec.report/CIK/0001301787

Exhibit 4 - Reference 336; Page 115 of 407

336. Under §404(a) of the SOX Act, BlueLinx is required to annually report on BlueLinx's own assessment of the effectiveness of its controls.

Year 2018

| Companies   Documents   Forms   Alerts | Ticker: BXC |
|---|---|

ITEM 9. *CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE* None.ITEM 9A. *CONTROLS AND PROCEDURES*Disclosure Controls and Procedures Our management, including our Chief Executive Officer and Chief Financial Officer, performed an evaluation of our disclosure controls and procedures, which have been designed to permit us to record, process, summarize and report, within time periods specified by the SEC's rules and forms, information required to be disclosed. Our management, including our Chief Executive Officer and Chief Financial Officer, concluded that the controls and procedures were effective as of December 29, 2018, to ensure that material information was accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Changes In Internal Control During the three months ended December 29, 2018, we did not make any changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Management's Annual Report on Internal Control Over Financial Reporting Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies may deteriorate. Management conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 29, 2018 using the criteria issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in the 2013 Internal Control-Integrated Framework. Based on that evaluation, management believes that our internal control over financial reporting was effective as of December 29, 2018. On April 13, 2018, we acquired Cedar Creek Holdings Inc. in a business combination. We are currently in the process of integrating policies, processes, information technology systems and other components of internal controls over financial reporting of the combined business. We believe that we will be able to maintain sufficient controls over the substantive results of financial reporting of Cedar Creek and its subsidiaries, but because of the size, complexity and timing of the integration, the internal controls over financial reporting of Cedar Creek have been excluded from management's assessment of the Company's internal control over financial reporting, [...] December 29, 2018, and [...] revenue and net loss, respectively, for the

year then ended. The effectiveness of our internal control over financial reporting as of December 29, 2018, has been audited by BDO USA, LLP, an independent registered public accounting firm, which also audited our Consolidated Financial Statements for the year ended December 29, 2018. BDO, USA, LLP's report on our internal control over financial reporting is set forth below.
70

Year 2019

ITEM 9. *CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE* None. ITEM 9A. *CONTROLS AND PROCEDURES* Disclosure Controls and Procedures Our management, including our Chief Executive Officer and Chief Financial Officer, performed an evaluation, as of the end of the period covered by this report, of our disclosure controls and procedures, which have been designed to permit us to record, process, summarize, and report, within time periods specified by the SEC's rules and forms, information required to be disclosed. Our management, including our Chief Executive Officer and Chief Financial Officer, concluded that the controls and procedures were effective as of December 28, 2019, to ensure that material information was accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. Changes in Internal Control During the three months ended December 28, 2019, other than as described below, we did not make any changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Management's Annual Report on Internal Control Over Financial Reporting Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies may deteriorate.

On April 13, 2018, we acquired Cedar Creek Holdings, Inc. in a business combination. At the end of fiscal 2019, we completed the process of integrating the policies, processes, information technology systems, and other components of internal control over financial reporting of the combined business. Management's assessment of our internal control over financial reporting for the fiscal year 2019 includes the internal control over financial reporting of Cedar Creek. Management conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 28, 2019, using the criteria issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in the 2013 Internal Control-Integrated Framework. Based on that evaluation, management believes that our internal control over financial reporting was effective as of December 28, 2019.



deteriorate.

On April 13, 2018, we acquired Cedar Creek Holdings, Inc. in a business combination. At the end of fiscal 2019, we completed the process of integrating the policies, processes, information technology systems, and other components of internal control over financial reporting of the combined business. Management's assessment of our internal control over financial reporting for the fiscal year 2019 includes the internal control over financial reporting of Cedar Creek. Management conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 28, 2019, using the criteria issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in the 2013 Internal Control-Integrated Framework. Based on that evaluation, management believes that our internal control over financial reporting was effective as of December 28, 2019.

The effectiveness of our internal control over financial reporting as of December 28, 2019, has been audited by BDO USA, LLP, an independent registered public accounting firm, which also audited our Consolidated Financial Statements for the year ended December 28, 2019. BDO USA, LLP's report on our internal control over financial reporting is set forth below.

64

## Exhibit 4 - Reference 338; Page 116 of 407

338. Under §302 of the SOX Act, BlueLinx's corporate officers must (among other things) accept responsibility (as evidenced by individual signatures) for the content of Interface's annual §404(a) report. The CEO and CFO must personally certify the content of the reports filed with the SEC and the procedures established by the issuer to report disclosures and prepare financial statements.

Year 2018

Companies  Documents  Forms  Alerts | Ticker: BXC

Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

BlueLinx Holdings Inc.
(Registrant)
By: /s/ Mitchell B.

/s/ Lewis
Lewis
Officer
Mitchell B.
President and Chief Executive

Date: March 13, 2019

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature Name | Capacity | Date |
|---|---|---|
| /s/ Mitchell B. Lewis — Mitchell B. Lewis | President, Chief Executive Officer, and Director | March 13, 2019 |
| /s/ Susan C. O'Farrell — Susan C. O'Farrell | Senior Vice President, Chief Financial Officer, Treasurer (Principal Accounting Officer) | March 13, 2019 |

Companies  Documents  Forms  Alerts | Ticker: BXC

| /s/ Kim S. Fennebresque — Kim S. Fennebresque | Chairman | March 13, 2019 |
| /s/ Karel K. Czanderna — Karel K. Czanderna | Director | March 13, 2019 |
| /s/ Dominic DiNapoli — Dominic DiNapoli | Director | March 13, 2019 |
| /s/ Alan H. Schumacher — Alan H. Schumacher | Director | March 13, 2019 |
| /s/ J. David Smith — J. David Smith | Director | March 13, 2019 |

80 External Resources:

2018 Certification of Mitchell B. Lewis, Chief Executive Officer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

| Communities   Documents   Forms   Alerts | | Ticker: BXC |
| --- | --- | --- |

EXHIBIT 31.1

CERTIFICATION REQUIRED BY RULE 13a-14(a) OR RULE 15d-14(a) OF THE SECURITIES        EXCHANGE ACT OF 1934

I, Mitchell B. Lewis certify that:

(1)  I have reviewed this annual report on Form 10-K of BlueLinx Holdings Inc;

(2)  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3)  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4)  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and

| Communities   Documents   Forms   Alerts | | Ticker: BXC |
| --- | --- | --- |

registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

March 13, 2019

                        /s/ Mitchell B. Lewis
                        Mitchell B. Lewis
                        BlueLinx Holdings Inc.
                        Chief Executive Officer

2018 Certification of Susan C. O'Farrell, Chief Financial Officer and Treasurer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

Companies   Documents   Forms   Alerts                                   Ticker: BXC

Exhibit 31.2

CERTIFICATION REQUIRED BY RULE 13a-14(a) OR RULE 15d-14(a) OF THE SECURITIES EXCHANGE ACT OF 1934

I, Susan C. O'Farrell certify that:

(1) I have reviewed this annual report on Form 10-K of BlueLinx Holdings Inc.:

(2) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3) Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4) The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5) The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and

Companies   Documents   Forms   Alerts                                   Ticker: BXC

registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5) The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

March 13, 2019

/s/ Susan C. O'Farrell
Susan C. O'Farrell
BlueLinx Holdings Inc.
Senior Vice President, Chief Financial Officer, and Treasurer

2018 Certification of Mitchell B. Lewis, Chief Executive Officer, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

Companies  Documents  Forms  Alerts                                      Ticker: BXC

**Exhibit 32.1**
**BLUELINX HOLDINGS INC.CERTIFICATION PURSUANT TO18 U.S.C. SECTION 1350AS ADOPTED PURSUANT TOSECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**
In connection with the annual report of BlueLinx Holdings Inc. (the "Company") on Form 10-K for the year ending December 29, 2018, as filed with the United States Securities and Exchange Commission on the date hereof (the "Report"), I, Mitchell B. Lewis, Chief Executive Officer of the Company, do hereby certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:
(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

March 13, 2019                    By:                         /s/ Mitchell B. Lewis
                                                             Mitchell B. Lewis
                                                             Chief Executive Officer

2018 Certification of Susan C. O'Farrell, Chief Financial Officer and Treasurer, pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002

Companies  Documents  Forms  Alerts                                      Ticker: BXC

**Exhibit 32.2**
**BLUELINX HOLDINGS INC.CERTIFICATION PURSUANT TO18 U.S.C. SECTION 1350AS ADOPTED PURSUANT TOSECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**
In connection with the annual report of BlueLinx Holdings Inc. (the "Company") on Form 10-K for the year ending December 29, 2018, as filed with the United States Securities and Exchange Commission on the date hereof (the "Report"), I, Susan C. O'Farrell, Chief Financial Officer and Treasurer of the Company, do hereby certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:
(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

March 13, 2019                    By:                         /s/ Susan C. O'Farrell
                                                             Susan C. O'Farrell
                                                             Senior Vice President,
                                                             Chief Financial Officer, and Treasurer

Year 2019

Companies   Documents   Forms   Alerts                                      Ticker: GMS

Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

                                        BlueLinx Holdings Inc.
                                        (Registrant)
                                        By: /s/ Mitchell B.

Lewis                                       Mitchell B.
Lewis                                       President and Chief Executive
Officer
Date: March 11, 2020

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature Name | Capacity | Date |
|---|---|---|
| /s/ Mitchell B. Lewis<br>Mitchell B. Lewis | President, Chief Executive Officer, and Director | March 11, 2020 |
| /s/ Susan C. O'Farrell<br>Susan C. O'Farrell | Senior Vice President, Chief Financial Officer, Treasurer (Principal Accounting Officer) | March 11, 2020 |

Companies   Documents   Forms   Alerts                                      Ticker: GMS

| /s/ Susan C. O'Farrell<br>Susan C. O'Farrell | (Principal Accounting Officer) | March 11, 2020 |
|---|---|---|
| /s/ Kim S. Fennebresque<br>Kim S. Fennebresque | Chairman | March 11, 2020 |
| /s/ Karel K. Czanderna<br>Karel K. Czanderna | Director | March 11, 2020 |
| /s/ Dominic DiNapoli<br>Dominic DiNapoli | Director | March 11, 2020 |
| /s/ Alan H. Schumacher<br>Alan H. Schumacher | Director | March 11, 2020 |
| /s/ J. David Smith<br>J. David Smith | Director | March 11, 2020 |

7) External Resources:

2019 Certification of Mitchell B. Lewis, Chief Executive Officer, pursuant to Section 302 of the

## Sarbanes-Oxley Act of 2002

Exhibit 31.1

CERTIFICATION REQUIRED BY RULE 13a-14(a) OR RULE 15d-14(a) OF THE SECURITIES          EXCHANGE ACT OF 1934

I, Mitchell B. Lewis certify that:

(1)  I have reviewed this annual report on Form 10-K of BlueLinx Holdings Inc.;

(2)  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3)  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4)  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors

registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

March 11, 2020

                                        /s/ Mitchell B. Lewis
                                        Mitchell B. Lewis
                                        BlueLinx Holdings Inc.
                                        Chief Executive Officer

2019 Certification of Susan C. O'Farrell, Chief Financial Officer and Treasurer, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

| Companies   Documents   Forms   Alerts | | Ticker: GMS |
|---|---|---|

Exhibit 31.2

CERTIFICATION REQUIRED BY RULE 13a-14(a) OR RULE 15d-14(a) OF THE SECURITIES     EXCHANGE ACT OF 1934

I, Susan C. O'Farrell certify that:

(1)  I have reviewed this annual report on Form 10-K of BlueLinx Holdings Inc.;

(2)  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3)  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4)  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))of the registrant and have:

a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors

| Companies   Documents   Forms   Alerts | | Ticker: GMS |
|---|---|---|

registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

March 11, 2020

/s/ Susan C. O'Farrell
Susan C. O'Farrell
BlueLinx Holdings Inc.
Senior Vice President, Chief Financial Officer, and Treasurer

2019 Certification of Mitchell B. Lewis, Chief Executive Officer, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

| Companies  Documents  Forms  Alerts | | Ticker: GMS |
| --- | --- | --- |

**Exhibit 32.1**
**BLUELINX HOLDINGS INC.CERTIFICATION PURSUANT TO18 U.S.C. SECTION 1350AS ADOPTED PURSUANT TOSECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**
In connection with the annual report of BlueLinx Holdings Inc. (the "Company") on Form 10-K for the year ending December 28, 2019, as filed with the United States Securities and Exchange Commission on the date hereof (the "Report"), I, Mitchell B. Lewis, Chief Executive Officer of the Company, do hereby certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:
(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

| March 11, 2020 | By: | /s/ Mitchell B. Lewis |
| | | Mitchell B. Lewis |
| | | Chief Executive Officer |

2019 Certification of Susan C. O'Farrell, Chief Financial Officer and Treasurer, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

| Companies  Documents  Forms  Alerts | | Ticker: GMS |
| --- | --- | --- |

**Exhibit 32.2**
**BLUELINX HOLDINGS INC.CERTIFICATION PURSUANT TO18 U.S.C. SECTION 1350AS ADOPTED PURSUANT TOSECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**
In connection with the annual report of BlueLinx Holdings Inc. (the "Company") on Form 10-K for the year ending December 28, 2019, as filed with the United States Securities and Exchange Commission on the date hereof (the "Report"), I, Susan C. O'Farrell, Chief Financial Officer and Treasurer of the Company, do hereby certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:
(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

| March 11, 2020 | By: | /s/ Susan C. O'Farrell |
| | | Susan C. O'Farrell |
| | | Senior Vice President, |
| | | Chief Financial Officer, and Treasurer |

## Exhibit 4 - Reference 342; Page 121 of 407

342. The objectives of the auditor, and therefore BDO USA, LLP in an audit of ICFR are to:

(1) obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment about the effectiveness of ICFR (as of date) and

(2) express an opinion on the effectiveness of ICFR in a written report, and communicate with management and those charged with governance, based on the auditor's findings.

# Year 2018



REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM  The Board of Directors and Stockholders of BlueLinx Holdings Inc. and subsidiariesMarietta, Georgia Opinion on the Consolidated Financial Statements We have audited the accompanying consolidated balance sheets of BlueLinx Holdings Inc. and subsidiaries (the "Company") as of December 29, 2018 and December 30, 2017, the related consolidated statements of operations and comprehensive (loss) income, cash flows, and stockholders' (deficit) equity for each of the periods ended December 29, 2018, December 30, 2017, and December 31, 2016, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 29, 2018 and December 30, 2017, and the results of their operations and their cash flows for each of the periods ended December 29, 2018, December 30, 2017, and December 31, 2016, in conformity with accounting principles generally accepted in the United States of America. We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 29, 2018, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated March 13, 2019 expressed an unqualified opinion thereon.Basis for OpinionThese consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm

Treadway Commission ("COSO") and our report dated March 13, 2019 expressed an unqualified opinion thereon.Basis for OpinionThese consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ BDO USA, LLPWe have served as the Company's auditor since 2015. Atlanta, GeorgiaMarch 13, 2019

37



REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON INTERNAL CONTROL OVER FINANCIAL REPORTINGThe Board of Directors and StockholdersBlueLinx Holdings Inc. and subsidiariesMarietta, Georgia Opinion on Internal Control over Financial ReportingWe have audited BlueLinx Holdings Inc. and subsidiaries' (the "Company") internal control over financial reporting as of December 29, 2018, based on criteria established in *Internal Control - Integrated Framework: (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO criteria"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 29, 2018, based on the COSO criteria. We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets of the Company as of December 29, 2018 and December 30, 2017, the related consolidated statements of operations and comprehensive (loss) income, cash flows and stockholders' (deficit) equity, for each of the periods ended December 29, 2018, December 30, 2017 and December 31, 2016, and the related notes and our report dated March 13, 2019 expressed an unqualified opinion thereon.Basis for OpinionThe Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Item 9A, "Management's Report on Internal Control over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over



2018 and December 30, 2017, the related consolidated statements of operations and comprehensive (loss) income, cash flows and stockholders' (deficit) equity, for each of the periods ended December 29, 2018, December 30, 2017 and December 31, 2016, and the related notes and our report dated March 13, 2019 expressed an unqualified opinion thereon.Basis for OpinionThe Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Item 9A, "Management's Report on Internal Control over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.We conducted our audit of internal control over financial reporting in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.As indicated in the accompanying Item 9A, Management's Report on Internal Control over



and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion. As indicated in the accompanying Item 9A, Management's Report on Internal Control over Financial Reporting", management's assessment of and conclusion on the effectiveness of internal control over financial reporting did not include the internal controls of Cedar Creek Holdings, Inc. ("Cedar Creek") which was acquired on April 13, 2018, and which is included in consolidated balance sheets of the Company as of December 29, 2018, and the related consolidated statements of operations and comprehensive (loss) income , cash flows, and stockholders' (deficit) equity, for the year then ended. Cedar Creek constituted 49.8% of total assets as of December 29, 2018, and 35.7% and 5.2% of revenues and net loss, respectively, for the year then ended. Management did not assess the effectiveness of internal control over financial reporting of Cedar Creek because of the timing of the acquisition which was completed on April 13, 2018. Our audit of internal control over financial reporting of the Company also did not include an evaluation of the internal control over financial reporting of Cedar Creek. **Definition and Limitations of Internal Control over Financial Reporting** A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company, (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

71

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.
/s/ BDO USA, LLP Atlanta, Georgia March 13, 2019

Year 2019

 Companies  Documents  Forms  Alerts                    Ticker: GMS

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM  The Board of Directors and Stockholders of BlueLinx Holdings Inc. and subsidiariesMarietta, Georgia Opinion on the Consolidated Financial Statements** We have audited the accompanying consolidated balance sheets of BlueLinx Holdings Inc. and subsidiaries (the "Company") as of December 28, 2019 and December 29, 2018, the related consolidated statements of operations and comprehensive loss, cash flows, and stockholders' deficit for the years then ended, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 28, 2019 and December 29, 2018, and the results of their operations and their cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 28, 2019, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated March 11, 2020 expressed an unqualified opinion thereon.**Basis for Opinion**These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement

 Companies  Documents  Forms  Alerts                    Ticker: GMS

Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 28, 2019, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated March 11, 2020 expressed an unqualified opinion thereon.**Basis for Opinion**These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ BDO USA, LLPWe have served as the Company's auditor since 2015. Atlanta, GeorgiaMarch 11, 2020

33

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**The Board of Directors and StockholdersBlueLinx Holdings Inc. and subsidiariesMarietta, Georgia Opinion on Internal Control over Financial ReportingWe have audited BlueLinx Holdings Inc. and subsidiaries' (the "Company") internal control over financial reporting as of December 28, 2019, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO criteria"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 28, 2019, based on the COSO criteria. We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets of the Company as of December 28, 2019 and December 29, 2018, the related consolidated statements of operations and comprehensive loss, cash flows and stockholders' deficit, for the years then ended, and the related notes and our report dated March 11, 2020 expressed an unqualified opinion thereon.**Basis for Opinion**The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Item 9A, "Management's Annual Report on Internal Control over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.We conducted our audit of internal control over financial reporting in accordance with the standards of the PCAOB. Those standards require that we plan

applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.We conducted our audit of internal control over financial reporting in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.**Definition and Limitations of Internal Control over Financial Reporting**A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.

unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.
/s/ BDO USA, LLP Atlanta, GeorgiaMarch 11, 2020

65

# EXHIBIT 5

# ATTACHMENT TO PLAINTIFF'S ORIGINAL COMPLAINT

## EXCERPTS FROM THE 2019 AND 2020 SPAR AND NMS 10K REPORTS AND 10-K/A (ANNUAL REPORT AMENDED)

### Source: https://sec.report/CIK/0001004989

### Exhibit 5 - Reference 361; Page 132 of 407

361. Under §404(a) of the SOX Act, SPAR is required to annually report on SPAR's own assessment of the effectiveness of its controls.

Year 2019

| Companies   Documents   Forms   Alerts | Ticker: SGRP |
|---|---|

**Management's Report on Internal Control Over Financial Reporting**

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting for the registrant, as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act. Management has designed such internal control over financial reporting by the Company to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

The Company's management has evaluated the effectiveness of the Company's internal control over financial reporting using the "Internal Control – Integrated Framework (2013)" created by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") framework. Based on this evaluation, management has concluded that internal controls over financial reporting were effective as of December 31, 2019.

**Management's Evaluation of Disclosure Controls and Procedures**

The Company's chief executive officer and chief financial officer have each reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of December 31, 2019, as required by Exchange Act Rules 13a-15(b) and Rule 15d-15(b). Based on that evaluation, the chief

Year 2020



**Management's Report on Internal Control Over Financial Reporting**

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting for the registrant, as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act. Management has designed such internal control over financial reporting by the Company to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

The Company's management has evaluated the effectiveness of the Company's internal control over financial reporting using the "Internal Control – Integrated Framework (2013)" created by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") framework. Based on this evaluation, management has concluded that internal controls over financial reporting were effective as of December 31, 2020.

**Management's Evaluation of Disclosure Controls and Procedures**

The Company's chief executive officer and chief financial officer have each reviewed and evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of December 31, 2020, as required by Exchange Act Rules 13a-15(b) and Rule 15d-15(b). Based on that evaluation, the chief executive officer and

---

### Exhibit 5 - Reference 361; Page 133 of 407

363. Under §302 of the SOX Act, NMS and SPAR's corporate officers must (among other things) accept responsibility (as evidenced by individual signatures) for the content of Interface's annual §404(a) report. The CEO and CFO must personally certify the content of the reports filed with the SEC and the procedures established by the issuer to report disclosures and prepare financial statements.

Year 2019

Ticker: SGRP

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

SPA
R
Grou
p,
Inc.

/s/
C
hr
ist
ia
an
M

Ticker: SGRP

an
M
.
Ol
iv
B   ie
y: r
C
hr
ist
ia
an
M
.
Ol
iv
ie
r
C

Companies   Documents   Forms   Alerts                          Ticker: SGRP

ie
r
C
h
i
.e
f
E
x
e
c
u
t
i
v
e
O
f
f

Companies   Documents   Forms   Alerts                          Ticker: SGRP

f
f
i
c
e
r

Date:
Apri
l 14,
2020

KNOW ALL THESE PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Christiaan M. Olivier and James R. Segreto and each of them, jointly and severally, his attorneys-in-fact, each with full power of substitution, for him in any and all capacities, to sign any and all amendments to this Report on Form 10-K, and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each said attorneys-in-fact or his substitute or substitutes, may do or cause to be done by virtue hereof.

| Companies  Documents  Forms  Alerts | Ticker: SGRP |
|---|---|

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated.

| SIGNATURE | TITLE |
|---|---|
| /s/ Christiaan M. Olivier<br>Christiaan M. Olivier<br>Date: April 14, 2020 | Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ Arthur B. Drogue<br>Arthur B. Drogue<br>Date: April 14, 2020 | Chairman of the Board and Director |
| William H. Bartels<br>Date: April 14, 2020 | Vice Chairman and Director |
| /s/ R. Eric McCarthey<br>R. Eric McCarthey | Director |

| Companies  Documents  Forms  Alerts | Ticker: SGRP |
|---|---|

| /s/ R. Eric McCarthey<br>R. Eric McCarthey<br>Date: April 14, 2020 | Director |
|---|---|
| /s/ Jeffrey A. Mayer<br>Jeffrey A. Mayer<br>Date: April 14, 2020 | Director |
| /s/ Arthur H. Baer<br>Arthur H. Baer<br>Date: April 14, 2020 | Director |
| Peter W. Brown<br>Date: April 14, 2020 | Director |
| Panagiotis N. Lazaretos | Director |

Companies   Documents   Forms   Alerts                          Ticker: SGRP

Director

Panagiotis N. Lazaretos
Date: April 14, 2020

/s/ James R. Segreto                    Chief Financial Officer,
James R. Segreto                        Treasurer and Secretary (Principal Financial and Accounting Officer)
Date: April 14, 2020

-57-

Year 2020

Companies   Documents   Forms   Alerts                          Ticker: SGRP

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

SPA
R
Grou
p,
Inc.

/s/
C
hr
ist
ia
an
M

Companies   Documents   Forms   Alerts

Ticker: SGRP

an
M
.
Ol
iv
B ie
y: r
    C
hr
ist
in
an
M
.
Ol
iv
ie
r
C

Companies   Documents   Forms   Alerts

Ticker: SGRP

ie
r
C
h
i
e
f
E
x
e
c
u
t
i
v
e
O
f
f

Companies  Documents  Forms  Alerts                    Ticker: SGRP

Date:
Apri
l 14,
2020

KNOW ALL THESE PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Christian M. Olivier and James R. Segreto and each of them, jointly and severally, his attorneys-in-fact, each with full power of substitution, for him in any and all capacities, to sign any and all amendments to this Report on Form 10-K, and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each said attorneys-in-fact or his substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated.

SIGNATURE                          TITLE

/s/ Christian M. Olivier           Chief Executive Officer and Director

---

Companies  Documents  Forms  Alerts                    Ticker: SGRP

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated.

SIGNATURE                          TITLE

/s/ Christian M. Olivier           Chief Executive Officer and Director
   Christian M. Olivier            (Principal Executive Officer)
Date: April 14, 2020

/s/ Arthur B. Drogue               Chairman of the Board and Director
   Arthur B. Drogue
Date: April 14, 2020

                                   Vice Chairman and Director
   William H. Bartels
Date: April 14, 2020

/s/ R. Eric McCarthey              Director
   R. Eric McCarthey

| | | |
|---|---|---|
| Companies  Documents  Forms  Alerts | | Ticker: SGRP |

/s/ R. Eric McCarthey          Director
R. Eric McCarthey
Date: April 14, 2020

/s/ Jeffrey A. Mayer          Director
Jeffrey A. Mayer
Date: April 14, 2020

/s/ Arthur H. Baer          Director
Arthur H. Baer
Date: April 14, 2020

                              Director
Peter W. Brown
Date: April 14, 2020

                              Director
Panagiotis N. Lazaretos

| | | |
|---|---|---|
| Companies  Documents  Forms  Alerts | | Ticker: SGRP |

                              Director
Panagiotis N. Lazaretos
Date: April 14, 2020

/s/ James R. Segreto          Chief Financial Officer,
James R. Segreto             Treasurer and Secretary (Principal Financial and Accounting Officer)
Date: April 14, 2020

-57-

2020 Certification of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

EX-31.1 6 ex-243035.htm EXHIBIT 31.1

Exhibit 31.1

CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Michael R. Matacunas, certify that:

1.     I have reviewed this annual report on Form 10-K/A for the year ended December 31, 2020, of SPAR Group, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external

[illegible line]

    (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to, materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 29, 2021                          /s/ Michael R. Matacunas
                                              Michael R. Matacunas, President and Chief Executive Officer

2020 Certification of Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act
of 2002

EX-31.2 7 ex_243036.htm EXHIBIT 31.2

Exhibit 31.2

CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Fay DeVriese, certify that:

1.      I have reviewed this annual report on Form 10-K/A for the year ended December 31, 2020 of SPAR Group, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

        (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external

those entities, particularly during the period in which this report is being prepared;

        (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

        (a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

        (b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 29, 2021

/s/ Fay DeVriese
Fay DeVriese, Chief Financial Officer,
Treasurer and Secretary

2020 Certification of Chief Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

EX-32.1 8 ex_243037.htm EXHIBIT 32.1

EXHIBIT 32.1

**Certification of Chief Executive Officer Pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the annual report on Form 10-K/A for the year ended December 31, 2020 (this "report"), of SPAR Group, Inc. (the "registrant"), the undersigned hereby certifies that, to his knowledge:

    1.    The report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and

    2.    The information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

/s/ Michael R. Matacunas
Michael R. Matacunas
President and Chief Executive Officer

April 29, 2021

A signed original of this written statement required by Section 906 has been provided to SPAR Group, Inc. and will be retained by SPAR Group, Inc., and furnished to the Securities and Exchange Commission or its staff upon request.

## 2020 Certification of Chief Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

EX-32.2 9 ex_243038.htm EXHIBIT 32.2

EXHIBIT 32.2

**Certification of Chief Financial Officer Pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the annual report on Form 10-K/A for the year ended December 31, 2020 (this "report"), of SPAR Group, Inc. (the "registrant"), the undersigned hereby certifies that, to his knowledge:

    1.    The report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and

    2.    The information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the registrant.

/s/ Fay DeVriese
Fay DeVriese
Chief Financial Officer, Treasurer and Secretary

April 29, 2021

A signed original of this written statement required by Section 906 has been provided to SPAR Group, Inc. and will be retained by SPAR Group, Inc., and furnished to the Securities and Exchange Commission or its staff upon request.

## Exhibit 5 - Reference 367; Page 138 of 407

367. The objectives of the auditor, and therefore BDO USA, LLP in an audit of ICFR are to:

(1) obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment about the effectiveness of ICFR (as of date) and

(2) express an opinion on the effectiveness of ICFR in a written report, and communicate with management and those charged with governance, based on the auditor's findings.

Year 2019

### Report of Independent Registered Public Accounting Firm

Board of The Directors and Stockholders
SPAR Group, Inc. and Subsidiaries
White Plains, New York

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of SPAR Group, Inc. (the "Company") and subsidiaries as of December 31, 2019 and 2018, the related consolidated statements of operations and comprehensive income (loss), equity, and cash flows for each of the two years in the period ended December 31, 2019, and the related notes and financial statement schedule listed in the accompanying index (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company and subsidiaries at December 31, 2019 and 2018, and the results of their operations and their cash flows for each of the two years in the period ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

Change in Accounting Principle

America.

**Change in Accounting Principle**

As discussed in Note 15 to the consolidated financial statements, the Company has changed its method of accounting for leases for the year ended December 31, 2019 due to the adoption of Accounting Standards Codification Topic 842, Leases.

**Emphasis of Matter**

As more fully described in Note 16 to the consolidated financial statements, the Company may be materially impacted by the novel strain Coronavirus (COVID-19) which was declared a global pandemic by the World Health Organization in March 2020.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

 Companies  Documents  Forms  Alerts     Ticker: SGRP

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

We have served as the Company's auditor since 2013.

/s/ BDO USA, LLP
Troy, Michigan
April 14, 2020

Year 2020

Companies  Documents  Forms  Alerts     Ticker: SGRP

**Report of Independent Registered Public Accounting Firm**

Board of The Directors and Stockholders
SPAR Group, Inc. and Subsidiaries
White Plains, New York

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of SPAR Group, Inc. (the "Company") and subsidiaries as of December 31, 2019 and 2018, the related consolidated statements of operations and comprehensive income (loss), equity, and cash flows for each of the two years in the period ended December 31, 2019, and the related notes and financial statement schedule listed in the accompanying index (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company and subsidiaries at December 31, 2019 and 2018, and the results of their operations and their cash flows for each of the two years in the period ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

**Change in Accounting Principle**

America.

**Change in Accounting Principle**

As discussed in Note 15 to the consolidated financial statements, the Company has changed its method of accounting for leases for the year ended December 31, 2019 due to the adoption of Accounting Standards Codification Topic 842, *Leases*.

**Emphasis of Matter**

As more fully described in Note 16 to the consolidated financial statements, the Company may be materially impacted by the novel strain Coronavirus (COVID-19) which was declared a global pandemic by the World Health Organization in March 2020.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

We have served as the Company's auditor since 2013.

/s/ BDO USA, LLP
Troy, Michigan
April 14, 2020

Fulton County Superior Court
***EFILED***QW
Date: 5/25/2022 1:23 PM
Cathelene Robinson, Clerk

**General Civil and Domestic Relations Case Filing Information Form**

☒ Superior or ☐ State Court of FULTON_____ County

| For Clerk Use Only | |
|---|---|
| Date Filed 5/25/2022 | Case Number 2022CV365268 |
| MM-DD-YYYY | |

**Plaintiff(s)**

Kengne    Raissa    D.

Last    First    Middle I.    Suffix    Prefix

Last    First    Middle I.    Suffix    Prefix

Last    First    Middle I.    Suffix    Prefix

Last    First    Middle I.    Suffix    Prefix

**Defendant(s)**

Freeman    Wesley

Last    First    Middle I.    Suffix    Prefix
BDO USA, LLP

Last    First    Middle I.    Suffix    Prefix
Meier    Scott

Last    First    Middle I.    Suffix    Prefix
Davison    Paul

Last    First    Middle I.    Suffix    Prefix

**Plaintiff's Attorney** _____ **State Bar Number** _____ **Self-Represented** ☒

### Check one case type and one sub-type in the same box (if a sub-type applies):

**General Civil Cases**

- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☒ Other General Civil

**Domestic Relations Cases**

- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____ Case Number    _____ Case Number

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ Language(s) Required

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20

**General Civil and Domestic Relations Case Filing Information Form Attachment**

**Additional Defendants**

| # | Type | Last Name OR Entity Name | First Name | Middle I. |
|---|------|--------------------------|------------|-----------|
| 1 | Individual | Freeman | Wesley | |
| 2 | Entity | BDO USA, LLP | N/A | N/A |
| 3 | Individual | Meier | Scott | |
| 4 | Individual | Davison | Paul | |
| 5 | Individual | Cuda | Jason | |
| 6 | Individual | Wilkes | Justin | |
| 7 | Individual | Reh | Anthony | I |
| 8 | Individual | Poppo | Peter | |
| 9 | Individual | Davenport | Mark | |
| 10 | Individual | Wong | Johnson | |
| 11 | Entity | Beacon Management Services, LLC | N/A | N/A |
| 12 | Individual | Simmons | Lisa | |
| 13 | Individual | Weibel | Steven | |
| 14 | Entity | 1280 West Condominium Associations, Inc. | N/A | N/A |
| 15 | Individual | Shinners | Michael | |
| 16 | Individual | Kurtzberg | Micah | |
| 17 | Individual | Bridges | Ronnie | |
| 18 | Individual | Dettmering | Brett | |
| 19 | Individual | Shaffer | Michael | |
| 20 | Individual | Rupani | Rohan | N |
| 21 | Entity | Finch McCranie | N/A | N/A |
| 22 | Individual | Sullivan | Michael | |
| 23 | Individual | Jospin | Walter | |
| 24 | Entity | Interface, Inc. | N/A | N/A |
| 25 | Entity | Atlanticus Holdings Corporation | N/A | N/A |
| 26 | Entity | SPAR GROUP, Inc. (NMS SPAR) | N/A | N/A |
| 27 | Entity | BioHorizons Implant Systems, Inc. (Henry Schein Subsidiary) | N/A | N/A |
| 28 | Individual | Naderi | Kas | |

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Raissa Djuissi Kengne

## DEFENDANTS

Wesley Freeman, BDO USA, LLP, Scott Meier, Et al.

**(b)** County of Residence of First Listed Plaintiff **FULTON**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **FULTON**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Pro Se

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane  [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product      Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument |      Liability  [ ] 367 Health Care/ | | **INTELLECTUAL** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel &      Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 430 Banks and Banking |
|      & Enforcement of Judgment |      Slander      Personal Injury | | [ ] 820 Copyrights | [ ] 450 Commerce |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'      Product Liability | | [ ] 830 Patent | [ ] 460 Deportation |
| [ ] 152 Recovery of Defaulted |      Liability  [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 470 Racketeer Influenced and |
|      Student Loans | [ ] 340 Marine      Injury Product | |      New Drug Application |      Corrupt Organizations |
|      (Excludes Veterans) | [ ] 345 Marine Product      Liability | | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| [ ] 153 Recovery of Overpayment |      Liability  **PERSONAL PROPERTY** | | [ ] 880 Defend Trade Secrets |      (15 USC 1681 or 1692) |
|      of Veteran's Benefits | [ ] 350 Motor Vehicle  [ ] 370 Other Fraud | **LABOR** |      Act of 2016 | [ ] 485 Telephone Consumer |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle  [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards | |      Protection Act |
| [ ] 190 Other Contract |      Product Liability  [ ] 380 Other Personal |      Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [x] 195 Contract Product Liability | [x] 360 Other Personal      Property Damage | [ ] 720 Labor/Management | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ |
| [ ] 196 Franchise |      Injury  [ ] 385 Property Damage |      Relations | [ ] 862 Black Lung (923) |      Exchange |
| | [ ] 362 Personal Injury -      Product Liability | [ ] 740 Railway Labor Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| |      Medical Malpractice | [ ] 751 Family and Medical | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** **PRISONER PETITIONS** |      Leave Act | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights  **Habeas Corpus:** | [ ] 790 Other Labor Litigation | | [ ] 895 Freedom of Information |
| [ ] 220 Foreclosure | [ ] 441 Voting  [ ] 463 Alien Detainee | [ ] 791 Employee Retirement | **FEDERAL TAX SUITS** |      Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment  [ ] 510 Motions to Vacate |      Income Security Act | [ ] 870 Taxes (U.S. Plaintiff | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/      Sentence | |      or Defendant) | [ ] 899 Administrative Procedure |
| [ ] 245 Tort Product Liability |      Accommodations  [ ] 530 General | | [ ] 871 IRS—Third Party |      Act/Review or Appeal of |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities -  [ ] 535 Death Penalty | **IMMIGRATION** |      26 USC 7609 |      Agency Decision |
| |      Employment  **Other:** | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of |
| | [ ] 446 Amer. w/Disabilities -  [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | |      State Statutes |
| |      Other  [ ] 550 Civil Rights |      Actions | | |
| | [ ] 448 Education  [ ] 555 Prison Condition | | | |
| | [ ] 560 Civil Detainee - | | | |
| |      Conditions of | | | |
| |      Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
18 U.S. Code § 1514A

Brief description of cause:
Civil action to protect against retaliation in fraud cases

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*  JUDGE _____  DOCKET NUMBER _____

DATE  05/18/2022

SIGNATURE OF ATTORNEY OF RECORD
Pro Se

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

| | |
|---|---|
| RAISSA DJUISSI KENGNE, | § |
| Plaintiff, | § |
| | § |
| v. | § |
| WESLEY FREEMAN, BDO USA, LLP, SCOTT | § |
| MEIER, PAUL DAVISON, JASON CUDA, | § |
| JUSTIN WILKES, ANTHONY REH, | § |
| PETER POPPO, MARK DAVENPORT, | § |
| JOHNSON WONG, JUSTIN MUNGAL, | § |
| | § |
| BEACON MANAGEMENT SERVICES, LLC; | § |
| LISA SIMMONS; STEVEN WEIBEL; | § |
| 1280 WEST CONDOMINIUM ASSOCIATION, INC.; | § |
| MICHAEL SHINNERS; MICAH KURTZBERG; | § |
| RONNIE BRIDGES; BRETT DETTMERING; | § |
| MICHAEL SHAFFER; ROHAN RUPANI, | § |
| FINCH MCCRANIE, LLP, | § |
| MICHAEL SULLIVAN, WALTER JOSPIN, | § |
| | § |
| and | § |
| | § |
| INTERFACE, INC.; | § |
| ATLANTICUS HOLDINGS CORPORATION; | § |
| SPAR GROUP, INC. (NMS SPAR); | § |
| BIOHORIZONS IMPLANT SYSTEMS, INC. | § |
| (an Henry Schein Subsidiary); KAS NADERI; | § |
| | § |
| Defendants. | § |

Civil Action File No. _____ 2022CV365268

AFFIDAVIT - SUMMARY

1 of 4

**AFFIDAVIT**

STATE OF GEORGIA

COUNTY OF FULTON

Personally appeared before the undersigned officer authorized to administer oaths, Raissa Djuissi Kengne, who states under oath that s/he has personal knowledge of the following facts:

I reported a violation of SEC regulations, PCAOB Standards, the Antitrust law, and a circumvention of the law prohibiting employers from asking about an applicant's pay history in the state of Georgia. The misconduct happened at BDO USA, LLP. I was retaliated against. My home was broken into, my life and my family's lives were threatened, and my computers and phones were hacked. The attorney firm I hired disclosed the content of our conversation to BDO USA, LLP. The following individuals and entities are responsible for allowing unauthorized individuals to break into my home in order to facilitate the harassment and retaliation perpetuated by BDO USA, LLP: a) Beacon Management Services, b) Lisa Simmons, c) Steven Weibel, d) Michael Shinners, e)1280 West Condominium Association, f) 1280 West Board of Directors (Micah Kurtzberg, Ronnie Bridges, Michael Shaffer, Brett Dettmering, And Rohan Rupani). See AFFIDAVIT ATTACHMENT 1.

This day 19th of _____ MAY _____, 20 22.

Raissa Djuissi Kengne _____

Affiant

_Marvin Wooley_

Notary Public

Sworn to and subscribed before me

this 19th day of MAY _____, 20 22

2 of 4

**AFFIDAVIT ATTACHMENT 1**

I was hired at BDO as an Information Systems (IS) Assurance Manager in September 2019. When I started, I noticed that the workpapers for both private clients and public clients were being rolled forward year after year without doing the work or without doing the work with professional care.

**Public Engagements**

The public clients included BlueLinx, Atlanticus, BioHorizons, and Interface. Interface had recently been under an SEC investigation and an executive employee at Interface has been suspended. In addition, to the work being mostly rolled forward on BlueLinx, Atlanticus, BioHorizons, and Interface, the IT findings severity were not properly reported on BlueLinx, Atlanticus, BioHorizons, Interface, and IZEA. When I started doing the IT audits and noted significant deficiencies or material weaknesses, which would have had for effect an adjustment in audit procedures, the results of the audit were disregarded by Wesley Freeman (IT Audit Director) and willfully removed from reporting as significant deficiencies and material weaknesses.

**Private Clients**

The private clients included Janus, Dustex, FCCI, RSR Group, ProCare, Vacation Express, and many others. The issue with the IS audit work performed was that several deficiencies that should have been identified as significant deficiencies or material weaknesses were actually identified as control deficiencies. Because they were never communicated to the financial statements audit team as significant deficiencies or material weaknesses, the financial statements audit teams never adjusted their audit strategy and therefore, never addressed the risk of material misstatements due to ineffective IT general controls (ITGCs). Private companies usually request audit reports because the banks require an audit to loan substantial amounts of money. Public companies are required to have an independent audit in conformity with the PCAOB standards. FCCI is an insurance company that is required to comply with Section 624.424(8), Florida Statutes by having an external independent CPA firm prepare the workpapers as required by Rule 690-137.002, Florida Administrative Code. FCCI IT audit has not been performed with due professional care since 2018. I did not look at the workpapers prepared before 2018. The right evidence was not requested and

obtained in 2018. The right evidence was requested and obtained in 2019 and 2020, the evidence was not properly tested and left out significant deficiencies and material weaknesses.

### Retaliation

I have informed the IS Assurance Director, Wesley Freeman, of the work that was not performed in roughly 75% of the public and private engagements he oversaw in the Atlanta office. Wesley Freeman did not deny it. Instead of fixing the issues going forward, Wesley Freeman kept misreporting the IT findings to hide the significant deficiencies and/or material weaknesses in the IS Assurance workpapers.

As I took the stand of performing the IS Assurance work with due diligence and refused to obey Wesley Freeman's tacit command to "stop doing my job so well" as he stated one day, Wesley Freeman launched a smear campaign against me. Wesley Freeman enlisted the assistance of junior associates to attempt to smear my reputation. It went so far that a Partner, Peter Popo, asked to talk to me and stated that he has never heard so many bad things mentioned about someone's behavior; usually what he hears is the bad work someone does. In my case, it was the opposite. These associates enlisted to smear my reputation were part of the group who delivered such a poor work product as described above. Most of the people responsible for executing the IT audit (Ling Tang and Dale Drushella) have left the Company, probably because they could no longer keep up with the fraud. I refused to commit fraud and I was targeted for it by Wesley Freeman. Wesley Freeman is not above lying to the PCAOB, the internal inspectors, and the Partners.

During a meeting with Scott Meier, the new IT Audit Principal who started in 2021, Scott Meier led me to understand that Wesley Freeman had accumulated a lot of good will with other Partners and I may need more Partners to speak on my behalf.

I believe the PCAOB standards were violated because I have noted as much when reviewing prior year workpapers. In addition, the severity of the IT findings on my engagements was inappropriately reported, and therefore, audit procedures may not have been performed to provide reasonable assurance that the financial statements were free from material misstatements due to error or fraud. In addition, BDO hired a new IS Assurance Principal at the beginning of 2021 who has noted the IT findings were not evaluated appropriately.

Fulton County Superior Court
***EFILED***QW
Date: 5/25/2022 1:23 PM
Cathelene Robinson, Clerk

IN THE ~~FULTON~~ COURT OF FULTON COUNTY
**STATE OF GEORGIA**

~~RAISSA DJUISSI KENGNE~~ )
    Plaintiff / Petitioner, )
                     )
v.                        )
                     )
~~WESLEY FREEMAN Et Al.~~ )
    Defendant / Respondent. )

Civil Action File No.:     2022CV365268

### ORDER ON AFFIDAVIT OF INDIGENCY

    The ☑Petitioner/Plaintiff ☐Respondent/Defendant has presented an *Affidavit of Indigency* to the Court. Pursuant to O.C.G.A. § 9-15-2(d), the Court has reviewed the *Affidavit of Indigency* and the other initial pleadings including ~~~~

    ☑ **Affidavit Approved** - It appears to the Court that the affiant is unable to pay the Court filing fees in this action. Therefore, the affiant's pleadings shall be filed, and the affiant shall be relieved from paying the filing fee, sheriff's/marshal's service fee, and other required court costs until a final order/judgment is entered or the case is dismissed.

    ☐ **Affidavit Not Approved (Not indigent)** – After a hearing, the affiant has not demonstrated that the affiant is unable to pay the filing fee and associated costs of this action. Therefore, the affiant shall not be relieved from paying the filing fee, sheriff's/marshal's service fee, or other required court costs.

    ☐ **Affidavit Not Approved (No justiciable issue)** – It appears to the Court that the pleading filed by the affiant shows on its face such a complete absence of any justiciable issue of law or fact that it cannot reasonably be believed that the Court could grant any relief against any party named in the pleading. It is hereby **ORDERED** that the affiant's request to file the pleading is hereby **DENIED**.

    **SO ORDERED**, this _____ day of _____, _____.

5.23.2022

_____
Presiding Judge
Fulton County _____ Court

*The duration of this Order terminates upon issuance of a Final Order in the case or a dismissal of the action.

Fulton Courts' Uniform Order on Affidavit of Indigency Approved July 27, 2017.
Provided by Fulton County Law Library Board of Trustees.

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| RAISSA DJUISSI KENGNE, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| WESLEY FREEMAN, BDO USA, LLP, SCOTT | )   Civil Action File No.:_____ |
| MEIER, PAUL DAVISON, JASON CUDA, | ) |
| JUSTIN WILKES, ANTHONY REH, | ) |
| PETER POPPO, MARK DAVENPORT, | ) |
| JOHNSON WONG, JUSTIN MUNGAL, | ) |
| | ) |
| BEACON MANAGEMENT SERVICES, LLC; | ) |
| LISA SIMMONS; STEVEN WEIBEL; | ) |
| 1280 WEST CONDOMINIUM ASSOCIATION; | ) |
| MICHAEL SHINNERS; MICAH KURTZBERG; | ) |
| RONNIE BRIDGES; BRETT DETTMERING; | ) |
| MICHAEL SHAFFER; ROHAN RUPANI, | ) |
| | ) |
| FINCH MCCRANIE, | ) |
| MICHAEL SULLIVAN, WALTER JOSPIN, | ) |
| and | ) |
| INTERFACE, INC.; | ) |
| ATLANTICUS HOLDINGS CORPORATION; | ) |
| SPAR GROUP, INC. (NMS SPAR); | ) |
| BIOHORIZONS IMPLANT SYSTEMS, INC. | ) |
| (an Henry Schein Subsidiary); KAS NADERI; | ) |
| | ) |
| Defendants. | ) |

ORDER ON AFFIDAVIT OF INDIGENCY

*The duration of this Order terminates upon issuance of a Final Order in the case or a dismissal of the action.

Fulton Courts' Uniform Order on Affidavit of Indigency Approved July 27, 2017.
Provided by Fulton County Law Library Board of Trustees.

Fulton County Superior Court
***EFILED***QW
Date: 5/25/2022 1:23 PM
Cathelene Robinson, Clerk

# IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| RAISSA DJUISSI KENGNE, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| WESLEY FREEMAN, BDO USA, LLP, SCOTT | ) |
| MEIER, PAUL DAVISON, JASON CUDA, | ) |
| JUSTIN WILKES, ANTHONY REH, | ) |
| PETER POPPO, MARK DAVENPORT, | ) |
| JOHNSON WONG, JUSTIN MUNGAL, | ) |
| | ) |
| BEACON MANAGEMENT SERVICES, LLC; | ) |
| LISA SIMMONS; STEVEN WEIBEL; | ) |
| 1280 WEST CONDOMINIUM ASSOCIATION; | ) |
| MICHAEL SHINNERS; MICAH KURTZBERG; | ) |
| RONNIE BRIDGES; BRETT DETTMERING; | ) |
| MICHAEL SHAFFER; ROHAN RUPANI, | ) |
| | ) |
| FINCH MCCRANIE, | ) |
| MICHAEL SULLIVAN, WALTER JOSPIN, | ) |
| and | ) |
| INTERFACE, INC.; | ) |
| ATLANTICUS HOLDINGS CORPORATION; | ) |
| SPAR GROUP, INC. (NMS SPAR); | ) |
| BIOHORIZONS IMPLANT SYSTEMS, INC. | ) |
| (an Henry Schein Subsidiary); KAS NADERI; | ) |
| | ) |
| Defendants. | ) |

Civil Action File No.:_____

2022CV365268

**AFFIDAVIT AND MOTION TO PROCEED IN FORMA PAUPERIS**

\*The duration of this Order terminates upon issuance of a Final Order in the case or a dismissal of the action.

Fulton Courts' Uniform Order on Affidavit of Indigency Approved July 27, 2017.
Provided by Fulton County Law Library Board of Trustees.

## AFFIDAVIT AND MOTION TO PROCEED IN FORMA PAUPERIS

I, Raissa Djuissi Kengne, the undersigned, having been duly sworn, hereby states as follows:

That I am the plaintiff in the above and foregoing case and thereby responsible for payment of fees and court costs.

I am presently 33 years of age, that because of my indigence I am unable to pay any deposit, fee, or other costs which normally required in the court and request that I be relieved of such responsibility.

If I am required to pay the costs of this case I will not be able to prosecute my case due to lack of funds.

I believe and state that I have a meritorious claim and desire to proceed in forma pauperis.

I submit the following financial information as required by the Court in support of my request.

2

## IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

| | | |
|---|---|---|
| RAISSA DJUISSI KENGNE, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| WESLEY FREEMAN, BDO USA, LLP, SCOTT | § | Civil Action File No. _____ |
| MEIER, PAUL DAVISON, JASON CUDA, | § | |
| JUSTIN WILKES, ANTHONY REH, | § | |
| PETER POPPO, MARK DAVENPORT, | § | |
| JOHNSON WONG, JUSTIN MUNGAL, | § | |
| | § | |
| BEACON MANAGEMENT SERVICES, LLC; | § | |
| LISA SIMMONS; STEVEN WEIBEL; | § | |
| 1280 WEST CONDOMINIUM ASSOCIATION, INC.; | § | |
| MICHAEL SHINNERS; MICAH KURTZBERG; | § | |
| RONNIE BRIDGES; BRETT DETTMERING; | § | |
| MICHAEL SHAFFER; ROHAN RUPANI, | § | |
| | § | |
| FINCH MCCRANIE, LLP, | § | |
| MICHAEL SULLIVAN, WALTER JOSPIN, | § | |
| | § | |
| and | § | |
| | § | |
| INTERFACE, INC.; | § | |
| ATLANTICUS HOLDINGS CORPORATION; | § | |
| SPAR GROUP, INC. (NMS SPAR); | § | |
| BIOHORIZONS IMPLANT SYSTEMS, INC. | § | |
| (an Henry Schein Subsidiary); KAS NADERI; | § | |
| | § | |
| Defendants. | § | |

1. Names and birth dates of affiant's children:

Name          Date of Birth

Not applicable.

2. SUMMARY OF AFFIANT'S INCOME AND NEEDS

 (a) Gross monthly income (from item 3A)    $ 0.00

 (b) Net monthly income (from item 3B)     0.00

 (c) Average monthly expenses (item 5A)    $ 5,260.00

    Monthly payments to creditors    + 3,000.00

    Total monthly expenses and payments
    to creditors (item 5C)       $ 8,260.00

2

**(3A)** AFFIANT'S GROSS MONTHLY INCOME
(All income must be entered based on monthly average regardless of date of receipt)

Salary - WAGES
ATTACH COPIES OF 2 MOST RECENT WAGE STATEMENTS          $ _____0.00_____

Commissions, Fees, Tips          $ _____0.00_____

Income from self-employment, partnership, close corporations,
and independent contracts (gross receipts minus ordinary
and necessary expenses required to produce income)          $ _____0.00_____

Rental Income (gross receipts minus ordinary and
necessary expenses required to produce income)          $ _____0.00_____

Bonuses          $ _____0.00_____

Overtime Payments          $ _____0.00_____

Severance Pay          $ _____0.00_____

Recurring Income from Pensions or Retirement Plans          $ _____0.00_____

Interest and Dividends          $ _____0.00_____

Trust Income          $ _____0.00_____

Income from Annuities          $ _____0.00_____

Capital Gains          $ _____0.00_____

Social Security Disability or Retirement Benefits          $ _____0.00_____

Workers' Compensation Benefits          $ _____0.00_____

Unemployment Benefits          $ _____0.00_____

Judgments from Personal Injury or Other Civil Cases          $ _____0.00_____

Gifts (cash or other gifts that can be converted to cash)          $ _____0.00_____

Prizes/Lottery Winnings          $ _____0.00_____

Alimony and maintenance from persons not in this case          $ _____0.00_____

Assets which are used for support of family          $ _____0.00_____

Fringe Benefits (if significantly reduce living expenses)          $ _____0.00_____

Any other income (do NOT include means-tested
Public assistance, such as TANF or food stamps)          $ _____0.00_____

**GROSS MONTHLY INCOME**          $ _____0.00_____

3

**(3B)**   Affiant's Net Monthly Income from employment
(deducting only state and federal taxes and FICA)           $ ___0.00___

Affiant's pay period (i.e., weekly, monthly, etc.) _N/A; Affiant is unemployed._

Number of exemptions claimed    ___0___

## 4.  ASSETS

| Description | Value | Separate Asset of the Husband | Separate Asset of the Wife | Basis of the Claim |
|---|---|---|---|---|
| Cash | $ 0.00 | N/A | 0 | 0 |
| Stocks, bonds | $ 0.00 | N/A | 0 | 0 |
| CD's/Money Market Accounts | $ 0.00 | N/A | 0 | 0 |
| **Bank Accounts** (list each account): | | | | |
| Truist | $ 200.00 | N/A | 200.00 | 200.00 |
| Ameris Bank | $ 800.00 | N/A | 800.00 | 800.00 |
| | $ | | | |
| Retirement Pensions, 401K, IRA, or Profit Sharing | $ 0.00 | N/A | 0.00 | 0.00 |
| Money owed you: | $ 0.00 | N/A | 0.00 | 0.00 |
| Tax Refund owed you: | $ 0.00 | N/A | 0.00 | 0.00 |
| **Real Estate:** | | | | |
| home: | $ 500,000 | N/A | 500,000 | 500,000 |
| debt owed: | $ | | | |
| other: | $ 200,000 | N/A | 200,000 | 200,000 |
| debt owed: | $ 190,000 | | | |
| **Automobiles/Vehicles:** | | | | |
| Vehicle 1: | $ N/A | N/A | N/A | N/A |
| debt owed | $ N/A | | | |
| Vehicle 2: | $ N/A | N/A | N/A | N/A |
| debt owed | $ N/A | | | |

4

| | | | | |
|---|---|---|---|---|
| Life Insurance (net cash value): | $ N/A | N/A | N/A | N/A |
| Furniture/furnishings: | $ N/A | N/A | N/A | N/A |
| Jewelry: | $ N/A | N/A | N/A | N/A |
| Collectibles: | $ N/A | N/A | N/A | N/A |
| Other Assets: | $ 55,000 | N/A | 55,000 | 55,000 |
| Debt Owed on Other Assets | $ 36,000 | N/A | 36,000 | 36,000 |
| Cryptocurrencies | $ 1,682.88 | N/A | 1,682.88 | 1,682.88 |
| | $ | | | |
| **Total Assets:** | $ 431,682.88 | N/A | 431,682.88 | 431,682.88 |

## (5A)   AVERAGE MONTHLY EXPENSES

$ _____

### HOUSEHOLD

| | | | |
|---|---|---|---|
| Mortgage or rent payments | $ 2,000.00 | Cable TV | $ 0.00 |
| Property taxes | $ 700.00 | Misc. household and grocery Items | $ 500.00 |
| Homeowner/Renter Insurance | $ 250.00 | Meals outside the home | $ 0.00 |
| Electricity | $ 150.00 | Other | $ 0.00 |
| Water | $ 100.00 | **AUTOMOBILE** Gasoline | $ 0.00 |
| Garbage and Sewer | $ 50.00 | Auto Repairs | $ 0.00 |
| Telephone: residential line: | $ 80.00 | Auto tags and license | $ 0.00 |
| cellular telephone: | $ 300.00 | Insurance | $ 0.00 |
| Gas | $ 10.00 | **OTHER VEHICLES (boats, trailers, RVs, etc.)** Gasoline and oil | $ 0.00 |
| Repairs and maintenance: | $ 0.00 | Repairs | $ 0.00 |
| Lawn Care | $ 100.00 | Tags and license | $ 0.00 |
| Pest Control | $ 25.00 | Insurance | $ 0.00 |

**CHILDREN'S EXPENSES**

| | | |
|---|---|---|
| Child care (total monthly cost) | $ | N/A |
| School tuition | $ | N/A |
| Tutoring | $ | N/A |
| Private lessons (e.g., music, dance) | $ | N/A |
| School supplies/expenses | $ | N/A |
| Lunch Money | $ | N/A |

Other Educational Expenses (list)

| | | |
|---|---|---|
| _____ | $ | _____ |
| _____ | $ | _____ |
| Allowance | $ | _____ |
| Clothing | $ | _____ |
| Diapers | $ | _____ |
| Medical, dental, prescription (out of pocket/uncovered expenses) | $ | _____ |
| Grooming, hygiene | $ | _____ |
| Gifts from children to others | $ | _____ |
| Entertainment | $ | _____ |
| Activities (including extra-curricular, school, religious, cultural, etc.) | $ | _____ |
| Summer Camps | $ | _____ |

**OTHER INSURANCE**

| | | | |
|---|---|---|---|
| Health | $ | 500 | |
| Child(ren)'s portion: | | | $ N/A |
| Dental | $ | 50 | |
| Child(ren)'s portion: | | | $ N/A |
| Vision | $ | 25 | |
| Child(ren)'s portion: | | | $ N/A |
| Life | $ | N/A | |
| Relationship of Beneficiary: | | | N/A |
| Disability | $ | N/A | |
| Other (specify): | $ | N/A | |

**AFFIANT'S OTHER EXPENSES**

| | | |
|---|---|---|
| Dry cleaning/laundry | $ | 50.00 |
| Clothing | $ | 0.00 |
| Medical, dental, prescription (out of pocket/uncovered expenses) | $ | 20.00 |
| Affiant's gifts (special holidays) | $ | 200.00 |
| Entertainment | $ | 0.00 |
| Recreational Expenses (e.g., fitness) | $ | 0.00 |
| Vacations | $ | 0.00 |
| Travel Expenses for Visitation | $ | 0.00 |
| Publications | $ | 0.00 |
| Dues, clubs | $ | 300.00 |
| Religious and charities | $ | 0.00 |
| Pet expenses | $ | 0.00 |
| Alimony paid to former spouse | $ | 0.00 |
| Child support paid for other children | $ | 0.00 |
| Other (attach sheet) | $ | N/A |
| **TOTAL ABOVE EXPENSES** | $ | 5,260.00 |

6

**B. PAYMENTS TO CREDITORS**

| To Whom: | Balance Due | Monthly Payment |
| --- | --- | --- |
| Bank of America | $16,000.00 | $800.00 |
| Paypal | $7,000.00 | $200.00 |
| Citi | $17,000.00 | $800.00 |
| American Express | $17,000.00 | $800.00 |
| Delta Community Credit Union | $10,000.00 | $200.00 |
| | | |
| | | |

TOTAL MONTHLY PAYMENTS TO CREDITORS:  $ __$3,000.00__

**(5C)   TOTAL MONTHLY EXPENSES:**                      $ __8,260.00__

Raissa D. Kengne

Signature

SWORN TO and SUBSCRIBED BEFORE ME,

this 19th day of MAY , 20 22

Marvin Wooley

**NOTARY PUBLIC**

My Commission Expires: 1/21/2022

*(Notary seal: MARVIN WOOLEY, NOTARY PUBLIC, COMMISSION EXPIRES JAN. 21, 2023, DEKALB COUNTY, GA)*

7

# STATE OF GEORGIA

# FULTON COUNTY

□ Magistrate Court □ State Court ☑ Superior Court

Raissa Djuissi Kengne

**Petitioner/Plaintiff,**

Civil Action File No. 2022CV365268 _____

v.

Wesley Freeman, BDO USA, LLP,
Scott Meier, Paul Davison, Jason Cuda,
Justin Wilkes, Anthony Reh, Peter Poppo,
Mark Davenport, Johnson Wong,
Justin Mungal,

Beacon Management Services, LLC;
Lisa Simmons; Steven Weibel;
1280 West Association; Michael Shinners;
Micah Kurtzberg; Ronnie Bridges;
Brett Dettmering; Michael Shaffer;
Rohan Rupani,

Finch McCranie, Michael Sullivan,
Walter Jospin,

and

Interface, Inc.;
Atlanticus Holdings Corporation;
SPAR GROUP, Inc. (NMS SPAR);
BioHorizons Implant Systems, Inc.
(an Henry Schein Subsidiary); Kas Naderi;

**Respondents/Defendants.**

## AFFIDAVIT OF INDIGENCY

I am the ☑ Plaintiff/Petitioner (party bringing suit) □ Defendant/Respondent (party responding to suit).

Fulton Courts' Uniform Affidavit of Indigency Approved July 27, 2017.

Provided by Fulton County Law Library Board of Trustees.

I am submitting this Affidavit of Indigency to ask that my court filing fees and costs be waived. I understand that the information I provide will be used by the Court to determine my eligibility to proceed without paying fees or costs. I further understand that a false statement or answer to any question in this affidavit will subject me to penalties for perjury and that state law provides that a person to whom a lawful oath or affirmation has been administered commits the offense of perjury when, in a judicial proceeding, s/he knowingly and willfully makes a false statement material to the issue or point in question. A person convicted of the offense of perjury shall be punished by a fine of not more than $1,000 or by imprisonment for not less than one nor more than ten years, or both. O.G.C.A. § 16-10-70.

## A. IDENTIFYING INFORMATION

Name: Raissa D. Kengne

Address: 570 Piedmont Ave NE, #55166, Atlanta, GA 30309

Phone: 404-932-1651                                    Year of Birth: 06/19/1988

Single ☑ Married ☐

## B. DEPENDENTS

1. How many people, not including yourself, do you financially support? _____0_____

   List any dependents below.

| Name | Age | Relationship |
|---|---|---|
| Not Applicable. | | |
| | | |
| | | |
| | | |
| | | |

Fulton Courts' Uniform Affidavit of Indigency Approved July 27, 2017.

Provided by Fulton County Law Library Board of Trustees.

## C. INCOME

1. What is your monthly household income (the combined monthly income of every adult in your household)? _____ $0.00 _____

2. Are you employed? □ Yes ☑ No

   If "No", when did you last work? _____

   If "Yes", give the name and address of your employer:

   _____

   _____

   I am paid □ Weekly □ Bi-Weekly □ Monthly (*check box that applies*)

   What is your gross monthly income (income before taxes):_____

   What is your net monthly income (income after taxes): _____

3. My income comes from the following sources: [*check all that apply*]

   □ Earnings from my job                          □ Child Support
   □ Earnings from business/ self-employment        □ TANF
   □ Other work                                     □ Alimony
   □ Social Security                                □ SSI
   □ Disability Insurance or Workers                □ VA benefits
   Compensation                                     □ Gifts or inheritances
   □ Unemployment benefits                          □ Life insurance payments
   □ Pension, annuities or Retirement Benefits      □ Any other sources
   □ Other income or payments regularly received

   List amount(s) received from these sources:

   | Source | Monthly Amount |
   |---|---|
   | N/A; Plaintiff has no current sources of income. | |
   | | |
   | | |
   | | |
   | | |

4.      Supporting documentation

    a.  If you have income from an employer, please provide a copy of your most recent pay stub (a document given to employees with each paycheck showing the amount of money the employee earned and the amount that was removed for taxes, insurance costs, etc.)

    b.  If you checked any of the other boxes above as a source of income, please provide supporting documentation for that income as well (copies of benefit checks, etc.).

    c.  Please provide any other documents relating to and/or supporting your inability to pay court costs.

## D. ASSETS

1.  How much money do you currently have on hand, including your checking and savings accounts?

    a.  Current amount in checking account $ ___$1,000.00___

    b.  Current amount in savings account $ ___0.00___

    c.  Current amount in any other account (*i.e.*, money market, CD, etc.) $ ___$1,682.88___

2.  Do you have cash on hand that is not in an account? ☑Yes ☐No

    a.  If yes, how much? $ ___$150.00___

3.  Do you own any stocks or bonds? ☐Yes ☑No

    a.  If yes, list and describe

      _____

      _____

Fulton Courts' Uniform Affidavit of Indigency Approved July 27, 2017.

Provided by Fulton County Law Library Board of Trustees.

4. Do you own or lease a motor vehicle? □ Yes ☑ No

    a. If yes, provide year, make, and model:

| Year | Make | Model |
|------|------|-------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |

5. Do you own a home or other real estate? ☑ Yes □ No

    a. If yes, list below:

| Description | Value | Amount Owed (Mortgage) |
|-------------|-------|------------------------|
| Condominium Unit | $500,000 | $100,000 |
| Second Home | $200,000 | $190,000 |
| Land Lots | $55,000 | $36,000 |

## E. EXPENSES

1. I pay the following bills each month:

| | | | | | |
|---|---|---|---|---|---|
| Rent/Mortgage $ 2,000 | Cell Phone $ 300 | Groceries $ 500 |
| Doctor/Hospital $ 0.00 | Loans $ 0.00 | Credit Cards $ 3,000 |
| Car Payment $ 0.00 | Alimony $ 0.00 | Child Support $ 0.00 |
| Cable/Sat TV $ 0.00 | Attorneys $ 0.00 | Utilities $ 250.00 |
| Other Debts $ 2,500 | Insurance $ 500 | Child Care $ 0.00 |

2. Please provide supporting documentation of the above listed bills for the court to consider.

## F. OTHER INFORMATION – SPECIAL FINANCIAL CIRCUMSTANCES

Are there other circumstances which make it impossible for you to pay the costs of this action that are not explained above (*e.g.*, disability, illness, etc.)? □ Yes □ No

If yes, use the space below to explain. Include any facts which will help the Court to determine whether you can afford to pay the required fees.

Plaintiff is filing a lawsuit against Defendants for retaliation, breaking into Plaintiff's home, and persecution, including blacklisting Plaintiff from relevant job opportunities.

□ I had or have a pending bankruptcy. The court case number and year of my bankruptcy is

_____

□ Other relevant financial information you would like the Court to consider:

_____
_____
_____
_____

## G. OTHER PENDING CASES

1. Do you have any other pending cases? □ Yes □ No

   a. If yes, list below:

   | Case Number | Type of Case | Status of Case |
   |---|---|---|
   | 22MS165625 | Small Claims - Tort | Open Case |
   | | | |
   | | | |

   b. If you checked Yes to Question 1 above, did you file an Affidavit of Indigency in the pending case(s)? ☑ Yes □ No

      i. If yes, state the outcome of the Affidavit(s) of Indigency.
         The Affidavit of Indigency was granted.
         _____
         _____

2. Other than any Affidavits of Indigency listed above, have you applied for indigent status in the past year? □ Yes ☑ No

Fulton Courts' Uniform Affidavit of Indigency Approved July 27, 2017.

Provided by Fulton County Law Library Board of Trustees.

a. If yes, was it granted or denied?

_____

_____

b. Please explain the details.

_____

_____

_____

I, _____Raissa D. Kengne_____, do swear or affirm under penalty of law that the statements contained in this Affidavit are true.  I further attest that I am the ☑ Plaintiff/Petitioner ☐ Defendant/Respondent in this action and that I personally provided the contents of this Affidavit of Indigency. I have read the summary of the perjury statute set forth above and am aware of the penalties for giving any false information on this form.

Signature of Affiant _____   Date _5/19/2022_____

**(Sign your name in front of the Notary)**

Sworn to and subscribed to me, this
_19th_ day of _MAY_____, 20 _22_.

_Marvin Wooley_____
NOTARY PUBLIC
My Commission Expires _1/21/2023_____.
(Notary Seal)

Fulton County Superior Court
***EFILED***MH
Date: 6/17/2022 11:25 AM
Cathelene Robinson, Clerk

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

RAISSA DJUISSI KENGNE,

           Plaintiff,

v.

WESLEY FREEMAN, et al.,

           Defendants.

Civil Action File No. 2022CV365268

## ANSWER AND JURY DEMAND OF DEFENDANT JUSTIN MUNGAL

For his Answer to *pro se* Plaintiff's 407-page shotgun pleading, Justin Mungal ("Defendant Mungal") alleges as follows:

## Answer

Defendant Mungal lacks knowledge or information sufficient to admit or deny any of the allegations in the Complaint except as follows:

**Nos. 3, 18, 28, 496, 536, 576, 618, 663, 706, 752, 806, 860, 904, 949, 990, 1049, 1109, 1166, 1225, 1252, 1280, 1280, 1311, 1331, 1354:** Defendant Mungal admits he lives at 1280 West Peachtree St. NW, Unit 2108, adjacent to Plaintiff. Defendant Mungal denies telling Plaintiff that he worked for BDO USA, LLP ("BDO").

**Nos. 29 and 413:** Defendant Mungal admits a letter addressed to Plaintiff was mistakenly delivered to him and he in turn delivered same to Plaintiff. Defendant Mungal lacks knowledge or information as to the contents of the letter. Defendant Mungal denies any intimidation.

**Nos. 30 and 414:** Defendant Mungal admits offering to help Plaintiff. Defendant Mungal denies telling Plaintiff he worked at BDO, that he spied on Plaintiff, and that he broke into Plaintiff's unit. Defendant Mungal lacks knowledge or information sufficient to admit or deny Plaintiff's employment relationship with BDO.

**Nos. 31 and 416:** Defendant Mungal denies the allegations in Paragraph 31 of the Complaint.

**No. 116:** Defendant Mungal admits the allegations in Paragraph 116 of the Complaint.

**No. 117:** Defendant Mungal admits his LinkedIn profile identifies him as an information technology professional in the State of Georgia. Defendant Mungal denies telling Plaintiff he worked for BDO.

**No. 118:** Defendant Mungal admits the allegations in Paragraph 118 of the Complaint.

**No. 379:** Defendant Mungal denies breaking into Plaintiff's house or being at all responsible for any such purported breakin(s).

**No. 412:** Defendant Mungal admits the allegations in Paragraph 412 of the Complaint.

**No. 415:** Defendant Mungal denies the allegations in Paragraph 415 of the Complaint.

**No. 417:** Defendant Mungal lacks knowledge or information sufficient to admit or deny if Plaintiff has called 911 and filed a report with the Atlanta Police Department. Defendant Mungal denies the remaining allegations in Paragraph 417 of the Complaint.

**Prayer for Relief:** Defendant Mungal denies Plaintiff is entitled to any relief.

## Jury Demand

Defendant Mungal demands a trial by a jury of twelve (12) persons.

Dated: June 17, 2022.

*/s/ William Daniel Davis*
William Daniel Davis
Georgia Bar No. 746811
Ichter Davis LLC
3340 Peachtree Road NE, Suite 1530
Atlanta, Georgia 30326
404.869.5261
ddavis@ichterdavis.com

Attorney for Defendant Mungal

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify I served a true and correct copy of the foregoing Answer and Jury Demand of Defendant Justin Mungal by emailing same as a .pdf file with the subject line STATUTORY ELECTRONIC SERVICE to [cianeseya2022@gmail.com](mailto:cianeseya2022@gmail.com).

Dated: June 17, 2022.

*/s/ William Daniel Davis*
William Daniel Davis
